ERIC MOTHANDER
NOAH STEIMEL
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7321
charles.mothander@cfpb.gov
noah.steimel@cfpb.gov

*Attorneys for Plaintiff Consumer
Financial Protection Bureau*

THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> *Plaintiff,* <br><br> v. <br><br> SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC, <br><br> *Defendants.* | COMPLAINT <br><br> Case No. 2:23-cv-00462-JCB |

The Consumer Financial Protection (Bureau) brings this action against Snap Finance LLC (Snap Finance), Snap RTO LLC (Snap RTO), Snap Second Look LLC (Snap Second Look), Snap U.S. Holdings LLC (Snap U.S. Holdings), and Snap Finance Holdings LLC (Snap Finance Holdings) (collectively, the Snap Defendants), and alleges the following:

INTRODUCTION

1.    The Snap Defendants offer and provide so-called "lease-purchase" or "rental-purchase" financing, through which consumers finance merchandise and

services from merchants and, in turn, make payments back to the Snap Defendants. The Snap Defendants target consumers with limited access to traditional forms of credit for their financing, whom they refer to internally using the acronym ALICE, standing for "Asset-Limited Income-Constrained and Employed." The Snap Defendants' "lease-purchase" and "rental-purchase" agreements (Purchase Agreements or Agreements) have a default 12-month payment schedule, which typically amounts to more than double the cash price of the financed merchandise or service. If consumers fall behind on payments, the Purchase Agreements prevent consumers from terminating their future payment obligations—effectively locking them into the 12-month schedule—even if they want to return or surrender their financed merchandise.

2.      Since at least January 2017, the Snap Defendants have designed and implemented their financing program in ways that misled these consumers, failed to provide them with required disclosures, and interfered with their ability to understand the terms and conditions of their Purchase Agreements.

3.      Since at least January 2017, the Snap Defendants have offered and provided more than three million of their Purchase Agreements to consumers in partnership with over 10,000 merchants in 47 states. Snap Finance, which is the consumer- and merchant-facing entity among the Snap Defendants, primarily partners with merchants in the following industries: tires and auto parts; furniture and mattresses; jewelry; auto electronics; and appliances.

4.      The Snap Defendants' illegal conduct pervaded virtually every step of the consumer experience, from advertising to contracting to servicing.

5.      *Advertising*. The Snap Defendants aggressively marketed their financing to cash-strapped consumers through advertisements that obscured the true nature of

their Purchase Agreements. In particular, Snap Finance provided merchants with advertisements to display in their stores that misrepresented an early payment discount option and failed to disclose the true costs consumers would incur under the Agreements.

6.    **Contracting.** Through the fall of 2020, the Snap Defendants designed their primary financing application to be completed—and for consumers' Purchase Agreements to be signed and submitted—on a merchant's computer or tablet. When consumers signed an Agreement, their understanding of its terms and conditions often depended on an oral explanation from a merchant's sales representative. But for years, Snap Finance failed to provide its merchant partners with any written guidance for explaining the Purchase Agreements to consumers. Merchants also frequently signed and submitted Purchase Agreements on behalf of consumers without consumers' prior review of their Agreement.

7.    The Snap Defendants' Purchase Agreements schedule automatic and recurring preauthorized ACH debits from consumers' bank accounts to continue for 12 months, amounting to approximately double the cash price of the financed merchandise or service. The Snap Defendants' contracting process left many consumers misinformed, or otherwise misled, regarding the cost and nature of the Agreement they had just entered.

8.    **Servicing**. The Snap Defendants' illegal conduct continued throughout the servicing process, including by threatening to take actions against consumers that Snap Finance does not take in collections.

9.    In the limited circumstances in which the Purchase Agreements permitted consumers to terminate their payment obligations, Snap Finance's misrepresentations impeded consumers' ability to do so.

10.    Despite furnishing consumer information about millions of Purchase Agreements to at least one consumer reporting agency, Snap Finance also failed to establish and implement reasonable written policies and procedures concerning the accuracy and integrity of the consumer information that it furnished.

11.    Finally, from January 2017 to at least March 2020, the Snap Defendants' Purchase Agreements were "credit" and "credit sales" under the Truth in Lending Act (TILA) and its implementing Regulation Z. As such, the Snap Defendants were required to provide certain disclosures to help consumers assess the cost of their financing but failed to do so, depriving consumers of essential—and legally mandated—information.

