James Kim (*pro hac vice* pending)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff*,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC.,<br><br>*Defendants*. | **DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY, AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:23-cv-00462-JNP-JCB<br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

RELIEF SOUGHT AND GROUNDS FOR MOTION ..... 1
INTRODUCTION ..... 1
LEGAL STANDARD ..... 7
ARGUMENT ..... 7
I. This Case Should Be Dismissed, Or At A Minimum Stayed, Because The Bureau Is Unconstitutionally Funded And Thus Unable To Prosecute This Lawsuit. ..... 7
II. Snap's LTOs Are Not Subject To The CFPA, TILA, Or EFTA. ..... 9
A. Snap's LTOs Did Not Extend "Credit" Under The CFPA, TILA, Or EFTA (Counts I-VIII, X). ..... 10
1. Under Snap's LTOs, Consumers Did Not Obtain The Right To Incur Debt Or Defer Its Payment. ..... 10
2. The Bureau's Allegations About How Snap's LTOs Allegedly Operated Do Not Bring Them Within The Definition Of "Credit." ..... 13
B. Snap's LTOs Were Not The "Functional Equivalent" Of Purchase Finance Arrangements Under The CFPA (Counts I-II, IV, VI-VIII, X). ..... 15
C. Snap's LTOs Were Not "Credit Sales" Under TILA And Regulation Z (Counts V, VI). ..... 18
1. Snap's LTOs Were "Terminable Without Penalty At Any Time." ..... 18
2. Consumers Did Not Agree To Pay An Amount "Substantially Equivalent To" The Purchase Price Of The Merchandise. ..... 21
3. Consumers Could Not Acquire The Merchandise For No, Or Nominal, Consideration At The End Of Their Agreement. ..... 23
III. Even If The CFPA Applied, Counts I And II Should Be Dismissed In Their Entirety Because The Complaint Fails To Plausibly Allege A CFPA Violation. ..... 24
A. The Bureau Fails To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Misleading. ..... 24
B. The Complaint Fails To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms. ..... 27
IV. The Bureau's Claims Are Untimely In Whole Or In Part. ..... 29

V. Snap Second Look LLC, Snap U.S. Holdings LLC, And Snap Finance Holdings LLC Should Be Dismissed From The Case Because The Complaint Does Not Allege Any Conduct By Those Defendants ............................................. 31

CONCLUSION ............................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)....................9

*Anderson v. Nextel Partners, Inc.*,
745 N.W.2d 464 (Iowa 2008)....................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022)....................8

*CFPB v. Credit Acceptance Corp.*,
No. 23 Civ. 00038, 2023 WL 5013303 (S.D.N.Y. Aug. 7, 2023)....................9

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....................25

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)....................28, 30

*CFPB v. Universal Debt & Payment Sols., LLC*,
No. 1:15-cv-00859, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015)....................29

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937)....................8

*Citizens State Bank v. FDIC*,
751 F.2d 209 (8th Cir. 1994)....................30

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022)....................8

*Commonwealth of Penn. v. Think Finance, Inc.*,
No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016)....................33, 34

*Consol. Bank, N.A. v. U.S. Dep't of Treasury*,
118 F.3d 1461 (11th Cir. 1997) ....................................................................................30

*Dorton v. Kmart Corp.*,
229 F. Supp. 3d 612 (E.D. Mich. 2017)................................................................11, 12

*FTC v. LoanPointe, LLC*,
No. 2:10-cv-225, 2011 WL 4348304 (D. Utah. Sept. 16, 2011) .......................................33

*FTC v. Nudge, LLC*,
No. 19-cv-867, 2022 WL 2132695 (D. Utah June 14, 2022) ......................................33, 34

*FTC v. Sears, Roebuck & Co.*,
No. 81-A-503, 1986 U.S. Dist. LEXIS 27383 (D. Colo. Mar. 31, 1986)...........................35

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)...........................................................................................29

*GFF Corp. v. Associated Wholesale Grocers, Inc.*,
130 F.3d 1381 (10th Cir. 1997) ......................................................................................12

*Gundy v. United States*,
139 S. Ct. 2116 (2019).....................................................................................................9

*In re Hanley*,
135 B.R. 311 (C.D. Ill. Bankr. 1990)...................................................................18, 19

*In re Harris*,
562 B.R. 403 (W.D. Mo. Bankr. 2016) .............................................................19, 20

*Head v. N. Pier Apartment Tower, a/k/a Broadacre Mgmt.*,
No. 02 C 5879, 2003 WL 22127885 (N.D. Ill. Sept. 12, 2003)..............................11, 13, 14

*Herrera v. City of Espanola*,
32 F.4th 980 (10th Cir. 2022) .........................................................................................30

*In re Johnson*,
203 B.R. 498 (S.D. Ga. Bankr. 1996).................................................18, 19, 22, 23

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992) ..........................................................................................25

*Kurimski v. Shell Oil Co.*,
570 F. Supp. 3d 1228 (S.D. Fla. 2021) .............................................................................26

*L–7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................26

*Laramore v. Ritchie Realty Mgmt. Co.*,
397 F.3d 544 (7th Cir. 2005)....................11

*Lemay v. Stroman's, Inc.*,
510 F. Supp. 921 (E.D. Ark. 1981)....................18, 22

*Liberty Leasing Co. v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998)....................11, 12, 14, 21

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019)....................28

*In re Martin*,
64 B.R. 1 (S.D. Ga. Bankr. 1984)....................19

*Myers v. Dr. Phil Org.*,
No. 14-cv-007, 2015 WL 476073 (D. Utah Feb. 5, 2015)....................32

*Ortiz v. Rental Mgmt., Inc.*,
65 F.3d 335 (3d Cir. 1995)....................18, 19

*Philibotte v. Nisource Corp. Servs. Co.*,
No. 14-cv-11300, 2014 WL 6968441 (D. Mass. Dec. 9, 2014)....................21, 22, 23

*Remco Enters., Inc. v. Houston*,
677 P.2d 567 (Kan. Ct. App. 1984)....................19, 22

*Riethman v. Berry*,
287 F.3d 274 (3d Cir. 2002)....................14

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2018)....................32

*Ross v. Pino*,
No. 20-cv-01292, 2021 WL 4398600 (D. Colo. Sept. 27, 2021)....................20

*Salt Lake City Corp. v. Sekisui SPR Ams., LLC*,
No. 2:17-cv-01095, 2018 WL 4688356 (D. Utah Sept. 28, 2018)....................31

*Shaumyan v. Sidetex Co.*,
900 F.2d 16 (2d Cir. 1990)....................11

*Silva v. Rent-A-Center*,
912 N.E.2d 945 (Mass. 2009) ....................22

*State v. Real Estate Law Center, P.C.*,
430 F. Supp. 3d 761 (D.N.M. Dec. 31, 2019) ....................33

*Tavernaro v. Pioneer Credit Recovery, Inc.*,
43 F.4th 1062 (10th Cir. 2022) ....................25

*Tiscareno v. Frasier*,
No. 2:07-cv-336, 2012 WL 1377886 (D. Utah Apr. 19, 2012) ....................15

*U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ....................8

*United States v. MacCollom*,
426 U.S. 317 (1976) ....................7

*United States v. Realty Co.*,
163 U.S. 427 (1896) ....................7

**Federal Statutes:**

5 U.S.C. § 706(2) ....................4

12 U.S.C. § 5481(5) ....................9

12 U.S.C. § 5481(6) ....................9

12 U.S.C. § 5481(7) ....................4, 5, 10, 12, 13

12 U.S.C. § 5481(14) ....................3

12 U.S.C. § 5481(15)(A)(ii) ....................16

12 U.S.C. § 5481(15)(A)(ii)(II) ....................5, 16

12 U.S.C. § 5481(15)(A)(xi) ....................3

12 U.S.C. § 5497(a)(2)(C) ....................8

12 U.S.C. § 5531(a) ....................3

12 U.S.C. § 5531(d)(1) ....................3

12 U.S.C. § 5536(a)(1)(A) ....................3

12 U.S.C. § 5536(a)(1)(B) ....................3
12 U.S.C. § 5564(g)(1) ....................30
15 U.S.C. Ch. 41, Subch. I....................23
15 U.S.C. § 45....................3
15 U.S.C. § 1602(f)....................10
15 U.S.C. § 1602(f)-(g)....................12
15 U.S.C. § 1638....................3
15 U.S.C. § 1640(e) ....................30
15 U.S.C. § 1667(1) ....................16
15 U.S.C. § 1681p....................31
15 U.S.C. § 1693k....................3
15 U.S.C. § 1693m(g)....................30

**Federal Regulations:**

12 C.F.R. Part 213.5(b)....................16
12 C.F.R. § 1005.2(f) ....................10, 12
12 C.F.R. § 1005.10(e)(1)....................3
12 C.F.R. § 1022.42(a)....................3
12 C.F.R. § 1022.42(b) ....................3
12 C.F.R. § 1026.2(a)(16)....................5, 18, 21, 22, 23
12 C.F.R. § 1026.4 ....................13
12 C.F.R. § 1026.17 ....................3
12 C.F.R. § 1026.18 ....................3

