ERIC MOTHANDER
NOAH STEIMEL
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
202-435-7321
charles.mothander@cfpb.gov
noah.steimel@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff*,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC,<br><br>*Defendants*. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY**<br><br>Case No. 2:23-cv-00462-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STANDARD OF REVIEW ..... 3

ARGUMENT ..... 3

I. Snap is a "Covered Person" under the CFPA ..... 3

A. Snap's Version of "Lease-Purchase" and "Rental-Purchase" Financing Meets the CFPA's Definition of "Credit" ..... 4

B. Snap is also a "Covered Person" subject to the CFPA under Two Additional Bases ..... 10

II. Snap's Agreements are "Credit" and "Credit Sales" under TILA and Regulation Z ..... 12

A. Snap's Agreements Were Not Terminable at Any Time ..... 13

B. Consumers Agreed to Pay a Sum of Substantially Equivalent to, or in Excess of, the total Value of Their Lease Merchandise or Service ..... 16

C. Consumers Become (or Have the Option to Become), for No Additional Consideration, the Owner of the Financed Property upon Compliance with Snap's Agreement ..... 19

III. Snap's Agreements Meet the Definition of Credit in EFTA and Regulation E ..... 20

IV. Counts I and II of the Bureau's Complaint Plausibly Allege Violations of the CFPA ..... 21

A. The Complaint Plausibly Alleges that Snap's "100 Day Cash Payoff" Advertisement was Misleading ..... 21

B. The Complaint Plausibly Alleges that Snap Materially Interfered with Consumers' Ability to Understand the Terms and Conditions of its Agreements ..... 24

V. None of the Bureau's Claims are Untimely in Any Part ..... 26

VI. The Complaint Sufficiently Pleads a Common Enterprise Among the Defendants ..... 28

VII. Snap's Objection to the Bureau's Statutory Method of Funding is Without Merit and Should Not Delay this Public Enforcement Action ..... 31

CONCLUSION ..... 34

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. 3

*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) ................................................................ 28

*Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr.*,
490 F.3d 718 (9th Cir. 2007) .................................................................. 34

*CFPB v. Carnes*,
2023 WL 6143307 (D. Kan. Sept. 20, 2023) ........................................... 34

*CFPB v. CashCall, Inc.*,
2023 WL 2009938 (C.D. Cal. Feb. 10, 2023) .......................................... 32

*CFPB v. CashCall, Inc.*,
No. 23-5229 (9th Cir. June 15, 2023) ..................................................... 34

*CFPB v. Center for Excellence in Higher Education*,
2022 WL 4182301 (D. Utah Sept. 13, 2022) ........................................... 32

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) ............................................................ 26

*CFPB v. Commonwealth Equity Grp., LLC*,
No. 1:20-cv-10991 (D. Mass. Dec. 15, 2022) .......................................... 34

*CFPB v. Consumer Advoc. Ctr., Inc.*,
2023 WL 5162392 (C.D. Cal. July 7, 2023) ............................................ 32

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ........................................................... 21, 23

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) ...................................................... 26

*CFPB v. Law Offices of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) .............................................................. 31, 32

*CFPB v. Navient Corp.*,
523 F. Supp. 3d 681 (M.D. Pa. 2021) .......... 27

*CFPB v. NDG Fin. Corp.*,
No. 15-CV-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......... 28, 29, 30

*CFPB v. Nesheiwat*,
No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022) .......... 27

*CFPB v. Ocwen Fin. Corp.*,
No. 17-80495, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) .......... 26, 28, 29, 30

*CFPB v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018) .......... 4

*CFPB v. TCF Nat'l Bank*,
No. CV 17-166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017) .......... 24

*CFPB v. Think Fin., LLC*,
No. CV-17-127, 2018 WL 3707911 (D. Mont. Aug. 3, 2018).......... 28, 29

*CFPB v. TransUnion*,
2023 WL 3605995 (N.D. Ill. Apr. 13, 2023) .......... 34

*CFPB v. TransUnion*,
641 F. Supp. 3d 474 (N.D. Ill. 2022) .......... 32

*CFPB v. Universal Debt & Payment Sols., LLC*,
No. 1:15-CV-0859, 2019 WL 1295004 (N.D. Ga. Mar. 21, 2019).......... 29, 30

*CFTC v. Chilcott Portfolio Mgmt., Inc.*,
713 F.2d 1477 (10th Cir. 1983).......... 33

*Community Financial Services Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) .......... 32, 33

*County of Santa Fe v. Pub. Serv. Co. of New Mexico*,
311 F.3d 1031 (10th Cir. 2002) .......... 22

*Dorton v. Kmart Corp.*,
229 F. Supp. 3d 612 (E.D. Mich. 2017) .......... 5, 6

*Erickson v. Pardus*,
551 U.S. 89 (2007) .......... 3

*Fernandez v. Clean House, LLC*,
883 F.3d 1296 (10th Cir. 2018) .......... 28

*FTC v. Crescent Publ'g Grp., Inc.*,
129 F. Supp. 2d 311 (S.D.N.Y. 2001) .......... 23

*FTC v. LoanPointe, LLC*,
525 Fed. App'x 696 (10th Cir. 2013) .......... 21

*FTC v. LoanPointe, LLC*,
No. 2:10-cv-225, 2011 WL 4348304 (D. Utah Sept. 16, 2011) .......... 28, 31

*FTC v. Nat'l Urological Grp.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) .......... 30

*FTC v. Nudge, LLC*,
No. 2:19-cv-867, 2022 WL 2132695 (D. Utah June 14, 2022) .......... 23, 30

*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) .......... 25

*FTC v. Zurixx, LLC*,
No. 2:19CV713, 2020 WL 6898341 (D. Utah Nov. 24, 2020) .......... 30, 31

*In re Ajax Integrated, LLC*,
554 B.R. 568 (Bankr. N.D.N.Y. 2016) .......... 8, 9

*In re Grubbs Const. Co.*,
319 B.R. 698 (Bankr. M.D. Fla. 2005) .......... 9

*In re Hanley*,
135 B.R. 311 (Bankr. C.D. Ill. 1990) .......... 14, 15, 17

*In re Harris*,
562 B.R. 403 (Bankr. W.D. Mo. 2016) .......... 15

*In re Integrity Advance, LLC*,
No. 2015-CFPB-0029, slip op. (Jan. 24, 2020) .......... 26

*In re Johnson*,
203 B.R. 498 (S.D. Bankr. 1996) .......... 14, 17

*In re Martin*,
64 B.R. 1 (Bankr. S.D. Ga. 1984) .......... 15

*In re Phoenix Equipment Co.*,
No. 2:08-bk-13108-SSC, 2009 WL 3188684 (Bankr. D. Ariz. Sept. 30, 2009) .......... 8

*In re Roberts*,
620 B.R. 336 (Bankr. D.N.M. 2020) .......... 8, 9

*In re WorldCom, Inc.*,
339 B.R. 56 (Bankr. S.D.N.Y. 2006) .......... 9, 10

*Integrity Advance, LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022) .......... 26

*Kurimski v. Shell Oil*,
570 F. Supp. 3d 1228 (S.D. Fla. 2021) .......... 21

*Lemay v. Stroman's, Inc.*,
510 F. Supp. 921 (E.D. Ark. 1981) .......... 17

*Liberty Leasing v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998) .......... 5, 7

*Mobley v. McCormick,*
40 F.3d 337 (10th Cir. 1994) .......... 5

*OPM v. Richmond*,
496 U.S. 414, 424 (1990) .......... 31

*Ortiz v. Rental Management*,
65 F.3d 335 (3d Cir. 1995) .......... 14, 17

*P.F. Collier & Son Corp. v. FTC*,
427 F.2d 261 (6th Cir. 1970) .......... 29

*Pennsylvania v. Think Finance*,
No. 14-CV-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) .......... 29

*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) .......... 32

*Philibotte v. Nisource Corp. Servs. Co.*,
793 F.3d 159 (1st Cir. 2015) .......... 18

*Philibotte v. Nisource Corp. Servs. Co.*,
No. 14-cv-11300, 2014 WL6968441 (D. Mass. Dec. 9, 2014) .......... 17, 19

*Remco Enterprises, Inc. v. Houston*,
677 P.2d 567 (1984) .......... 14, 20

*SEC v. Lauer*,
52 F.3d 667 (7th Cir. 1995) .......... 11

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) .......... 32

*Silva v. Rent-A-Center*,
912 N.E.2d 945 (Mass. 2009) .......... 18

*TFG-Illinois, L.P. v. United Maint. Co.*,
829 F. Supp. 2d 1097 (D. Utah 2011) .......... 7

