James Kim (admitted *pro hac vice*)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff*,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLD-INGS LLC.,<br><br>*Defendants*. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY**<br><br>**Case No. 2:23-cv-00462-JNP-JCB**<br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................ 1
ARGUMENT ........................................................ 1
I. If This Case Is Not Dismissed Outright On Constitutional Grounds, It Should Be Stayed Pending The Supreme Court's Impending Decision........................................ 1
II. Snap's LTOs Were Not Subject To The CFPA, TILA, Or EFTA................................ 2
A. Snap's LTOs Were Not "Credit" Under The CFPA, TILA, Or EFTA (Counts I-VIII, X). ........................................................ 2
B. The Complaint Fails To Allege Any Alternative Basis For Subjecting Snap's LTOs To The CFPA (Counts I-II, IV, VI-VIII, X)............. 6
C. Snap's LTOs Were Not "Credit Sales" Under TILA And Regulation Z (Counts V, VI). ........................................................ 8
III. The Complaint Fails To Plausibly Allege A CFPA Violation In Counts I and II. ..... 11
A. The Bureau Has Failed To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Materially Misleading...... 11
B. The Bureau Has Failed To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms. ...... 12
IV. All Claims Are Untimely In Whole Or In Part. ........................................................ 14
V. The Court Should Dismiss Snap Second Look LLC, Snap U.S. Holdings LLC, And Snap Finance Holdings LLC From The Case. ........................................................ 15
CONCLUSION ........................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) ........................................................................14

*CFPB v. Credit Acceptance Corp.*,
2023 WL 5013303 (S.D.N.Y. Aug. 7, 2023)..............................................................2

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ........................................................................12

*CFPB v. MoneyGram Int'l, Inc.*,
2022 WL 17547438 (S.D.N.Y. Dec. 9, 2022) ..............................................................2

*CFPB v. TCF National Bank*,
2017 WL 6211033 (D. Minn. Sept. 8, 2017)..............................................................13

*CFSA v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ........................................................................1

*Dorton v. Kmart Corp.*,
229 F. Supp. 3d 612 (E.D. Mich. 2017)..............................................................4

*Escano v. Concord Auto Protect, Inc.*,
2023 WL 4247703 (10th Cir. June 29, 2023)..............................................................14

*FTC v. Sears, Roebuck & Co.*,
U.S. Dist. LEXIS 27383 (D. Colo. Mar. 31, 1986) ..............................................................15

*In re Harris*,
562 B.R. 403 (Bankr. W.D. Mo. 2016)..............................................................9

*Liberty Leasing Co. v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998) ..............................................................3, 4

*Matter of Martin*,
64 B.R. 1 (Bankr. S.D. Ga. 1984)..............................................................8

*Philibotte v. Nisource Corp. Servs. Co.*,
2014 WL 6968441 (D. Mass. Dec. 9, 2014), *aff'd*, 793 F.3d 159 (1st Cir. 2015) ..............................................................3, 5, 6, 10

*Remco Enters., Inc. v. Houston*,
677 P.2d 567 (Kan. Ct. App. 1984) ....................8

*In re Roberts*,
620 B.R. 336 (Bankr. D.N.M. 2020) ....................5

*Salt Lake City Corp. v. Sekisui SPR Ams., LLC*,
2018 WL 4688356 (D. Utah Sept. 28, 2018)....................15

*SEC v. Lauer*,
52 F.3d 667 (7th Cir. 1995) ....................7

*Silva v. Rent-A-Center, Inc.*,
912 N.E.2d 945 (Mass. 2009)....................10

*State v. Real Estate Law Center, P.C.*,
430 F. Supp. 3d 761 (D.N.M. Dec. 31, 2019)....................15

*In re WorldCom, Inc.*,
339 B.R. 56 (Bankr. S.D.N.Y. 2006)....................5

**Statutes:**

12 U.S.C. § 5481(6)(A)....................7

12 U.S.C. § 5531(a) ....................7

12 U.S.C.§ 5536(a)(3)....................14

**Regulations:**

12 C.F.R. § 1026.2(a)(16)....................8

12 C.F.R. § 1026.2(a)(16)(i) ....................9

12 C.F.R. § 1026.2(a)(16)(ii) ....................10

**Other Authorities:**

UCC § 1-203(b) ....................5

## INTRODUCTION

The Bureau's Opposition confirms that it lacks authority to bring this enforcement action. Even if it had constitutional authority, the Bureau has alleged no plausible basis for asserting statutory authority to police Snap's legacy lease agreements under the CFPA, TILA, or EFTA.

