## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>      Plaintiff,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC,<br><br>      Defendants. | **MEMORANDUM DECISION & ORDER ON DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00462-JNP-JCB<br><br>District Judge Jill N. Parrish |

Through this first-of-its-kind action, the Consumer Financial Protection Bureau ("CFPB") alleges that the Snap corporate family (collectively referred to in this order simply as "Snap") violated a suite of consumer financial protection statutes. Before the court is Snap's motion to dismiss (or, in the alternative, to stay) the complaint, ECF No. 31 ("Mot."). For the reasons set out below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Snap partners with merchants of certain consumer goods (including furniture, mattresses, car tires, and other auto parts) to offer lease-to-own agreements to consumers.[1] Snap's services are

---

[1] Snap is a corporate family made up of all of the defendants named in the caption. Snap RTO LLC issues and holds the lease agreements and Snap Finance LLC services the agreements. Snap U.S. Holdings LLC owns the equity interests in Snap Finance and Snap RTO, and Snap Finance Holdings LLC is a member of Snap U.S. Holdings. Snap Second Look LLC purchases retail installment contracts from merchants and participation interests in certain installment loans. The

directed toward consumers who are unable to pay the full price of goods up front and who lack access to credit-financing arrangements. If a consumer elects to use Snap's service, Snap purchases the consumer good, allows the consumer to possess it as Snap's agent, and executes with the consumer a lease-to-own agreement that contemplates that the consumer may eventually come to own the leased property upon fulfillment of certain terms.

For the most part, the CFPB's allegations relate to Snap's lease-to-own program as it existed between 2017 and 2020.[2] Under that legacy lease program, Snap's merchant-partners would display Snap-provided advertisements promoting the lease-to-own program and would facilitate consumers' execution of the legacy lease through Snap's "merchant portal." Snap's

---

CFPB argues that each entity is liable for the alleged consumer-protection statutory violations because the Defendants acted as a "common enterprise." Specifically, the CFPB alleges that:

[1] The Snap Defendants operate through Snap Finance's website and branding, and all share the same business address.

[2] From late 2015 to late 2019, Snap Finance Holdings directly owned 100% of Snap Finance and Snap RTO, and 88.1% of Snap Second Look. Throughout that period, four out of the five officers for Snap Finance, Snap RTO, and Snap Second Look were also officers for Snap Finance Holdings. In late 2019, those officers created Snap U.S. Holdings, which owns 100% of the equity interests in Snap Finance and Snap RTO, and the officers went on to hold their same position at all five of the Snap Defendants through at least December 2020 (Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Legal Officer).

[3] The Snap Defendants' financial statements and balance sheets are all issued on a consolidated basis. At the close of 2020, the Snap Defendants held $476 million in assets and made nearly $114 million in net income for the year.

Compl. ¶ 22.

[2] The lease agreement used during this period is referred to in this memorandum decision and order as the "legacy lease." Since 2020, Snap represents that its lease agreements operate under different terms—for example, that such leases are terminable regardless of consumers' payment status. Mot. at 2 n.3.

advertising included the prominent phrase "100-Day Cash Payoff" without any further explanation of the terms of the legacy lease. ECF No. 2 ("Compl.") ¶ 27.[3]

When a consumer executed a legacy lease agreement, Snap automatically scheduled, via Automated Clearing House ("ACH") debit payments, twelve months' worth of automatic payments, "typically amounting to more than double the cash price of the financed merchandise or service." *Id*. ¶ 27. To exercise the 100-day early payoff discount option, consumers were required to access Snap's online customer portal and schedule a new payment amount or make a balloon payment before the 100-day deadline. But the CFPB alleges that consumers commonly believed that Snap's services consisted entirely of a 100-day financing agreement, under which automatic payments would fulfill their payment obligations within 100 days.

Under the terms of the legacy lease, Snap would own the purchased property until the consumer fulfilled his or her obligations under the agreement—either by making automatic payments for twelve months or by exercising the early buyout option. At that point, ownership of the property would be transferred to the consumer. If consumers were delinquent on scheduled payments, Snap had a contractual right to repossess the property. ECF No. 32-2 ("Legacy Lease") at 3. The CFPB alleges, however, that Snap has neither repossessed nor taken any other legal action against any delinquent consumer since at least January 2017.[4]

---

[3] The CFPB alleges that the merchant-partners failed to adequately explain the nature of Snap's lease-to-own arrangement at the point of sale "or otherwise misled consumers regarding the nature of the [a]greement." Compl. ¶ 38. The CFPB also alleges that Snap collected a processing fee from consumers before the consumer had seen or signed the final agreement.

[4] The CFPB further alleges that Snap sent emails threatening repossession or legal action. The CFPB also alleges that Snap sent such emails to consumers who were current on their payments or who had yet to even receive the property they sought to possess.

Consumers were permitted to terminate the legacy lease agreement after an initial 60-day lease term, but only under limited circumstances. First, consumers had to be current on all payments, fees and charges. In other words, delinquent consumers who were unable to bring their accounts current were locked into the agreement. Second, consumers needed to return (to the merchant) or surrender (to Snap) the leased property. The CFPB alleges that Snap failed, however, to sufficiently explain to consumers their surrender rights and actively misled consumers regarding surrender. It alleges that Snap's internal policy strictly discouraged surrender, and instead encouraged "'buy-back' settlement agreement[s]." *Id.* ¶ 69. As a result of this alleged obfuscation, the CFPB alleges that Snap has allowed surrender in only 165 cases.

On the backend, the CFPB alleges that Snap furnished consumer information about millions of purchase agreements to a consumer reporting agency despite failing to fully comply with regulatory requirements for such reporting activities.

In September of 2023, the CFPB initiated this action. Through its complaint, it asserts ten causes of action relating to Snap's conduct ranging from formation of the legacy lease-to-own agreements with consumers to its reporting of consumer information to credit agencies. Namely, CFPB alleges that Snap is liable under the following statutes for the following reasons:

1. (Claim One) The Consumer Financial Protection Act ("CFPA"), pursuant to 12 U.S.C. §§ 5531(a), 5536(a)(1), for misleading consumers to believe that the advertised 100-day early payment option was the default payment plan;
2. (Claim Two) the CFPA, pursuant to 12 U.S.C. § 5531(a), 5531(d)(1), and 5536(a)(1)(B), for materially interfering with consumers' understanding of the lease-to-own agreement by relying on merchants to explain the transaction terms, employing the "merchant portal," and charging an application fee;
3. (Claim Three) the Electronic Fund Transfer Act ("EFTA"), pursuant to 15 U.S.C. § 1693k, and its implementing regulation, Regulation E, pursuant to 12 C.F.R. § 1005.10(e)(1), for conditioning consumers' repayment of the purchase price on the preauthorization of ACHs;