12.    The Bureau brings this action under Sections 1036(a) and 1054 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a) and 5564; Section 918(a) of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693o(a)(5), and its implementing Regulation E, 12 C.F.R. Part 1005; Section 108(a) of TILA, 15 U.S.C. § 1607(a), and its implementing Regulation Z, 12 C.F.R. Part 1026; and Section 621(b)(1)(H) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s(b)(1)(H), and its implementing Regulation V, 12 C.F.R. Part 1022, to stop the Snap Defendants' unlawful conduct, to rescind or reform the terms of their Purchase Agreements with consumers, to obtain redress for affected consumers and an appropriate penalty, and to obtain all other appropriate relief.

JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5564(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C § 1345.

14.     Venue is proper in this district because the Snap Defendants are located, reside, and do business here. 12 U.S.C. § 5564(f).

PLAINTIFF

15.     The Bureau is an independent agency of the United States charged with enforcing "Federal consumer financial laws." 12 U.S.C. § 5491(a).

16.     The Bureau is authorized to initiate proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including the CFPA, EFTA and Regulation E, TILA and Regulation Z, and FCRA and Regulation V. 12 U.S.C. §§ 5564(a)-(b), 5565.

THE SNAP DEFENDANTS

17.     Snap Finance is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance partners with merchants to market, offer, and underwrite Purchase Agreements for consumers. In certain states, Snap Finance also offers two unsecured installment loan products: Snap Loan and Snap Credit+. If Snap Finance denies a consumer's application for Snap Credit+ (which features a longer default term and lower interest rate than Snap Loan), Snap Finance automatically submits the consumer's application for a Purchase Agreement or for a Snap Loan.

18.     Snap RTO is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance provides underwriting, originations, collections, and other services for Snap RTO. Snap RTO issues and holds completed Purchase Agreements, which Snap Finance services.

19.     Snap Second Look is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Second Look purchases retail installment contracts from merchants and participation interests in certain installment loans originated by Transportation Alliance Bank, Inc. Snap Finance then services those contracts on behalf of Snap Second Look.

20.     Snap U.S. Holdings is a Delaware limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap U.S. Holdings owns 100% of the equity interests in Snap Finance and Snap RTO, and is the sole manager of Snap Finance, Snap RTO, and Snap Second Look.

21.     Snap Finance Holdings is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance Holdings is a member of Snap U.S. Holdings, and remains the ultimate parent of Snap Finance, Snap RTO, and Snap Second Look.

22.     The Snap Defendants operate as a common enterprise. Of the Snap Defendants, only Snap Finance has employees. The Snap Defendants operate through Snap Finance's website and branding, and all share the same business address. From late 2015 to late 2019, Snap Finance Holdings directly owned 100% of Snap Finance and Snap RTO, and 88.1% of Snap Second Look. Throughout that period, four out of the five officers for Snap Finance, Snap RTO, and Snap Second Look were also officers for Snap Finance Holdings. In late 2019, those officers created Snap U.S. Holdings, which owns

100% of the equity interests in Snap Finance and Snap RTO, and the officers went on to hold their same position at all five of the Snap Defendants through at least December 2020 (Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Legal Officer). The Snap Defendants' financial statements and balance sheets are all issued on a consolidated basis. At the close of 2020, the Snap Defendants held $476 million in assets and made nearly $114 million in net income for the year.

23.     An act by one entity constitutes an act by each entity comprising the common enterprise. The Snap Defendants are each jointly and severally liable for the acts and practices alleged below.

<u>THE SNAP DEFENDANTS' ADVERTISEMENTS</u>

24.     When a merchant partners with the Snap Defendants, a Snap Finance sales manager visits the store to set up the Merchant Portal and provide Snap Finance's print advertising materials for the merchant to display.

25.     Snap Finance requires its merchant partners to display only the print advertisements that Snap Finance provides to them, or that Snap Finance otherwise approves.

26.     From January 2017 through at least 2020, Snap Finance provided merchants with advertisements to display in their stores that included the prominent phrase "100 Day Cash Payoff" without any further explanation of the Purchase Agreements.

27.     In fact, Snap Finance automatically schedules consumers' payments via preauthorized ACH debits to continue for the full 12 months of their Purchase Agreement, typically amounting to more than double the cash price of the financed merchandise or service.

28.     To exercise a 100-day early payment discount option, which is always more than the "cash" price of the merchandise or service being financed, consumers must first learn of their payoff amount by contacting Snap Finance or accessing Snap Finance's online customer portal, and then schedule a new payment amount or make a balloon payment before their 100-day deadline.

29.     Snap Finance does not send periodic statements to consumers, or otherwise affirmatively notify consumers of an impending deadline to exercise their 100-day early payment discount option.

30.     Consumers who miss this 100-day deadline must pay significantly more than the "cash" price under the terms of the Purchase Agreement.