**State Statutes:**

22 G.C.A. §§ 57101-57114....................2

815 Ill. Comp. Stat. Ann. 665/1 ....................3

Ala. Code §§ 8-25-1–8-25-6 ....................2

Ariz. Rev. Stat. Ann. §§ 44-6801–44-6814 ....................2

Cal. Civ. Code § 1812.620-.650 ....................23

Cal. Civ. Code § 1812.623 ....................3

Cal. Civ. Code § 1812.624 ....................3

Conn. Gen. Stat. Ann. §§ 42-240–42-259 ....................2

D.C. Code Ann. §§ 42-3671.01–42-3671.14 ....................2

Fla. Stat. Ann. §§ 559.9231–559.9241 ....................2

Miss. Code §§ 75-24-151–75-24-175 ....................2

N.Y. Pers. Prop. Law §§ 500–508 ....................2

N.Y. Pers. Prop. Law § 501 ....................3

Okla. Stat. tit. 59, §§ 1950–1957 ....................2

S.C. Code §§ 37-2-701–37-2-714 ....................2

Tex. Bus. & Com. Code Ann. §§ 92.001-92.002 ....................2

Tex. Bus. & Com. Code Ann. §§ 92.051-92.055 ....................2

Tex. Bus. & Com. Code Ann. §§ 92.101- 92.104 ....................3

Tex. Bus. & Com. Code Ann. §§ 92.151-92.157 ....................3

Tex. Bus. & Com. Code Ann. §§ 92.201-92.202 ....................3

Utah Code §§ 15-8-1–15-8-12 ....................2

W. Va. Code §§ 46B-1-1–46B-1-5 ....................3

**Other Authorities:**

1 Joseph Story, *Commentaries on the Constitution of the United States* (4th ed. 1873) ....................8

Fed. R. Civ. P. 12(b)(6)........................................................................................................1, 29

Snap Finance, https://snapfinance.com/about-us ...............................................................................1

U.S. Const. art. 1, § 9, cl. 7 ...............................................................................................................7

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Defendants move to dismiss the Complaint with prejudice because (i) the Consumer Financial Protection Bureau ("Bureau") is unconstitutionally funded and therefore has no authority to bring this lawsuit; (ii) the Bureau lacks the statutory authority to bring an enforcement action concerning the lease-to-own agreements at issue here; (iii) certain Counts fail to state a claim for relief under Fed. R. Civ. P. 12(b)(6) for still further reasons; (iv) all Counts are time-barred, at least in part; and (v) all claims against Snap Second Look LLC, Snap U.S. Holdings LLC, and Snap Finance Holdings LLC should be dismissed because the Complaint does not allege those Defendants engaged in any conduct. In the alternative, the Court should stay this matter pending the U.S. Supreme Court's resolution of the constitutionality of the Bureau's funding in *CFPB v. Community Financial Services Association of America, Ltd.*, No. 22-448.

## INTRODUCTION

The Bureau brings this enforcement action in a first-of-its-kind attempt to impose the federal consumer finance laws that it enforces on state-regulated lease-to-own ("LTO") agreements. But this result can only be achieved by supplanting state law, disregarding the plain language of federal statutes and regulations, and rejecting longstanding precedent. The Court should decline the Bureau's invitation to do so.

Snap Finance LLC ("Snap") was founded in 2012 with the goal of providing consumers who lacked credit history, or had poor credit, an alternative means to access needed consumer goods.[1] Snap has accomplished its mission. Consumers have used Snap's LTO agreements more than three million times to access, and in many cases ultimately obtain ownership of, goods such

[1] *See* Snap Finance, https://snapfinance.com/about-us (accessed Sept. 4, 2023).

as furniture, appliances, tires, and mattresses. Compl. ¶ 3. In so doing, Snap has provided consumers with access to critical household goods they otherwise could not have obtained.

Here is how the legacy version of Snap's leases worked. Under the legacy (*i.e.*, 2020 and earlier) versions of Snap's LTO agreements at issue in this lawsuit, consumers agreed to a single 60-day lease term. Compl. ¶ 60.[2] Consumers could renew their lease for additional 60-day terms, but they were not contractually obligated to do so. *Id.* ¶ 46. Instead, consumers could terminate any future payment obligations by returning or surrendering the leased merchandise, and making any payments due to Snap through the current lease term. *Id.* ¶ 48.[3] If consumers renewed their leases for additional 60-day terms, at the end of 12 months they would acquire ownership of the merchandise for no additional cost. *Id.* ¶ 43. Consumers also had the option to obtain ownership of the merchandise within the first 100 days "for slightly more than the cash price" by exercising a "100-Day Payment Option" or "Cash Payoff Option." *Id.* ¶ 45.

LTO agreements, like Snap's here, are nothing new. They have existed for decades and are heavily regulated under state law and also under section 5 of the Federal Trade Commission Act. Currently, at least 46 states have laws that comprehensively regulate LTO transactions,[4]

[2] Snap no longer offers leases with 60-day terms. Since mid-2020, Snap's leases have had terms that range from one week to one month. The Complaint does not allege otherwise. *See* Compl. ¶ 46 (alleging that "[f]rom January 2017 through March 2020, nearly all of the Snap [LTOs] featured a 60-day term").

[3] Here, too, the Complaint's allegations target a legacy feature of Snap's LTO agreements. Since 2020, the LTO agreements have expressly permitted consumers to terminate their lease at any time, and regardless of their payment status.

[4] *See, e.g.*, Ala. Code §§ 8-25-1–8-25-6; Ariz. Rev. Stat. Ann. §§ 44-6801–44-6814; Conn. Gen. Stat. Ann. §§ 42-240–42-259; D.C. Code Ann. §§ 42-3671.01–42-3671.14; Fla. Stat. Ann. §§ 559.9231–559.9241; 22 G.C.A. §§ 57101–57114; Utah Code §§ 15-8-1–15-8-12; Miss. Code §§ 75-24-151–75-24-175; N.Y. Pers. Prop. Law §§ 500–508; Okla. Stat. tit. 59, §§ 1950–1957; S.C. Code §§ 37-2-701–37-2-714; Tex. Bus. & Com. Code Ann. §§ 92.001–92.002, 92.051–

governing everything from the content of notices and disclosures, *e.g.*, N.Y. Pers. Prop. Law § 501; Cal. Civ. Code § 1812.623; 815 Ill. Comp. Stat. Ann. 665/1, to prices, N.Y. Pers. Prop. Law § 501, to fees and payments, Cal. Civ. Code § 1812.624. The Federal Trade Commission also has enforcement authority under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Despite this comprehensive regulation at the federal and state levels, the Bureau now alleges, for the first time in litigation, that LTO agreements are subject to the full suite of requirements imposed by the federal Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), and the Electronic Funds Transfer Act ("EFTA").[5]

But even taking the Complaint's allegations at face value, Snap's LTO agreements are not subject to any of these federal statutes. And because they are not, the Bureau cannot use this enforcement action as a vehicle to regulate them. The only mechanism for the Bureau to attempt to do so would be through an exercise of its rulemaking authority. *See, e.g.*, 12 U.S.C. § 5481(15)(A)(xi). Even then, there is substantial reason to believe that such a rulemaking would be in excess of the Bureau's statutory authority, as Congress in the CFPA expressly subjected only one specific category of leases to the Bureau's jurisdiction and, as shown below, Snap's leases are outside that narrow category. *See* pp. 21-23, *infra*.

In any event, the Bureau has never proposed such a rule. Instead, it asks this Court to rewrite the CFPA, TILA, and EFTA by judicial fiat, avoiding the public rulemaking process and all industry and consumer input. This Court should not permit the Bureau to evade the procedural

---

92.055, 92.101– 92.104, 92.151–92.157, 92.201–92.202; W. Va. Code §§ 46B-1-1–46B-1-5.

[5] 12 U.S.C. §§ 5531(a), 5531(d)(1), 5536(a)(1)(A), 5536(a)(1)(B), 12 U.S.C. § 5481(14); 15 U.S.C. § 1693k; 12 C.F.R. § 1005.10(e)(1); 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18; 12 C.F.R. § 1022.42(a), (b).

safeguards of notice-and-comment rulemaking, and the judicial safeguards of the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"), through this enforcement action. Instead, this Court should uphold the well-defined federal and state boundaries between LTO products and the credit products under the Bureau's already broad jurisdiction.

In the Complaint, the Bureau alleges ten separate violations of federal consumer financial law. But the Bureau has no cognizable claims for multiple independent reasons, and so the Court should dismiss the Bureau's Complaint with prejudice.

First, the Court should dismiss this lawsuit without deciding whether the Bureau has stated any plausible claims for relief because the Bureau's funding mechanism violates the Appropriations Clause of the U.S. Constitution and, as a result, it has no lawful authority to file and prosecute this action. At a minimum, the Court should stay further proceedings in this matter pending the Supreme Court's resolution of this issue, which would conserve judicial resources.