*United States v. Bruce*,
950 F.3d 173 (3d Cir. 2020) .......... 33

*United States v. Hill*,
197 F.3d 436 (10th Cir. 1999) .......... 4

**Federal Statutes**

1 Stat. 232 (1792) .......... 32

12 U.S.C. § 5481(15)(A)(i) .......... 3

12 U.S.C. § 16 .......... 32

12 U.S.C. § 1815(d) .......... 32

12 U.S.C. § 5481(15)(A)(ii) .......... 10, 11

12 U.S.C. § 5481(6) .......... 3

12 U.S.C. § 5481(6)(A) .......... 12

12 U.S.C. § 5481(7) .......... *passim*

12 U.S.C. § 5497 .......... 31

12 U.S.C. § 5531 .......... 33

12 U.S.C. § 5531(a) .......... 11

12 U.S.C. § 5531(c) .......... 11

12 U.S.C. § 5531(d) .......... 33

12 U.S.C. § 5564(g)(1) .......... 26, 28

12 U.S.C. § 5481(5) .......... 3

12 U.S.C. § 1820(e) .......... 32

12 U.S.C. § 5536(a) .......... 33

12 U.S.C. § 243 .......... 32

15 U.S.C. § 1602(f) .......... 12

15 U.S.C. § 1602(h) .......... 13

15 U.S.C. § 1607(a)(6) .......... 26

15 U.S.C. § 1607(b) .......... 26

15 U.S.C. § 1638 .......... 12

15 U.S.C. § 1640(e) .......... 26

15 U.S.C. § 1681p .......... 27

15 U.S.C. § 1681s(d) .......... 28

15 U.S.C. § 1693m(g) .......... 27

15 U.S.C. § 1693*o*(a)(5) .......... 27

31 U.S.C. § 1304(a) .......... 32

**Other Authorities**

Taskforce on Federal Consumer Financial Law Report (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf. .......... 6

Brief for Appellee, *Ortiz v. Rental Management*, 65 F.3d 335 (No. 95-5035), 1995 WL 17162917 .......... 17

Brief of Defendant Appellees Rent-A-Center, et al., *Silva v. Rent-A-Center*, No. SJC-10393, 912 N.E.2d 945 (Mass. May 4, 2009), 2009 WL 1542089 .......... 18

Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 80 Fed. Reg. 37496 (June 30, 2015) .......... 10

Def.'s Mem. in Supp. of Mot. to Dismiss, *Philibotte v. Nisource Corp. Servs. Co.*, No. 3:14-cv-11300-KPN (D. Mass. May 1, 2014) (Dkt. No. 19) .......... 17

FTC Bureau of Economics, *Survey of Rent-to-Own Customers* 1 (April 2000), https://www.ftc.gov/sites/default/files/documents/reports/survey-rent-own-customers/renttoownr.pdf ........ 17

Objection to Confirmation of Debtor's Chapter 13 Plan, *In re Harris*, No. 15-43667-abf13 (W.D. Mo. Feb. 11, 2016) (Dkt. No. 23) ........ 16

UCC § 1-201(b)(35) ........ 8

UCC § 1–203 ........ 8

U.S. Const. Art. I, § 8, cl. 12 ........ 32

**Rules**

Fed. R. Civ. P. 8(a)(2) ........ 3

**Regulations**

12 C.F.R. § 1005.2(f) ........ 20

12 C.F.R. § 1026.18 ........ 12, 13

12 C.F.R. § 1026.2(a)(16) ........ 13, 17, 20

12 C.F.R. § 1026.17 ........ 12

## INTRODUCTION

The Consumer Financial Protection Bureau (Bureau) filed this action to hold the Snap Defendants (collectively, Snap or Defendants) accountable for violations of Federal consumer financial law, and to remedy the consumer harm wrought by Defendants' business practices. Since at least 2017, Snap has offered and provided to consumers—primarily those with limited access to traditional forms of credit—financing for merchandise and services through contracts styled as "lease-purchase" or "rental-purchase" agreements (Agreements). But unlike conventional "leases" or "rent-to-own" arrangements, Snap's Agreements require consumers to enroll in a default 12-month payment schedule with terms that automatically and repeatedly renew absent affirmative steps by the consumer, and impose significant restrictions on their ability to terminate future payment obligations. These restrictions affect consumers that fall behind on payments most acutely—Snap's Agreements include a provision that prevented past-due consumers from terminating entirely, effectively locking them into the default payment schedule that amounts to more than double the cash price of the financed merchandise or services.

The Bureau is charged with enforcing its statute, the Consumer Financial Protection Act of 2010 (CFPA), when covered entities engage in prohibited conduct in connection with offering or providing a consumer financial product or service, which includes the extension of credit. As alleged in the Complaint, at each step of the consumer experience, Snap engaged in deceptive and abusive acts and practices in violation of the CFPA. Snap advertised its financing in a way that misled its customers, and designed and implemented an application and contracting process that interfered with consumers' ability to understand the costly terms of its Agreements. Then, while

servicing its Agreements, Snap misrepresented consumers' rights and payment obligations. The Bureau also alleges that Snap violated the Truth in Lending Act (TILA) and the Electronic Fund Transfer Act (EFTA) in connection with its Agreements, and the Fair Credit Reporting Act (FCRA) in connection with its servicing practices.

To avoid liability, Snap argues in its Motion to Dismiss (Motion) (Dkt. No. 31) that the Bureau lacks statutory authority in this matter under the CFPA, TILA, and EFTA.[1] But the Bureau's allegations clearly demonstrate that Snap's Agreements constitute credit under these statutes. Snap designed its Agreements to include 60-day "terms" that renew automatically, such that consumers continue to incur obligations under their 12-month payment period regardless of whether they make scheduled payments, and a requirement that consumers make all regular and past-due payments as a precondition for terminating their future payment obligations, which consumers could only attempt to do at the end of a recurring 60-day term. Compl. ¶ 103. These provisions result in Snap's Agreements meeting the definitions of "credit" in the CFPA, TILA, and EFTA, as well as the definition of "credit sale" in TILA. *Id.* ¶¶ 88, 105, 123.

Contrary to the sweeping claims in Snap's Motion, nothing about this action represents a "sea change" in consumer financial regulation. Rather, this action applies existing law to the distinctive features in Snap's Agreements, as well as to Snap's advertising, contracting, and servicing practices that violate Federal law and harm consumers. The arguments Snap makes in its Motion, which rely on cases addressing contracts markedly different from its own Agreements, are insufficient to dismiss this

---

[1] Snap's Motion does not address, or otherwise appear to contest, the Bureau's jurisdiction in this matter under FCRA, or the allegations the Bureau raises in Count IX of its Complaint, except with respect to timeliness.

suit. Snap's Constitutional challenge similarly lacks merit and is not a basis to delay this matter. Snap's Motion should be denied in full.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure require that the Bureau provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Snap's Motion must be denied if the Bureau has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In reviewing the Bureau's Complaint, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Complaint is sufficient if it "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 93 (internal quotation marks omitted).

## ARGUMENT

### I. Snap is a "Covered Person" under the CFPA.

The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). As alleged in the Bureau's Complaint, Snap offered and provided a consumer financial product or service by "extending credit" through their Agreements. 12 U.S.C. §§ 5481(5), (15)(A)(i); Compl. ¶ 88. And as further alleged, Snap is also subject to the Bureau's jurisdiction as a "covered person" under two additional bases—by extending "the functional equivalent of purchase finance arrangements," Compl. ¶ 89, and by "offering" credit by leading

consumers to reasonably believe they were financing the purchase of property or services for which they were deferring payment, *id.* ¶ 90.

### A. Snap's Version of "Lease-Purchase" and "Rental-Purchase" Financing Meets the CFPA's Definition of "Credit."

"Credit" under the CFPA is defined broadly as "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7). The CFPA does not define the term "debt." When a word is not defined by statute, courts typically construe it in accord with its ordinary or natural meaning. *See United States v. Hill*, 197 F.3d 436, 444 (10th Cir. 1999) (using Black's Law Dictionary). One court that examined the scope of 12 U.S.C. § 5481(7) adopted the Black's Law Dictionary definition of "debt," a "specific sum of money due by agreement or otherwise." *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 762 (S.D.N.Y. 2018), *amended*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *vacated on other grounds and remanded*, 828 F. App'x 68 (2d Cir. 2020), *and aff'd in part, rev'd in part and remanded*, 828 F. App'x 68 (2d Cir. 2020). Consumers' obligations to Snap, under its Agreements' terms, meet this definition.