The Opposition is most remarkable for what it does not purport to offer: a single case interpreting or applying the CFPA, TILA, or EFTA that supports subjecting Snap's legacy lease agreements to these statutory regimes. As to Snap's caselaw, the Bureau advances distinctions that are irrelevant to the application of these statutes. In fact, the Bureau's theories are predicated on ignoring the CFPA's, TILA's, and EFTA's plain terms and the terms of Snap's lease agreements. And the Bureau would have the application of federal consumer finance law turn not on a product's objective characteristics, but instead on the Bureau's subjective view of what some consumers could have "believed" despite the product's clear terms.

There is also no need for a Bureau enforcement action here. The Bureau ignores that Snap's leases are designed to comply with existing law, and have been and still are heavily regulated by state law and subject to the enforcement authority of the FTC. Mot. 2-3. Rather than attempt to bring LTOs within its own enforcement authority through rulemaking, the Bureau seeks to expand its already broad jurisdiction through litigation. Dismissal is warranted.

## ARGUMENT

### I. If This Case Is Not Dismissed Outright On Constitutional Grounds, It Should Be Stayed Pending The Supreme Court's Impending Decision.

The Bureau's funding mechanism violates the Appropriations Clause. Mot. 7-9. The Bureau dismisses *CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022), as an "outlier," but does not meaningfully address its reasoning or the authorities on which the decision is based. *See* Opp. 32.

At a minimum, a stay is warranted in light of the Supreme Court's impending decision in *CFPB v. CFSA*, No. 22-448, which is what numerous courts have done. *See CFPB v. Credit Acceptance Corp.*, 2023 WL 5013303 (S.D.N.Y. Aug. 7, 2023) (unpublished); *CFPB v. MoneyGram Int'l, Inc.*, 2022 WL 17547438 (S.D.N.Y. Dec. 9, 2022) (unpublished). The Bureau ignores Snap's showing that a stay would promote judicial efficiency. Mot. 9. Instead, it argues that a stay would be contrary to the public interest because "[i]t would mean more time in which Snap is not subject to the injunctive relief the Bureau seeks." Opp. 33-34. But the Complaint targets (alleged) legacy conduct, not continuing violations. Nor would an at-most eight-month delay increase the risk of evidence loss, as such evidence remains subject to a hold. Although some courts have declined to stay other litigation brought by the Bureau, in none of those cases was the Bureau asking a court to dramatically expand the scope of federal statutes by rejecting longstanding precedent.

## II. Snap's LTOs Were Not Subject To The CFPA, TILA, Or EFTA.

### A. Snap's LTOs Were Not "Credit" Under The CFPA, TILA, Or EFTA (Counts I-VIII, X).

The Bureau first argues that Snap's legacy leases extended credit because the lease term "continues to 'automatically and repeatedly' renew across the 12-month payment period, unless and until consumers manage to terminate their Agreement," thereby "locking" them into a 12-month payment schedule. Opp. 4-5. But the Bureau does not contest that consumers had a contractual right to "terminate their Agreement," and that doing so would end all future "payment obligations." *See* Compl. ¶ 47. It cites no authority or statutory language suggesting that consumers having to take "affirmative steps … to terminate" their future payment obligations converts a contemporaneous exchange of payment and possession (*i.e.*, a lease) into an extension of credit. Opp. 10. Nor is there any language in the CFPA, TILA, or EFTA that even hints at the notion that

leases with automatically renewing terms are "credit." Automatic renewal is a customary feature of lease terms, and if Congress wanted to regulate automatic-renewing leases under the CFPA, TILA, or EFTA, it could have (and would have) done so. Instead, it defined only a very narrow subset of leases that would be subject to these statutes, without any reference to automatic-renewing terms.