4

4. (Claim Four) the CFPA, for the same conduct as alleged in Count Three by operation of 12 U.S.C. §§ 5481(14), 5536(a)(1)(A) (making violations of the EFTA violations of the CFPA);

5. (Claim Five) the Truth in Lending Act ("TILA"), pursuant to 15 U.S.C. § 1638, and its implementing regulation, Regulation Z, pursuant to 12 C.F.R. §§ 1026.17, 1026.18, for failing to provide consumers with certain disclosures;

6. (Count Six) the CFPA, for the same conduct as alleged in Count Five by operation of 12 U.S.C. §§ 5481(14), 5536(a)(1)(A) (making violations of the TILA violations of the CFPA);

7. (Claim Seven) the CFPA, pursuant to 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), for misrepresenting consumers' right to terminate their payment obligations via surrender and for encouraging "buy-back settlement agreements" over surrender;

8. (Claim Eight) the CFPA, pursuant to 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), for misrepresenting consumers' payment obligations and threatening a false intent to take "further action" against consumers, including repossession of the purchased property;

9. (Claim Nine) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, and its implementing regulation, Regulation V, pursuant to 12 C.F.R. §§ 1022.42(a), 1022.42(b), for failing to establish and implement certain mandated policies regarding the accuracy of consumer information furnished to consumer reporting agencies and for failing to consider or incorporate Appendix E into its policies; and

10. (Claim Ten) the CFPA, for the same conduct as alleged in Count Nine by operation of 12 U.S.C. §§ 5481(14), 5536(a)(1)(A) (making violations of the FCRA violations of the CFPA).

Snap subsequently moved to dismiss the Complaint in its entirety. Through its motion, Snap offers several lines of defense against the CFPB's enforcement action. First, Snap argues that the CFPB's action should be set aside because that agency is unconstitutionally funded. Alternatively, it argues that the action should be stayed pending the Supreme Court's resolution of a case raising the same issue.[5] Second, Snap argues that it is not subject to the CFPA, TILA, or EFTA because its lease-to-own agreements did not extend "credit" *or*, for the purposes of the

---

[5] Since Snap filed its motion, the Supreme Court decided *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024), which decisively defeats this constitutional argument. The court therefore **DENIES** Snap's motion to dismiss on this basis. And now that the decision has been issued, Snap's motion to stay is **DENIED** as moot.

CFPA, were not the "functional equivalent" of a purchase finance arrangement *and*, for purposes of the TILA, were not "credit sales."

In the event that this court finds Snap is subject to the CFPA, and that its legacy lease constituted a credit arrangement, Snap alternatively argues that the CFPB has failed to sufficiently plead its first two claims. As a last line of defense, Snap argues that the CFPB's claims are untimely in whole or in part and that, in any case, the claims should be dismissed as against some of the defendants for failure to allege conduct by those defendants in particular.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusion and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ANALYSIS

### I.      Credit (CFPA, EFTA, TILA)

Snap argues that its legacy lease-to-own agreements did not constitute credit for the purposes of the CFPA, EFTA, and TILA. The court first reviews the relevant statutory definitions before turning to consider Snap's legacy lease program in light of those provisions.

6

### A.  Statutory Definitions

***The Consumer Financial Protection Act ("CFPA")***

In relevant part, the CFPA prohibits unfair, deceptive, or abusive acts or practices by "covered person[s]" "in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a); *see also* 12 U.S.C. § 5536(a)(1).[6] In turn, financial product or service is defined to mean, among other things,

> (i) extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions); [and]
> (ii) extending or brokering leases of personal or real property that are the functional equivalent of purchase finance arrangements, if—
> > (I) the lease is on a non-operating basis;
> > (II) the initial term of the lease is at least 90 days; and
> > (III) in the case of a lease involving real property, at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee, subject to standards prescribed by the Bureau[.]

*Id*. § 5481(c). Finally, under the CFPA, "credit" means "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).

***The Electronic Funds Transfer Act ("EFTA")***

The EFTA generally regulates the electronic transfer of funds, seeking to "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). As relevant here, the EFTA proscribes

---

[6] The statute defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service" and "any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6).

"condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers[.]" 15 U.S.C. § 1693k(a); *accord* 12 C.F.R. § 1005.10(e)(1). Regulation E, which implements EFTA, defines credit to mean "the right granted by a financial institution to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 1005.2(f).

### *The Truth in Lending Act ("TILA")*

The TILA demands that creditors disclose certain information to consumers in the course of a consumer credit transaction other than under an open end credit plan. 15 U.S.C. § 1638(a); *see also* 12 C.F.R. §§ 1026.17, 1026.18. The term "creditor" is limited by the statute's definition of "credit," which means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).

Thus, the three statutes share identical or nearly identical definitions of credit.[7] This definition of credit is shared with other statutory schemes, including the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq. See* 15 U.S.C. § 1691a(d) (defining credit to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor"). While some of the statutes at issue here have received little judicial attention, the ECOA and its definition of credit have been interpreted and considered in many more opinions. For this reason, in construing the consumer-protection statutes at issue, the court often considers judicial interpretation of the

---

[7] The court notes that the TILA's definition of credit differs from that contained in the CFPA and EFTA by omitting transactions in which consumers purchase property or services and defer payment therefor. *See* 15 U.S.C. § 1602(f). However, that difference is immaterial here.

ECOA's identical definition of credit.[8] *See Brothers v. First Leasing*, 724 F.2d 789, 796 (9th Cir. 1984) (Canby, J., dissenting) (discussing the history of the ECOA and its relationship to the TILA).

### B. Snap's Legacy Lease

Whether the CFPB has stated a claim under the CFPA, EFTA, and TILA turns on whether Snap's legacy lease-to-own agreements created "credit" under those statutes' shared definition. Thus, the court considers whether Snap's legacy lease-to-own arrangement granted consumers "the right . . . to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7); *accord* 12 C.F.R. § 1005.2(f).[9]

Snap argues that its legacy lease did not create a credit arrangement with consumers because it did not provide consumers with the right to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase. The CFPB disagrees, contending that the lease's automatic and repeated renewal over a twelve-month period, coupled with the agreement's conditioning of termination on non-delinquency, created a *de facto* credit arrangement. ECF No. 42 ("Opp'n Mem.") at 5. But the CFPB's argument proves too much. At bottom, the CFPB would have this court adopt an expansive interpretation of "credit" that has

---

[8] In so doing, the court assumes that, because Congress employed language "mirror[ing]" the ECOA, it intended these financial regulation regimes "to be treated the same." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 294 (2018) (Breyer, J., dissenting). In any case, the court is not aware of any reason that the original public meaning of the ECOA's definition of credit would differ in any way from the identical provisions in the consumer-protection statutes at issue here. *See id.* at 284 (interpreting statutory text by ascertaining its original public meaning).