31.     Consumers with Purchase Agreements commonly believed they had entered into a 100-day financing agreement, under which their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period.

### THE SNAP DEFENDANTS' MERCHANT PORTAL

32.     The Snap Defendants offer their financing exclusively through web-based applications at SnapFinance.com, at a merchant's own website, or at a merchant's storefront location through Snap Finance's Merchant Portal.

33.     Snap Finance's Merchant Portal is a website that merchants access through their own computers or tablets. Merchants use the Merchant Portal to help consumers apply for Snap Defendants' financing and, if approved, sign their Purchase Agreement. Merchants also use the Merchant Portal to access trainings and resources that Snap Finance now provides.

34.     From January 2017 to at least September 2020, approximately 63 percent of consumer applications that resulted in completed Purchase Agreements were submitted through Snap Finance's Merchant Portal.

35.     From January 2017 to at least September 2020, Merchant Portal applications for the Snap Defendants' financing were primarily completed—and the resulting Purchase Agreements signed—on a merchant's own computer or tablet.

36.     From January 2017 to at least September 2020, certain merchants DocuSigned and submitted Purchase Agreements through the Merchant Portal on behalf of consumers without consumers' prior review of their Agreement.

37.     Snap Finance's Merchant Portal application and contracting process tasks merchants with explaining the Snap Defendants' Purchase Agreement. But Snap Finance did not provide merchants with written training materials about Purchase Agreements until February 2020.

38.     From January 2017 to at least September 2020, merchants often failed to adequately explain the Snap Defendants' Purchase Agreement to consumers at the point of sale, or otherwise misled consumers regarding the nature of the Agreement. Frequently, consumers did not understand that they were automatically scheduled to pay approximately double the cash price of their financed merchandise or service over the course of the 12-month payment period, or that their automatic payments would continue past the cash price or the 100-day early payment deadline.

39.     From January 2017 to at least September 2020, Snap Finance required merchants to collect a "processing fee" from consumers after Snap Finance approved them for a Purchase Agreement, but before merchants reached a screen in the Merchant Portal that included a summary of the terms of the consumer's Agreement. As a result,

consumers were required to pay a fee associated with their Agreement before receiving a complete summary of its terms, and before seeing or signing their final Agreement.

THE SNAP DEFENDANTS' PURCHASE AGREEMENTS

40.     Snap Finance requires consumers to provide their bank account information as part of the application process for Purchase Agreements. When consumers enter an Agreement, Snap Finance uses that banking information to schedule automatic payments from consumers' accounts to continue for 12 months.

41.     Since at least January 2017, under all versions of the Snap Defendants' Purchase Agreements, a consumer's term "automatically and repeatedly" renews across the full 12 months of the Agreement (or until the consumer successfully terminates their payment obligations), regardless of whether the consumer makes their next scheduled payment.

42.     Since at least January 2017, all Purchase Agreements have included a "Customer Authorization for Payments via ACH" provision, under which consumers must agree to the preauthorization of ACH debits for the purpose of making payments required under the Agreement.

43.     Since at least January 2017, under all Purchase Agreements, consumers may only revoke their authorization for payments via ACH debit sometime after signing the Agreement.

44.     The total cost of the Snap Defendants' Purchase Agreements over the 12-month payment period typically amounts to more than double the cash price of the financed merchandise or service.

45.     Consumers have the option of paying off their Agreement within the first 100 days for slightly more than the cash price of their merchandise or service through a

"Cash Payoff Option" or a "100-Day Payment Option." To take advantage of these early payment options, consumers must affirmatively change their scheduled payments by calling Snap Finance or using Snap Finance's online customer portal, or by making a balloon payment before the deadline. Once the 100-day deadline passes, consumers can pay off their Purchase Agreement early by exercising an "Early Buyout Option" for a smaller discount on the amount consumers would have owed under the full 12-month payment period of their Agreement.

46.    From January 2017 through March 2020, nearly all of the Snap Defendants' Purchase Agreements featured a 60-day term, which automatically and repeatedly renewed across the Agreement's 12-month payment period. Consumers were not permitted to terminate their Agreement until the end of a 60-day term.

47.    Since at least January 2017, the Snap Defendants' Purchase Agreements have stated, "You may terminate your lease payment obligations under this Agreement without penalty by paying all Regular Payments, fees and charges that are due or past due and voluntarily surrendering or returning the Property in its original condition, less reasonable wear and tear at the expiration of any lease term." These Agreements also state, in connection with termination, that consumers "must promptly return the Property to us in accordance with our directions[.]"

48.    In servicing Purchase Agreements, Snap Finance informed consumers they could not terminate their future payment obligations under their Agreement until they made all payments due and past due through the end of their recurring 60-day term.