Second, even if the Bureau had constitutional authority to bring this lawsuit, it still lacks the statutory authority under the CFPA, TILA, and EFTA. The Bureau has alleged that Snap's legacy LTO agreements were subject to these statutes because they are extensions of "credit," "the functional equivalent of purchase finance arrangements," and/or "credit sales." Compl. ¶¶ 88, 89. But Snap's legacy LTO agreements were none of these things, even accepting the Complaint's allegations as true.

The LTO agreements were not credit because they did not grant consumers "the right" to "defer payment" of a "debt" or "purchase property . . . and defer payment for such purchase." *E.g.*, 12 U.S.C. § 5481(7). There was no "debt" because consumers were not contractually obligated to renew their lease upon expiration of any 60-day term and could "terminate" any further "payment

obligations" under the lease. Compl. ¶¶ 41, 46-47, 66, 70. Nor did consumers have "the right" to "defer payment." Again, under the LTO agreements consumers agreed to make payments before or contemporaneous with their retention of the leased merchandise, pursuant to 60-day lease terms. If a consumer failed to make their payment, Snap had the contractual right to repossess the merchandise. Compl. ¶¶ 72-73. And under Snap's LTO agreements consumers did not "purchase property . . . and defer payment for such purchase," 12 U.S.C. § 5481(7), because consumers purchased the property only *after* making full payment, by renewing their 60-day lease terms for 12-months or exercising an early-buyout option.

Nor were Snap's LTO agreements the "functional equivalent of purchase finance arrangements." Consumers did not "purchase" the merchandise at the inception of an agreement. Once again, they purchased the merchandise only by repeatedly renewing their agreements' 60-day terms for 12 months or by exercising an early ownership option. Snap's LTO agreements also did not meet another statutory requirement under the "functional equivalent" definition, because they did not have an "initial term of . . . at least 90 days." 12 U.S.C. § 5481(15)(A)(ii)(II). Indeed, the Complaint alleges that Snap's LTO agreements had initial terms of just 60 days. Compl. ¶ 46.

Finally, Snap's LTO agreements were not "credit sales." First, the agreements were "terminable without penalty at any time by the consumer." 12 C.F.R. § 1026.2(a)(16). Though the Bureau asserts that the LTO agreements were not terminable because consumers were required to pay past-due amounts to terminate their leases, and could only terminate at the end of their current lease term, courts have repeatedly held that these exact terms, which are commonplace in leases, do not render a lease non-terminable by the consumer. *See* pp. 14-15, *infra*. Second, consumers did not "[a]gree[] to pay" the "substantial[] equivalent" of the value of the merchandise under an

LTO agreement. 12 C.F.R. § 1026.2(a)(16). Instead, consumers agreed to pay only for usage of the merchandise during a single 60-day term. And third, consumers did not have the right to obtain ownership for a "nominal" sum upon satisfaction of the agreement, because the lease was fully satisfied upon completion of the single 60-day lease term they agreed to, at which point the consumer did not own the merchandise.

Third, the Bureau's claims require dismissal for several additional reasons.

Count I should be dismissed because Snap's "100 Day Cash Payoff" advertising slogan was neither misleading to a reasonable consumer nor likely to impact a reasonable consumer's behavior, and therefore was not deceptive under the CFPA.

Count II alleges that Snap violated the CFPA by materially interfering with consumers' ability to understand their LTO agreements. Though the Complaint asserts that Snap is liable for the alleged actions of third-party merchants (*see* Compl. ¶¶ 116-20), it lacks plausible allegations that merchants materially interfered with consumers' ability to understand their lease terms, or that *Snap* was the proximate cause of any alleged merchant misconduct. The Complaint also fails to plausibly allege that charging a processing fee in the application process interfered with consumers' ability to understand the terms of the lease they subsequently signed.

The Bureau's claims are also untimely, in whole or in part. One-year statutes of limitation govern the TILA and EFTA claims, and based on the facts pled in the Complaint those claims expired on April 21, 2022 and July 19, 2022, respectively. Although the CFPA and Fair Credit Reporting Act claims accrue based on when the Bureau discovered the alleged wrongdoing, the Bureau has wholly failed to allege the dates of discovery, rendering those claims untimely in part.

Finally, all counts against three of the five Defendants—Snap U.S. Holdings, Snap Finance

Holdings, and Snap Second Look—should be dismissed because the Complaint fails to allege any plausible basis for liability as to those Defendants.

## LEGAL STANDARD

To survive dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[L]abels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertion[s]" devoid of "further factual enhancement" are not sufficient. *Twombly*, 550 U.S. at 555, 557. Rather, a plaintiff must present "enough factual matter (taken as true)" to "raise a right to relief above the speculative level." *Id.* at 555, 556.

## ARGUMENT

### I. This Case Should Be Dismissed, Or At A Minimum Stayed, Because The Bureau Is Unconstitutionally Funded And Thus Unable To Prosecute This Lawsuit.

The Court should dismiss this lawsuit, or at a minimum stay it, because the Bureau is funded through a process that violates the Constitution. Even if the Bureau had viable claims to assert (and as shown below, it does not), it may not pursue those claims in this lawsuit using funds that have been requisitioned in violation of the Constitution.

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. The "established rule" under this Clause is that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion). Congress may not delegate to a federal agency, such as the Bureau, the power to fund itself, because the power to appropriate

funds belongs to Congress alone. *See United States v. Realty Co.*, 163 U.S. 427, 440-41 (1896).

The Appropriations Clause thus serves as a "bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.). By conferring on Congress the exclusive power of the purse, the Appropriations Clause "restrict[s] . . . the disbursing authority of the Executive department," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937), and thus grants the legislative branch "a controlling influence over the executive power," 1 Joseph Story, *Commentaries on the Constitution of the United States* § 531 p. 384 (4th ed. 1873).

These bedrock constitutional principles doom this lawsuit because Congress does not appropriate set sums of money each year to fund the Bureau's operations. Instead, Congress has impermissibly delegated that authority to the Bureau. The CFPA authorizes the Bureau's Director to instruct the Federal Reserve to transfer an amount of money that the Director—not Congress—determines is appropriate to carry out the Bureau's functions for that year, up to 12% of the Federal Reserve's multi-billion-dollar annual operating expenses. *See* 12 U.S.C. § 5497(a)(2)(C); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623-24 (5th Cir. 2022) ("*CFSAM*"). Indeed, the CFPA prohibits the House and Senate Appropriations Committees from reviewing how the Bureau spends the money it appropriates to itself. 12 U.S.C. § 5497(a)(2)(C).

This funding scheme, under which the Bureau is neither dependent on, nor accountable to, Congress for its funding levels, infringes on Congress's exclusive power of the purse and "contravenes the Constitution's separation of powers." *CFSAM*, 51 F.4th at 635-41. Because this lawsuit is being prosecuted using unconstitutionally obtained funds, "the proper remedy here is to disregard the government action" and "dismiss the enforcement action." *CFPB v. All Am. Check*

*Cashing, Inc.*, 33 F.4th 218, 241-42 (5th Cir. 2022) (Jones, J., concurring); *see also CFSAM*, 51 F.4th at 641-43 (vacating Bureau rulemaking because of Appropriations Clause violation).[6]

If the Court does not dismiss this lawsuit on these grounds, the Court should stay further proceedings pending the Supreme Court's resolution of this issue in *CFPB v. Community Financial Services Association of America, Ltd.*, No. 22-448. Staying a case under these circumstances is warranted because it would "not 'unduly prejudice'" the Bureau and would "promot[e] judicial efficiency." *E.g.*, *CFPB v. Credit Acceptance Corp.*, No. 23 Civ. 00038, 2023 WL 5013303, at *3 (S.D.N.Y. Aug. 7, 2023) (unpublished) (staying Bureau enforcement action) (citations omitted).

## II. Snap's LTOs Are Not Subject To The CFPA, TILA, Or EFTA.

Even if the Bureau's funding mechanism passes constitutional muster, the Court should dismiss the Bureau's CFPA, TILA, and EFTA claims because the Bureau has no authority under these statutes to police the legacy lease agreements at issue here. The Complaint asserts various theories for why the lease agreements are subject to one or more of these statutes: that the leases provided a form of "credit," that they were the "functional equivalent of purchase finance arrangements," and/or that they constituted "credit sales." But the Bureau has failed to plausibly allege any factual basis to infer that Snap's leases fell within any of these statutory provisions.[7]

[6] This enforcement action also violates the Constitution because Congress has provided no "intelligible principle" to guide the Bureau's unfettered authority to determine what constitutes unfair, deceptive, or abusive acts or practices under the CFPA. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521-22 (1935). The delegation at issue here violates the non-delegation doctrine as advanced by several current Justices of the Supreme Court. *See Gundy v. United States*, 139 S. Ct. 2116, 2131-48 (2019) (Gorsuch, J., dissenting); *id*. at 2130-31 (Alito, J. concurring in the judgment). Defendants expressly preserve this argument in the event of an intervening change of law regarding the non-delegation doctrine.

[7] Because Snap's LTO agreements are not a "consumer financial product or service," 12 U.S.C. §5481(5), Snap also is not a "covered person" under the CFPA, *id.* § 5481(6).