When consumers enter Snap's Agreements, Snap sets a 12-month schedule of automatic debits amounting to more than twice the value of the financed merchandise or services. Compl. ¶¶ 40, 43. Much like other forms of financing, consumers may pay off their purchase before the end of the 12-month payment period, though that purchase always amounts to more than the cash price. *Id.* ¶ 45. But the Agreement's "term" (and corresponding payment obligations) continues to "automatically and repeatedly" renew across the 12-month payment period, unless and until consumers manage to terminate

their Agreement. *Id.* ¶ 41. And if consumers fall behind on payments and cannot afford to catch up, they are, by the Agreement's terms, prevented from terminating and thus locked into their full 12-month payment schedule. *Id.* ¶¶ 47, 48.

Under these terms, Snap's Agreements create a debt consumers owe to Snap, which is deferred for the default 12-month duration of Snap's Agreement. *Id.* ¶ 88. Moreover, because the 12-month payment schedule amounts to more than double the value of the financed goods or services, consumers, in fact, purchase the property or services and defer their payment over that period. *Id.* Thus, Snap's Agreements allow consumers to "incur debt and defer its payment" and also to "purchase property or services and defer payment for such purchase" under the CFPA's definition. *See* 12 U.S.C. § 5481(7).[2]

In its Motion, Snap cites two cases interpreting ECOA's definition of "credit," which closely resembles the CFPA's definition, for the proposition that a contract is a lease, and not "credit," if there is a "contemporaneous exchange" of payments for the possession of goods. *See* Mot. at 11–12 (discussing *Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612 (E.D. Mich. 2017) and *Liberty Leasing v. Machamer*, 6 F. Supp. 2d 714 (S.D. Ohio 1998)).[3] Under Snap's Agreements, if a consumer cannot afford to keep making

---

[2] In its Motion, Snap represents that, since 2020, its Agreements have permitted consumers to terminate at any time regardless of their payment status. *See* Mot at 2 n.3. To be clear, the Bureau alleges that Snap revised the termination provision in its Agreements in only *four* states in 2020. Compl. ¶ 49. In any case, competing allegations outside the four corners of the Complaint are not appropriate for this stage. *See, e.g.*, *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.").

[3] Snap also attaches to its Motion an excerpt of a January 2021 report on Bureau letterhead titled "Taskforce on Federal Consumer Financial Law Report." That report, however, is a report of an advisory committee convened to advise the Bureau, not a report of the Bureau itself. Moreover, Snap omits the first page of that document, which

payments, the Agreement's 60-day term continues to "automatically and repeatedly" renew, leaving consumers in possession of the merchandise and accruing further payment obligations, despite not making additional payments. Moreover, if consumers who cannot afford to make past-due payments wish to stop accruing further payment obligations by surrendering possession of the merchandise, Snap's Agreement prevents them from doing so, even at the close of a 60-day term. This is not the "contemporaneous exchange" of payments for possession.

Indeed, the disconnect between payments and possession under Snap's Agreements is in stark contrast with the contracts at issue in *Dorton* and *Liberty Leasing*. In *Dorton*, upon quoting an advertisement for the leasing program at issue ("You'll make additional minimal payments that allow you to keep your items for the time period of your choice"), the court explained that if a customer "does nothing except make the minimum payments on the lease, he must eventually return the product to Defendants." 229 F. Supp. 3d at 624–25. Under Snap's Agreement, if a consumer made their scheduled payments for the first 60 days but then stopped, their Agreement still renews for another "term," they incur further payment obligations, and they are barred from surrendering the merchandise to Snap and terminating their Agreement if they cannot catch up.

---

explains that the report was produced in violation of the Federal Advisory Committee Act and that readers should not assume that the report provides "sound advice." 1 Taskforce on Federal Consumer Financial Law Report at i (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf. In any case, none of the general statements in the excerpt Snap filed bear on the specific allegations in the Bureau's Complaint, or the distinctive features of Snap's Agreements.

In *Liberty Leasing*, the court analyzed a commercial lease under which, upon the lessees' default, the lessor had the right to lease the equipment to another party to mitigate damages, thus relieving the original lessees from the entire obligation of the lease. 6 F. Supp. 2d at 717. In such circumstances, the lessee would only owe payments under the lease for the time they possessed the equipment. For this reason, the court concluded the lessees would not have "necessarily incurred a debt for which payment was deferred[.]" *Id.*

The *Liberty Leasing* scenario is strikingly different from Snap's Agreements. As alleged, Snap's Agreements did not permit past-due consumers to simply surrender and owe Snap only for the time they retained possession. *See* Compl. ¶¶ 47, 48. As a result, the remedial scenario described by *Liberty Leasing* is impossible; a past-due consumer would be unable to surrender possession to Snap in the first place. Instead, Snap's Agreements required those consumers to retain possession of merchandise while their payment obligations continued to accrue.

The Uniform Commercial Code (UCC) (as adopted by many states), which courts use to distinguish "leases" from "security interests," provides further support for the Bureau's position that Snap's Agreements constitute "credit" under the CFPA. *See, e.g.*, *Liberty Leasing*, 6 F. Supp. 2d at 717 ("The Court's holding and conclusion is buttressed not only by the terms of the lease agreements, but also by the provisions of the Uniform Commercial Code ('UCC') governing commercial lease transactions[.]"); *TFG-Illinois, L.P. v. United Maint. Co.*, 829 F. Supp. 2d 1097, 1122 (D. Utah 2011) ("Utah Code Ann. § 70A–1a–203 [tracking the UCC's § 1–203] sets forth guidelines for distinguishing

between a lease and a security interest.").[4] Under the UCC, whether a transaction in the form of a lease creates a lease or security interest "is determined by the facts of each case," § 1–203(a), and the relevant provision provides four tests for when contracts "not subject to termination" create security interests, *see* § 1–203(b). *See In re Phoenix Equipment Co.*, No. 2:08-bk-13108-SSC, 2009 WL 3188684, at *7 (Bankr. D. Ariz. Sept. 30, 2009) (unpublished) ("If the lease is not terminable by the lessee and one or more of the enumerated conditions [in § 1–203(b)] is present, then the contract is a *per se* security agreement, and the court's analysis may conclude.").

As alleged, Snap's Agreements: (1) are "not subject to termination" whenever customers cannot afford to make all regular and past-due payments, Compl. ¶¶ 47, 48; (2) feature terms that "automatically and repeatedly" renew regardless of payment across the 12-month payment period, *id.* ¶ 41; and (3) confer ownership through no additional consideration upon full compliance with the Agreement, *id.* ¶ 103. Thus, Snap's Agreements meet the UCC's "bright line" test for a security interest. *See* § 1–203(b).

A "contextual analysis that examines the facts and circumstances of the case" also supports finding that Snap's Agreements are "credit" under the CFPA. *See In re Ajax Integrated, LLC*, 554 B.R. 568, 578 (Bankr. N.D.N.Y. 2016). *See also In re Roberts*, 620 B.R. 336, 342 (Bankr. D.N.M. 2020) ("If the 'one factor' test [under § 1–203(b)] is rejected, then the court must consider all the facts of the case to determine whether the

---

[4] If a purported lease creates a security interest, it creates "an interest in personal property . . . which secures payment . . . of an obligation," UCC § 1-201(b)(35), and thus the purported lessee has "defer[red] payment of a debt, incur[red] debt and defer[red] its payment, or purchase[d] property or services and defer[red] payment for such purchase," 12 U.S.C. § 5481(7).

'economic realities' of the agreement indicate a lease or a security agreement."). Here, "[t]he touchstone of the economic realities test is whether the lessor retains an economically significant reversionary interest." *In re Roberts*, 620 B.R. at 342 (internal quotation marks omitted). If not, then a lessor "can be said to have had no interest in the 'economic value or remaining useful life of the goods,' and, therefore, transferred title . . . 'in substance if not in form.'" *In re Ajax Integrated, LLC*, 554 B.R. at 582 (quoting *In re WorldCom, Inc.*, 339 B.R. 56, 72 (Bankr. S.D.N.Y. 2006)).