The Bureau next theorizes that because Snap's legacy agreements allegedly required consumers to pay for past usage of the merchandise to terminate their leases, consumers with past-due amounts could not terminate their leases and thus "accru[ed] further payment obligations, despite not making additional payments." Opp. 6. But even under the Bureau's allegations, all consumers, even past-due ones, could terminate their leases and all future payment obligations by bringing their account current. The Opposition suggests otherwise (in a footnote), but none of the referenced paragraphs raises a plausible inference that Snap's leases prevented consumers from terminating their agreements. *See* Opp. 11 n.5 (citing Compl. ¶¶ 47, 48, 60, 89).

Regardless, an extension of "credit" occurs only if the consumer is afforded "the right" to "defer payment of a debt, [] incur debt and defer its payment, or [] purchase property or services and defer payment for such purchase." Mot. 10. Here, as the Complaint alleges and Snap's leases make clear, consumers had no such right; instead, Snap's leases required consumers to pay for use of the merchandise for each 60-day lease period, and when a consumer defaulted on a payment obligation it triggered Snap's right to repossess the merchandise and terminate the agreement. Mot. 11-14.[1] Thus, the same "remedial scenario" described in *Liberty Leasing Co. v. Machamer*,

[1] The Bureau does not—and cannot—argue that Snap's alleged decision not to "forcibly repossess[]" merchandise somehow conferred a "right" on consumers to incur debt. *See* Mot. 14; *see also Philibotte v. Nisource Corp. Servs. Co.*, 2014 WL 6968441, at *4 (D. Mass. Dec. 9, 2014)

6 F. Supp. 2d 714 (S.D. Ohio 1998), was in fact possible here. *Cf.* Opp. 7. Although the Bureau argues that Snap's leases "allow[ed]" or "cause[d]" consumers to incur debt (*e.g.*, Opp. 5, 10), absent the "right" to do so, no credit has been extended. The Bureau cites no contrary authority, nor does it meaningfully respond to the cases establishing that Snap's leases do not extend credit.[2]

Finally, the Bureau contends that because renewing a lease for 12 months means consumers will have paid double the purchase price, "consumers, in fact, purchase the property or services … over that period." Opp. 5. But under the express terms of the lease a consumer could terminate after any lease period and acquired ownership only *after* 12 months of payments. Mot. 12 (citing Compl. ¶¶ 40-45). Under the Bureau's theory *every* LTO transaction in the industry would be an extension of "credit." It makes no attempt to defend such a sweeping theory.

Lacking any authority in support of its expansion of the CFPA, TILA, and EFTA, the Bureau resorts to arguing that Snap's leases are "security interests" under the Uniform Commercial Code. Opp. 7-9. The Bureau does not cite any authority, however, that the UCC is relevant to the meaning of "credit" under the federal CFPA, TILA, and EFTA. The one case it does cite—*Liberty Leasing*—referenced the UCC solely because "th[at] [wa]s a diversity lawsuit governed by the substantive laws of Ohio." 6 F. Supp. 2d at 717 n.2.

But even if the UCC were instructive, the UCC "tests" the Bureau references appear to

(unpublished) ("whatever [lessor's] practice or intent is with regard to the removal of the [merchandise], the contract clearly provides [lessor] with the right to possess … the [merchandise] … even though … it is generally not exercised"), *aff'd*, 793 F.3d 159 (1st Cir. 2015).

[2] The Bureau attempts to distinguish *Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612, 625 (E.D. Mich. 2017), by arguing that if the consumer there "d[id] nothing except make the minimum payments on the lease, he must eventually return the product to Defendants." Opp. 6. Here, if consumers did nothing except make their payments they would eventually own the merchandise. The Bureau does not explain why this difference matters. Nor does the Bureau (or *Dorton*) explain what would have occurred under the lease there had the consumer stopped making payments.

approximate the factors for determining the existence of a "credit sale" under TILA, and so are not present here for the same fundamental reasons. *Compare* UCC § 1-203(b), *with* Mot. 18-23 and pp. 7-10, *infra*. In any event, the Court should entirely disregard this argument and the "four tests": the Bureau does not even identify what those "tests" are, let alone proffer an analysis purporting to demonstrate that any of them are satisfied based on the allegations here.