[9] For the purposes of the CFPA, the court also considers the "functional equivalent" provision contained in 12 U.S.C. § 5481(15)(A)(ii) below. Similarly, the court considers another key definition of TILA—"credit sales"—separately below.

been roundly rejected by the federal courts. Although it attempts to differentiate Snap's lease arrangement from those at issue in previous decisions construing "credit," it ultimately loses sight of the statutory text and salient characteristics of the Snap legacy lease.

The first relevant episode in the saga of judicial interpretation of the common statutory definition of "credit" was the Ninth Circuit's decision in *Brothers v. First Leasing*, 724 F.2d 789 (9th Cir. 1984). In that case, the Ninth Circuit considered whether an application to lease an automobile for personal use constituted an application for credit for the purposes of the ECOA and TILA. To answer that question, that court considered the threshold question of whether the automobile lease would constitute credit under the statutory definition.

Ultimately, the panel majority held that consumer-automobile lease transactions were credit because payment of the total amount of the lease "would have been deferred, and [the applicants or lessees] would have been required to make 48 monthly installment payments." *Brothers*, 724 F.2d at 792 n.8. That is, the Ninth Circuit reasoned that the lease agreement would have given the lease applicants the right to defer payment of a debt because, in practice, payment would have been staggered. In reaching this result, the panel majority was clear that its interpretation of the statutory text was driven by its view of "the overriding national policy . . . that underlies the Act" and the statutory scheme's "strong purpose." *Id*. at 793 (citations omitted). *Brothers* does not hide that fact that it goes "beyond the literal language of the statute" because it understood that "reliance on that language would defeat the plain purpose of the statute." *Id*. (internal citations and quotations omitted).

Judge Canby dissented, arguing in measured terms that the majority was effectively re-writing the statute and commandeering the policymaking prerogative of Congress. Judge Canby noted that, under the logic posited by the majority, almost all leases would create credit

10

arrangements. *Id*. at 797 (Canby, J., dissenting). This result would be inexplicable, he explained, insofar as Congress acknowledged and created alternative legislative schemes for "credit" and "lease" transactions in the statutes at issue there. *Id*. (Canby, J., dissenting). While Judge Canby did not conduct much statutory-textual analysis of the statutory definition's qualification that credit must create a "right" to defer payment, his characterization of lease arrangements as "payments (normally in advance) for *contemporaneous use*" rather than "deferred debts," *Id*. at 798 (Canby, J., dissenting) (emphasis added), has proven influential.

The Second Circuit, in *Shaumyan v. Sidetex Co.*, 900 F.2d 16 (2nd Cir. 1990), elected to track the *Brothers* dissent's "contemporaneous" analysis. *Shaumyan* considered a home-improvement contract providing for progress payments by the homeowners. In construing the ECOA's definition of credit, the panel in *Shaumyan* zeroed in on the text's definitional requirement that credit arrangements grant a right to defer payment. *Id*. at 18. Because the contractual arrangement demanded "incremental payments as the work progressed," and because those payments were "substantially contemporaneous" with performance under the contract, the panel concluded that no right to defer payment was created. *Id*. (citations omitted). The Second Circuit expressly declined to follow the *Brothers* majority's broad and overriding construction of statutory purpose, instead hewing to the "plain language" of the statute. *Id*. And while the panel in *Shaumyan* recognized that contracts for labor or services created a line-drawing problem with regard to the deferral of debt, it reiterated that no right to defer payment is granted where a payment obligation is "substantially contemporaneous" with performance. *Id*. at 19.

The Third Circuit followed suit in *Riethman v. Berry*, 287 F.3d 274 (3rd Cir. 2002), in which it cited *Shuamyan* as persuasive in holding that legal services contracts did not constitute credit because the clients in those arrangements were not granted any right to make deferred

payments. *Id*. at 277. *Riethman* also decided that, even where a party "fail[s] to enforce their right to prompt payment," no "right to defer payments" is created. *Id*. "This position," the Third Circuit decided, would be "inconsistent with ordinary principles of contract interpretation," because the terms of the contract manifest a retained "right to prompt and full payments." *Id*. at 277-78.

The rationale of contemporaneous use fist advanced by Judge Canby in his *Brothers* dissent (and recognized in *Shaumyan*) was further developed by the Southern District of Ohio, which characterized the analysis as one in search of "contemporaneous exchange." *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717 (S.D. Ohio 1998). In determining whether the exchange of value at issue was contemporaneous, *Machamer* considered (i) the contract-at-suit's arrangement of monthly payments in exchange for month-long entitlements to quiet use and enjoyment; (ii) the fact that no obligation "to pay the total lease amount" arose "in all circumstances under the lease agreement[]"; and (iii) the remedial rights of the lessor to re-lease the property, as well as the right of the lessee to "surrender [] possession of the [property]." *Id*. at 717. The Seventh Circuit elected to follow *Machamer* as persuasive (and accordingly expressly rejected the reasoning of the *Brothers* majority) in its decision in *Laramore v. Ritchie Realty Mgmt. Co.*, 397 F.3d 544, 545 (7th Cir. 2005). *Laramore* focused, in particular, on the second factor considered in *Machamer*, that is, whether "[a] [lessee's] responsibility to pay the total amount of rent due . . . arise[s] at the moment the lease is signed," *Id*. at 547, in determining that residential leases did not constitute credit transactions under the ECOA.[10]

---

[10] This consideration is also emphasized in *Dorton v. KMart Corp.*, 229 F. Supp. 3d 612, 623 (E.D. Mich. 2017), which followed *Machamer*, *Laramore*, and *Shaumyan* to conclude that a consumer lease-to-own agreement did not create a credit arrangement because a lessee, by executing the agreement, "has no obligation whatsoever to purchase the product." *Id*. at 625.

Since *Brothers*, considerable judicial consensus has thus emerged that there is no right to deferred payment (and therefore no credit) where an exchange of value between parties is contemporaneous or substantially contemporaneous. In this analysis as applied to agreements purporting to create lease arrangements, courts have considered *when* payments are made (relative to the use or possession of property), whether an obligation to pay the total lease amount arises at the execution of the lease, and the remedial rights of the parties.

Considering these factors, Snap's legacy lease provided for substantially contemporaneous exchange of value between Snap and contracting consumers. Consumers paid for 60-day periods of possession of the leased property. Upon executing the legacy lease, consumers did not bind themselves "in all circumstances" to pay the total lease amount. *Machamer*, 6 F. Supp. 2d at 717. And, perhaps most significantly, Snap retained, at all times, the contractual right to repossess the leased property from delinquent consumers, just as consumers had a (conditional) right to surrender possession of the property.[11]

The CFPB's argument ultimately boils down to an invitation to consider the practical operation of the legacy lease as alleged rather than the formal terms of the lease agreement. The CFPB alleges that (i) delinquent consumers were not permitted to surrender the property and, (ii) Snap never exercised its right to repossess. As a result, the CFPB argues that payment was decoupled from possession—that is, in practice, consumers possessed the goods but would pay later, as under a credit arrangement.