49.    In 2020, the Snap Defendants began offering revised Purchase Agreements in four states.

50.     The Snap Defendants' revised Purchase Agreements state that consumers may terminate their future payment obligations "[a]t any time . . . without penalty . . . by surrendering or returning to us the Property in its original condition, less reasonable wear and tear." The Agreements also state, in connection with termination, that consumers "must return the Property to a reasonable place we designate."

51.     Under all versions of the Snap Defendants' Purchase Agreements, consumers are required to contact Snap Finance to obtain instructions for how to terminate their Agreement.

52.     Under their Purchase Agreements, the Snap Defendants also warn consumers, without any explanation, accounting, or basis, of potential "fees, charges and taxes imposed by governmental authorities in connection with termination," or of "official fees and taxes imposed in connection with termination, including, but not limited to any applicable fines, surcharges, and taxes."

53.     Under their Purchase Agreements, the Snap Defendants inform consumers that they are responsible for "all maintenance, repairs, upkeep and care" of the financed property, that the consumer "will pay any operating costs" associated with the property, and that the consumer "will, at [their] expense, service the Property in accordance with manufacturer standards."

<u>THE SNAP DEFENDANTS' REPRESENTATIONS ABOUT CONSUMERS' RIGHT TO TERMINATE THEIR PAYMENT OBLIGATIONS</u>

54.     Internally, Snap Finance considers a "return" to be when a consumer seeking to terminate their future payment obligations under their Purchase Agreement returns their financed merchandise back to the merchant where the sale occurred. Snap Finance considers a "surrender" to be when a consumer seeking to terminate their

payment obligations returns their financed merchandise directly to Snap Finance, or to another place that Snap Finance designates (including a charity or a site for disposal).

55.    Neither the Purchase Agreements, nor Snap Finance's advertisements, nor its website explain this internal distinction in terminology.

56.    In fact, the Purchase Agreements use both "surrendering" and "returning" when discussing consumers' "Right to Terminate" their future payment obligations by returning their merchandise directly to Snap Finance, or to another place it designates.

57.    Snap Finance included the following in its internal trainings for its employees: "Surrenders . . . We never surrender! Because we lose too much money and there is always a better more profitable option."

58.    Snap Finance's internal trainings also informed its employees that "Surrenders are a last resort. They [consumers] committed to this purchase and should be held accountable."

59.    Snap Finance's internal trainings also included the following instruction to its employees: "We use qualifying as a way to get [consumers] to work with us and not surrender. The truth is we don't want their used merchandise. We want the money they committed to paying back. Never Surrender is the motto because our losses on Surrenders and Repossessions are huge due to these factors."

60.    Here, "qualifying" refers to Snap Finance's requirements that "the merchandise must be in proper and working condition" and that a "[c]ustomer must be current on payments and stay current on the account until their next term date." Snap Finance instructed its employees: "It is the customer[']s responsibility to call on the term date to continue with surrender."

61.     Snap Finance also instructed its employees: To start the surrender process, "[t]he customer must clearly say ['] I want to surrender.['] Not [']cancel.[']" Snap Finance confirmed: "CS representative **should not** offer Surrender proactively as an option[.]"

62.     When consumers call Snap Finance seeking to surrender or return their financed merchandise and terminate their Purchase Agreement, Snap Finance's representatives typically instruct the consumer to attempt to return their merchandise directly to the merchant where the sale occurred.

63.     If a merchant does accept a return, the merchant is required to refund the payment they received back to Snap Finance for the original sale.

64.     Commonly, Snap Finance's merchant partners will not accept the return of a consumer's financed merchandise.

65.     When merchants refuse to accept the return of merchandise from consumers seeking to terminate their Purchase Agreement, Snap Finance representatives frequently state that Snap Finance is obligated or contractually bound to follow the merchant's "cancellation" or "return" policy, and thus consumers are required to continue making payments.

66.     In fact, the Snap Defendants' Purchase Agreements provide consumers who are current on their payment obligations with the "Right to Terminate" their future payment obligations by returning or surrendering their financed merchandise to Snap Finance.

67.     Snap Finance representatives also inform consumers seeking to terminate their future payment obligations that certain types of financed merchandise, such as

mattresses, tires, and other auto parts or services cannot be surrendered, and thus consumers are required to continue making payments.

68.     In fact, the Snap Defendants' Purchase Agreements include no such exceptions to consumers' "Right to Terminate."

69.     Snap Finance representatives also inform consumers seeking to terminate their Agreement by returning or surrendering their financed merchandise that reaching a new "buy-back" settlement agreement with Snap Finance and keeping the financed merchandise is their "best" or "only" option.