### A. Snap's LTOs Did Not Extend "Credit" Under The CFPA, TILA, Or EFTA (Counts I-VIII, X).

The Bureau alleges that Snap's legacy leases are subject to the CFPA, EFTA, and TILA because they were extensions of "credit." Compl. ¶ 88. "Credit" is defined substantially the same across all three statutes to mean "the right granted by a person to" "[1] defer payment of a debt, [2] incur debt and defer its payment, or [3] purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7) (CFPA); *see* 12 C.F.R. § 1005.2(f) (EFTA); 15 U.S.C. § 1602(f) (TILA). But the Complaint fails to plausibly allege that Snap's leases satisfied any prong of this definition: they did not create a "debt" obligation, nor did they grant a consumer the right to "defer" any payment, either in connection with a "debt" or "purchase [of] property." Instead, Snap's leases operated just like traditional "rent-to-own" or "lease-to-own" agreements—arrangements that numerous courts and even the Bureau itself have concluded "are not credit." Exhibit 1, Bureau of Consumer Financial Protection, 1 *Taskforce on Federal Consumer Financial Law Report* 215 (Jan. 2021) ("*CFPB Taskforce Rept.*").[8]

#### 1. Under Snap's LTOs, Consumers Did Not Obtain The Right To Incur Debt Or Defer Its Payment.

The Complaint does not plausibly allege that Snap's leases "granted" consumers "the right" to "defer payment of a debt" or "incur debt and defer its payment."

Snap's lease agreement did not create "debt." Although Snap's lease agreements could be renewed for a maximum potential duration of 12 months, each lease was a discrete and distinct 60-day lease. Compl. ¶¶ 40-41. Critically, consumers were not contractually obligated to renew their leases upon expiration of any 60-day term; instead, they retained the contractual right to

[8] The referenced exhibits are attached to the accompanying Declaration of Levi W. Swank.

"terminate their Agreement" at the end of any lease period by returning the merchandise, which would "terminate" any further "payment obligations" under the lease. Compl. ¶¶ 41, 46-47, 66, 70. Thus, because consumers paid for the contemporaneous use of merchandise over the course of a single 60-day lease term, and had no future contractual payment obligations, they did not incur "debt." The "lion's share of caselaw nationwide" has held that leases with these precise characteristics are not extensions of "credit." *Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612, 614, 622, 625 (E.D. Mich. 2017) (LTO agreement was not "credit" where lessee was required to make "payments . . . as a contemporaneous exchange of consideration for the right of possession and use of the equipment" with "no obligation whatsoever to purchase the product") (quotation marks omitted); *see also, e.g.*, *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717-18 (S.D. Ohio 1998) (agreement involving the "contemporaneous exchange" of "incremental payments" for "the possession of the leased goods" was not "credit" under the Equal Credit Opportunity Act).[9]

Snap's leases also did not "grant[]" consumers the "right" to "defer" payment of a debt. Again, under Snap's leases consumers agreed to make payments before or contemporaneous with their use of the leased merchandise for 60-day terms. If a consumer failed to make their payment, Snap had the contractual right to repossess the merchandise. Compl. ¶¶ 72-73. Thus, consumers

[9] *Accord Shaumyan v. Sidetex Co.*, 900 F.2d 16, 19 (2d Cir. 1990) (payment that was "substantially contemporaneous" with work performed was not "credit"); *Head v. N. Pier Apartment Tower, a/k/a Broadacre Mgmt.*, No. 02 C 5879, 2003 WL 22127885, at *3 (N.D. Ill. Sept. 12, 2003) (unpublished) (similar for residential lease); *Laramore v. Ritchie Realty Mgmt. Co.*, 397 F.3d 544, 547 (7th Cir. 2005) (residential lease was not "credit" because "[a] tenant's responsibility to pay the total amount of rent due does not arise at the moment the lease is signed" but "instead a tenant has the responsibility to pay rent over roughly equal periods of the term of the lease"); *Anderson v. Nextel Partners, Inc.*, 745 N.W.2d 464, 468 (Iowa 2008) (cell service contract was not "credit" under state law because "the agreement expressly allowed both parties the option to cancel the agreement before the end of the term" and the customer was "obligated . . . only for the services already provided").

obtained no "right" to "defer" payments under Snap's lease agreements. *See, e.g.*, *Liberty Leasing Co.*, 6 F. Supp. 2d at 717 (no "right . . . to defer payment" where "upon default by the lessees, Plaintiff had the right to lease the equipment to another party").

Finally, Snap's LTO agreements did not enable consumers to "purchase property . . . and defer payment for such purchase." 12 U.S.C. § 5481(7) (CFPA); 12 C.F.R. § 1005.2(f) (EFTA). Rather, as the Complaint acknowledges, consumers did not become owners of leased merchandise until *after* they either (a) exercised one of the early pay-off options; or (b) repeatedly renewed their 60-day leases for the maximum potential 12-month period. Compl. ¶¶ 40-45. In either case, ownership *followed* full payment. In addition, and as explained above, consumers retained the "[r]ight to [t]erminate" their lease agreements and return the merchandise (Compl. ¶¶ 66, 70)—a right that is incompatible with any view that consumers "purchased" the merchandise upon agreeing to a 60-day lease term. This is clear not only from the Complaint's allegations, but also from the lease agreements themselves, which state that Snap "retain[ed] title to the Property for the term of the lease" and customers "will not own the property until [they ] have paid the total payments" for the merchandise. Exhibit 2, at 1, 3 (Lease Agreement)[10]; *see Dorton*, 229 F. Supp. 3d at 625 (holding that a LTO program could not be classified as "credit" because ownership of property was never transferred to the consumer).[11]

---

[10] The Court may take judicial notice of the attached lease agreements on a motion to dismiss because they are incorporated by reference in the Complaint and are central to the Bureau's claims. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (if a "document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").

[11] The Complaint also asserts that Snap's lease agreements had a "finance charge," and were therefore "credit" for purposes of TILA and Regulation Z, because consumers "pay[] more than double the cash price of the financed merchandise or service over the default 12-month payment period."

**2. The Bureau's Allegations About How Snap's LTOs Allegedly Operated Do Not Bring Them Within The Definition Of "Credit."**

Despite this straightforward application of established law, the Complaint selectively references certain alleged features of Snap's leases agreements that it asserts render them "credit." Even taking these allegations at face value, however, they do not convert an LTO agreement, such as Snap's (legacy) agreements at issue here, into an extension of credit.

First, the Complaint alleges that Snap's lease agreements "automatically renew . . . regardless of whether a consumer makes their next scheduled payment." Compl. ¶ 88. But consumers who retained possession of merchandise, but failed to make their lease payment on time (*e.g.*, because of insufficient funds) did not obtain "the right" to "defer payment," 12 U.S.C. § 5481(7); the consumer remained contractually obligated to pay for the use of the merchandise for that lease term, and Snap had the right to repossess the property if the consumer did not pay. Compl. ¶¶ 72-73. The lease agreements themselves make this clear: consumers that "d[id] not pay any payment," were in "default" and Snap had the right to "terminate th[e] Agreement … if [the customer was] in default of [her] payment … obligations," and to require the customer to "return the [p]roperty." Exhibit 2 at 2, 3. Snap's right to repossess merchandise and terminate agreements in the absence of payment is irreconcilable with consumers having had a "right" to defer payment. *See Head*, 2003 WL 22127885, at *3 (holding that rental agreement did not give the lessee a "right" to defer payment because "[t]he lease provided that upon the lessee's default, the lessor had the

---

Compl. ¶ 99; *see* 15 U.S.C. § 1602(f)-(g). A "finance charge" is defined as "the cost of consumer credit," 12 C.F.R. § 1026.4, and because Snap's leases do not involve "credit," the total amount a consumer pays over the life of a lease is not a "finance charge." A contrary rule would make virtually every "rent-to-own" or "lease-to-own" agreement an extension of credit, which is contradicted by established caselaw and the Bureau's own concessions to the contrary. *See* pp. 11-12 & n.9 *supra* (collecting cases); Exhibit 1, *CFPB Taskforce Rept.*, *supra*, at 215.

right to lease the equipment to another party in an attempt to mitigate damages, thus relieving the original lessees from the entire obligation of the lease"); *Liberty Leasing Co.*, 6 F. Supp. 2d at 717 (holding that lease was not "credit" because "Plaintiff had the right to lease the equipment to another party," thus leaving "the lessees . . . liable only for any accrued and unpaid rent" (quotation marks omitted)). Moreover, the Bureau has acknowledged that LTO agreements like Snap's customarily involved "automatic renewal until stopped," but are nevertheless "not credit." Exhibit 1, *CFPB Task Force Report*, *supra*, at 215.