Snap demonstrated no interest in owning the goods it financed through its Agreements. *See, e.g.*, Compl. ¶ 59 ("The truth is we don't want their used merchandise. We want the money they committed to paying back."). As alleged, Snap has never repossessed merchandise, *id.* ¶ 75, and instructed its employees that direct returns (surrenders) to Snap were prohibited or otherwise a "last resort," *id.* ¶¶ 57, 58 ("They [consumers] committed to this purchase and should be held accountable."). Snap requires consumers seeking to return their merchandise to attempt their return directly with the merchant where the transaction occurred, and informs consumers that Snap is "bound" by that merchant's return policy. *Id.* ¶¶ 62, 65. Otherwise, Snap seeks to enter a new settlement agreement with consumers, under which consumers make additional payments to Snap and continue to retain the merchandise. *Id.* ¶ 69. Further, under its Agreements, Snap warns consumers they may face tax liabilities and renounces all obligations relating to repairs or maintenance. *Id.* ¶¶ 52, 53. *See also In re Grubbs Const. Co.*, 319 B.R. 698, 720 (Bankr. M.D. Fla. 2005) (facts supporting conclusion that transactions are security agreements include "[lessee] is responsible for the payment of all taxes associated with the leased property" and "[lessee] is responsible for all repairs and maintenance[.]"). Finally, consumers commonly use Snap's Agreements to finance

auto repairs, *see* Compl. ¶ 67, which includes services that cannot be physically returned to Snap, as well as items that are impractical or difficult for a consumer to surrender to Snap, such as tires, *see id*. *See also In re WorldCom, Inc.*, 339 B.R. at 74 ("the practical inability of the lessee to return the leased goods due to the cost and difficulty of removal is evidence that a security interest was created.").

In sum, Snap's Agreements cause consumers to incur a debt that finances the purchase of merchandise and services. Under these Agreements, consumers agree, at the time of contracting, to 12 months of scheduled payments along with significant restrictions on termination. Absent affirmative steps by consumers to alter their default schedule or terminate (if that option is even available), the Agreements dictate that consumers owe Snap payments at recurring intervals over the 12-month period until consumers have satisfied their obligations for the merchandise or services. Case law addressing the meaning of "contemporaneous exchange," as well as the factors used by courts to distinguish leases from security interests under the UCC, demonstrate the true substance of these transactions. For these reasons, Snap's Agreements meet the CFPA's definition of "credit" under 12 U.S.C. § 5481(7).

### B. Snap is also a "Covered Person" subject to the CFPA under Two Additional Bases.

In the alternative, Snap qualifies as a "covered person" because it extends purported leases of personal property "that are the functional equivalent of purchase finance arrangements." 12 U.S.C. § 5481(15)(A)(ii). Snap's financing is "non-operating" because Snap is not "engaged in operating, servicing, maintaining, or repairing the leased property[.]" *See* Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or

Service, 80 Fed. Reg. 37496, 37499 (June 30, 2015). The remaining requirement for purported leases of personal property to qualify as a "financial product or service" for purposes of 12 U.S.C. § 5481(15)(A)(ii) is that the "initial term" be at least 90 days.

Since 2017, as alleged, nearly all of Snap's Agreements list a 60-day term. *See* Compl. ¶ 46. But the Agreement's provisions locked past-due consumers into their default 12 months of payment obligations. As alleged, consumers are permitted to surrender merchandise and terminate their future payment obligations only if they are current on payments at the end of a term; otherwise, they must wait an additional 60 days, while making all regular and any past-due payments, before their next opportunity. *Id.* ¶ 103. In such cases, the term in Snap's Agreements is, in fact, 12 months, and Snap is subject to the Bureau's jurisdiction under 12 U.S.C. § 5481(15)(A)(ii) as well.[5]

Finally, an act or practice violates the CFPA if it is committed "in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). In the securities context, it is well-established that "it is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security)." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995). In such analogous circumstances, the *Lauer* court observed that "[a] central purpose of the securities laws is to protect investors . . . against misrepresentations[.]" *Id.* The CFPA similarly protects against unfair, deceptive, or abusiveness acts or practices. 12 U.S.C. § 5531(a). Under the

---

[5] In its Motion, Snap contends that "the Bureau does not actually allege that past-due consumers had an 'inability' to terminate their leases, such that the terms were 'in reality' longer than 60 days." Mot. at 17. In fact, that is what the Bureau alleges. *See* Compl. ¶ 89; *see also* ¶¶ 47, 48, 60.

CFPA, if Snap merely *offered* credit, it would still be a covered person. *See* 12 U.S.C. § 5481(6)(A).

Snap advertised its financing in merchant storefronts using the prominent phrase "100 Day Cash Payoff" without any further explanation of its Agreements. *See* Compl. ¶ 26. Snap then tasked its merchant partners to explain its Agreements as part of the Merchant Portal application and contracting process, and failed to provide them with written training materials. *Id.* ¶ 37. Through this process, during which consumers received an inadequate or misleading explanation of its Agreements, and in some cases did not sign an Agreement at all, Snap led consumers to reasonably believe they were financing the purchase of property or services for which they were deferring payment. *Id.* ¶¶ 36, 38, 90. Snap is subject to the CFPA under this additional basis as well.

## II. Snap's Agreements are "Credit" and "Credit Sales" under TILA and Regulation Z.

For the same reasons discussed above regarding the CFPA, Snap's Agreements also meet the definition of "credit" in TILA. *See* 15 U.S.C. § 1602(f) ("the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment"); Compl. ¶¶ 103, 105. And as alleged in the Bureau's Complaint, Snap meets the definitions of "creditor" and "seller." *See id.* ¶¶ 99, 101. As a creditor, Snap's Agreements were subject to TILA and Regulation Z's disclosure requirements for closed-end credit transactions, which it failed to provide. *See* 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18; Compl. ¶¶ 132, 134.

In addition, and as discussed below, the Bureau has sufficiently alleged that Snap's Agreements constitute a "credit sale" under Regulation Z, whose definition includes leases "(unless terminable without penalty at any time by the consumer) under

which the consumer: (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16); Compl. ¶¶ 103, 105.[6]

**A. Snap's Agreements Were Not Terminable at Any Time.**

The Bureau's Complaint plainly alleges Snap's Agreements *prevented* consumers who had fallen behind on their payments from surrendering their merchandise in order to terminate their future payment obligations. *See, e.g.*, Compl. ¶¶ 47, 48, 103. The Complaint further alleges that Snap's Agreements only permitted surrenders, for those consumers who were not past-due and thus able to terminate, at the conclusion of an automatically renewing 60-day term throughout the entire course of the Agreement's 12-month payment period. *Id.* ¶ 103. For these reasons, Snap's Agreements were not terminable "at any time."[7]

Snap leads with the argument that various aspects of its Agreements are not a "penalty." *See* Mot. at 18–19. But the Bureau does not allege that Snap charged

[6] TILA and Regulation Z define "credit sale" as "a sale in which the seller is a creditor." 15 U.S.C. § 1602(h); 12 C.F.R. § 1026.2(a)(16). *See* Compl. ¶ 100. Transactions that qualify as "credit sales" require additional disclosures under TILA. *See* 12 C.F.R. § 1026.18(j).

[7] To illustrate further: A consumer might finance tires for her car using Snap's Agreement, with biweekly payments automatically scheduled at the time of contracting to continue across the default 12-month payment period. If the consumer decides that she can no longer afford her payments 70 days into her Agreement, she is still required, under the Agreement's provisions, to continue paying on a biweekly basis for 50 more days before having the opportunity to surrender those tires to Snap at the close of the term. But if she falls behind on payments during those 50 days, she no longer has the opportunity to surrender in order to terminate the Agreement, and her payment obligations continue to accrue under her default payment schedule.

consumers a "penalty" upon termination as a basis for its jurisdiction. *See* Compl. ¶ 103. Nor is such an allegation necessary. Since Snap's Agreements were not terminable "at any time," whether or not aspects of its Agreements constitute a "penalty" is irrelevant.

The cases Snap cites (chiefly about the meaning of a "penalty" under TILA) highlight the extent to which Snap's Agreements are an outlier in their restrictions on termination. For example, the court in *Remco* addressed a contract with a one-week rental period that could be terminated at the end of each week. *Remco Enterprises, Inc. v. Houston*, 677 P.2d 567, 570 (1984). Similarly, the agreement in *Hanley* allowed renters to terminate at any time after an initial rental period of either one or two weeks. *In re Hanley*, 135 B.R. 311, 313 (Bankr. C.D. Ill. 1990).

As for *Ortiz v. Rental Management*, the agreement had *no* initial lease period, and provided that Ortiz could cancel at any time and return the furniture. 65 F.3d 335, 341 (3d Cir. 1995) ("[T]he facts as Ortiz presents them show that if she wanted to terminate the lease, she only had to return the furniture."). Finally, though the agreement in *Johnson* had a longer initial term than that in *Remco* and *Hanley*, the court held that the lessee was permitted to "cancel the lease without penalty *at any time* following the initial three month period[.]" *In re Johnson*, 203 B.R. 498, 500 (S.D. Bankr. 1996) (emphasis added). None of the contracts at issue restricted termination by (1) requiring that consumers wait until the end of an automatically recurring term throughout the entirety of the Agreement and, notably, (2) preventing past-due consumers from terminating entirely. Snap's Agreements feature both restrictions.