The Bureau also argues for a "contextual analysis" that looks to "whether the lessor retains an economically significant reversionary interest." Opp. 8-9. This test, too, has no basis in the CFPA, TILA, or EFTA. Even if it did, Snap retained a "reversionary interest" in the merchandise: it had the right to repossess and re-lease the merchandise (thus terminating the lease) if a consumer defaulted (Mot. 11-12, 13), which is sufficient under the Bureau's own case law, *see In re World-Com, Inc.*, 339 B.R. 56, 71 (Bankr. S.D.N.Y. 2006) (reversionary interest where "(1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake … in the value of the goods at the end of the lease term") (citation omitted); *In re Roberts*, 620 B.R. 336, 342 (Bankr. D.N.M. 2020) ("Upon termination, [lessor] could have used the Equipment himself, re-leased it, or sold it.").[3]

The Bureau responds that Snap lacked an "interest" in the merchandise in the colloquial sense (*i.e.*, that it did not want the merchandise). Opp. 8-9. But courts have rejected that precise argument. In *Philibotte*, the lessee argued that a lease was a "disguised credit sale" because the lessor "d[id] not want the [merchandise]" and so "ha[d] no intention of retaining a reversionary interest." 2014 WL 6968441, at *1, *3. The court rejected that argument because "whatever [the

[3] That some items "are impractical or difficult for a consumer to surrender" or return, such as tires (Opp. 9-10), is irrelevant to whether the items retain a significant residual value.

lessor's] practice or intent …, the contract clearly provides [lessor] with the right to possess … the heaters at the conclusion of the lease." *Id*. at *4. The same principle applies here.

**B. The Complaint Fails To Allege Any Alternative Basis For Subjecting Snap's LTOs To The CFPA (Counts I-II, IV, VI-VIII, X).**

The Bureau's first alternative theory is that Snap's legacy leases are the "functional equivalent of [a] purchase finance arrangement." The Bureau's only argument as to the "purchase" prong is that because a consumer will have allegedly paid "more than double the value of the [] goods or services," they "in fact, purchase the property or servicers and defer their payment" over the course of 12 months. Opp. 5. Not only does this argument make no sense, it also re-writes the lease agreement, which the Bureau admits transfers ownership only after 12 months of payments, not before (*see* Compl. ¶¶ 40-45). *See* p. 4, *supra*; Mot. 16.

The Bureau's argument (Opp. 11) that Snap's leases had "'initial term[s]' [of] … at least 90 days" also re-writes its own allegations. The Bureau alleges that "Snap's Agreements list a 60-day term." Opp. 11 (citing Compl. ¶ 46). Thus, the initial term of the lease is not "at least 90 days." The Bureau asks the Court to ignore the Complaint's allegations and the actual terms of the lease, arguing that "past-due consumers" were "locked" "into their default 12 months of payment obligations." Opp. 11. But there is no authority for looking beyond the black-and-white terms of the agreement to determine the length of a specified initial term. Moreover, as discussed, past-due consumers were not "locked" into 12 months of payment obligations. The Bureau acknowledges in the Complaint that even past-due consumers could terminate their lease agreement by paying for past usage of the merchandise and surrendering or returning the merchandise. Compl. ¶¶ 47, 48. Nor does the Bureau try to square its theory that all the terms of a lease should be collapsed into one with the statute's use of the modifier "initial," which necessarily

contemplates *subsequent* lease terms that are, as here, irrelevant to the statute's application. Mot. 16. Finally, the Bureau does not dispute that it would be wholly unworkable to base the CFPA's application on the experience of one subset of consumers (those with past-due amounts) facing one specific set of circumstances (the inability to pay for past usage), rather than the terms of the lease agreements themselves. Mot. 15.