_____

[11] Additionally, consumers did not "purchase" the property under the agreement, meaning the third prong of the "credit" definition is inapt. Although the CFPB argues that the court should look to the economic realities of the lease arrangement, that is better suited for a "functional equivalent" argument, which is considered below. And for the same reasons as in *Riethman*, this court declines to ignore the express terms of the contract. 287 F.3d at 277.

But the CFPB's argument strays too far from the statutory definition of credit. Although consumers' payment for possession of the leased property may have been practically deferred, this deferral was not by the exercise of any right of the consumer. Instead, payment was deferred because Snap declined to exercise its contractual right to repossess the property. And, as *Riethman* persuasively teaches, a lessor's election not to exercise its contractual rights does not confer on the lessee a right to defer payment.[12]

In short, Snap's practice of declining to repossess the leased property did not render the exchange of value non-contemporaneous, nor did it grant consumers the right to defer payment. Instead, it more reasonably transformed the lease agreements for the real property at issue, in at least some instances, into the functional equivalent of a purchase finance arrangement.[13] And Congress evidenced a clear intent to treat such functional equivalents differently than credit arrangements when it acknowledged this category of transactions in the CFPA, as is discussed

---

[12] Additionally, it would create perverse incentives to suggest that consumer-finance firms like Snap ought to be required, at least occasionally, to repossess consumer goods or else face regulation under these statutory schemes.

[13] Secondarily, the CFPB—borrowing from the Uniform Commercial Code's ("UCC") analysis of secured transactions—invites the court to consider the economic realities of the legacy lease arrangement to conclude that it is a disguised form of credit.

But the consumer-protection statutes at issue here, unlike the UCC, do not invite courts to consider the economic realities or functional operation of the lease agreements at issue when determining whether certain instruments create credit. Instead, credit is defined by consumers' rights to defer payment or incur debt and defer its payment. Even where, as may be the case here, payment is sometimes deferred, unless it is by the consumers' invocation of a right to do so, it simply does not create a credit arrangement.

If Congress wanted economic realities to plug into the statutory definition of credit, the court presumes that it would have said so. Instead, the CFPA covers "functional equivalent[s]" (perhaps approximating something like the economic realities test), but only under limited circumstances, as discussed below.

below. In any case, Snap's legacy lease does not meet the statutory definition of credit because it did not give consumers any right to defer the payment of debt, incur debt and defer its payment, or purchase goods or services and defer payment therefor.[14]

### C.  The CFPB's Proposed Subjective Theory (CFPA)

Alternatively, the CFPB argues that, even if the legacy lease agreements did not constitute credit, Snap should nonetheless be subject to regulation under the CFPA because consumers might have subjectively believed that they were entering into credit arrangements when they executed Snap's legacy lease. The CFPB bases its argument on the use of the term "offering" in the CFPA provision providing it enforcement jurisdiction.[15] The CFPB argues that Snap's advertising induced consumers to reasonably believe that the Snap arrangement was a credit financing plan. As a result, according to the CFPB's logic, Snap was "offering" credit. Although there are few (if any) textual clues suggesting this result, the CFPB suggests that this court should import doctrine from the securities context insofar as both the securities laws and the CFPA are designed to protect buyers against unfair, deceptive, or abusive acts. In particular, the CFPB invites this court to follow *SEC v. Lauer*, 52 F.2d 667 (7th Cir. 1995), in analogizing to *Lauer*'s conclusion that "it is the

---

[14] This is the case at least insofar as the CFPB's complaint alleges the use of Snap's legacy lease in the purchase of goods or merchandise. The issue of the financing of (one-time) services is considered separately below.

[15] "The Bureau may take any action authorized under subtitle E [12 USCS §§ 5561 et seq.] to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, *or the offering* of a consumer financial product or service." 12 U.S.C. § 5531(a) (emphasis added); *accord id*. § 5481(6)(A) (defining "covered person" to mean "any person that engages in offering or providing a consumer financial product or service[.]").

representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security)." *Id*. at 670.

But the line from *Lauer* that the CFPB cites, which it takes well out of context, does not support the CFPB's theory. In *Lauer*, the Seventh Circuit considered an appeal from the grant of a preliminary injunction sought by the Securities and Exchange Commission ("SEC") in a suit against Mr. Lauer and his company for securities fraud. The SEC had alleged that Mr. Lauer promoted the so-called "Konex Roll Program," which "purported to invest in 'Prime Bank Instruments,' a non-existent high-yield security." *Id*. at 669. In considering the appeal, the Seventh Circuit was asked to consider whether the non-existent Konex Roll Program, which was nothing but the "perilous deposit of money with a fraud," *id*. at 671, and its false promises of investment in Prime Bank Instruments, which "[did] not exist," *id*. at 670, could constitute an "investment contract" pursuant to 15 U.S.C. § 77b(a)(1). The question, then, turned not on whether the Konex Roll Program would have constituted an "investment contract" had it (and the Prime Bank Instruments) existed,[16] but instead whether their non-existence was legally determinative.

In deciding that it was the representations to potential buyers that mattered, rather than the non-existence of the advertised investments in the first place, the Seventh Circuit's rationale boiled down to the observation that "[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws." *Id*. at 670. That is, if securities laws will regulate true

---

[16] As the Seventh Circuit explains, after all, "investment contract" is essentially a catch-all term and itself undefined in 15 U.S.C. § 77b.

The Seventh Circuit never suggested that, should a buyer have misconceived some non-fraudulent offering as an "investment contract," the SEC could regulate the transaction as if it truly were an investment contract.

investment contracts, they should also regulate Ponzi schemes *purporting* to create investment contracts. It is hard to see how *Lauer*, in this context, speaks to the CFPB's argument. Even if consumers misunderstood the technical nature of the purchase arrangement they were entering into with Snap, Snap (unlike Mr. Lauer) did, in fact, do as promised.

That the CFPA covers both offering and providing suggests that *Lauer*'s logic might, in some cases, prove relevant to the CFPA, however. For example, if a person purported to offer credit, but in fact did no such thing (instead merely fraudulently inducing payment from consumers), they may well be within the CFPA's reach. However, this does not mean that consumers' expectations regarding the nature of a financial service—rather than the actual terms or operation of that service—should determine a statute's regulatory coverage. In other words, "offering" should be understood in contradistinction to "providing," not as a broad invitation to subject regulatory schemes to consumers' subjective understanding of financial arrangements. At bottom, a failure to regulate lease-to-own agreements that consumers believe to be credit would not frustrate the logic of the CFPA in the way that failing to regulate Ponzi schemes would frustrate the logic of securities laws.