70.     In fact, under the Snap Defendants' Purchase Agreements, consumers current on their payment obligations have a "Right to Terminate" their future payment obligations by "surrendering or returning" their merchandise without entering into a new settlement agreement with Snap Finance.

71.     Out of the nearly 1.7 million Purchase Agreements the Snap Defendants entered with consumers between January 2017 and January 2020, Snap Finance permitted consumers to "surrender" their financed merchandise in only 165 cases.

<u>THE SNAP DEFENDANTS' COLLECTION ACTIVITIES</u>

72.     Since at least January 2017, after 40 days of non-payment, Snap Finance typically emails consumers with Purchase Agreements a collection notice titled "Demand for Payment and Return of Merchandise."

73.     In that collection notice, Snap Finance states, "Failure to respond to this demand by [date], may result in further action." Snap Finance also states, "Due to non-payment, we now require you to **RETURN TO US** the merchandise[.]" Snap Finance confirms, "<u>Do not</u> return your merchandise to [merchant's name]; this arrangement must be worked out with us directly."

74.     Snap Finance ends its collection notice by directing consumers to contact Snap Finance at a phone number or email address to "discuss your options or give you instructions regarding the return of the merchandise."

75.     Since at least January 2017, Snap Finance has not forcibly repossessed merchandise due to non-payment by a consumer, or otherwise taken legal action against a consumer due to non-payment.

76.     Further, from January 2017 to at least March 2020, the Snap Defendants' Purchase Agreements, as well as Snap Finance's internal policies and procedures, prevented past-due consumers—including those to whom Snap Finance sent its "Demand for Payment and Return of Merchandise" notice—from surrendering or returning their financed merchandise directly to Snap Finance.

77.     Since at least 2017, Snap Finance has also sent emails demanding payment to consumers who had already completed their payment obligations under their Purchase Agreement, to consumers who were current on their scheduled payments, and to consumers who had yet to, or had just received, their financed merchandise.

78.     In fact, under the terms of their Purchase Agreements, none of those consumers had the payment obligations that Snap Finance demanded in its emails.

<u>THE SNAP DEFENDANTS' FURNISHING ACTIVITIES</u>

79.     From January 2017 to at least June 2022, Snap Finance furnished consumer information about millions of Purchase Agreements to DataX, a consumer reporting agency that collects and provides consumer payment history on payday and installment loans, subprime credit cards, and other specialty loans.

80.     From January 2017 to at least June 2022, Snap Finance also furnished consumer information to DataX for most of the installment loans and retail installment

contracts held by Snap Second Look. For a subset of Snap Second Look's installment contracts, Snap Finance furnished consumer information to Experian.

81.     From January 2017 to at least June 2022, Snap Finance maintained one internal policy document concerning its responsibilities for furnishing consumer information relating to Purchase Agreements and installment contracts.

82.     Snap Finance's sole internal policy document relating to its furnishing responsibilities failed to include any direction as to the steps employees should take, or the systems employees should consult, in order to furnish accurate consumer information for the millions of Purchase Agreements and installment contracts that it serviced during this period.

83.     Snap Finance's sole internal policy document also failed to include any direction as to the steps employees should take, or the systems employees should consult, in order to conduct reasonable investigations of consumer furnishing disputes.

## THE FEDERAL CONSUMER FINANCIAL LAWS

### THE CFPA

84.     Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with "any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

85.     The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6).

86.     The CFPA defines "financial product or service" to include "extending credit and servicing loans." 12 U.S.C. § 5481(15)(A)(i).

17

87.    The CFPA defines "credit" to mean "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).

88.    The Snap Defendants' Purchase Agreements, which automatically renew across the full 12-month payment period regardless of whether a consumer makes their next scheduled payment, and which require past-due consumers to continue paying under the full 12-month period, are "credit" because they allow consumers to "to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase."

89.    In the alternative, the Snap Defendants offer or provide the consumer financial product or service of leases of personal property that are the functional equivalent of a purchase finance arrangement, that are on a non-operating basis, and that, in reality, have initial terms of at least 90 days due to the inability of past-due consumers to terminate their future payment obligations under the Purchase Agreement within 90 days. 12 U.S.C. § 5481(15)(A)(ii).

90.    The Snap Defendants also lead consumers to reasonably believe they are financing the purchase of property or services for which they are deferring payment, and are thus subject to the CFPA by "offering" a consumer financial product or service. *See* 12 U.S.C. § 5531(a).

## EFTA AND REGULATION E

91.    EFTA provides that "No person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k.

92.    Regulation E similarly provides that "No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers[.]" 12 C.F.R. § 1005.10(e)(1).