That Snap allegedly did not "forcibly repossess[]" merchandise for past-due customers (Compl. ¶ 75) is irrelevant to whether those consumers had "the right" under their lease agreements to "defer payment." The mere "failure to enforce . . . right[s]" to payment under a lease agreement does not confer on the consumer "a unilateral right to defer payments." *Riethman v. Berry*, 287 F.3d 274, 277 (3d Cir. 2002) (agreement was not "credit" under TILA or the ECOA); *accord Liberty Leasing Co*., 6 F. Supp. 2d at 716, 717 (lease was not "credit" where lessor had "right to lease the equipment to another party in an effort to mitigate damages," even though lessor did not exercise right); *Head*, 2003 WL 22127885, at *3 (lease is not "credit" "when remedial scenarios exist where the lessee's financial obligation can be extinguished"). In any event, the Complaint itself alleges that after forty days of non-payment, Snap would engage in collection activities in an effort to obtain past due payments – further indication that Snap did not grant consumers "the right" to defer payment. *See* Compl. ¶¶ 72-78. It would be perverse to interpret a consumer protection law to incentivize LTO providers to *immediately* exercise every remedy at their disposal against consumers—including repossession—to avoid being subject to otherwise inapplicable federal regulation.

Second, the Bureau asserts that Snap's lease agreements "require past-due consumers to continue paying under the full 12-month period." *Cf.* Compl. ¶ 88. But there was no such requirement. Snap's leases provided all consumers—regardless of their payment status—the right to terminate future payment obligations by paying any past-due amounts and surrendering or returning the merchandise. Compl. ¶ 47; *see* p. 11, *supra.* That Snap allegedly required consumers to bring their account current negates any inference that Snap was affording consumers "the right" to defer payment. And by focusing solely on "past-due" consumers, *e.g.*, Compl. ¶ 88, the Bureau appears to argue that application of the CFPA should turn on the payment status of an individual consumer—a rule that would be unprecedented and unworkable.

Finally, the Complaint suggests that Snap's legacy leases were extensions of credit because Snap "le[]d consumers to reasonably believe they are financing the purchase of property or services for which they are deferring payment." Compl. ¶ 90. But the Complaint does not allege any facts supporting this conclusory assertion, and so the Court should disregard it. *See Tiscareno v. Frasier*, No. 2:07-cv-336, 2012 WL 1377886, at *4 (D. Utah Apr. 19, 2012) (unpublished) (holding that a "court need not . . . consider allegations which are conclusory, or that 'do not allege the factual basis' for the claim") (citation omitted). And even if the Bureau had pled such facts, it has no legal support for the proposition that its statutory authority under the CFPA, TILA, or EFTA ebbs and flows based on a consumer's subjective *belief* about the product, rather than that product's objective features. Accepting that theory would likewise be unprecedented and sow enormous uncertainty in applying these statutes.

### B. Snap's LTOs Were Not The "Functional Equivalent" Of Purchase Finance Arrangements Under The CFPA (Counts I-II, IV, VI-VIII, X).

The Bureau's alternative theory for jurisdiction under the CFPA is that Snap's leases were

"leases of personal [] property" that are the "functional equivalent of purchase finance arrangements." 12 U.S.C. § 5481(15)(A)(ii); Compl. ¶ 89. To meet this definition, however, Snap's leases must have been both (i) the "functional equivalent of [a] purchase finance arrangement[]," and also (ii) have an "initial term of . . . at least 90 days." 12 U.S.C. § 5481(15)(A)(ii)(II). Snap's leases met neither requirement.

First, Snap's lease agreements were not the "functional equivalent of [a] purchase finance arrangement[]" because consumers did not "purchase" the merchandise at the inception of a lease. Instead, a consumer acquired ownership of leased merchandise only after having leased the merchandise for a full 12 months, or through exercising an early buy-out option. *See* Compl. ¶¶ 40-45. Nor did Snap provide financing to consumers to facilitate such purchases. Rather, as explained above, consumers made contemporaneous payments in exchange for the right to use merchandise for defined lease terms; they incurred no debt and had no right to defer payment. *See* p. 5, *supra*.

Second, the initial terms of Snap's lease agreements were not at least 90 days. The Complaint alleges that, during the time period at issue, Snap's lease agreements had initial terms of 60-days. Compl. ¶ 46; p. 11, *supra*. It does not matter that consumers could renew their lease agreements every 60 days because, under the statute, only the length of the "*initial* term" matters. *See* 12 U.S.C. § 5481(15)(A)(ii)(II) (emphasis added). Indeed, the statute's use of the qualifier "initial" is a tacit acknowledgement that leases may have successive terms.[12] But on the face of the statute those later terms are irrelevant to whether the "functional equivalent" test has been met.

---

[12] The Consumer Leasing Act and Regulation M also apply only to leases with a particular initial term—four months or longer—even though they acknowledge that leases can be subject to "extension[s] . . . beyond the originally scheduled end of the lease term." *See* 15 U.S.C. § 1667(1); 12 C.F.R. Part 213.5(b). So Congress knows the difference between initial terms and renewing or extended terms, and specifically chose to bring only the former within the jurisdiction of the CFPA.

The Complaint tries to avoid this necessary conclusion by alleging that notwithstanding the express terms of the lease, "*in reality*" Snap's lease agreements "have initial terms of at least 90 days due to the inability of past-due consumers to terminate their future payment obligations under the Purchase Agreement within 90 days." Compl. ¶ 89 (emphasis added); *see id*. ¶¶ 47-48. As best Snap can ascertain, this appears to be another reference to Snap's alleged former policy of requiring past-due consumers to pay Snap for usage of merchandise to date before they were permitted to terminate their agreement. But as discussed below, courts have consistently held that requiring payment for use of merchandise to date does not alter or extend the agreement's lease term. *See* pp. 19-20, 22-23, *infra*. Moreover, the Bureau does not actually allege that past-due consumers had an "inability" to terminate their leases, such that the terms were "in reality" longer than 60 days. Compl. ¶ 47. And because initial lease terms were 60 days, every Snap consumer reached the end of their initial lease term—and the end of their contractual payment obligations—before the 90-day period expired (unless they renewed their agreement for another term). *Id.* ¶ 47. Notably, the Complaint fails to allege that even one customer was prevented from returning or surrendering merchandise during the "*initial term*" of their lease, *id.* ¶¶ 54-71—the only lease term that matters under the statute. And, again, under the Bureau's apparent theory, whether a product is subject to the CFPA will vary based on whether consumers are current on their payments or past due at the 90-day threshold—an untenable basis on which to rest jurisdiction under the CFPA.

In any event, the Bureau's premise is wrong because the circumstances under which a consumer could terminate future payment obligations are irrelevant under the statute. Congress could have codified such a requirement, but it chose not to. Instead, all the statute considers is the length of the initial lease term, which the Complaint acknowledges is less than 90 days. The Court should

reject the Bureau's attempt to rewrite the statute.

### C. Snap's LTOs Were Not "Credit Sales" Under TILA And Regulation Z (Counts V, VI).

The Bureau also asserts that Snap's leases were "credit sales" under TILA and Regulation Z. *See Ortiz v. Rental Mgmt., Inc.*, 65 F.3d 335, 338 (3d Cir. 1995) ("The TILA only applies to 'credit sales'"). Regulation Z (which implements TILA) defines "credit sale" to encompass leases only in very narrow situations:

> The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:
>
> (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
>
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

12 C.F.R. § 1026.2(a)(16).[13]

Courts have repeatedly held that lease-to-own agreements are not "credit sales" under TILA. *See, e.g.*, *In re Hanley*, 135 B.R. 311 (C.D. Ill. Bankr. 1990); *Ortiz*, 65 F.3d at 338-42; *Lemay v. Stroman's, Inc.*, 510 F. Supp. 921 (E.D. Ark. 1981); *accord In re Johnson*, 203 B.R. 498, 501 (S.D. Ga. Bankr. 1996). No different conclusion is warranted here.

#### 1. Snap's LTOs Were "Terminable Without Penalty At Any Time."

The Complaint fails to plausibly allege the threshold requirement for a lease to be a "[c]redit sale"—that it not be "terminable without penalty at any time by the consumer." 12 C.F.R. § 1026.2(a)(16). The Bureau asserts that Snap's leases were not terminable at will because Snap

[13] Since the Bureau assumed rulemaking and enforcement authority under TILA and Regulation Z, it has not sought to amend the definition of "credit sale," which has been in effect since 1981.

"only permitted consumers to terminate their Agreements at the conclusion of an automatically renewing 60-day term." Compl. ¶ 103. But requiring a lessee to wait until the end of the *current* term to terminate is not a "penalty," because a consumer may still terminate their *future* payment obligations. In *Johnson*, for example, the court held that a LTO agreement that permitted the lessee to "cancel the lease without penalty at any time *following* the initial three month period" of the lease was not a "credit sale" under TILA (or Georgia law). 203 B.R. at 500 (emphasis added). Other courts have reached similar conclusions. *See Remco Enters., Inc. v. Houston*, 677 P.2d 567, 570, 571 (Kan. Ct. App. 1984) (rent-to-own agreement that allowed the "[r]enter [to] . . . terminate th[e] agreement at the end of any [one-week] rental period" was "not [a] 'credit sale' . . . subject to . . . TILA"); *accord In re Harris*, 562 B.R. 403, 406, 407 (W.D. Mo. Bankr. 2016) (lease-purchase agreement was not a "security agreement" under Missouri law, in part because lessee could "terminate the Agreement, without penalty, at any time after [the initial] four month[ term]").