Snap also cites *Hanley*, along with two additional bankruptcy cases (*Martin* and *Harris*), in support of its statement that "courts have repeatedly held that lease agreements are 'terminable without penalty at any time,' even if the consumer must pay

past-due amounts before terminating." Mot. at 19. In fact, the contracts in these bankruptcy cases merely clarify that when lessees terminate a rental agreement, they still owe lessors for their time in possession. The contracts did not require consumers to bring their account current through the end of a term as a *precondition* for surrendering their merchandise in order to avoid incurring *future* payment obligations, as do Snap's Agreements. *See* Compl. ¶¶ 47, 48.

For example, the *Hanley* court explained that the contract at issue "provides the renters the right to terminate the rental relationship at any time by returning the goods," and that, upon termination, renters "are obligated . . . for the amount of rent attributable to their actual possession of the goods." 135 B.R. at 313. Likewise, the agreement in *Martin* gave the lessees "the option to terminate the contract at any time by return of the freezer . . . together with all rental payments due through the date of return." *In re Martin*, 64 B.R. 1 (Bankr. S.D. Ga. 1984). Lastly, in *Harris*, the court explained that the renter could terminate the Agreement at any time after the first four months, with no penalty, because "[a]ll she has to do is return the Bedroom Furniture (or arrange for [the lessor] to pick it up) and pay any unpaid rent up to that point." *In re Harris*, 562 B.R. 403, 407 (Bankr. W.D. Mo. 2016). While the consumers in those cases would still owe past-due charges for their time in possession, the contracts did not condition consumers' ability to terminate, and to prevent future charges, on the payment of these past-due charges.[8]

---

[8] As the creditor in *Harris* confirmed: "The plain language of the Agreement provides that the Debtor can stop making payments and 'walk away' from the Bedroom Furniture and the Agreement with no further obligation at any time after the first four months. While the Agreement states that Debtor would remain liable for any <u>unpaid</u> rental payments (and sales tax), the Debtor is not liable for any future payments on the Bedroom Furniture itself. Simply put, there is no language in the Agreement that

In contrast, under Snap's Agreements, consumers could not owe Snap for payments following termination, because past-due consumers would have been prohibited from surrendering their merchandise and terminating their Agreement in the first place. *See, e.g.*, Compl. ¶¶ 47–48, 59–60. In sum, the contracts these three courts interpreted did not require consumers to make all regular and past due payments as a precondition for surrendering their merchandise to avoid incurring future payment obligations. Instead, they confirm the commonplace principle that, upon termination, renters still owe payments for time the merchandise was in their possession.

### B. Consumers Agreed to Pay a Sum Substantially Equivalent to, or in Excess of, the Total Value of Their Leased Merchandise or Service.

The Bureau's Complaint alleges facts sufficient to conclude that consumers "agree" to pay a sum in excess of the total value of the financed merchandise and service. Compl. ¶¶ 103, 105. While Snap's Agreements use the phrase "term" to describe the 60-day periods during which no consumer can surrender their merchandise, those terms "automatically and repeatedly" renew regardless of whether a consumer makes their next scheduled payment, and continue to do so across the Agreement's 12-month payment period. *See* Compl. ¶¶ 41, 103.[9] Further, Snap's Agreements prevent consumers who cannot afford to make regular or past-due payments from surrendering their merchandise and terminating their future payment obligations, even at the end of a term. *See id.* ¶¶ 47, 48, 103. Thus, if consumers are ever unable to afford to make a

---

requires the Debtor to continue to making payments if she decides to surrender the Bedroom Furniture." Objection to Confirmation of Debtor's Chapter 13 Plan at 8, *In re Harris*, No. 15-43667-abf13 (W.D. Mo. Feb. 11, 2016) (Dkt. No. 23).

[9] The Agreement's early payment options also require payment of a sum substantially equivalent to the total value of financed merchandise and services. Compl. ¶¶ 45, 111, 112.

scheduled payment, they are, under Snap's Agreements, required to continue to incur obligations under their default 12-month payment schedule. *Id.* ¶ 1.[10] As a result, consumers who enter Snap's Agreements "agree" to pay a sum substantially equivalent to the total value of the financed merchandise. *See* 12 C.F.R. 1026.2(a)(16)(i).

Here, again, Snap's Motion seeks support from cases interpreting fundamentally different contracts from its Agreement. Snap cites *Philibotte v. Nisource Corp. Servs. Co.* for the premise that "courts may only look to the initial term of the lease and may not look to the possibility that the lease will be renewed multiple times." No. 14-cv-11300, 2014 WL 6968441, at *4 (D. Mass. Dec. 9, 2014) (unpublished), *aff'd*, 793 F.3d 159 (1st Cir. 2015). Because the plaintiff in *Philibotte* alleged the $204 she owed for the initial term was not "substantially equivalent to or in excess of the value of" the water heater she leased, the court held this definitional prong had not been met. *Id.*[11]

---

[10] This arrangement is contrary to leases in cases that Snap cites throughout its Motion, where consumers agree to subsequent lease terms by paying for them. *See, e.g.*, *Hanley*, 135 B.R. at 313 ("The renter exercises the renewal option by making an additional rental payment to Royce."); Brief for Appellee at 4, *Ortiz*, 65 F.3d 335 (No. 95-5035), 1995 WL 17162917, at *4 ("At the end of the week, two weeks or month, you have the option to either keep the property for another week, two weeks or month and pay another rental fee, or return the property and the lease is over."); *Johnson*, 203 B.R. at 501 ("The Agreement . . . [is] renewable with each payment after the initial period."); *Lemay v. Stroman's, Inc.*, 510 F. Supp. 921, 923 (E.D. Ark. 1981) ("Thereafter [the first week's payment], if [plaintiff] chose to keep the television for another week, he could pay the rent. Otherwise, the defendant would pick up the television from the plaintiff's residence, for a $5.00 charge."). *See also* FTC Bureau of Economics, *Survey of Rent-to-Own Customers* 1 (April 2000), https://www.ftc.gov/sites/default/files/documents/reports/survey-rent-own-customers/renttoownr.pdf ("At the end of each [weekly or monthly] period, the consumer can continue to rent *by paying for an additional period*, or can return the merchandise." (emphasis added)).

[11] The agreement in *Philibotte* was of an entirely different nature than the Agreements in this case, where ownership confers upon completion of the default 12-month payment period for no additional consideration. Compl. ¶ 103; *cf.* Def.'s Mem. in Supp. of Mot. to Dismiss at 8, No. 3:14-cv-11300-KPN (D. Mass. May 1, 2014) (Dkt. No. 19) ("Unlike a rent-to-own transaction in which a lessee can obtain automatic ownership of the good

The *Philibotte* district court relied on a state court decision (*Silva v. Rent-A-Center*, 912 N.E.2d 945 (Mass. 2009)), which Snap also quotes in its Motion. *See* Mot. at 22. On appeal, the First Circuit found that the *Philibotte* plaintiff's claim "plainly fail[ed] to meet the first prong" of the "credit sale" definition (plaintiff "only contract[ed] to pay $204, a sum concededly less than half the 'value of the property . . . involved'"), but declined to decide whether *Silva*, which analyzed a state retail installment sales and services statute, controlled the construction of that state's TILA statute. *Philibotte v. Nisource Corp. Servs. Co.*, 793 F.3d 159, 166–67 (1st Cir. 2015).

Neither the agreements in *Philibotte*, nor *Silva*, nor any other case Snap cites, conditioned the ability of consumers to surrender their merchandise in order to terminate their *future* payment obligations on remaining current through the end of a recurring term. In *Silva*, though the court explained that consumers may "terminate the lease by returning the rental property and paying all rental payments and other charges due through the date of return," 454 Mass. at 670–71, this, again, does not mean that the contract required paying all past-due charges as a precondition for termination. Indeed, the plaintiff in *Silva* could "terminate the rental at any time *by simply not making an advance payment renewing the agreement*." Brief of Defendant Appellees Rent-A-Center, et al. at 2, No. SJC-10393, 912 N.E.2d 945 (Mass. May 4, 2009), 2009 WL 1542089, at *2 (emphasis added). In *Philibotte*, the plaintiff could terminate her lease even before the end of the original term by making all payments due through that

---

by renting it for a specified period of time, the only way for Ms. Philibotte to obtain ownership of the water heater under the terms of the Lease Agreement is by exercising the purchase option provided for in Section 6[.]").

period; otherwise, after the initial term, she could terminate on 30 days written notice. 2014 WL 6968441, at *2.