The Bureau's second alternative theory is that Snap "*offer[ed]* … consumer financial product[s] or service[s]," 12 U.S.C. § 5531(a) (emphasis added), not because its leases in fact offered financing but because it "led consumers" to believe they did. Opp. 12. But the Bureau cites no caselaw that anything other than the objective characteristics of a product or service are relevant to the Bureau's statutory authority under the CFPA. Although an entity that "offer[s]" a "consumer financial product or service" is a "covered person," what it "offer[s]" must still *be* such a product or service. 12 U.S.C. § 5481(6)(A). Snap's leases are not. *See* Mot. 10-15; pp. 2-6, *supra*.[4]

Even if the Bureau's argument had a basis in the CFPA, the Bureau has not alleged facts to support its naked assertion that "Snap led consumers to reasonably believe they were financing the purchase of property or services." Opp. 12. Nothing about the phrase "100 Day Cash Payoff" plausibly suggests a financing arrangement, and allegations that Snap "failed to provide [merchants] with written training materials" or that "in some cases [consumers] did not sign an Agreement at all" are likewise devoid of any facts raising a plausible inference that Snap somehow "led" consumers to believe they were financing the purchase of merchandise. *Cf. id.*

[4] *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995), relied on cases holding that "representations" were relevant to determining application of the securities laws based on the specific text and legislative history of those laws. The Bureau has made no such showing here.

### C. Snap's LTOs Were Not "Credit Sales" Under TILA And Regulation Z (Counts V, VI).

Snap's LTOs were not credit sales, first, because they were "terminable without penalty at any time by the consumer." 12 C.F.R. § 1026.2(a)(16); *see* Mot. 18-21. The Bureau does not contest Snap's showing that a lease that permits termination at the end of an *initial* lease term is "terminable without penalty at any time." Mot. 18-19 (collecting cases). Instead, the Bureau argues that Snap "restricted termination" by requiring consumers to "wait until the end of an automatically recurring term *throughout the entirety of the Agreement*." Opp. 14 (emphasis added). But the Bureau never explains why this matters under the statute. And if a lease that allows termination only at the end of an initial lease term is "terminable at any time," there is no logical reason why permitting termination at the end of any *subsequent* lease term (*i.e.*, allowing consumers to terminate after every lease period) would render the lease no longer terminable. *See Remco Enters., Inc. v. Houston*, 677 P.2d 567, 570 (Kan. Ct. App. 1984) (no "credit sale" under TILA where lessee was permitted to terminate "*at the end* of *any* rental period" (emphasis added)).

The Bureau argues that Snap also restricted termination by "preventing past-due consumers from terminating entirely." Opp. 1, 14. But requiring consumers to pay past-due amounts to terminate did not "lock" consumers into a 12-month payment obligation or "entirely" prevent consumers from terminating: they could pay the amounts accrued to date for their usage of the merchandise and return or surrender it. *E.g.*, Compl. ¶¶ 1, 47, 48, 140-41. There is no authority to support the Bureau's theory that requiring a consumer to pay for past use as a condition for terminating the lease renders the lease no longer terminable at will. The caselaw cited in the Motion holds the exact opposite, contrary to the Bureau's assertions. *See* Opp. 15. For example, in *Matter of Martin*, 64 B.R. 1 (Bankr. S.D. Ga. 1984), the agreement permitted the consumer to "terminate

the contract at any time by return of the [merchandise] … *together with* all rental payments due through the date of return." *Id*. at *1 (emphasis added); *see also id*. (lessee "had the right to terminate the contract by surrendering the freezer *and* paying in full" past-due amounts (emphasis added)). Similarly, in *In re Harris*, 562 B.R. 403 (Bankr. W.D. Mo. 2016), the lessee could terminate the agreement by "return[ing] the Bedroom Furniture … *and* pay[ing] any unpaid rent up to that point." *Id*. at 407. Moreover, in comparing that lease to one in another case, the *Harris* court explained that "the contract at issue provided that, *in order to terminate* before the end of the full term, the debtors were liable to pay any unpaid monthly payments due under the contract (*as is the case here*)." *Id*. at 406 (emphases added).[5]