In short, Snap offered (and actually provided) a financial service. That service, for the reasons discussed above, was not credit. Therefore, regardless of what consumers subjectively believed, Snap was not offering credit. And because it was not, in fact, offering credit, Snap's legacy lease-to-own agreements are not subject to the relevant provisions of the CFPA. The CFPA may be directed toward protecting consumers in a general sense, but it does so in some ways (including by setting forward a uniform definition of credit) but not others. Under no reasonable interpretation does that statute defer to consumers' subjective understanding (or misunderstanding) to define key terms or to determine the scope of the CFPB's regulatory jurisdiction.

### D.  Services (CFPA)

The CFPB, in its opposition memorandum and at oral argument, asserts that Snap's legacy lease arrangement was used in the context of financing one-time services such as auto repairs, and insists that it has properly pleaded the financing of services through Snap's lease. For example, the CFPB states, in its opposition memorandum, that "consumers commonly use Snap's Agreements to finance auto repairs . . . which includes services that cannot be physically returned to Snap." Opp'n Mem. at 9-10 (citing Compl. ¶ 67). At oral argument, the CFPB also represented that Snap's legacy lease was used to finance such services as engine repairs or auto collision repairs not attendant to any merchandise.

If this were so, the "credit" analysis above might conceivably be different.[17] Answering this question would likely require forging new doctrinal paths. And, what's worse, the court would be asked to do so without argument by the parties about the statutes' application to one-time services or any specific pleading in the complaint regarding what the services-financing arrangement looked like in practice. In short, it would demand that this court speculate about what sorts of services might be at issue or how the transaction would occur, primarily on the basis of brief statements by the CFPB at oral argument.

But the court need not decide at this juncture how the credit calculus ought to be applied to payment for services because such payment is inadequately pleaded in the complaint. Although

---

[17] It is somewhat difficult to imagine how an exchange of value for a (one-time) service could be contemporaneous or substantially contemporaneous if stretched out over the course of twelve months. Additionally, because services can neither be surrendered nor possessed, the significance of the parties' remedial rights in the arrangement is very different from lease arrangements for possession of property. *See Shaumyan*, 900 F.2d at 18-19 (discussing *Ketchum v. City of Buffalo*, 14 N.Y. 356, 364 (1856) ("[E]very contract for labor, not paid for in advance, is necessarily a contract upon credit, because the labor, when once performed, cannot be recalled.")).

the CFPB argues that it pleaded the use of Snap's legacy leases "to finance auto repairs," Opp'n Mem. at 9-10, the complaint alleges no such thing. *See* Compl. ¶ 67. Instead, that paragraph of the complaint simply alleges that Snap representatives "inform[ed] consumers" that "certain types of financed *merchandise*, such as mattresses, tires, and *other auto parts* or services[,] cannot be surrendered, and thus consumers are required to continue making payments." Compl. ¶ 67 (emphasis added). Although the complaint cursorily mentions "services," it is only in the context of "financed *merchandise*," including "tires[] and *other auto parts*[.]" *Id.* (emphasis added). Further, paragraph 67 outlines only what Snap representatives told inquiring consumers and does not necessarily allege that consumers actually financed one-time services through Snap's legacy lease. *Id.*

While the complaint superficially (and without any detail) states that the Snap legacy lease was used for "merchandise and[/or] services," *e.g.*, *id.* ¶¶ 1, 7, 27, 28, 38, it does so in the form of labels and legal conclusions arguing that the lease agreement met the statutory definition of credit. *E.g.*, *id.* ¶¶ 88, 90, 99, 101; *see Twombly*, 550 U.S. at 555. More importantly, however, it does so in the context of allegations that Snap "primarily partners with merchants" that provide only goods: "tires and auto parts; furniture and mattresses; jewelry; auto electronics; and appliances." *Id.* ¶ 3. At bottom, then, the CFPB's complaint does not sufficiently allege the financing of services via Snap's legacy lease, and the court need not consider that issue here.

## II.    Functional Equivalent of Purchase Finance Agreement (CFPA)

For the reasons stated in the foregoing sections, Snap's legacy lease did not constitute credit. And although Snap was certainly offering (and providing) financial services of a kind, it was not offering credit for the purposes of the CFPA. But the CFPB has identified one additional proposed hook in the CFPA by which it suggests it may regulate Snap's legacy lease. As stated

19

above, the CFPA regulates persons who offer or provide "financial product[s] or service[s.]" 12 U.S.C. § 5481(6)(A). "[F]inancial product or service," in turn, includes both "extending credit and servicing loans" *and* extending certain "leases of personal or real property that are the functional equivalent of purchase finance arrangements[.]" *Id*. § 5481(15)(A). The CFPB argues that Snap's legacy leases fit into this second category.

As explained its discussion of the statutory definition of "credit," the court is satisfied that Snap's legacy lease agreement may well have been the functional equivalent of a purchase finance arrangement. While this term is not statutorily defined (and has received little or no judicial attention or interpretation), the court understands the salient characteristics of such functional equivalents to be that (i) payment is, in fact, deferred (regardless of the formal terms of the agreement), with (ii) the deferred payment being for the purchase price of personal or real property (even if the lessee does not come to own the property at purchase). In other words, while Snap's legacy lease may not have actually created credit, the CFPB has properly alleged that the agreements, in practice, certainly functioned like credit financing.

But the analysis does not end there. In crafting the CFPA, Congress elected not to subject to the CFPA's reach any and all leases of personal or real property that are the functional equivalent of purchase finance arrangements. Instead, it added three important qualifiers. Functional-equivalent leases are regulable only if

> (I) the lease is on a non-operating basis;
> (II) the initial term of the lease is at least 90 days; and
> (III) in the case of a lease involving real property, at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee, subject to standards prescribed by the Bureau[.]

12 U.S.C. § 5481(15)(A)(ii).

20

Snap argues that the second condition—that the initial term of the lease must be at least 90 days—is not satisfied here because the legacy lease identifies the instrument's "initial minimum lease term" to be "60 days." Legacy Lease at 2, *accord* Compl. ¶ 46 ("[N]early all of the Snap Defendants' Purchase Agreements featured a 60-day term[.]"). The CFPB, on the other hand, would have this court ignore the formal terms of the agreement and conclude, in the case of consumers who are delinquent on their payments and unable to bring their accounts current at the end of the first 60-day term, and who are thus "locked" into payment for subsequent terms, that "the term in Snap's [a]greements is, in fact, 12 months[.]" Opp'n Mem. at 11.[18]

But the CFPA is not concerned with "the term" of lease agreements, *id*., but instead specifies that it is concerned with "the *initial* term of the lease[.]" 12 U.S.C. § 5481(15)(A)(ii)(II) (emphasis added). The modifier "initial" is significant as it necessarily contemplates subsequent terms, rather than capturing the entire potential term of conduct agreed to by the contracting parties.[19] And, as the CFPB acknowledges in its opposition memorandum, the legacy lease contemplated the possibility of the termination of the agreement at the "end of a term," Opp'n Mem. at 11. Thus, the initial term of the legacy lease was 60 days.