93.    Regulation E defines "person" as "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j).

94.    Regulation E defines "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 12 C.F.R. § 1005.2(k).

95.    The Snap Defendants meet the definition of "person" in Regulation E.

96.    Preauthorized ACH debits from consumers' bank accounts meet the definition of "preauthorized electronic fund transfer" in Regulation E.

### TILA AND REGULATION Z

97.    TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).

98.    Under Regulation Z, a "creditor" includes "a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 C.F.R. § 1026.2(a)(17).

99.    The Snap Defendants meet the definition of "creditor" under TILA and Regulation Z. The Snap Defendants' Purchase Agreements feature a "finance charge" because they result in consumers paying more than double the cash price of the financed merchandise or service over the default 12-month payment period, and that cost is

imposed directly or indirectly by the Snap Defendants as an incident to the extension of credit. 12 C.F.R. § 1026.4(a). The Snap Defendants are also a "creditor" under TILA and Regulation Z because consumers make more than four installment payments to Snap Finance pursuant to the Purchase Agreement.

100.    TILA and Regulation Z define "credit sale" as "a sale in which the seller is a creditor." 15 U.S.C. § 1602(h); 12 C.F.R. § 1026.2(a)(16).

101.    The Snap Defendants are a "seller" because they purchase merchandise or services from their merchant partners, which they then sell to consumers through their Purchase Agreements.

102.    Regulation Z's definition of "credit sale" includes leases, "(unless terminable without penalty at any time by the consumer) under which the consumer: (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16).

103.    From January 2017 to at least March 2020, the Snap Defendants' Purchase Agreements only permitted consumers to terminate their Agreement at the conclusion of an automatically renewing 60-day term, and only if consumers were current on their payment obligations through the end of that term. Further, the Snap Defendants' Purchase Agreements automatically renewed across the 12-month payment period, regardless of whether a consumer made their next scheduled payment. Upon completing required payments at the conclusion of this 12-month payment period, consumers paid approximately double the cash price of the financed merchandise or

service and became (or had the option to become) for no additional consideration the owner of their financed merchandise.

104.    Snap Finance represented to consumers—both at the time of contracting and throughout the servicing process—that their Purchase Agreements were 12-month agreements.

105.    From January 2017 to at least March 2020, the Snap Defendants were a creditor whose Purchase Agreements with consumers qualified as "credit" and "credit sales" under TILA and Regulation Z. 12 C.F.R. § 1026.2(a)(14), (16).

### FCRA AND REGULATION V

106.    From January 2017 to at least June 2022, Snap Finance was a "furnisher" under FCRA and Regulation V because it "furnish[ed] information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c).

### THE SNAP DEFENDANTS' VIOLATIONS OF LAW

### COUNT I: VIOLATION OF THE CFPA
(Deceptive Acts or Practices)

*The Snap Defendants used the misleading phrase "100 Day Cash Payoff" in advertisements for their Purchase Agreements.*

107.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 24–31, and 84–90.

108.    An act or practice is deceptive under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances and (3) the representation, omission, or practice is material.

109.     From January 2017 through at least 2020, Snap Finance used print advertisements for the Snap Defendants' financing for merchants to display in their stores that prominently featured the phrase "100 Day Cash Payoff," and that omitted any further explanation of the Snap Defendants' Purchase Agreement financing.

110.     Snap Finance schedules consumers' payments via preauthorized ACH debits to continue for the full 12 months of their Purchase Agreement.

111.     To exercise a 100-day early payment discount option, which is always more than the "cash" price of the financed merchandise or service, consumers must schedule a new payment amount or make a balloon payment before their 100-day deadline.

112.     Consumers who miss this 100-day deadline must pay significantly more than the "cash" price under the terms of the Purchase Agreements.

113.     Consumers who received the Snap Defendants' financing reasonably believed they had entered into a 100-day financing agreement, where their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period.

114.     Snap Finance's use of the prominent phrase "100 Day Cash Payoff" in its advertisements was material and likely to mislead consumers acting reasonably under the circumstances as to the nature of the Snap Defendants' Purchase Agreements.

115.     As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

<u>COUNT II: VIOLATION OF THE CFPA</u>
(Abusive Acts or Practices)

22

*The Snap Defendants' Merchant Portal application and contracting process materially interfered with consumers' ability to understand the terms and conditions of their Purchase Agreements.*

116.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 32–39, and 84–90.