It makes no difference if, as the Complaint alleges, Snap's lease agreements permitted termination "only if consumers were current on their payment obligations through the end of that term." Compl. ¶ 103; *see also id.* ¶ 47. Such amounts do not constitute a "penalty" under TILA because they are amounts previously due (for prior use of the merchandise), not "*additional* charges imposed upon termination of the agreement." *Ortiz*, 65 F.3d at 342 (emphasis added). Consistent with that understanding, courts have repeatedly held that lease agreements are "terminable without penalty at any time," even if the consumer must pay past-due amounts before terminating. *See Hanley*, 135 B.R. at 312-13 (rent-to-own agreement where lessee could terminate "at any time by returning the goods" and paying "for the amount of rent attributable to their actual possession of the goods" was not a "credit sale" under TILA); *In re Martin*, 64 B.R. 1, 1, 3 (S.D.

Ga. Bankr. 1984) (rental agreement that gave renter "option to terminate" by paying "all rental payments due through the date of [merchandise] return" was "a true lease and not a disguised secured transaction"); *Harris*, 562 B.R. at 405, 407 (LTO agreement was "true lease" and not a "disguised security agreement" under Missouri law where lessee "c[ould] terminate the Agreement at any time after the first four months, with no penalty" "and pay any unpaid rent up to that point").

And the Bureau has failed to plausibly allege that consumers were unable to exercise their termination rights. The Complaint's allegations on this issue say nothing more than that Snap disfavored termination (as any lessor would) and encouraged consumers to renew their leases or enter a "buy-back" or other settlement with Snap. Compl. ¶¶ 54-71. But the Complaint fails to allege any facts to support its leap from these allegations to the conclusion that the agreements were not terminable by the consumer. *See Ross v. Pino*, No. 20-cv-01292, 2021 WL 4398600, at *3 (D. Colo. Sept. 27, 2021) (unpublished) (plaintiff may not avoid dismissal based on "numerous inferential leaps which are unsupported by factual allegations"). Indeed, the Complaint acknowledges that many consumers (at least "165") successfully surrendered the merchandise and thereby terminated their agreements. Compl. ¶¶ 54, 71.[14] The Complaint also acknowledges that consumers had termination options that did not involve surrendering the merchandise to Snap, including returning the merchandise to the merchant, or reaching a "buy-back" settlement with Snap. Compl. ¶¶ 62, 65, 69. The Complaint's silence about the number of consumers who sought to and successfully exercised these alternative termination options speaks volumes, and renders the Bureau's inference that leases were not terminable wholly speculative. Tellingly, the Complaint does not

[14] The Complaint mischaracterizes this number by comparing it to the total number of *purchase agreements*, rather than the total number of consumers who sought to terminate their agreement by surrendering their merchandise—the relevant denominator. *See* Compl. ¶ 71.

allege that any consumers were actually prevented from terminating their lease agreement.

In any event, even if a consumer had been unable in practice to terminate their agreement, that would not convert Snap's lease agreements into "credit sales," because whether a lease is subject to TILA is "most fairly determined by the terms of the leasing agreement." *Liberty Leasing Co.*, 6 F. Supp. 2d at 717. Here, the Complaint's allegations make clear that Snap's lease agreements afforded consumers the right to terminate. *E.g.*, Compl. ¶ 47. Any failure by Snap to honor that right "in reality" could only have been grounds for a possible breach of contract action under state law. It could not magically convert a lease agreement into a "credit sale."

**2. Consumers Did Not Agree To Pay An Amount "Substantially Equivalent To" The Purchase Price Of The Merchandise.**

Under Snap's lease agreements, consumers also did not "[a]gree[] to pay . . . a sum substantially equivalent to, or in excess of, the total value of the property . . . involved." 12 C.F.R. § 1026.2(a)(16). For purposes of conducting this analysis, "courts may only look to the *initial term* of the lease and may not look to the possibility that the lease will be renewed multiple times." *Philibotte v. Nisource Corp. Servs. Co.*, No. 14-cv-11300, 2014 WL 6968441, at *4 (D. Mass. Dec. 9, 2014) (unpublished), *aff'd*, 793 F.3d 159 (1st Cir. 2015). Here, the Complaint alleges that Snap's lease agreements "featured a 60-day term" (Compl. ¶¶ 46, 103), and that customers could either "renew[]" their agreements for another 60-day term *or* decline renewal and "terminate[] their payment obligations" (*id.* ¶¶ 41, 46-47, 66, 70); *see also* pp. 14-15, *supra*. Thus, consumers did not "[a]gree[] to pay" the "total value of the property"; they agreed to pay a fraction of the total value of the property for use during a 60-day term period. The Bureau does not allege otherwise.

Courts have consistently held that a lessee has not "agree[d]" to pay "a sum substantially equivalent to, or in excess of, the total value of the property and service involved," 12 C.F.R.

§ 1026.2(a)(16), where, as here, the lessee agrees only to an initial lease term that requires payment of a fraction of the total value of the merchandise. In *Philibotte*, for example, the court held that a lessee did not pay "'substantially equivalent to or in excess of the value of'" the merchandise because "after the initial term of the lease—which is all the court may look to—[the lessee] was required to pay significantly less than the value of the good." 2014 WL 6968441, at *4; *see also Lemay*, 510 F. Supp. at 923 (because "[t]he sole payment the [lessee] agreed to make and was obligated to make was the first week's payment for rent," the lease agreement "was not . . . a 'credit sale'" under TILA); *accord Johnson*, 203 B.R. at 502 (lessee "was not required to pay the equivalent value of the rented items" where he agreed only to an initial three-month term).

It makes no difference if, as the Complaint alleges, "a customer's term 'automatically . . . renews' across the full 12 months of the Agreement" or if the total amount paid "over the 12 month payment period" exceeds "double the cash price" of the merchandise. Compl. ¶¶ 41, 44; *see also id*. ¶¶ 99, 103. Although a customer may "exercise[] his or her right to renew a consumer lease multiple times" and "the lease payments eventually will exceed the value of the item," the "application of a regulatory framework does not depend on the economics of hindsight" but on "the nature of the contract *at the time it was formed*, focusing on the parties' contractual rights and obligations *at that point*." *Philibotte*, 2014 WL 6968441, at *4 (emphasis added) (quoting *Silva v. Rent-A-Center*, 912 N.E.2d 945, 951 (Mass. 2009)); *see also Remco Enters.*, 677 P.2d at 569-72 (lease was not a credit sale under TILA despite periodic payments, totaling approximately double the cash value of the merchandise). Here, consumers were under no obligation to renew for subsequent 60-day terms; they could refuse renewal and "terminate" their payment obligations, Compl. ¶¶ 41, 46-47, and therefore they did not "agree" to pay the market-value of the merchandise

upon signing their lease agreement.

**3. Consumers Could Not Acquire The Merchandise For No, Or Nominal, Consideration At The End Of Their Agreement.**

For substantially the same reasons, the Complaint fails to plausibly allege that consumers may own the merchandise "for no additional consideration . . . upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16). As alleged, a customer must pay *additional* sums to obtain ownership of the property after the initial 60-day term has ended, by utilizing an early buy-out option (Compl. ¶ 45) or by "renew[ing]" multiple times over a 12-month period (Compl. ¶ 41). *See Johnson*, 203 B.R. at 502 (lease agreement was not "credit sale" where lessee "could purchase the items at the end of the initial lease period only by paying the entire remaining amount due under the lease"); *Philibotte*, 2014 WL 6968441, at *3-4 (lease agreement was not a "credit sale" under state law where lessee had to pay additional sum "after the initial term" of the lease).

The Complaint thus fails to allege that Snap's lease agreements satisfy even one—let alone all three—of the requirements for a "credit sale" under TILA.

*     *     *

Accepting the Bureau's invitation to rewrite the CFPA, TILA, and EFTA in the context of this enforcement action would not only mark a sea change in existing law, but also create irreconcilable conflicts in federal and state disclosure requirements and sow crippling compliance uncertainty for the lease-to-own industry. In the absence of a rulemaking specifying the precise circumstances under which a lease is subject to these laws, the industry would be left to guess as to which disclosure regime—state or federal—they are subject to. "Both" is no answer, because state-mandated lease disclosures are often inconsistent with those required for true credit products by, for example, TILA. *Compare, e.g.*, 15 U.S.C. Ch. 41, Subch. I, *with* Cal. Civ. Code § 1812.620-.650.

Guessing incorrectly would place companies in substantial legal jeopardy.

The Court should dismiss Counts I-VIII and X with prejudice. If the Bureau truly believes these federal statutes should be interpreted to cover lease products like Snap's, it should initiate a rulemaking and sort out inconsistencies via the notice-and-comment process and through any subsequent legal challenges to such a rule under the APA; it need not ask this Court to resolve these issues in the context of this enforcement action.

## III. Even If The CFPA Applied, Counts I And II Should Be Dismissed In Their Entirety Because The Complaint Fails To Plausibly Allege A CFPA Violation.

Count I alleges that Snap violated the CFPA by providing merchants with misleading advertisements (Compl. ¶¶ 107-15), and Count II alleges that certain aspects of Snap's "application and contracting process" materially interfered with consumers' ability to understand the terms of their leases (*id.* ¶¶ 116-20). The Bureau has failed to plausibly allege key elements of either claim.