Because Snap's Agreements prevented past-due consumers from terminating their future payment obligations, they cannot be reduced to an initial term. Should the plaintiff in *Philibotte* have fallen behind on her scheduled payments upon the close of the original term, she would not have been contractually obligated to incur another term of financial obligations. But this is exactly what Snap's customers agreed to, at the time of contracting. Under Snap's Agreements, if customers cannot afford to make one or more scheduled payments, they cannot surrender the merchandise and terminate the Agreement when they reach the end of a term. Compl. ¶¶ 47, 48. Should customers fall behind, they continue to incur charges under their default 12-month payment schedule, which typically amounts to more than double the cash price of the financed merchandise. *Id.* ¶¶ 41, 44. The Bureau's Complaint thus sufficiently alleges facts meeting this requirement for "credit sales" under TILA and Regulation Z. *Id.* ¶ 103.

### C. Consumers Become (or Have the Option to Become), for No Additional Consideration, the Owner of the Financed Property upon Compliance with Snap's Agreement.

Under Snap's Agreements, consumers assume ownership upon completing all scheduled payments across the 12-month agreement without paying any additional consideration (or upon taking advantage of any of Snap's early payment discount options). Snap apparently does not dispute that it schedules, at the time of contracting, a consumer's automatic payments to continue for 12 months, *see* Compl. ¶ 40, and upon completing those scheduled payments ownership confers to the consumer for no additional consideration, *see* Compl. ¶ 103. Thus, at a minimum, consumers agree to *the option* to become, for no additional consideration, the owner of the financed

merchandise at the completion of the Agreement's 12-month payment term. By this straightforward measure, Snap's Agreements meet the requirement described in 12 C.F.R. § 1026.2(a)(16)(ii). *See, e.g.*, *Remco*, 677 P.2d at 570 ("Plaintiff does not contest that defendant had the option to become the owner of the TV set for no additional consideration upon her compliance with her contractual obligations.").

Snap ignores this option in arguing that its Agreements do not meet the requirements in 12 C.F.R. § 1026.2(a)(16)(ii). Instead, Snap relies on the same argument it makes regarding 12 C.F.R. § 1026.2(a)(16)(i)—that consumers only "agree" to an initial 60-day term. *See* Mot. at 23. But Snap's Agreements require consumers to agree to something fundamentally different than one 60-day term, due to the Agreement's automatically renewing terms and restrictions on termination.[12] In any case, this argument is distinct from the fact that consumers have the "option" to become owners of their financed property for no additional consideration upon full compliance with their Agreement, as contemplated by 12 U.S.C. § 1026.2(a)(16)(ii).

## III. Snap's Agreements Meet the Definition of Credit in EFTA and Regulation E.

EFTA and Regulation E prohibit any person from conditioning an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfer (EFT). Regulation E defines credit as "the right granted by a financial institution to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor," which is nearly identical the definition of credit under CFPA. 12 C.F.R. § 1005.2(f). Because Snap's Agreements meet

[12] Accordingly, Snap repeatedly represented to consumers—both at the time of contracting and throughout servicing—that its Agreements are 12-month (rather than renewable, 60-day) contracts. *See* Compl. ¶ 104.

the CFPA's definition of "credit" under 12 U.S.C. § 5481(7), its Agreements also meet the definition found in EFTA and Regulation E. And, as alleged in the Bureau's Complaint, Snap violated EFTA and Regulation E by conditioning the extension of credit on consumers' agreement to repayment by means of preauthorized electronic fund transfers. *See* Compl. ¶¶ 121–124.

## IV. Counts I and II of the Bureau's Complaint Plausibly Allege Violations of the CFPA.

### A. The Complaint Plausibly Alleges that Snap's "100 Day Cash Payoff" Advertisement was Misleading.

Under the CFPA, an "act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (internal quotation marks omitted); *see also FTC v. LoanPointe, LLC*, 525 Fed. App'x 696, 700 (10th Cir. 2013) (applying the FTC Act).

Snap contends that "[n]o reasonable consumer would have been misled into believing that their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." Mot. at 25 (internal quotation marks omitted). In support, Snap argues "the most the phrase '100 Day Cash Payoff' communicated to a reasonable consumer was that Snap was offering them the option of acquiring ownership of the merchandise by paying off their lease, with cash, in 100 days." *Id.* Snap also cites to *Kurimski v. Shell Oil*, from the Southern District of Florida, where the court found advertising claims relating to "split pricing" permissible under state law would likely not be deceptive to a reasonable consumer. 570 F. Supp. 3d 1228, 1244–45 (S.D. Fla. 2021) (finding plaintiff's expectations "not plausible").

The Complaint sets forth detailed factual allegations describing how Snap's "100 Day Cash Payoff" advertisements were likely to mislead—and indeed did mislead—reasonable consumers concerning the nature of Snap's financing arrangement. Snap provided its merchant partners its "100 Day Cash Payoff" advertisement, which had no other description or explanation of its Agreements, to display in their stores, *see* Compl. ¶ 26, and it was thus viewable to consumers who applied for Snap's financing while at a merchant's storefront, *see id.* ¶¶ 32, 40.[13] The Bureau alleges in Count I that consumers were required to take affirmative action to change their default payment schedule and take advantage of Snap's 100-day early payment discount option, which "is always more than the 'cash' price of the merchandise or service being financed[.]" *Id.* ¶ 111. The Bureau further alleges that "[c]onsumers who received the Snap Defendants' financing reasonably believed they had entered into a 100-day financing agreement, where their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." *Id.* ¶ 113. Finally, the Bureau alleges Snap's "use of the prominent phrase '100 Day Cash Payoff' in its advertisements was material and likely to mislead consumers acting reasonably under the circumstances as to the nature of the Snap Defendants' Purchase Agreements." *Id.* ¶ 114.

Snap argues that any misconception drawn from its advertisements would have been dispelled long before the 100-day deadline, whether based on the customer's

[13] Here, in debating the merits of the Bureau's claim, Snap offers competing narratives such as consumers who saw Snap's advertising "had already chosen to lease merchandise from Snap," or that Snap was offering the option of "paying off their lease[] with cash[.]" *See* Mot. at 24–25. But these assertions conflict with the Bureau's allegations. *See, e.g.*, Compl. ¶¶ 109, 112. For the purpose of this motion to dismiss, the allegations of the Complaint control. *See County of Santa Fe v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1035 (10th Cir. 2002).

subsequent payment experience or disclosures in Snap's agreements. Again, Snap attempts to contest the factual allegations of the Bureau's complaint at the motion to dismiss stage. In any event, "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance." *Gordon*, 819 F.3d at 1194. Further, a customer's subsequent payment history or "the number or proportion of Snap's consumers who elected the 100-day option" (Mot. at 26) are not relevant at this stage given the plausibility of the Bureau's allegations. Finally, Snap appears to question the materiality of its own advertisements. *See* Mot. at 27. "A representation [is] material if it [is] likely to affect a consumer's decision to buy a product or service." *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *12 (D. Utah June 14, 2022) (unpublished) (internal quotation marks omitted). As alleged, the prominent representation at issue appeared on advertisements that Snap provided to its merchant partners to display in their stores for potential applicants to view, and relates to the costs and terms associated with Snap's financing. *See* Compl. ¶¶ 24–26. Such representations have long been held to be material. *See, e.g.*, *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is [considered] material.").

The Bureau has stated a plausible claim for relief that Snap's "100 Day Cash Payoff" advertisements led consumers to reasonably believe they had entered into a 100-day financing agreement, whereby their automatically scheduled payments would fulfill their payment obligations to Snap by the close of the 100-day period. That is sufficient, at this stage, to allege a claim for a deceptive act or practice.

### B. The Complaint Plausibly Alleges that Snap Materially Interfered with Consumers' Ability to Understand the Terms and Conditions of its Agreements.

Snap contends that the Bureau's Count II fails to state a claim for two reasons, neither of which have merit. First, Snap contends that the Bureau failed to plausibly allege any "material interference" with a consumer's ability to understand the Agreement. Mot. at 27. In fact, the Bureau alleges that Snap's Merchant Portal application and contracting process led to merchants signing and submitting Agreements on behalf of consumers without their prior review. Compl. ¶¶ 36, 118. That Snap designed a process that led consumers to not even see or sign their Agreement is surely a plausible allegation of material interference with consumers' ability to understand that Agreement's terms. *See, e.g.*, *CFPB v. TCF Nat'l Bank*, No. CV 17-166 (RHK/DTS), 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017) (unpublished) (finding the Bureau plausibly alleged material interference, where bank's alleged conduct as part of the account-opening process was likely to confuse customers about its overdraft services, even where consumers received a federally mandated written notice explaining those services). The same is true of the Bureau's allegation that merchants were left to explain Snap's Agreements to consumers without the benefit of written guidance from Snap, *see id.* ¶¶ 37, 118, particularly given the accompanying allegation that merchants often failed to adequately explain those Agreements to consumers, or otherwise misled consumers regarding the nature of the Agreement, *see id.* ¶ 38.