Snap's lease agreements also did not require consumers to "[a]gree[] to pay … a sum substantially equivalent to, or in excess of, the total value of the property … involved." 12 C.F.R. § 1026.2(a)(16)(i). The Bureau's entire argument rests on its assertion that *some* past-due consumers were supposedly prevented from terminating their future payment obligations—those that could not "afford to make regular or past-due payments"—and that such consumers thereby "'agree[d]' to pay a sum substantially equivalent to the total value of the financed merchandise." Opp. 16-17. That makes no sense. Consumers did not "agree" to make 12 months of payments "at the time of contracting," because that would mean consumers "agree[d]" to *default* on their lease at the time of contracting. Opp. 19. And if consumers did somehow "agree" to make 12 months of payments "at the time of contracting," how is it possible that those consumers who paid

[5] That the lessee in *Harris* "[would] not [be] liable for any *future* payments" upon termination, as the briefing (not decision) in that case says (Opp. 15 n.8 (emphasis added)), is irrelevant to the conditions under which termination was permitted (there, and here, only if past-due amounts had been paid).

amounts accrued to date could terminate all future payment obligations? Indeed, the Bureau offers no explanation for how its theory renders Snap's leases "credit sales" where the consumer remained current on their payment obligations. The Bureau's position is illogical.[6]

Finally, the Complaint fails to allege that a consumer could "become (or ha[d] the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16)(ii). The Bureau's only argument to the contrary is its same theory that consumers agreed "at the time of contracting" to all potential 60-day lease periods. Opp. 19-20; *see* p. 9, *supra*. Not so. Consumers agreed to 60-day lease terms, and as such were required to make additional payments to acquire ownership. *See* Mot. 23 (citing Compl. ¶¶ 41, 45).

The Bureau's suggestions that consumers had the "option" to own the merchandise for no (or nominal) consideration (Opp. 19-20) does not cure the flaw in its argument because the relevant "agreement" is the same—the 60-day lease term. Thus, a consumer did not have the "option" to become the owner for no (or nominal) consideration at the end the 60-day lease term either. The only way for a consumer to acquire ownership of the merchandise was by utilizing an early buyout option (Compl. ¶ 45) or "renew[ing]" multiple times over a 12-month period (Compl. ¶ 41)—

[6] The Bureau attempts to distinguish *Philibotte*, *supra*, and *Silva v. Rent-A-Center, Inc.*, 912 N.E.2d 945 (Mass. 2009). As to *Philibotte*, the Bureau argues that lease is different from Snap's leases because there the consumer had to take affirmative action to purchase the property after the initial lease term, whereas here the terms renew automatically. Opp. 17 n.11. But the Bureau does not explain why that difference matters. The Bureau argues that the agreement in *Silva* did not require paying past-due amounts to terminate, but relies on the defendant's appellate brief (not the court's decision) that itself cites no record evidence. Notwithstanding anything the CFPB found in the case briefing, the Court was clear in its opinion: in order to terminate the lease, the consumer was required to "return the rental property *and pay all rental payments and other charges due*." 912 N.E.2d at 949, 951 (emphasis added).

both of which required additional consideration. *See* Mot. 23.

## III. The Complaint Fails To Plausibly Allege A CFPA Violation In Counts I and II.

### A. The Bureau Has Failed To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Materially Misleading.

The Bureau makes three arguments in response to Snap's showing (Mot. 25) that, based on the language and context of the advertisement, no reasonable consumer would have believed they had entered into a 100-day financing agreement. First, the Bureau argues that it was misleading because "consumers were required to take affirmative action to change their default payment schedule." Opp. 22. But as Snap showed (Mot. 25), the four-word slogan made no promise and left no impression about how a consumer could exercise the early-payment option, whether there was one or many lease options, or the default terms. The Bureau offers no contrary explanation.