---

[18] It is reasonable to conclude that Congress may have imagined that "initial lease terms" in a lease agreement that is the "functional equivalent" to a purchase finance agreement would automatically renew or presumptively be renewed until the conclusion of a longer payoff timeline. After all, if that weren't the case, such leases may not be the functional equivalent of purchase finance agreements.

[19] If Congress believed that it was the entire potential period of time in which parties' conduct might have been contractually bound, it would not have chosen to use the *initial* term as the statutory-definitional benchmark in defining financial services.

The CFPB's argument relies on this court looking to its characterization of the practical operation of the lease arrangement rather than the formal characteristics of the agreement itself.[20] But the CFPA is careful to invite that pragmatic, functional analysis only in specified ways. For example, the CFPA ostensibly invites this sort of practical test in determining what is a "functional equivalent" of a purchase finance agreement. But Congress was careful to qualify its inclusion of functional equivalents to purchase finance agreements by asking courts to consider at least one formal, objective characteristic of the lease arrangement—the length of the initial lease term. The CFPB, by inviting this court to search for functional equivalents of purchase finance agreements without more, ignores Congress's policy decisions and fine-tuning of the CFPA and, as a result, asks this court to step beyond interpretation and into the business of legislating. It declines to do so.

## III.    Credit Sales (TILA)

Next, Snap argues that the CFPB has not alleged a violation of the TILA because its legacy leases were not credit sales as defined in Regulation Z. Regulation Z, which implements the TILA, includes certain leases in its definition of "credit sales" for which certain disclosures to consumers must be made. Regulation Z defines "credit sale" to mean

> a sale in which the seller is a creditor. The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:

---

[20] It all but defies common sense to imagine that any consumers actually intended to lease a mattress or tires for only 60 days; and it is reasonable to assume that many—perhaps most—consumers intended to ride out the default payment regime, which stretched over a year. However, the initial lease term was for 60 days. Therefore, these practical considerations cannot displace the requirements of the statutory text. Like the *Riethman* court, this court declines to ignore the formal characteristics of the lease arrangement in search of a means to expand the CFPB's regulatory jurisdiction. *Riethman*, 287 F.3d at 277.

> (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

12 C.F.R. § 1026.2(16).[21]

    The parties dispute several facets of this regulatory definition—for example, whether Snap's legacy lease was "terminable without penalty at any time," whether consumers agreed to pay an amount "substantially equivalent to" the purchase price of the leased property, and whether consumers could acquire the merchandise for no (or nominal) consideration upon compliance with the agreement. Here, however, the court need consider only the second definitional element: whether a transacting consumer "[a]grees to pay *as compensation for use* a sum substantially equivalent to, or in excess of, the *total value of the property* and service involved." *Id*. § 1026.2(a)(i)(emphasis added).

---

21 "Creditor," in turn, is defined to mean

> [a] person who *regularly extends consumer credit* that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

12 C.F.R. § 1026.2(17) (emphasis added).

Regulation Z apparently does not demand that the "credit sale" in question constitute credit in the traditional sense (hence the regulatory recognition of "bailment[s] [and] lease[s]" in the first place). It does, however, demand that the seller regularly erngage in *other* traditional-credit transactions. As the CFPB alleges, Snap, in some states, "offers [] unsecured installment loan products: Snap Loan and Snap Credit+." Compl. ¶ 17. Thus, the CFPB alleges that Snap regularly extended consumer credit. Additionally, Snap, in its motion, does not argue that there were no "credit sales" on the basis that Snap wasn't a creditor—instead, its arguments focus on the characteristics of the legacy lease itself.

Under Snap's legacy lease, a consumer is permitted to use the leased property for an initial term of 60 days. Although the legacy lease agreement contemplated recurring payments that would exceed the purchase price of the property, consumers were not obligated to pay that amount as compensation for their use of the property because they had a contractual right to terminate the agreement after the initial term. *Cent. Rents v. Johnson (In re Johnson)*, 203 B.R. 498, 502 (Bankr. S.D. Ga. 1996); *Smith v. ABC Rental Sys., Inc.*, 491 F. Supp. 127, 129 (E.D. La. 1978), *aff'd* 618 F.2d 397 (5th Cir. 1980) ("[T]o be within [the TILA's] coverage, the lessee must be obligated to pay a sum at least as great as the value of the property. Under the terms of the instant rental agreement, plaintiff was never obligated for any sum other than the [] weekly rental for each week he chose to keep the set."); *accord Dodson v. Remco Enters., Inc.*, 504 F. Supp. 540, 543 (E.D. Va. 1980); *Stewart v. Remco Enters., Inc.*, 487 F. Supp. 361, 363 (D. Neb. 1980); *Givens v. Rent-A-Center, Inc.*, 720 F. Supp. 160, 162 (S.D. Ala. 1988); *Remco Enters., Inc. v. Houston*, 9 Kan. App. 2d 296, 300 (1984).[22] The legacy lease agreement allowed a consumer to use the property for at least 60 days, and the compensation due to Snap for this use was not "a sum

---

[22] As the Third Circuit recognized in *Ortiz v. Rental Mgmt.*, 65 F.3d 335 (3rd Cir. 1995), there is a colorable ambiguity regarding whether this regulatory language "refers to the lessee's rights or obligations." *Id.* at 340. However, the court agrees with the cases cited above that the best interpretation of that language suggests that the language refers to lessee's obligations—that is, what they must pay as compensation for use. If Regulation Z, in 12 C.F.R. § 1026.2(16)(i), wanted to refer to a lessee's option, the court presumes that it would do what it does in the following provision (§ 1026.2(16)(ii)) and clearly say as much.

Consumers also had this termination right (even if conditional) during subsequent terms before the consumer's total payments to Snap approached the substantial equivalent to the "total value" of the property, which is best reflected by its purchase price.