117.    An act or practice is abusive under the CFPA if it, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

118.    From January 2017 to at least September 2020, Snap Finance designed and implemented a Merchant Portal application and contracting process that: (1) was, in most cases, completed entirely on a merchant's computer or tablet, and frequently led to merchants signing and submitting Purchase Agreements on behalf of consumers without consumers' prior review of their Agreement; (2) relied on merchants to explain those Agreements while providing them with no written guidance for doing so; and (3) required consumers to pay a processing fee before receiving a complete summary of the terms of their Agreement and before seeing or signing their final Agreement.

119.    Snap Finance's Merchant Portal application and contracting process materially interfered with consumers' ability to understand the terms and conditions of the Purchase Agreements, including that consumers were automatically scheduled to pay approximately double the cash price of their financed merchandise or service over the course of the Agreement, or that their automatic payments would continue past the cash price or the 100-day early payment deadline.

120.    As a result, the Snap Defendants engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(1), 5536(a)(1)(B).

COUNT III: VIOLATION OF EFTA AND REGULATION E

*The Snap Defendants conditioned the extension of credit on consumers' repayment by preauthorized EFTs.*

121.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 40–53, and 91–96.

122.    Since at least January 2017, all versions of the Snap Defendants' Purchase Agreements have included a "Customer Authorization for Payments via ACH" provision, in which consumers must agree to the preauthorization of ACH debits for the purpose of making payments required under the Agreement. The Snap Defendants do not allow consumers to enter Purchase Agreements without agreeing to this provision.

123.    Through this provision in their Purchase Agreements, the Snap Defendants condition the extension of credit on repayment by preauthorized electronic fund transfers.

124.    As a result, the Snap Defendants violated EFTA and Regulation E. 15 U.S.C. § 1693k; 12 C.F.R. § 1005.10(e)(1).

COUNT IV: VIOLATION OF THE CFPA

125.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 40–53, and 91–96.

126.    The CFPA defines "Federal consumer financial law" to include EFTA and its implementing Regulation E. 12 U.S.C. § 5481(14).

127.    Under the CFPA, covered persons' violations of Federal consumer financial law are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

128.    As a result, the Snap Defendants' violation of EFTA and Regulation E, as described in Count III, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT V: VIOLATION OF TILA AND REGULATION Z

*The Snap Defendants failed to provide required disclosures for their consumer credit transactions.*

129.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 40–53, and 97–105.

130.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. § 1026.18.

131.    Among other requirements, Regulation Z prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

132.    From January 2017 to at least March 2020, the Snap Defendants were a creditor whose Purchase Agreements qualified as "credit" and "credit sales" under TILA and Regulation Z, *see* 12 C.F.R. § 1026.2(a)(14), (16), and their Agreements were therefore subject to TILA and Regulation Z's disclosure requirements.

133.    The Snap Defendants did not provide such disclosures to consumers who entered into Purchase Agreements.

134.    As a result, the Snap Defendants violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18.

## COUNT VI: VIOLATION OF THE CFPA

135.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 40–53, and 97–105.

136.    The CFPA defines "Federal consumer financial law" to include TILA and its implementing Regulation Z. 12 U.S.C. § 5481(14).

137.    Under the CFPA, covered persons' violations of Federal consumer financial laws are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

138.    As a result, the Snap Defendants' violation of TILA and Regulation Z, as described in Count V, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

<u>COUNT VII: VIOLATION OF THE CFPA</u>
(Deceptive Acts or Practices)

*The Snap Defendants misrepresented consumers' right to terminate their payment obligations.*

139.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 54–71, and 84–90.

140.    Since at least January 2017, Snap Finance has misrepresented that consumers—including those current on their payment obligations—must continue making payments, including by misrepresenting that: (1) consumers may not terminate their Agreement absent a merchant agreeing to accept the merchandise as a return; (2) consumers cannot surrender their merchandise to Snap Finance, and thus must continue making payments (including for mattresses, tires, or merchandise damaged through no fault of the consumer); and (3) the "best" or "only" option for consumers who no longer want their financed merchandise is entering into a new "buy-back" settlement agreement with Snap Finance and keeping the merchandise.

141.    In fact, under the Snap Defendants' Purchase Agreements, consumers have the ability to end their payment obligations, provided they are current at the end of a 60-day term, by "surrendering or returning" their financed merchandise directly to Snap Finance, or to a place that Snap Finance designates.

142.    Each of these misrepresentations was material and likely to mislead consumers acting reasonably under the circumstances.

143.    As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

<u>COUNT VIII: VIOLATION OF THE CFPA</u>
(Deceptive Acts or Practices)

*The Snap Defendants misrepresented consumers' payment obligations and threatened actions the Snap Defendants do not take.*

144.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 72–78, and 84–90.

145.    Since at least January 2017, Snap Finance has misrepresented in collection emails that the company may imminently take "further action" due to a consumer's non-payment under their Purchase Agreement.