### A. The Bureau Fails To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Misleading.

The Complaint alleges that Snap violated the CFPA by providing merchants with advertisements that read: "100 Day Cash Payoff." Compl. ¶¶ 24-31. The Bureau does not allege that this advertising slogan was false—*i.e.*, that it misrepresented the terms and conditions of an available lease option. Nor does the Bureau allege as the basis of its deception claim that a "100 Day Cash Payoff" lease was not in fact an option available to every consumer, or even that this advertisement impacted consumers' decisions to lease merchandise. Instead, all Count I alleges is that Snap's "100 Day Cash Payoff" advertisement led consumers who had already chosen to lease merchandise from Snap to "believe[] they had entered into a 100-day financing agreement, where their automatically scheduled payments would fulfill their payment obligations by the close of the

100-day period." Compl. ¶ 113.

To determine whether an advertising statement is misleading, courts evaluate the statement in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall "net impression" is misleading. *See CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). On a motion to dismiss, a court must assume that "the reasonable consumer would read a communication in its entirety and make sense of a communication by assessing it as a whole and in its context." *Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1072 (10th Cir. 2022). If the "overall net impression" is found to be misleading, the court must then determine if the statement was material to a reasonable consumer—*i.e.*, "likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (citation omitted). Here, the "100 Day Cash Payoff" advertising slogan was neither misleading nor material.

No reasonable consumer would have been misled into believing that "their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." Compl. ¶ 113. On its face, the most the phrase "100 Day Cash Payoff" communicated to a reasonable consumer was that Snap was offering them the option of acquiring ownership of the merchandise by paying off their lease, with cash, in 100 days. This four-word slogan made no promises and left no impression about how a consumer could exercise that early payment discount option, whether this was the only lease option or one of many, or the default terms of the lease. None of these is a reasonable inference to draw from the phrase "100 Day Cash Payoff."

In addition, the phrase "100 Day Cash Payoff" appeared on print advertisements (Compl. ¶ 109), as advertisements often promote one payment option or one set of terms and conditions. "Reasonable consumers . . . understand that [] signage does not necessarily provide the complete

universe of pricing-related information that they may need prior to their purchase." *Kurimski v. Shell Oil Co.*, 570 F. Supp. 3d 1228, 1242-46 (S.D. Fla. 2021) (dismissing deceptive advertising claim). Thus, no reasonable consumer would have concluded that because Snap advertised a "100 Day Cash Payoff" they were automatically scheduled to pay off their lease in 100 days.

Even if a consumer who saw the advertisement had drawn the inference asserted by the Bureau, any such misconception would have been dispelled long before the 100-day deadline for a consumer to exercise their right to a "100 Day Cash Payoff." Snap's lease agreements had 60-day terms (not 100-days), and a maximum potential duration of 12-months (not 100 days). Compl. ¶¶ 7, 46. Moreover, the Bureau alleges that the full cost after renewing a lease for the maximum potential 12-month period was not the "cash" price, but instead "approximately double the cash price." *Id.* And the first page of the lease agreement told the consumer exactly how to exercise their "100 Day Cash Payoff" option. *See* Exhibit 2 at 1. Faced with the black-and-white terms of the lease, no reasonable consumer could have believed that they had been automatically scheduled to purchase the leased merchandise for its "cash" price on day 100.[15] Tellingly, the Complaint never alleges any details about the number or proportion of Snap's consumers who successfully elected the 100-day option. Without such allegations, there is no plausible basis to infer the "100 Day Cash Payoff" slogan actually misled consumers.

[15] Consumers' experience after executing their leases further belies the Bureau's theory of deception. The payments any consumer would have made prior to day 100 would have been only a fraction of the cash price of the merchandise. For instance, a consumer who leases merchandise worth $1,000, and who will pay roughly $2,000 if the lease is renewed for 12 months (*see* Compl. ¶ 7), will have paid only approximately $550 by Day 100 and would have no basis to think that they now owned $1,000 worth of merchandise. *See L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) ("Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable").

Finally, even if the Court were to find that the Bureau has plausibly alleged a misleading statement, that four-word advertising slogan was not likely to affect the conduct of a reasonable consumer. The Bureau's allegation of materiality is a legal conclusion—it simply alleges that use of the phrase "100 Day Cash Payoff" "was material." Compl. ¶ 114. But the Bureau does not allege that the advertisement induced any consumer to lease merchandise from Snap. *See id.* ¶ 113 (alleging only that consumers "who received the Snap Defendants' financing" were misled). And the Bureau has not alleged any facts raising the plausible inference that the four-word advertising slogan had any impact at all on consumers, let alone that it continued to impact their conduct three-plus months later in connection with choosing whether to exercise their "100 Day Cash Payoff" option. Count I should be dismissed with prejudice.

### B. The Complaint Fails To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms.

Count II alleges that Snap materially interfered with consumers' ability to understand their lease agreements because it "designed and implemented a Merchant Portal application and contracting process that" (1) "frequently led to merchants signing and submitting Purchase Agreements on behalf of consumers without consumers' prior review of their Agreement; (2) relied on merchants to explain those Agreements while providing them with no written guidance for doing so; and (3) required consumers to pay a processing fee before receiving a complete summary of the terms of their Agreement and before seeing or signing their final Agreement." Compl. ¶ 118.

As an initial matter, the Bureau has failed to plausibly allege any "material interference" with consumer's ability to understand their leases. The Complaint is devoid of any allegation that merchants signed and submitted lease agreements without a consumer's authorization to do so, or in any way inhibited consumers from reviewing their lease agreement. The Bureau also does not

identify any specific inaccuracies in explanations provided by merchants that would have materially interfered with consumers' understanding of their leases. At most, the Bureau has "allege[d] facts that are merely consistent with a defendant's liability," which "stops short of the line between possibility and plausibility of entitlement to relief." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) (citation and quotation marks omitted).

Nor does the Complaint plausibly allege that requiring consumers to pay a processing fee "materially interfered" with their ability to understand the terms of their lease agreements. The only way that could even conceivably be true is if paying the fee—which the Bureau alleges occurred before the consumer was provided with a copy of the agreement, Compl. ¶ 39—bound the consumer to the lease agreement. But the Complaint alleges the opposite—that consumers paid the processing fee *before* "signing the Agreement" and being contractually bound to its terms. *Id.* The alleged processing fee was no different than an application fee. In no plausible way could it have "materially interfered" with consumers' ability to understand the terms of their LTO agreements.

But even if the Bureau had plausibly alleged material interference, it has failed to plausibly allege that Snap proximately caused that interference. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918 n.34 (S.D. Ind. 2015) ("[P]roximate cause is [] a necessar[y] element of a theory of liability [under the CFPA]."). The most the Bureau has alleged is "but for" causation—that Snap "designed and implemented" a process that "led to" interference with consumers' ability to understand their lease terms. Compl. ¶ 118. But as the Complaint makes clear, the proximate cause of any consumer injury was the alleged actions of certain unnamed "merchants" who allegedly signed and submitted lease agreements without consumers' prior review, and failed to

adequately explain those agreements. Given the independent intervening conduct of a third-party, proximate causation fails unless Snap (i) facilitated the alleged conduct; or (ii) the conduct was reasonably foreseeable. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015). The Bureau has failed to plausibly allege either predicate.

First, the Complaint contains no allegation that Snap facilitated the alleged conduct, such as by encouraging or instructing merchants to sign and submit lease agreements on behalf of consumers. Nor does it allege that any specific features of the Merchant Portal made this conduct more likely to occur. If the Bureau's theory is that Snap facilitated this alleged conduct merely by offering a contracting process that involved merchants, that novel theory would be a death sentence not only for segments of the "lease-to-own" or "rent-to-own" industry, but also for indirect auto finance and other point-of-sale consumer finance arrangements.

Second, the Bureau has also failed to allege, even in conclusory fashion, that the conduct it attributes to certain unnamed merchants was reasonably foreseeable. The Complaint does not allege that consumers complained to Snap about such conduct, nor have any other facts been pled that raise a plausible inference that Snap had such knowledge. *Cf. CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-cv-00859, 2015 WL 11439178, at *18 (N.D. Ga. Sept. 1, 2015) (unpublished) (conduct of third-party reasonably foreseeable because complaint "alleges facts to support the inference that [defendant] knew the risks [the third parties] pose" and there were "numerous warning signs"). The absence of such allegations is fatal to Count II.

## IV. The Bureau's Claims Are Untimely In Whole Or In Part.

Under Rule 12(b)(6), a court may dismiss a claim as untimely where "the allegations on the face of the complaint surrounding the date of accrual . . . make clear that the right sued upon

has been extinguished." *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citation and quotation marks omitted). Here, each of the Bureau's claims is untimely, at least in part.

TILA: Count V alleges a claim under TILA, which must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). TILA's limitations period applies to an action by the Bureau to enforce that statute. *See ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 922-23; *accord Consol. Bank, N.A. v. U.S. Dep't of Treasury*, 118 F.3d 1461, 1467 (11th Cir. 1997) (applying one-year limitations period against the Office of Comptroller of Currency); *Citizens State Bank v. FDIC*, 751 F.2d 209, 218 (8th Cir. 1994) (applying one-year limitations period against the Federal Deposit Insurance Corporation). The Complaint alleges that Snap violated TILA from January 2017 through March 2020. Compl. ¶ 103. Even accounting for the time periods subject to the parties' tolling agreements,[16] the Bureau's TILA claim expired on or about April 21, 2022. Therefore, the TILA claim is untimely.