The Bureau also alleges that Snap's Merchant Portal contracting process required approved consumers to pay a processing fee associated with their Agreement before receiving a complete summary of its terms, and before seeing or signing their final Agreement. *Id.* ¶¶ 39, 118. Again, this allegation—requiring approved consumers to

complete a transaction for Snap's financing before seeing their Agreement—plausibly states one way (of several alleged in the Bureau's Complaint) in which Snap's contracting process interfered with consumers' ability to understand that Agreement.

Second, Snap contends that even if the Bureau sufficiently alleged material interference, it failed to plead that Snap proximately caused it. *See* Mot. at 28. However, courts have repeatedly held that federal consumer protection statutes incorporate common-law principles of agency liability, *see FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009), and the Bureau has more than adequately alleged an agency relationship between Snap and its "merchant partners." As described in the Bureau's Complaint, these merchant partners use Snap's Merchant Portal to help consumers apply for Snap's financing and, if approved, sign Snap's Agreement. Compl. ¶¶ 24, 33. The Bureau's Complaint also alleges that Snap controls a merchant's access to its Merchant Portal, through which merchants access trainings that Snap now provides. *Id.*

Further, the Complaint alleges that it was *Snap* (rather than any third party) that "designed and implemented" the Merchant Portal application and contracting process that materially interfered with consumer's ability to understand the terms and conditions of Snap's Agreements. *See id.* ¶ 118. In other words, alleged cases of merchants signing and submitting Agreements on behalf of consumers without consumers' prior review of their Agreement were facilitated by Snap because Snap designed and implemented the Merchant Portal process. Likewise, it is Snap's requirement that consumers pay a processing fee before receiving a complete summary of the terms of Snap's Agreement, and before seeing or signing a final Agreement. *Id.* ¶¶ 39, 118. And while Snap relies on its merchant partners to explain its Agreements to consumers, it is Snap that failed to provide those merchants with written guidance for

doing so. *Id.* ¶ 37. The Bureau's Complaint plausibly states a claim for abusive acts or practices.

## V. None of the Bureau's Claims are Untimely in Any Part.

As an initial matter, Snap's Motion misstates the relevant limitations period for Bureau actions brought under TILA, EFTA, and FCRA. Bureau actions under TILA are brought through 15 U.S.C. § 1607(a)(6), rather than 15 U.S.C. § 1640(e), and are governed by the CFPA's three-year date-of-discovery limitations period found in 12 U.S.C. § 5564(g)(1). This is because section 1607 specifies that a violation of TILA "shall be deemed to be" a violation of the CFPA, *see* 15 U.S.C. § 1607(b), and violations of the CFPA are subject to a three-years-from-discovery statute of limitations, 12 U.S.C. § 5564(g)(1). *See, e.g.*, *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 49 (D.R.I. 2020); *CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *28 (S.D. Fla. Sept. 5, 2019) (unpublished*), adhered to on denial of reconsideration*, No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019). *See also In re Integrity Advance, LLC*, No. 2015-CFPB-0029, slip op. at 28 (Jan. 24, 2020) (Dkt. No. 249), https://files.consumerfinance.gov/f/documents/cfpb_2015-CFPB-0029_Document-249_2020-01.pdf.[14] While Snap cites the sole case (*CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015)) finding that the Bureau was subject to TILA's one-year statute of limitations pursuant to 15 U.S.C. § 1640(e), that holding has been consistently rejected since. *See, e.g., Citizens*, 504 F. Supp. 3d at 48 (D.R.I. 2020) ("[T]his Court

[14] The Tenth Circuit affirmed the Bureau Director's final (2021) order in this administrative matter in *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2610 (2023).

does not find the agency interpretations on which the *ITT* court relied to be persuasive.").

The Bureau's claims under EFTA and FCRA are likewise not subject to the statutes of limitations that Snap cites. Regarding EFTA, the statute of limitations provision that Snap invokes requires "any action under this section," i.e., under section 1693m, to be brought within one year of the violation, 15 U.S.C. § 1693m(g). But the Bureau does not bring claims under 15 U.S.C. § 1693m, which is the provision that Snap cites in its Motion; consumers do in private actions. The Bureau instead brings EFTA claims under section 1693*o*, which does not impose a statute of limitations, and Subtitle E of the CFPA. *See* 15 U.S.C. § 1693*o*(a)(5) (providing that compliance with EFTA "shall be enforced under . . . subtitle E of the [CFPA] by the Bureau").

Likewise, the provision of FCRA that Snap cites, 15 U.S.C. § 1681p, applies only to private plaintiffs who rely on that provision for the authority to bring suit, not the Bureau, which brings suit under a separate provision. *See generally CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at *2 (9th Cir. Dec. 27, 2022) (unpublished) (discussing date of discovery for alleged violations of FCRA, the TSR, and CFPA); *CFPB v. Navient Corp.*, 523 F. Supp. 3d 681, 696–97 (M.D. Pa. 2021), *motion to certify appeal granted*, 522 F. Supp. 3d 107 (M.D. Pa. 2021) (discussing date of discovery for alleged violations of the CFPA, FDCPA, and Regulation V of FCRA). In particular, 15 U.S.C. § 1681p authorizes "[a]n action to enforce any liability created under [FCRA]" to be brought in certain courts within specified time limits. But the Bureau does not rely on that authorization for particular actions—section 1681s, not 1681p, grants it the authorization to sue—and therefore is not subject to the time limits for those actions. And section 1681s provides that violations of FCRA "shall be deemed to be" violations of

the CFPA, and thus the CFPA's three-years-from-discovery statute of limitations applies to the Bureau's FCRA's claim. *See* 15 U.S.C. § 1681s(d).

Dismissal under Rule 12(b)(6) is only appropriate "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). The Complaint does not state when the Bureau "discovered" Snap's alleged violations. Nor was the Bureau under any obligation to plead such facts. *See Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019) ("A complaint need not anticipate any affirmative defenses that may be raised by the defendant, including the statute of limitations; it is the defendant's burden to plead[.]"). There is not yet a "factual basis" for the elements of a statute of limitations defense under 12 U.S.C. § 5564(g)(1) of the CFPA, and the dismissal of any Bureau claim here, in full or in part, is unwarranted.

## VI. The Complaint Sufficiently Pleads a Common Enterprise Among the Defendants.

The common enterprise doctrine holds that "[w]hen one or more corporate entities operate as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. LoanPointe, LLC*, No. 2:10-cv-225DAK, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011) (unpublished) (internal quotation marks omitted). Historically applied under the FTC Act, "common enterprise liability has been consistently applied to the CFPA." *Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *12. *See also CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *16 (S.D.N.Y. Dec. 2, 2016) (unpublished); *CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *7 (D. Mont. Aug. 3, 2018) (unpublished);

*CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *14 (N.D. Ga. Mar. 21, 2019) (unpublished).

Common enterprise liability reflects courts' recognition that, "where the public interest is involved . . . a strict adherence to common law principles is not required in the determination of whether a parent should be held [liable] for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *NDG Fin.*, 2016 WL 7188792, at *16 (quoting *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970)). In extending common enterprise doctrine to the CFPA, courts have noted that it serves the same public purpose as the FTC Act, as "[b]oth statutes are designed to protect the public from practices that unfairly exploit the imbalance of power between the individual consumer and the corporation ... [and] empower watchdog agencies . . . to enforce their standards through investigation and litigation." *NDG Fin.*, 2016 WL 7188792, at *16.[15]

In its Motion, Snap ignores the weight of authority on this issue and cites to *Pennsylvania v. Think Finance*, No. 14-CV-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) (unpublished), a case in which the Bureau was not a party, for the proposition that common enterprise liability does not apply to claims brought by the Bureau. Mot. at 27. Since *Pennsylvania v. Think Finance* was decided, the other courts that have examined this issue have criticized its reasoning, including the court that heard the Bureau's own case against Think Finance. *See Think Fin.*, 2018 WL 3707911, at *7. *See*

[15] Courts have applied the common enterprise doctrine to other Federal consumer financial protection statutes as well. *See, e.g.*, *Ocwen Fin. Corp.*, 2019 WL 13203853, at *12 (noting the common enterprise liability theory has been applied to claims arising under TILA and the FDCPA).