Second, the Bureau repeats the Complaint's allegation that the advertisement "had no other description or explanation" of the 100-day option. Opp. 22. But the Bureau cites no authority, nor is there any, that an advertisement is deceptive unless it contains instructions about how to exercise the advertised payment option or term. Likewise, the Bureau does not argue, let alone support, that only a default payment option or term may be advertised.

Third, the Bureau also repeats the Complaint's allegation that the "100 Day Cash Payoff" option was "more than the 'cash' price of the merchandise or service." Opp. 22. But that is irrelevant because Count I alleges that consumers were misled into "believ[ing] they had entered into a 100-day financing agreement" (Compl. ¶ 113; Opp. 22), not that they were misled by the cost of the 100-day payoff option. Mot. 24.[7]

---

[7] The Bureau's allegation that consumers "reasonably believed they had entered into a 100-day financing agreement" (Compl. ¶ 113; Opp. 22), is a legal conclusion the Court should disregard.

Snap established that the circumstances surrounding and throughout the transaction render it wholly implausible that any reasonable consumer was deceived. Mot. 26. In response, the Bureau accuses Snap of "attempt[ing] to contest the factual allegations of the [] Complaint." Opp. 23. But the Bureau does not challenge either predicate of Snap's argument: (i) that the overall "net impression" of an advertisement must be evaluated within the context of the entire transaction and course of dealing (Mot. 25); and (ii) that the circumstances that render the Bureau's allegation of deception wholly implausible here, including the black-and-white language of the lease agreement and consumers' payment experiences, appear on the face of the Complaint or in documents incorporated by reference therein (Mot. 26).[8]

Although statements that "affect a consumer's decision to buy a product or service" may be material (Opp. 23), the Bureau does not allege that here. Despite suggestions to the contrary in the Opposition, the Complaint is devoid of any allegation that the phrase "100 Day Cash Payoff" induced any consumer to lease merchandise from Snap. Compl. ¶¶ 107-15. And the Bureau ignores (and so concedes) Snap's showing that the 100-day option lease was, in fact, an option available to every consumer until day 100 of their lease agreement. *See* Mot. 24-25.

### B. The Bureau Has Failed To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms.

The Bureau does not dispute that the Complaint lacks any allegation that merchants signed or submitted lease agreements without a consumer's authorization or in any way inhibited consumers from reviewing their lease agreements before execution, and that it also has failed to

---

[8] *CFPB v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016), stands for the proposition that "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims" where the deception "induces the first contact through deception." (citation omitted). Here, the Bureau does not allege inducement, so correction was unnecessary.

plead any specific inaccuracies communicated to consumers by merchants. Mot. 27-28. The Complaint's allegations stand in stark contrast to those in *CFPB v. TCF National Bank*, 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017), where the complaint alleged specific conduct by the defendant that impeded consumers from understanding their transaction, including directing employees to use a script that mischaracterized the transaction and structuring the form-signing process to hide certain specific information. Here, the Bureau has alleged nothing of the sort.

Defendants also explained in the Motion that requiring consumers to pay a processing fee could not have materially interfered with their ability to understand the terms of the lease agreement because, like an application fee, the Bureau alleges that consumers paid the fee *before* seeing and signing (and, hence, being contractually bound to) their agreements. Mot. 28. The Bureau argues that this conduct was abusive because Snap was "requiring approved consumers to complete a transaction for Snap's financing before seeing their Agreement." Opp. 24-25. The "transaction" the Bureau appears to be referencing is the "processing fee" itself, but the Bureau cites no authority that charging such a fee *before* consumers become contractually bound by their lease agreements materially interferes with their ability to understand those agreements, or that it makes any difference if consumers were "approved" for a lease when they paid the fee.