Also, *Remco* persuasively parses the legislative history of the TILA (and the regulatory history of Regulation Z) to bolster the conclusion that lease-to-own agreements like this one should not be considered credit sales. *See* 9 Kan. App. 2d at 300.

substantially equivalent to, or in excess of, the total value of the property and service involved" unless the consumer continued to use the property for multiple subsequent term periods. *See Smith*, 491 F. Supp. at 129.[23]

In other words, the court agrees with the cases cited above that a lease that permits termination after an initial period is not a credit sale under Regulation Z because the "compensation for use" a consumer owes to a seller is only a fraction of "a sum substantially equivalent to, or in excess of, the total value of the property and service involved." 12 C.F.R. § 1026.2(16). While the compensation for *ownership* of the leased property would be, as the CFPB alleges, certainly in excess of the sum of the total value of the leased property, the compensation for *use* is not, and the consumer is never obligated to obtain ownership of the leased property.[24] Use can occur during an initial lease term (for which a consumer pays a fraction of the purchase price), and a consumer can

---

[23] The *Smith* court states that it is significant that the plaintiff could "terminate the agreement at any time." 491 F. Supp. at 129. However, that the agreement was terminable at any time is not necessary to support that court's conclusion that terminability generally meant that "[t]he week-to-week rental is not a sum substantially equivalent to the set's value, and the transaction in question is, therefore, not a credit sale." *Id*. Here, as elsewhere, independent elements of Regulation Z's definition of credit sales are sometimes blended or confused in interpretation.

[24] It is significant that the regulatory language states what the agreed-to compensation is for. For example, the CFPB merely states that "consumers 'agree' to pay a sum in excess of the total value of the financed merchandise and service." Opp'n Mem. at 16. And, following *Ortiz*, it is true that the legacy lease gave consumers the *option* of paying such a sum. However, under the legacy lease, consumers' only obligation, as compensation for *use* of the property, was much more limited.

As in the CFPB's proposed subjective-belief analysis of credit, discussed above, the CFPB seems to suggest that it is what consumers *believed* would happen in the future, and not the actual terms of the agreement, that ought to define what consumers agreed to. However, for the reasons set out above, the court declines to disregard the formal terms of the legacy lease.

conditionally decline to renew the lease for subsequent terms before paying a sum substantially equivalent to the total value (i.e., purchase price) of the property.[25]

While this analysis considers terminability, it does not consider the conditions placed on termination (as the CFPB would emphasize). The "compensation for use" definitional requirement simply does not invite such analysis. Those considerations are better suited under the provision that the lease be terminable without penalty at any time. But that is an issue that the court need not probe here. Under the legacy lease agreement, after the initial lease term is underway, no further renewal (or payment) is necessary for use to have taken place, and compensation for use is therefore decoupled from the total value of the property. Thus, Snap's legacy lease-to-own agreement does not constitute a "credit sale" under the plain language of Regulation Z's definition.

## IV.    Timeliness (FCRA)

Snap moves to dismiss the FCRA claim only on timeliness grounds. The court therefore turns to consider Snap's timeliness argument as to the FCRA. In its motion, Snap suggests the

---

[25] Some courts have concluded otherwise. For the most part, they focus on "the practical consequences" of agreements as they understand them. *Davis v. Colonial Sec. Corp.*, 541 F. Supp. 302, 305 (E.D. Pa. 1982); *Waldron v. Best T.V. & Stereo Rentals, Inc.*, 485 F. Supp. 718, 720 (D. Md. 1979) (analogizing to the UCC and considering "practical[]" implications of agreements, along with "[p]ublic policy"); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982) (considering "the practices of the trade, the course of dealing of the parties, and the intention of the parties in addition to specific contractual obligations"). But if Congress or any agency thought it appropriate for this court to consider such practical realities, it ought to have said so (as is the case with the UCC, discussed above).

*Clark* in particular rests almost entirely on a generalized, purposivist reading of the statute (as well as public policy) and does not delve into the regulatory text. This court, however, hews to the plain text of Regulation Z—along with cases that parse and interpret its definition of "credit sales"—rather than impose its own policy ideals onto the regulatory language.

proper statute of limitations is provided by 15 U.S.C. § 1681p. The CFPB argues, however, that the applicable statute of limitations is instead contained in 15 U.S.C. § 1681s.

Section 1681p, titled "[j]urisdiction of courts; limitation of actions," states that "[a]n action to enforce any liability created under this title . . . may be brought in any appropriate United States district court . . . not later than the earlier of—[] 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or [] 5 years after the date on which the violation that is the basis for such liability occurs." Because the CFPB has not pled the date it allegedly discovered any FCRA violation, Snap argues that it is impossible to tell which limitations period applies under § 1681p and that, in any case, any FCRA claim based on conduct occurring before August 29, 2017 would be untimely.

Section 1681s, titled "[a]dministrative enforcement," provides that violations of the FCRA "shall be deemed to be a violation of a requirement imposed" under the CFPA. 15 U.S.C. § 1681s(d), and that compliance with the requirements of the FCRA "shall be enforced under" subtitle E of the CFPA (12 USCS §§ 5561 *et seq*.). 15 U.S.C. § 1681(b)(1)(H). Thus, the CFPB argues that the CFPA's statute of limitations, which states that "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates," ought to apply. 12 U.S.C. § 5564(g)(1).

The court agrees with the CFPB that its enforcement action for a violation of the FCRA is properly enforced under the CFPA, which lays out the governing statute of limitations. As a result, the statute of repose contained at 15 U.S.C. § 1681p(2) is inapplicable,[26] and the CFPB's FCRA

---

[26] This is also true because the CFPB's action does not arise "solely" under the FCRA. 12 U.S.C. § 5564(g)(2)(B).

claims are limited only insofar as "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1).

"A complaint need not anticipate any affirmative defenses that may be raised by the defendant, including the statute of limitations; it is the defendant's burden to plead an affirmative defense. *Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019) (citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)) (internal citation omitted). Accordingly, "[i]t is only proper to dismiss a complaint based on an affirmative defense when the complaint itself admits all the elements of the affirmative defense." *Id*.

Here, because 12 U.S.C. § 5564(g)(1) limits actions by operation of a plaintiff's discovery of certain facts, "the limitations period does not begin to run until the discovery of facts forming the basis for the cause of action." *Id*. (internal quotation marks and citation omitted); *accord Bryer v. ConocoPhillips, Co.*, 725 F. App'x 645, 648 (10th Cir. 2018) (unpublished).[27] In other words, the date that the CFPB discovered the facts forming the basis for the FCRA claim alleged establishes and is an element essential to the applicable statute of limitations. However, at this juncture, because "the complaint itself [does not] admit[] all the elements of the affirmative defense" (namely, the date of discovery), Snap has not carried its burden, and dismissal of the CFPB's FCRA claims, in whole or in part, would be inappropriate. *Bistline*, 918 F.3d at 876.[28]

---

[27] The court notes that *Bistline* and *Bryer* discuss state-law restatements of tolling under the discovery rule in equity. However, the court is satisfied that these same general discovery-rule principles apply to the discovery-limited statute of limitations provided by 12 U.S.C. § 5564(g)(1).