146.    In fact, since at least January 2017, Snap Finance has not forcibly repossessed merchandise due to non-payment, or otherwise taken legal action against a consumer due to non-payment under a Purchase Agreement.

147.    Further, despite instructing past-due consumers in those emails to "**RETURN TO US** the merchandise," the Snap Defendants' Purchase Agreements, along with the Snap Finance's internal policies and procedures, prevented those consumers from surrendering or returning their financed merchandise directly to Snap Finance while past-due.

148.    Such misrepresentations are material, and are likely to mislead consumers acting reasonably under the circumstances.

149.    Since at least January 2017, Snap Finance has also misrepresented consumers' payment obligations under their Purchase Agreements by demanding payments from consumers that they did not owe or were not due, including to consumers who had already completed their payment obligations, to consumers who

were current on their payment obligations, and to consumers who had yet to, or had just received, their financed merchandise.

150.     Likewise, such misrepresentations are material, and are likely to mislead consumers acting reasonably under the circumstances.

151.     As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

<u>COUNT IX: VIOLATION OF FCRA AND REGULATION V</u>

*The Snap Defendants failed to establish and implement reasonable written policies and procedures concerning the accuracy and integrity of consumer information that they furnished.*

152.     The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 79–83, and 106.

153.     Section 1022.42(a) of Regulation V, the implementing regulation of FCRA, 15 U.S.C. § 1681 et seq., requires a furnisher to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the consumer information that it furnishes to a consumer reporting agency, and further provides that the policies and procedures must be appropriate to the nature, size, complexity, and scope of each furnisher's activities. 12 C.F.R. § 1022.42(a).

154.     From January 2017 to at least June 2022, Snap Finance furnished consumer information about millions of Purchase Agreements and retail installment contracts that it serviced.

155.     From January 2017 to at least June 2022, given the size, complexity, and scope of Snap Finance's furnishing activities, Snap Finance failed to establish or implement reasonable written policies and procedures regarding the accuracy and integrity of the consumer information that it furnished to consumer reporting agencies.

156.    Section 1022.42(b) of Regulation V requires furnishers to consider the guidelines in Appendix E of Regulation V in developing appropriate policies and procedures and to incorporate those guidelines where appropriate. 12 C.F.R. § 1022.42(b).

157.    Appendix E of Regulation V provides that, in developing its policies and procedures, a furnisher should address the following topics, among others, as appropriate: appropriate internal controls regarding the accuracy and integrity of furnished information, such as by verifying random samples of information provided to consumer reporting agencies; conducting a periodic evaluation of the furnisher's own practices, investigations of disputed information, and corrections of inaccurate information; and maintaining records for a reasonable period in order to substantiate the accuracy of any information about consumers it furnishes that is subject to a direct dispute. Appendix E to 12 C.F.R. Part 1022.

158.    From January 2017 to at least June 2022, Snap Finance failed to incorporate the elements set forth in Appendix E, as appropriate, in its policies and procedures governing its furnishing.

159.    As a result, the Snap Defendants violated Regulation V. 12 C.F.R. § 1022.42(a), (b).

<u>COUNT X: VIOLATION OF THE CFPA</u>

160.    The Bureau incorporates and re-alleges by reference Paragraphs 22–23, 79–83, and 106.

161.    The CFPA defines "Federal consumer financial law" to include FCRA and its implementing Regulation V. 12 U.S.C. § 5481(14).

162.    Under the CFPA, covered persons' violations of Federal consumer financial law are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

163.    As a result, the Snap Defendants' violation of FCRA and Regulation V, as described in Count IX, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

<u>PRAYER FOR RELIEF</u>

164.    The Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

a.    Permanently enjoin the Snap Defendants from committing future violations of the CFPA, EFTA and Regulation E, TILA and Regulation Z, and FCRA and Regulation V in connection with the advertising, contracting, and servicing of Purchase Agreements;

b.    Grant additional injunctive relief as the Court may deem just and proper;

c.    Award monetary relief, including but not limited to rescission or reformation of the Purchase Agreements; the refund of monies paid; restitution; disgorgement or compensation for unjust enrichment; and the payment of damages;

d.    Award the Bureau civil money penalties;

e.    Award the Bureau the costs of bringing this action; and

f.    Award such other and additional relief as the Court may determine to be just and proper.


Dated: July 19, 2023                Respectfully submitted,

Eric Halperin
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Michael Favretto
*Assistant Litigation Deputy*

/s/ Eric Mothander
Eric Mothander
Noah Steimel
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7321
Charles.Mothander@cfpb.gov
Noah.Steimel@cfpb.gov