EFTA: An EFTA claim (Count III) must be filed "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). The Bureau alleges that Snap has violated EFTA "[s]ince at least January 2017," Compl. ¶ 122, but the Complaint was not filed until July 19, 2023. Therefore, the EFTA claim is barred as to any alleged conduct before July 19, 2022.

CFPA: The statute of limitations also bars in part the Bureau's CFPA claims. The CFPA provides that "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The Bureau has not pled the date it discovered any alleged CFPA violation, and so has not raised a plausible inference that

[16] The parties agreed to toll the statutes of limitations for any CFPA and TILA claim for one year, twenty-one days, and the limitations period for any FCRA claim for ten months, twenty-one days. The parties did not agree to toll the limitations period for any EFTA claim.

the statute began to accrue within the three years immediately preceding the filing of this Complaint. *See, e.g.*, *Salt Lake City Corp. v. Sekisui SPR Ams., LLC*, No. 2:17-cv-01095, 2018 WL 4688356, at *11 (D. Utah Sept. 28, 2018) (unpublished) (to invoke the discovery rule, a plaintiff must "plead the time and manner of the discovery of the cause of action, as well as facts showing the inability to discover the action sooner through the exercise of reasonable diligence"). Because the Complaint was filed on July 19, 2023, and taking the tolling period into account, *see* note 16, *supra*, any CFPA claim is untimely as to alleged conduct occurring before June 29, 2019.

FCRA: The FCRA claim is also untimely in part. A FCRA claim must be brought "not later than the earlier of . . . 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or . . . 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. The Bureau has not pled the date it allegedly discovered any FCRA violation, *see, e.g.*, *Salt Lake City Corp., LLC*, 2018 WL 4688356, at *11, so it is impossible to tell which limitations period applies. Even if the 5-year limitations period applied, and taking the tolling period into account, any FCRA claim based on conduct before August 29, 2017 is untimely.

## V. Snap Second Look LLC, Snap U.S. Holdings LLC, And Snap Finance Holdings LLC Should Be Dismissed From The Case Because The Complaint Does Not Allege Any Conduct By Those Defendants.

The Bureau filed this lawsuit against five separate and distinct corporate entities: Snap Finance LLC, Snap RTO LLC, Snap Second Look LLC, Snap U.S. Holdings LLC, and Snap Finance Holdings LLC. Compl. ¶¶ 17-21. But despite pleading that the "Snap Defendants" have collectively engaged in tortious conduct, the Complaint lacks any factual allegations of conduct specific to any Defendant, other than Snap Finance LLC and Snap RTO LLC. The Court should

dismiss the claims against the other Defendants for this additional reason.

The Complaint is an inconsistent mishmash of allegations that reference the "Snap Defendants" and "Snap Finance" interchangeably. For example, the Complaint sometimes alleges that the "Snap Defendants" used misleading advertisements (Compl. p. 7), but other times alleges that "Snap Finance used print advertisements" that were misleading (*id.* ¶ 109). The same is true as to the "Merchant Portal," which is sometimes attributed to the "Snap Defendants" (*id.* p. 8), and other times attributed to "Snap Finance" (*id.* ¶ 33).

The Complaint offers no discernable basis for its differing characterizations of the alleged conduct. Instead, the Bureau resorts to impermissible group pleading precisely because it cannot plausibly allege that any Defendant other than Snap Finance LLC, which services the lease agreements, and Snap RTO LLC, which issues and holds the agreements, engaged in any relevant conduct. The Complaint alleges no conduct by the two holding company Defendants—Snap U.S. Holdings and Snap Finance Holdings, *see* Compl. ¶¶ 20-21—and it is black-letter law that a holding company is not liable for the actions of its subsidiaries, *see, e.g.*, *Myers v. Dr. Phil Org.*, No. 14-cv-007, 2015 WL 476073, at *3 (D. Utah Feb. 5, 2015) (unpublished). Nor does the Complaint allege that Snap Second Look engaged in any tortious conduct or conduct that is subject to the Bureau's jurisdiction. *See* Compl. ¶¶ 18-19. The Bureau cannot paper over these pleading deficiencies by making allegations against all five "Snap Defendants" collectively. *See, e.g.*, *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2018) (rejecting "group pleading" because "the complaint's use of . . . the collective term 'Defendants'" made it "impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed").

The Complaint tries to justify its "group pleading" by asserting that the "Snap Defendants"

are members of a "common enterprise," Compl. ¶ 22, but these allegations fail on both the law and the alleged facts. As to the law, "common-enterprise" liability simply does not apply to the types of claims alleged in the Complaint. *See, e.g.*, *Commonwealth of Penn. v. Think Finance, Inc.*, No. 14-cv-7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) (unpublished) (holding that common-enterprise doctrine "should not be superimposed on a claim under the [CFPA]"). And even if it were available, common-enterprise liability only exists when individuals "transact business through a maze of interrelated companies," *FTC v. LoanPointe, LLC*, No. 2:10-cv-225, 2011 WL 4348304, at *10 (D. Utah. Sept. 16, 2011) (unpublished), and do so to "use[] corporate structures to circumvent legal prohibitions." *State v. Real Estate Law Center, P.C.*, 430 F. Supp. 3d 761, 865 (D.N.M. Dec. 31, 2019); *see also Think Finance, Inc.*, 2016 WL 183289, at *26 (common-enterprise liability is a "court-created exception to general common-law principles and operates to 'prevent individuals and companies from using corporate structures to circumvent the [Federal Trade Commission Act]'"). Nothing like that is alleged here.

In addition, the Complaint fails to raise a plausible inference that the "Snap Defendants" operated as a "common enterprise" under the relevant factors: whether the companies "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *FTC v. Nudge, LLC*, No. 19-cv-867, 2022 WL 2132695, at *48 (D. Utah June 14, 2022) (unpublished). The Complaint's allegations boil down to assertions that Defendants shared a business address and corporate officers (Compl. ¶ 22), but these allegations fall short of plausibly pleading the existence of a common enterprise, particularly in the absence of allegations that any common enterprise was used to abuse the corporate form and avoid liability (as opposed to establish a commonplace holding/operating

company structure).

To start, although the Complaint alleges that Defendants have, in the past, shared corporate officers, those allegations are limited to before "December 2020." *See, e.g.*, Compl. ¶¶ 122, 140, 145, 154. And if sharing corporate officers and a business address were sufficient to disregard the legal principles of corporate separateness, common-enterprise liability would frequently attach to corporate relationships, despite being an "exception" to "general common law principles." *Think Finance, Inc.*, 2016 WL 183289, at *26. The Complaint also lacks any plausible allegations that Defendants "commingle[d] funds" or "share[d] advertising and marketing." *Nudge, LLC*, 2022 WL 2132695, at *48. The Complaint alleges that "[t]he Snap Defendants financial statements and balance sheets are all issued on a consolidated basis," Compl. ¶ 22, but that does not raise a plausible inference that the companies "*commingle[d]* funds," *Nudge, LLC*, 2022 WL 2132695, at *48 (emphasis added), or otherwise ignored principles of corporate separateness. Further, although alleging that Defendants "operate[d] through Snap Finance's website and branding," Compl. ¶ 22, the Complaint makes no mention of "share[d] advertise[ments or] marketing," *Nudge, LLC*, 2022 WL 2132695, at *48, undertaken on behalf of all Defendants. Nor is it alleged—or plausible—that holding companies would engage in advertising or marketing. Compl. ¶¶ 17-21.

Moreover, the Bureau does not allege that Snap Finance LLC, Snap RTO LLC, and their holding companies "transact business through a maze of interrelated companies," let alone to "circumvent legal prohibitions." Instead, the Bureau attempts to plead that the everyday relationship between operating companies and their holding companies constitutes a *per se* common enterprise. This would undermine the "general presumption [] that a subsidiary corporation is legally separate from its parent," as well as the rule that "absent highly unusual circumstances, the corporate entity

will not be disregarded." *FTC v. Sears, Roebuck & Co.*, No. 81-A-503, 1986 U.S. Dist. LEXIS 27383, at *3 (D. Colo. Mar. 31, 1986) (unpublished). The Bureau has thus failed to raise a plausible inference that the Defendants operated as a common enterprise, and Snap U.S. Holdings, Snap Finance Holdings, and Snap Second Look should all be dismissed for this independent reason.

## CONCLUSION

The Court should dismiss the Complaint with prejudice or, alternatively, stay further proceedings pending the Supreme Court's decision in *CFPB v. Community Financial Services Association of America, Ltd.*, No. 22-448.

Dated: September 18, 2023

Respectfully submitted,

/s/ *Nathan R. Marigoni*
James Kim (*pro hac vice* pending)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2023, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ *Nathan R. Marigoni*
Nathan R. Marigoni