*also NDG Fin.*, 2016 WL 7188792, at *16; *Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *14 n.11.

A common enterprise exists when, "for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Nudge*, 2022 WL 2132695, at *48–49. *See also Ocwen Fin. Corp.*, 2019 WL 13203853, at *13 (citing same factors). None of these factors is dispositive, and when determining whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008); *see also FTC v. Zurixx, LLC*, No. 2:19CV713-DAK-DAO, 2020 WL 6898341, at *2 (D. Utah Nov. 24, 2020) (unpublished).

The Complaint sufficiently pleads a common enterprise among the Defendants. From late 2015 to late 2019, four out of the five officers for Snap Finance, Snap RTO, and Snap Second Look were officers for Snap Finance Holdings. Compl. ¶ 22. Those officers then created Snap U.S. Holdings, which owns 100% of the equity interests in Snap Finance and Snap RTO, and went on to hold their same position at all five of the Defendants through at least December 2020 (Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Legal Officer). *Id.*

Further, the Defendants all share the same business address, and issue financial statements and balance sheets on a consolidated basis. *Id.* The Defendants also all operate through the website and branding of Snap Finance, which services all financing agreements held by Snap RTO and Snap Second Look, and which is the only Defendant with employees. *Id.* ¶¶ 18, 19, 22. Such allegations describe an interrelated network of companies that, if proven, will be sufficient to demonstrate the existence of a common

enterprise. *See LoanPointe, LLC*, 2011 WL 4348304, at *10; *see also Zurixx*, 2020 WL 6898341, at *3 (common enterprise sufficiently pled in complaint detailing "overlapping ownership, management structure, and business purpose among [the defendants]").[16]

### VII. Snap's Objection to the Bureau's Statutory Method of Funding is Without Merit and Should Not Delay this Public Enforcement Action.

Snap also seeks to escape liability with the counterintuitive claim that Congress violated the Appropriations Clause when it passed a law appropriating money for the Bureau's operations. *See* Mot. at 7–9. That argument is wrong and does not warrant dismissal or delay to the resolution of the Bureau's well-pled claims on behalf of the public.

Supreme Court precedent refutes Snap's attack. The Court's cases hold that the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Id.* The Bureau's funding is so authorized. *See* 12 U.S.C. § 5497. It thus "does not offend the Appropriations Clause." *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 181 (2d Cir. 2023). Contrary to Snap's claim (Mot. at 6), the Bureau does not "fund itself." Rather, Congress exercised its power of the purse when it passed a law setting out how and at what level

---

[16] Snap also contends that the Complaint references "Snap Defendants" and "Snap Finance" interchangeably. *See* Mot. at 32. In support, Snap apparently cites two headings in the Bureau's Complaint, which appropriately reference the "Snap Defendants" given the common enterprise the Bureau alleges here. The Complaint provides detailed allegations regarding the roles of each Defendant within the common enterprise. *See* Compl. ¶¶ 17–21.

to fund the Bureau's operations, and Congress remains free to revisit that choice at any time to modify the Bureau's funding.

Constitutional text and long historical practice also refute Snap's suggestion (at 8) that Congress must appropriate funds "each year." The Constitution limits appropriations for the Army—but not for any other purpose—to no more than two years, Art. I, § 8, cl. 12, demonstrating that the Framers were aware of multiyear appropriations but chose not to impose a temporal limitation for non-Army appropriations. Indeed, Congress has long funded important agencies through sources other than annual spending bills. *See, e.g.*, 1 Stat. 232 (1792) (establishing Post Office and funding it through postage rates). Today, there are numerous such agencies and programs. *See, e.g.*, 12 U.S.C. § 16 (OCC); *id.* § 243 (Federal Reserve Board); *id.* §§ 1815(d), 1820(e) (FDIC); 31 U.S.C. § 1304(a) (Judgment Fund).

No surprise then that every court bar one to have ever considered Snap's claim has rejected it. *See, e.g.*, *Moroney*, 63 F.4th at 181–83; *PHH Corp. v. CFPB*, 881 F.3d 75, 95–96 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020); *CFPB v. Consumer Advoc. Ctr., Inc.*, 2023 WL 5162392, at *6–7 (C.D. Cal. July 7, 2023) (unpublished); *CFPB v. TransUnion*, 641 F. Supp. 3d 474, 482–83 (N.D. Ill. 2022); *CFPB v. Center for Excellence in Higher Education*, 2022 WL 4182301, at *6 (D. Utah Sept. 13, 2022) (unpublished); *see also CFPB v. CashCall, Inc.*, 2023 WL 2009938, at *3 (C.D. Cal. Feb. 10, 2023) (unpublished) (collecting cases).

Snap entirely ignores these cases, focusing instead on the sole decision to have gone the other way, *Community Financial Services Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ("*CFSA*"), *cert. granted*, No. 22-448 (argument held Oct. 3, 2023). But that decision recognized that it was an outlier, *id.* at 641; failed to grapple with

constitutional text and history; and sought to distinguish similarly funded agencies such as the Federal Reserve Board with the dubious assertion that the Bureau exercises more "regulatory authority," *id.* Its remedial holding—that the Bureau's method of funding rendered the challenged action itself invalid—only compounded that error, including because the court failed to address whether any portions of the funding provision it found objectionable could be severed from the rest.[17]

The Fifth Circuit's erroneous outlier ruling does not support dismissal here. Nor would that decision—and the Bureau's resulting need to seek further review of the decision in the Supreme Court—support the delay that Defendants seek (Mot. at 9) to this public enforcement action, a delay that could last until June 2024. "The right to proceed in court should not be denied except under the most extreme circumstances." *CFTC v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983). Snap's passing request for a stay, which it barely attempts to justify, does not demonstrate the "extreme circumstances" required to warrant such delay.

Moreover, and contrary to Snap's suggestion (Mot. at 9), halting this case in its tracks for the better part of a year would harm the Bureau and the public interest. It would mean more time in which Snap is not subject to the injunctive relief the Bureau

---

[17] Snap also seeks (Mot. at 9 n.6) to "preserve th[e] argument" that the Bureau's authority to file civil actions addressing unfair, deceptive, and abusive trade practices violates the non-delegation doctrine. *See* 12 U.S.C. §§ 5531, 5536(a). But Snap does not actually articulate any such argument and thus have not preserved it. And on the merits, Snap's claim is foreclosed by binding precedent, as Snap appears to recognize. *See* Mot. at 9 n.6 (hoping for "an intervening change of law"). First, "the non-delegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power." *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020). Second, the Bureau's statute defines at length what constitutes an unfair or abusive practice, *see* 12 U.S.C. § 5531(c)-(d), and the meaning of deception is well established, including in cases involving the FTC's use of its similar authority. The relevant statutory provisions thus provide more-than-sufficient intelligible principles.

seeks for the public's protection and more time consumers would have to wait for redress. And because "[d]elay inherently increases the risk that witness memories will fade and evidence will become stale," *Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr.*, 490 F.3d 718, 724 (9th Cir. 2007), a stay could make it harder for the Bureau to secure any relief. That risk is more acute here given the length of time that has already passed since Snap's violations began. *See, e.g.*, Compl. ¶¶ 2–3 (alleging that Defendants' unlawful conduct began at least seven years ago).

Snap apparently believes that the Fifth Circuit's error means the Bureau should be prevented from moving forward with enforcement actions anywhere in the country until mid-2024. Numerous courts have rejected that view in other Bureau cases. *See, e.g.*, *CFPB v. Carnes*, 2023 WL 6143307, at *13–14 (D. Kan. Sept. 20, 2023) (unpublished) (concluding that "the balance of interests does not favor a stay"); Order, *CFPB v. CashCall, Inc.*, No. 23-5229 (9th Cir. June 15, 2023) (Dkt. No. 13) (denying motion to stay appeal from enforcement action); *CFPB v. TransUnion*, 2023 WL 3605995 (N.D. Ill. Apr. 13, 2023) (unpublished) (denying motion to stay enforcement action); Order, *CFPB v. Commonwealth Equity Grp., LLC*, No. 1:20-cv-10991 (D. Mass. Dec. 15, 2022) (Dkt. No. 93) (same). The Court should do the same here.

**CONCLUSION**

For the reasons stated, Snap's Motion should be denied in full.

Dated: October 16, 2023

Respectfully submitted,

*/s/* Eric Mothander
Eric Mothander
Noah Steimel
*Enforcement Attorneys*
Consumer Financial Protection Bureau

1700 G Street, NW
Washington, DC 20552
202-435-7321
Charles.Mothander@cfpb.gov
Noah.Steimel@cfpb.gov