The Bureau does not contest that it must plausibly plead proximate causation to state a claim under the CFPA. Even so, the Bureau doubles-down on "but for" causation, arguing that Snap designed a process that "led to" merchants engaging in certain activity, and that "led consumers to" not understand their lease agreements. Opp. 24. But the Bureau does not respond to Snap's argument that the Complaint fails to plead that the alleged conduct of merchants was reasonably foreseeable. Mot. 29. Instead, the Bureau argues it has alleged "an agency relationship

between Snap and its 'merchant partners.'" Opp. 25. In fact, there is no such allegation in the Complaint. Agency exists only when the putative agent "act[s] on the principal's behalf and subject to the principal's control." *Escano v. Concord Auto Protect, Inc.*, 2023 WL 4247703, at *3 (10th Cir. June 29, 2023) (citation omitted). The Complaint alleges the opposite: that Snap designed and implemented a process with *too little* oversight, training, and control by Snap. Compl. ¶¶ 32-39. That merchants allegedly "use[d]" and "access[ed]" the Merchant Portal that Snap designed and administered does not raise a plausible inference that Snap controlled their behavior.[9] *See also Escano*, 2023 WL 4247703, at *3 (affirming dismissal of agency theory where "nothing in these allegations indicates [principal's] control over [agent] or [agent's] assent to such control").

### IV. All Claims Are Untimely In Whole Or In Part.

The Bureau argues that all of its claims are subject to the CFPA's three-years-from-date-of-discovery limitations period. Opp. 28. Even if that is so, the conduct alleged in the Complaint dates back to "at least seven years ago." Opp. 34. By not pleading the date of discovery, the Bureau has failed to plead plausible claims for that entire period. Although the Bureau says it is not required to anticipate an affirmative defense, because the conduct alleged occurred more than three years ago, "the complaint itself admits all the elements of the affirmative defense." *Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019). Where, as here, the limitations period "contain[s] [an] explicit discovery clause[,]" and the Complaint "includes dates indicating the action is

[9] The Bureau argues that Snap "facilitated" the alleged conduct by designing and implementing a merchant application and contracting process. Opp. 25. But this argument is merely a repackaging of its "but for" causation theory. Although liability may attach under the CFPA to a person who "knowingly or recklessly provide[s] substantial assistance to a covered person or service provider" who is violating the statute, the Bureau has not alleged that here. *See* 12 U.S.C.§ 5536(a)(3).

untimely," "the plaintiff must plead the time and manner of the discovery of the cause of action." *Salt Lake City Corp. v. Sekisui SPR Ams., LLC*, 2018 WL 4688356, at *11 (D. Utah Sept. 28, 2018) (unpublished). At a minimum, the Court should dismiss all claims based on conduct preceding July 19, 2020.

### V. The Court Should Dismiss Snap Second Look LLC, Snap U.S. Holdings LLC, And Snap Finance Holdings LLC From The Case.

The Bureau has not alleged that Snap Second Look LLC, Snap U.S. Holdings LLC, or Snap Finance Holdings LLC engaged in relevant conduct. Even if the "common enterprise" doctrine applied to claims under the CFPA, TILA, EFTA, or FCRA (and it does not, Mot. 33), the Bureau has not alleged facts that warrant applying this exception to general common-law principles of corporate liability. Mot. 34. The Bureau insists it has offered "detailed allegations regarding the roles of each Defendant within the common enterprise." Opp. 31 n.16. Not so. For example, the Complaint pleads nothing about Snap U.S. Holdings LLC or Snap Finance Holdings LLC except that they are holding companies. Compl. ¶¶ 20-21. And there are no allegations of wrongdoing by the holding companies or Snap Second Look LLC. The Bureau also ignores (and so concedes) that it has not alleged that Defendants structured their business to "circumvent legal prohibitions," *State v. Real Estate Law Center, P.C.*, 430 F. Supp. 3d 761, 865 (D.N.M. Dec. 31, 2019), or that other "highly unusual circumstances" justify the doctrine's application, *FTC v. Sears, Roebuck & Co.*, U.S. Dist. LEXIS 27383, at *3 (D. Colo. Mar. 31, 1986) (unpublished).

## CONCLUSION

The Court should dismiss the Complaint with prejudice or, alternatively, stay further proceedings pending the Supreme Court's decision in *CFSA*.

Dated: October 30, 2023

Respectfully submitted,

/s/ *Nathan R. Marigoni*
James Kim (admitted *pro hac vice*)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2023, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ *Nathan R. Marigoni*
Nathan R. Marigoni