[28] Contrary to Snap's argument, the complaint itself does not include dates indicating that the action is untimely, because it does not include any facts suggesting when the CFPB discovered the facts that form the basis of this action. The authority cited by Snap, which relates to *equitable tolling* of claims, is distinguishable. *See* ECF No. 45 ("Reply Mem.") at 15 (citing *Salt Lake City Corp. v. Sekisui SPR Ams., LLC*, 2018 U.S. Dist. LEXIS 168489, at *32 (D. Utah Sep. 28, 2018)). Here, the CFPB is not asking the court to equitably toll the statute of limitations as a matter of equity—

28

V.       **Common-Enterprise Doctrine (FCRA)**

Finally, Snap argues that the CFPB's claims should be dismissed as to all defendants except Snap Finance LLC and Snap RTO LLC. Mot. at 31. This is because, Snap argues, the complaint "alleges no conduct by the two holding company [d]efendants—Snap U.S. Holdings and Snap Finance Holdings," or any unlawful conduct by Snap Second Look. *Id.* at 32. After all, "[i]t is axiomatic that each defendant is entitled to 'an individualized determination of his interests.'" *FTC v. Kuykendall*, 371 F.3d 745, 758 (10th Cir. 2004) (quoting *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994)).

The CFPB, in its complaint, apparently anticipated this problem by pleading that all members of the Snap corporate family "operate as a common enterprise" and are thus "jointly and severally liable" for the actions alleged in the complaint. Compl. ¶ 22.[29] The CFPB cites *FTC v. Loanpointe*, 2011 U.S. Dist. LEXIS 104982, at *24 (D. Utah Sep. 15, 2011), which states that "[w]hen one or more corporate entities operate as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *Id.* (citing *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000)). Notably, however, the common-enterprise doctrine fits uneasily in this case—particularly considering the dismissal of the better part of the CFPB's claims.

At bottom, the common-enterprise doctrine is the creature of Federal Trade Commission Act ("FTC Act") jurisprudence. *E.g.*, *FTC v. On Point Capital Partners, LLC*, 17 F.4th 1066, 1081

---

instead, the statute of limitations itself sets the timeliness threshold as a matter of discovery, and the well-pleaded complaint, on its face, does not admit the elements necessary for an affirmative timeliness defense.

[29] *See* note 1.

(11th Cir. 2021); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014). As the CFPB recognizes, however, some district courts have extended the common-enterprise doctrine to the context of the CFPA's prohibition against abusive, unfair, and deceptive practices (declared in 12 U.S.C. §§ 5531 and 5536(a)(1)(B)).[30] *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 U.S. Dist. LEXIS 177756 (S.D.N.Y. Dec. 2, 2016); *Consumer Fin. Prot. Bureau v. Think Fin.*, 2018 U.S. Dist. LEXIS 130898, (D. Mont. Aug. 3, 2018); *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols.*, *LLC*, 2019 U.S. Dist. LEXIS 46492, (N.D. Ga. Mar. 21, 2019); *accord Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 2019 U.S. Dist. LEXIS 152336, (S.D. Fla. Sep. 5, 2019); *but see Pennsylvania v. Think Fin., Inc.*, 2016 U.S. Dist. LEXIS 4649, (E.D. Pa. Jan. 14, 2016) (declining to extend the common-enterprise doctrine to a CFPA deceptive-practices claim). This is because, as those courts reasoned, §§ 5531 and 5536(a)(1)(B) of the CFPA proscribe similar activities as does the FTC Act, and for similar purposes.[31]

Regardless of whether the common-enterprise doctrine is properly applied to unfair-practices claims brought under §§ 5531 or 5536(a)(1)(B) of the CFPA, the CFPB has not identified (nor can this court find) any persuasive authority or argument suggesting that the doctrine should be imported into the context of the FCRA or the CFPA's § 5536(a)(1)(A) catch-all provision. Because the FCRA and § 5536(a)(1)(A) of the CFPA do not mirror the FTC Act's language or

---

[30] The court emphasizes that, although the parties (and some previous district courts) discuss the common-enterprise doctrine's applicability to CFPA claims generally, that doctrine has only ever been applied (or, under the authorities briefed by the parties, discussed) in the context of claims for unfair, deceptive, or abusive practices brought under §§ 5531 and 5536(a)(1)(B), *not* the catch-all provision proscribing violations of other consumer financial protection laws at § 5536(a)(1)(A).

[31] This also because those courts reason that the interpretation of key FTC Act terms is sometimes imported into the interpretation of the CFPA. *See NDG Fin. Corp.*, 2016 U.S. Dist. LEXIS 177756 at *45-*48; *Payment Sols., LLC*, 2019 U.S. Dist. LEXIS 46492 at *39-*40.

particular purposes (in combating deceptive practices against consumers), the court declines to extend the common-enterprise doctrine to the CFPB's surviving claims. The logic of that doctrine, in the context of the FTC Act, is simply too attenuated from the CFPB's FCRA claim, and applying that doctrine here risks creating a far-ranging shortcut to be exploited by the government at its whim to circumvent traditional group-pleading rules. Snap's motion to dismiss the surviving claims (claims nine and ten) as against Snap U.S. Holdings LLC, and Snap Finance Holdings LLC is thus **GRANTED**.[32]

## CONCLUSION & ORDER

For the foregoing reasons, Snap's motion to dismiss, ECF No. 31, is **GRANTED IN PART AND DENIED IN PART**. **IT IS HEREBY ORDERED** as follows:

1) Claims one through eight of the CFPB's complaint are **DISMISSED** for failure to state a claim upon which relief can be granted. To the extent, however, that such dismissal turns on the CFPB's failure to plead the use of Snap's legacy lease to finance one-time services under the CFPA or EFTA, however, the dismissal is without prejudice;

2) Snap's motion to dismiss in whole or in part the surviving claims (claims nine and ten) for untimeliness is **DENIED**;

3) Snap's motion to dismiss the surviving claims (claims nine and ten) as against Snap U.S. Holdings LLC and Snap Finance Holdings LLC is **GRANTED**;

---

[32] However, because the complaint alleges that "[f]or a subset of Snap Second Look's installment contracts, Snap Finance furnished consumer information to Experian," Compl. ¶ 80, the CFPB has plausibly alleged furnishing-related conduct by Snap Second Look LLC, and Snap's motion to dismiss the surviving claims against Snap Second Look LLC is accordingly **DENIED**.

4) Snap's motion to dismiss this action on the ground that the CFPB is unconstitutionally funded is **DENIED**.

5) Snap's motion to stay this action pending the Supreme Court's resolution of *CFPB v. Community Financial Services Association of America, Ltd.* is **DENIED** as moot;

DATED August 1, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge