ERIC MOTHANDER
NOAH STEIMEL
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7321
charles.mothander@cfpb.gov
noah.steimel@cfpb.gov

*Attorneys for Plaintiff Consumer
Financial Protection Bureau*

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> *Plaintiff,* <br><br> v. <br><br> SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC, <br><br> *Defendants.* | AMENDED COMPLAINT <br><br> Case No. 2:23-cv-00462-JCB |

The Consumer Financial Protection (Bureau) brings this action against Snap Finance LLC (Snap Finance), Snap RTO LLC (Snap RTO), Snap Second Look LLC (Snap Second Look), Snap U.S. Holdings LLC (Snap U.S. Holdings), and Snap Finance Holdings LLC (Snap Finance Holdings) (collectively, the Snap Defendants), and alleges the following:

INTRODUCTION

1.      The Snap Defendants offer and provide "lease-purchase" or "rental-purchase" financing, through which consumers finance merchandise and services from

1

merchants and, in turn, make payments back to the Snap Defendants. The Snap Defendants target consumers with limited access to traditional forms of credit for their financing, whom they refer to internally using the acronym ALICE, standing for "Asset-Limited Income-Constrained and Employed." The Snap Defendants' "lease-purchase" and "rental-purchase" agreements (Purchase Agreements or Agreements) have a default 12- or 18-month payment schedule, which typically amounts to more than double the cash price of the financed merchandise or service.

2.      Since at least January 2017, the Snap Defendants have designed and implemented their financing program in ways that misled these consumers and interfered with their ability to understand the terms and conditions of their Purchase Agreements.

3.      Since at least January 2017, Snap Finance, which is the consumer-facing and merchant-facing entity among the Snap Defendants, has partnered with merchants across industries to offer and provide consumers with financing through Purchase Agreements. Notably, since at least January 2017, Snap Finance has partnered with auto repair merchants to offer and provide financing through Purchase Agreements for one-time auto repairs and services (engine repairs, transmission repairs, A/C system repairs, collision repairs, etc.) for which consumers' scheduled payments, whether over 12 or 18 months, are not contemporaneous or substantially contemporaneous with the value received. Nor can such one-time services be surrendered, possessed, or recalled. For example, consumers cannot possess or return the one-time labor or services extended to fix their transmission, *see* Exs. A and B, to fix their engine, *see* Exs. C and D, or for a collision repair, *see* Ex. E. Nor can consumers surrender dried paint or dissipated fluids associated with such auto repairs and services. *See* Exs. D and E.

4.      Since at least January 2017, for consumers who finance auto repairs and services through Purchase Agreements, the Snap Defendants' merchant partners often itemize the costs of the auto parts or merchandise being installed or replaced as part of the invoice appended to the consumer's Agreement. *See* Ex. D. The total amount consumers owe under their Purchase Agreement is based on their invoice total, and is inclusive of labor or service costs.

5.      Since at least January 2017, for numerous consumers who financed auto repairs and services through Purchase Agreements, their Agreements reflect that they financed exclusively one-time labor or service costs not attendant to any auto parts or merchandise. *See* Exs. A, F, and G.

6.      For all such consumers who financed auto repairs and services through a Purchase Agreement, the Snap Defendants' illegal conduct pervaded virtually every step of the consumer experience, from advertising to contracting to servicing.

7.      ***Advertising***. The Snap Defendants aggressively marketed their financing to cash-strapped consumers through advertisements that obscured the true nature of their Purchase Agreements. In particular, Snap Finance provided auto repair merchants with advertisements to display in their stores that misrepresented an early payment discount option and failed to disclose the true costs consumers would incur under the Agreements.

8.      ***Contracting.*** Through the fall of 2020, the Snap Defendants designed their primary financing application for auto repairs and services to be completed—and for consumers' Purchase Agreements to be signed and submitted—on a merchant's computer or tablet. When consumers signed an Agreement, their understanding of its terms and conditions often depended on an oral explanation from an auto repair

merchant's sales representative. But for years, Snap Finance failed to provide its auto repair merchant partners with any written guidance for explaining the Purchase Agreements to consumers. Auto repair merchants also frequently signed and submitted Purchase Agreements on behalf of consumers without consumers' prior review of their Agreement.

9.   The Snap Defendants' Purchase Agreements schedule automatic and recurring preauthorized ACH debits from consumers' bank accounts to continue for 12 or 18 months, amounting to approximately double the cash price of the financed auto repairs and services. The Snap Defendants' contracting process left many consumers who financed auto repairs and services misinformed, or otherwise misled, regarding the cost and nature of the Agreement they had just entered.

10.   *Servicing*. The Snap Defendants' illegal conduct continued throughout the servicing process, including by threatening to take actions against consumers who financed auto repairs and services that Snap Finance does not take in collections.

11.   In the limited circumstances in which the Purchase Agreements permitted consumers to terminate their payment obligations, Snap Finance's misrepresentations impeded consumers' ability to do so.

12.   Finally, despite furnishing consumer information about millions of Purchase Agreements and retail installment contracts on behalf of Snap RTO and Snap Second Look, Snap Finance failed to establish and implement reasonable written policies and procedures concerning the accuracy and integrity of the consumer information that it furnished.

13.   The Bureau brings this action under Sections 1036(a) and 1054 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a) and 5564;

4

Section 918(a) of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693o(a)(5), and its implementing Regulation E, 12 C.F.R. Part 1005; and Section 621(b)(1)(H) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s(b)(1)(H), and its implementing Regulation V, 12 C.F.R. Part 1022, to stop the Snap Defendants' unlawful conduct, to rescind or reform the terms of their Purchase Agreements with consumers, to obtain redress for affected consumers and an appropriate penalty, and to obtain all other appropriate relief.

## JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5564(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C § 1345.

15.    Venue is proper in this district because the Snap Defendants are located, reside, and do business here. 12 U.S.C. § 5564(f).

## PLAINTIFF

16.    The Bureau is an independent agency of the United States charged with enforcing "Federal consumer financial laws." 12 U.S.C. § 5491(a).

17.    The Bureau is authorized to initiate proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including the CFPA, EFTA and Regulation E, and FCRA and Regulation V. 12 U.S.C. §§ 5564(a)-(b), 5565.

## THE SNAP DEFENDANTS

18.    Snap Finance is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance partners with merchants to

5

market, offer, and underwrite Purchase Agreements for consumers. In certain states, Snap Finance also offers two unsecured installment loan products: Snap Loan and Snap Credit+. If Snap Finance denies a consumer's application for Snap Credit+ (which features a longer default term and lower interest rate than Snap Loan), Snap Finance automatically submits the consumer's application for a Purchase Agreement or for a Snap Loan.

19.     Snap RTO is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance provides underwriting, originations, collections, and other services for Snap RTO. Snap RTO issues and holds completed Purchase Agreements, which Snap Finance services.

20.     Snap Second Look is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Second Look purchases retail installment contracts from merchants and participation interests in certain installment loans originated by Transportation Alliance Bank, Inc. Snap Finance then services those contracts on behalf of Snap Second Look.

21.     Snap U.S. Holdings is a Delaware limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap U.S. Holdings owns 100% of the equity interests in Snap Finance and Snap RTO, and is the sole manager of Snap Finance, Snap RTO, and Snap Second Look.

22.     Snap Finance Holdings is a Utah limited liability company headquartered at 1193 West 2400 South, West Valley City, UT 84119. Snap Finance Holdings is a member of Snap U.S. Holdings, and remains the ultimate parent of Snap Finance, Snap RTO, and Snap Second Look.

6

23.     From January 2017 to mid-2021, the Snap Defendants entered approximately 2.6 million Purchase Agreements with consumers. During approximately that same period, approximately 191,000 consumers contracted for a Snap Loan or Credit+ financing.

24.     According to an internal presentation from 2022, "Auto_Service" accounted for 13.3 percent of the Snap Defendants' business across its financing products. Separately, "Tires_Rims" accounted for 31.2 percent and "Car_Audio" accounted for 6.5 percent of the Snap Defendants' business.

25.     The Snap Defendants operate as a common enterprise. Of the Snap Defendants, only Snap Finance has employees. The Snap Defendants operate through Snap Finance's website and branding, and all share the same business address. From late 2015 to late 2019, Snap Finance Holdings directly owned 100% of Snap Finance and Snap RTO, and 88.1% of Snap Second Look. Throughout that period, four out of the five officers for Snap Finance, Snap RTO, and Snap Second Look were also officers for Snap Finance Holdings. In late 2019, those officers created Snap U.S. Holdings, which owns 100% of the equity interests in Snap Finance and Snap RTO, and the officers went on to hold their same position at all five of the Snap Defendants through at least December 2020 (Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Legal Officer). The Snap Defendants' financial statements and balance sheets are all issued on a consolidated basis. At the close of 2020, the Snap Defendants held $476 million in assets and made nearly $114 million in net income for the year.

26.     An act by one entity constitutes an act by each entity comprising the common enterprise. The Snap Defendants are each jointly and severally liable for the acts and practices alleged below.

<u>THE SNAP DEFENDANTS' ADVERTISEMENTS</u>

27.     When a merchant partners with the Snap Defendants, a Snap Finance sales manager visits the store to set up the Merchant Portal and provide Snap Finance's print advertising materials for the merchant to display.

28.     Snap Finance requires its merchant partners to display only the print advertisements that Snap Finance provides to them, or that Snap Finance otherwise approves.

29.     From January 2017 through at least 2020, Snap Finance provided auto repair merchants with advertisements to display in their stores that included the prominent phrase "100 Day Cash Payoff" without any further explanation of the Purchase Agreements. Rather, along with the prominent phrase "100 Day Cash Payoff," Snap Finance's advertisements for its Purchase Agreements included phrases such as "No Credit Needed."



30.     In fact, Snap Finance automatically schedules consumers' payments via preauthorized ACH debits to continue for the full 12 or 18 months of their Purchase

Agreement, typically amounting to more than double the cash price of the financed auto repairs and services.

31.     To exercise a 100-day early payment discount option, which is always more than the "cash" price, consumers must first learn of their payoff amount by contacting Snap Finance or accessing Snap Finance's online customer portal, and then schedule a new payment amount or make a balloon payment before their 100-day deadline.

32.     Snap Finance does not send periodic statements to consumers, or otherwise affirmatively notify consumers of an impending deadline to exercise their 100-day early payment discount option.

33.     Consumers who miss this 100-day deadline must pay significantly more than the "cash" price under the terms of the Purchase Agreement.

34.     Consumers who financed auto repairs and services through Purchase Agreements commonly believed they had entered into a 100-day financing agreement, under which their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period.

<u>THE SNAP DEFENDANTS' MERCHANT PORTAL</u>

35.     The Snap Defendants offer their financing exclusively through web-based applications at SnapFinance.com, at a merchant's own website, or at a merchant's storefront location through Snap Finance's Merchant Portal.

36.     Snap Finance's Merchant Portal is a website that merchants access through their own computers or tablets. Merchants use the Merchant Portal to help consumers apply for Snap Defendants' financing and, if approved, sign their Purchase

9

Agreement. Merchants also use the Merchant Portal to access trainings and resources that Snap Finance now provides.

37.  From January 2017 to at least September 2020, approximately 63 percent of consumer applications that resulted in completed Purchase Agreements across industries were submitted through Snap Finance's Merchant Portal.

38.  From January 2017 to at least September 2020, Merchant Portal applications for the Snap Defendants' financing were primarily completed—and the resulting Purchase Agreements signed—on a merchant's own computer or tablet.

39.  From January 2017 to at least September 2020, auto repair merchants frequently DocuSigned and submitted Purchase Agreements through the Merchant Portal on behalf of consumers without consumers' prior review of their Agreement.

40.  In January 2020, a Snap Finance Compliance Analyst responsible for addressing consumer complaints across industries emailed three Snap Finance employees the following: "[T]he customer is claiming that the salesperson at the store signed his agreement. As you may image [sic] this complaint is our most common complaint."

41.  Snap Finance's Merchant Portal application and contracting process tasks merchants with explaining the Snap Defendants' Purchase Agreement. But Snap Finance did not provide its merchant partners with written training materials about Purchase Agreements until February 2020.

42.  From January 2017 to at least September 2020, auto repair merchants often failed to adequately explain the Snap Defendants' Purchase Agreement to consumers at the point of sale, or otherwise misled consumers regarding the nature of the Agreement. Frequently, consumers did not understand that they were automatically

scheduled to pay approximately double the cash price of their financed auto repairs and services over the course of the 12-month payment period, or that their automatic payments would continue past the cash price or the 100-day early payment deadline.

43.     From January 2017 to at least September 2020, Snap Finance required auto repair merchants to collect a "processing fee" from consumers after Snap Finance approved them for a Purchase Agreement, but before merchants reached a screen in the Merchant Portal that included a summary of the terms of the consumer's Agreement. As a result, approved consumers were required to pay a fee associated with their Agreement before receiving a complete summary of its terms, and before seeing or signing their final Agreement.

44.     In an August 2020 internal training presentation about upcoming changes to its Merchant Portal, Snap Finance included the following observations regarding common consumer complaints across industries pertaining to Purchase Agreements: "The Complaint: 'What do you mean COST OF LEASE? I never knew about that!' We know this because we here [sic] comments like this all the time." and "The Complaint: 'They did not explain that at the store!' We know this because we here [sic] comments like this all the time."

THE SNAP DEFENDANTS' PURCHASE AGREEMENTS

45.     Snap Finance requires consumers to provide their bank account information as part of the application process for Purchase Agreements. When consumers enter an Agreement, Snap Finance uses that banking information to schedule automatic payments from consumers' accounts to continue for 12 or 18 months.

46. Since at least January 2017, under all versions of the Snap Defendants' Purchase Agreements, a consumer's term "automatically and repeatedly" renews across the full 12 or 18 months of the Agreement (or until the consumer successfully terminates their payment obligations), regardless of whether the consumer makes their next scheduled payment.

47. Since at least January 2017, all Purchase Agreements have included a "Customer Authorization for Payments via ACH" provision, under which consumers must agree to the preauthorization of ACH debits for the purpose of making payments required under the Agreement.

48. Since at least January 2017, under all Purchase Agreements, consumers may only revoke their authorization for payments via ACH debit sometime after signing the Agreement.

49. The total cost of the Snap Defendants' Purchase Agreements over the 12- or 18-month payment period typically amounts to more than double the cash price of the financed merchandise or service.

50. Consumers have the option of paying off their Agreement within the first 100 days for slightly more than the cash price of their merchandise or service through a "Cash Payoff Option" or a "100-Day Payment Option." To take advantage of these early payment options, consumers must affirmatively change their scheduled payments by calling Snap Finance or using Snap Finance's online customer portal, or by making a balloon payment before the deadline. Once the 100-day deadline passes, consumers can pay off their Purchase Agreement early by exercising an "Early Buyout Option" for a smaller discount on the amount consumers would have owed under the full 12-month payment period of their Agreement.

51.     From January 2017 through March 2020, nearly all of the Snap Defendants' Purchase Agreements featured a 60-day term, which automatically and repeatedly renewed across the Agreement's 12-month payment period. Consumers were not permitted to terminate their Agreement until the end of a 60-day term.

52.     Since at least January 2017, the Snap Defendants' Purchase Agreements have stated, "You may terminate your lease payment obligations under this Agreement without penalty by paying all Regular Payments, fees and charges that are due or past due and voluntarily surrendering or returning the Property in its original condition, less reasonable wear and tear at the expiration of any lease term." These Agreements also state, in connection with termination, that consumers "must promptly return the Property to us in accordance with our directions[.]"

53.     In servicing Purchase Agreements, Snap Finance informed consumers they could not terminate their future payment obligations under their Agreement until they made all payments due and past due through the end of their recurring 60-day term.

54.     Since at least January 2017, the Snap Defendants' Purchase Agreements used to finance auto repairs and services identify such one-time repairs and services as the "Property," or as part of the "Property," being purchased. *See* Exs. A–G.

55.     The Snap Defendants' auto repair merchant partners often code one-time labor or service costs—including for "auto repair," "transmission repair," "engine repair," and "collision repair"—as costs for "Products" for the Snap Defendants' recordkeeping when completing a Purchase Agreement within the Merchant Portal.

56.     Likewise, the Snap Defendants' auto repair merchant partners often group together "parts and labor" and code both as costs for "Products" for the Snap

Defendants' recordkeeping when completing a Purchase Agreement within the Merchant Portal.

57.     In 2020, the Snap Defendants began offering revised Purchase Agreements in four states with a term that matches the consumer's regular payment due date.

58.     Under all versions of the Snap Defendants' Purchase Agreements for auto repairs and services, consumers' scheduled payments across their initial term typically, or almost always, would not cover the costs of one-time labor or repairs. *See* Exs. A–G.

59.     The Snap Defendants' revised Purchase Agreements also state that consumers may terminate their future payment obligations "[a]t any time . . . without penalty . . . by surrendering or returning to us the Property in its original condition, less reasonable wear and tear." The Agreements also state, in connection with termination, that consumers "must return the Property to a reasonable place we designate."

60.     Under all versions of the Snap Defendants' Purchase Agreements, consumers are required to contact Snap Finance to obtain instructions for how to terminate their Agreement.

61.     In 2022, the Snap Defendants began offering Purchase Agreements with 18-month payment periods.

62.     Under their Purchase Agreements, the Snap Defendants warn consumers, without any explanation, accounting, or basis, of potential "fees, charges and taxes imposed by governmental authorities in connection with termination," or of "official fees and taxes imposed in connection with termination, including, but not limited to any applicable fines, surcharges, and taxes."

14

63.    Under their Purchase Agreements, the Snap Defendants inform consumers that they are responsible for "all maintenance, repairs, upkeep and care" of the financed property, that the consumer "will pay any operating costs" associated with the property, and that the consumer "will, at [their] expense, service the Property in accordance with manufacturer standards."

## THE SNAP DEFENDANTS' REPRESENTATIONS ABOUT CONSUMERS' RIGHT TO TERMINATE THEIR PAYMENT OBLIGATIONS

64.    Internally, Snap Finance considers a "return" to be when a consumer seeking to terminate their future payment obligations under their Purchase Agreement returns their financed "Property" back to the merchant where the sale occurred. Snap Finance considers a "surrender" to be when a consumer seeking to terminate their payment obligations returns their financed merchandise directly to Snap Finance, or to another place that Snap Finance designates (including a charity or a site for disposal).

65.    Likewise, internally, Snap Finance considers a "cancellation" to be when a consumer's Purchase Agreement is voided, and any payments made pursuant to that Agreement are refunded back to the consumer, typically after a merchant partner agrees to accept the return of any financed "Property." Conversely, Snap Finance considers a "termination" to relate to the cessation of future payment obligations consumers would owe under their Agreement.

66.    Neither the Purchase Agreements, nor Snap Finance's advertisements, nor its website explain these internal distinctions in terminology.

67.    In fact, the Purchase Agreements use both "surrendering" and "returning" when discussing consumers' "Right to Terminate" their future payment obligations, and

also use the terms "Revocation, Cancellation, Termination" together, within a single provision.

68.    Snap Finance commonly receives complaints from consumers who had financed auto repairs and services and who seek to terminate their future payment obligations.

69.    When consumers who financed auto repairs and services call Snap Finance seeking to terminate their future payment obligations under their Purchase Agreement, Snap Finance's representatives typically instruct the consumer to discuss the matter directly with the auto repair merchant where the sale occurred.

70.    If an auto repair merchant agrees to "cancel" the consumer's prior transaction, including by receiving as a return any parts installed as part of an auto repair or service, the merchant is required to refund the payment they received back to Snap Finance for the original sale.

71.    Commonly, Snap Finance's auto repair merchant partners will not agree to "cancel" consumers' prior auto repair and services transactions that include one-time labor or service costs.

72.    When auto repair merchants refuse to "cancel" a consumer's prior transaction, Snap Finance representatives frequently inform consumers seeking to terminate their future payment obligations that Snap Finance is obligated or contractually bound to follow the merchant's "cancellation" policy, and thus consumers are required to continue making payments.

73.    In fact, the Snap Defendants' Purchase Agreements provide consumers who financed auto repairs and services and who are current on their payment obligations with the "Right to Terminate" their future payment obligations.

16

74.     Snap Finance representatives also inform consumers seeking to terminate their future payment obligations that auto parts or merchandise installed as part of auto repairs and services, as well as the one-time labor or services, cannot be returned or surrendered, and thus consumers are required to continue making payments.

75.     In fact, the Snap Defendants' Purchase Agreements include no such exceptions to consumers' "Right to Terminate" their future payment obligations.

THE SNAP DEFENDANTS' COLLECTION ACTIVITIES

76.     Since at least January 2017, after 40 days of non-payment, Snap Finance typically emails consumers with Purchase Agreements a collection notice titled "Demand for Payment and Return of Merchandise."

77.     In that collection notice, Snap Finance states, "Failure to respond to this demand by [date], may result in further action." Snap Finance also states, "Due to non-payment, we now require you to **RETURN TO US** the merchandise[.]" Snap Finance confirms, "Do not return your merchandise to [merchant's name]; this arrangement must be worked out with us directly."

78.     Snap Finance ends its collection notice by directing consumers to contact Snap Finance at a phone number or email address to "discuss your options or give you instructions regarding the return of the merchandise."

79.     Since at least January 2017, Snap Finance has not forcibly repossessed merchandise due to non-payment by a consumer, or otherwise taken legal action against a consumer due to non-payment for auto repairs and services.

80.     Further, from January 2017 to at least March 2020, the Snap Defendants' Purchase Agreements, as well as Snap Finance's internal policies and procedures, prevented past-due consumers—including those to whom Snap Finance sent its

17

"Demand for Payment and Return of Merchandise" notice—from surrendering or returning their financed "Property" directly to Snap Finance.

81.    During subsequent calls, consumers have asked Snap Finance representatives, for example, "are they going to take this to court?" and "how do you [ ] possibly expect to legally take the brakes off my car?"

82.    During subsequent calls with consumers with Purchase Agreements across industries, Snap Finance representatives have described its collection notice as "an empty threat just to get customers to pay," "just [ ] a demand to call back," and as an automatic email "just to get customers to call in . . . [because] when we send that email we get phone calls." A Snap Finance supervisor has also disclosed, "Because you got labor [ ] work . . . brakes done and everything, we are not going to be able to take that from you."

SNAP FINANCE'S FURNISHING ACTIVITIES

83.    From January 2017 to at least June 2022, Snap Finance furnished consumer information about millions of Purchase Agreements held by Snap RTO to DataX, a consumer reporting agency that collects and provides consumer payment history on payday and installment loans, subprime credit cards, and other specialty loans.

84.    From January 2017 to at least June 2022, Snap Finance also furnished consumer information to DataX for most of the installment loans and retail installment contracts held by Snap Second Look. For a subset of Snap Second Look's installment contracts, Snap Finance furnished consumer information to Experian.

18

85.    From January 2017 to at least June 2022, Snap Finance maintained one internal policy document concerning its responsibilities for furnishing consumer information relating to Purchase Agreements and installment contracts.

86.    Snap Finance's sole internal policy document relating to its furnishing responsibilities failed to include any direction as to the steps employees should take, or the systems employees should consult, in order to furnish accurate consumer information for the millions of Purchase Agreements and installment contracts that it serviced during this period.

87.    Snap Finance's sole internal policy document also failed to include any direction as to the steps employees should take, or the systems employees should consult, in order to conduct reasonable investigations of consumer furnishing disputes.

## THE FEDERAL CONSUMER FINANCIAL LAWS

### THE CFPA

88.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with "any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

89.    The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6).

90.    The CFPA defines "financial product or service" to include "extending credit and servicing loans." 12 U.S.C. § 5481(15)(A)(i).

91.     The CFPA defines "credit" to mean "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).

92.     The Snap Defendants' Purchase Agreements, when used to finance one-time auto repairs and services that are not contemporaneous or substantially contemporaneous with consumers' scheduled payments, and that cannot be surrendered nor possessed, are "credit" because they grant consumers the right "to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase."

EFTA AND REGULATION E

93.     EFTA provides that "No person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k.

94.     Regulation E similarly provides that "No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers[.]" 12 C.F.R. § 1005.10(e)(1).

95.     Regulation E defines "person" as "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j).

96.     Regulation E defines "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 12 C.F.R. § 1005.2(k).

97.     The Snap Defendants meet the definition of "person" in Regulation E.

20

98.    Preauthorized ACH debits from consumers' bank accounts meet the definition of "preauthorized electronic fund transfer" in Regulation E.

## FCRA AND REGULATION V

99.    From January 2017 to at least June 2022, Snap Finance was a "furnisher" under FCRA and Regulation V because it "furnish[ed] information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c).

## THE SNAP DEFENDANTS' VIOLATIONS OF LAW

### COUNT I: VIOLATION OF THE CFPA
(Deceptive Acts or Practices)

*The Snap Defendants used the misleading phrase "100 Day Cash Payoff" in advertisements for their Purchase Agreements.*

100.    The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 27–34, and 88–92.

101.    An act or practice is deceptive under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances and (3) the representation, omission, or practice is material.

102.    From January 2017 through at least 2020, Snap Finance used print advertisements for the Snap Defendants' financing for auto repair and services merchants to display in their stores that prominently featured the phrase "100 Day Cash Payoff," and that omitted any further explanation of the Snap Defendants' Purchase Agreement financing.

103.    Snap Finance schedules consumers' payments via preauthorized ACH debits to continue for the full 12 months of their Purchase Agreement.

21

104.     To exercise a 100-day early payment discount option, which is always more than the "cash" price of the financed auto repair and services, consumers must schedule a new payment amount or make a balloon payment before their 100-day deadline.

105.     Consumers who miss this 100-day deadline must pay significantly more than the "cash" price under the terms of the Purchase Agreements.

106.     Consumers who received the Snap Defendants' financing for auto repairs and services reasonably believed they had entered into a 100-day financing agreement, where their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period.

107.     Snap Finance's use of the prominent phrase "100 Day Cash Payoff" in its advertisements was material and likely to mislead consumers acting reasonably under the circumstances as to the nature of the Snap Defendants' Purchase Agreements.

108.     As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

<u>COUNT II: VIOLATION OF THE CFPA</u>
(Abusive Acts or Practices)

*The Snap Defendants' Merchant Portal application and contracting process materially interfered with consumers' ability to understand the terms and conditions of their Purchase Agreements.*

109.     The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 35–44, and 88–92.

110.     An act or practice is abusive under the CFPA if it, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

22

111.    From January 2017 to at least September 2020, Snap Finance designed and implemented a Merchant Portal application and contracting process for auto repairs and services that: (1) was, in most cases, completed entirely on an auto repair merchant's computer or tablet, and frequently led to merchants signing and submitting Purchase Agreements on behalf of consumers without consumers' prior review of their Agreement; (2) relied on auto repair merchants to explain those Agreements while providing them with no written guidance for doing so; and (3) required approved consumers to pay a processing fee before receiving a complete summary of the terms of their Agreement and before seeing or signing their final Agreement.

112.    Snap Finance's Merchant Portal application and contracting process materially interfered with consumers' ability to understand the terms and conditions of the Purchase Agreements, including that consumers were automatically scheduled to pay approximately double the cash price of their financed auto repair and services over the course of the Agreement, or that their automatic payments would continue past the cash price or the 100-day early payment deadline.

113.    As a result, the Snap Defendants engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(1), 5536(a)(1)(B).

COUNT III: VIOLATION OF EFTA AND REGULATION E

*The Snap Defendants conditioned the extension of credit on consumers' repayment by preauthorized EFTs.*

114.    The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 45–63, and 93–98.

115. Since at least January 2017, all versions of the Snap Defendants' Purchase Agreements have included a "Customer Authorization for Payments via ACH" provision, in which consumers must agree to the preauthorization of ACH debits for the purpose of making payments required under the Agreement. The Snap Defendants do not allow consumers to enter Purchase Agreements without agreeing to this provision.

116. Through this provision in their Purchase Agreements, the Snap Defendants condition the extension of credit on repayment by preauthorized electronic fund transfers.

117. As a result, the Snap Defendants violated EFTA and Regulation E. 15 U.S.C. § 1693k; 12 C.F.R. § 1005.10(e)(1).

COUNT IV: VIOLATION OF THE CFPA

118. The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 45–63, and 93–98.

119. The CFPA defines "Federal consumer financial law" to include EFTA and its implementing Regulation E. 12 U.S.C. § 5481(14).

120. Under the CFPA, covered persons' violations of Federal consumer financial law are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

121. As a result, the Snap Defendants' violation of EFTA and Regulation E, as described in Count III, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

COUNT V: VIOLATION OF THE CFPA<br>(Deceptive Acts or Practices)

*The Snap Defendants misrepresented consumers' right to terminate their payment obligations.*

122. The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 64–75, and 88–92.

24

123.    Since at least January 2017, Snap Finance has misrepresented that consumers who used Purchase Agreements to finance auto repairs and services must continue making payments pursuant to that Agreement by misrepresenting that consumers may not terminate their future payment obligations absent a merchant agreeing to "cancel" their prior transaction.

124.    In fact, under the Snap Defendants' Purchase Agreements, consumers have the "Right to Terminate" their future payment obligations, provided they are current at the end of a 60-day term (or under the Snap Defendants' more recent Purchase Agreements, "[a]t any time"), by "surrendering or returning" their financed "Property" to Snap Finance, or to a place that Snap Finance designates.

125.    Such misrepresentations were material and likely to mislead consumers acting reasonably under the circumstances.

126.    As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

COUNT VI: VIOLATION OF THE CFPA
(Deceptive Acts or Practices)

*The Snap Defendants threatened actions the Snap Defendants do not take in collections.*

127.    The Bureau incorporates and re-alleges by reference Paragraphs 25–26, 76–82, and 88–92.

128.    Since at least January 2017, Snap Finance has misrepresented in collection emails to consumers who financed auto repairs and services that the company may imminently take "further action" due to a consumer's non-payment under their Purchase Agreement.

25

129. In fact, since at least January 2017, Snap Finance has not forcibly repossessed "Property" due to non-payment, or otherwise taken legal action against a consumer due to non-payment under a Purchase Agreement.

130. Further, despite instructing past-due consumers in those emails to "**RETURN TO US** the merchandise," the Snap Defendants' Purchase Agreements, along with Snap Finance's internal policies and procedures, prevented those consumers who financed auto repairs and services from surrendering or returning their financed "Property" directly to Snap Finance while past-due.

131. Such misrepresentations are material, and are likely to mislead consumers acting reasonably under the circumstances.

132. As a result, the Snap Defendants engaged in deceptive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

<u>COUNT VII: VIOLATION OF FCRA AND REGULATION V</u>

*Snap Finance failed to establish and implement reasonable written policies and procedures concerning the accuracy and integrity of consumer information that they furnished.*

133. The Bureau incorporates and re-alleges by reference Paragraphs 18–20, 83–87, and 99.

134. Section 1022.42(a) of Regulation V, the implementing regulation of FCRA, 15 U.S.C. § 1681 et seq., requires a furnisher to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the consumer information that it furnishes to a consumer reporting agency, and further provides that the policies and procedures must be appropriate to the nature, size, complexity, and scope of each furnisher's activities. 12 C.F.R. § 1022.42(a).

26

135.    From January 2017 to at least June 2022, Snap Finance furnished consumer information about millions of Purchase Agreements and retail installment contracts that it serviced on behalf of Snap RTO and Snap Second Look.

136.    From January 2017 to at least June 2022, given the size, complexity, and scope of Snap Finance's furnishing activities, Snap Finance failed to establish or implement reasonable written policies and procedures regarding the accuracy and integrity of the consumer information that it furnished to consumer reporting agencies.

137.    Section 1022.42(b) of Regulation V requires furnishers to consider the guidelines in Appendix E of Regulation V in developing appropriate policies and procedures and to incorporate those guidelines where appropriate. 12 C.F.R. § 1022.42(b).

138.    Appendix E of Regulation V provides that, in developing its policies and procedures, a furnisher should address the following topics, among others, as appropriate: appropriate internal controls regarding the accuracy and integrity of furnished information, such as by verifying random samples of information provided to consumer reporting agencies; conducting a periodic evaluation of the furnisher's own practices, investigations of disputed information, and corrections of inaccurate information; and maintaining records for a reasonable period in order to substantiate the accuracy of any information about consumers it furnishes that is subject to a direct dispute. Appendix E to 12 C.F.R. Part 1022.

139.    From January 2017 to at least June 2022, Snap Finance failed to incorporate the elements set forth in Appendix E, as appropriate, in its policies and procedures governing its furnishing.

27

140.    As a result, Snap Finance violated Regulation V. 12 C.F.R. § 1022.42(a), (b).

### COUNT VIII: VIOLATION OF THE CFPA

141.    The Bureau incorporates and re-alleges by reference Paragraphs 18–20, 83–87, and 99.

142.    The CFPA defines "Federal consumer financial law" to include FCRA and its implementing Regulation V. 12 U.S.C. § 5481(14).

143.    Under the CFPA, covered persons' violations of Federal consumer financial law are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

144.    As a result, Snap Finance's violation of FCRA and Regulation V, as described in Count VII, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

### PRAYER FOR RELIEF

145.    The Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

a.    Permanently enjoin the Snap Defendants from committing future violations of the CFPA, EFTA and Regulation E, and FCRA and Regulation V in connection with the advertising, contracting, and servicing of Purchase Agreements;

b.    Grant additional injunctive relief as the Court may deem just and proper;

c.    Award monetary relief, including but not limited to rescission or reformation of the Purchase Agreements; the refund of monies paid; restitution; disgorgement or compensation for unjust enrichment; and the payment of damages;

d.    Award the Bureau civil money penalties;

28

e.      Award the Bureau the costs of bringing this action; and

f.      Award such other and additional relief as the Court may determine to

be just and proper.

Dated: August 28, 2024             Respectfully submitted,

Eric Halperin
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Michael Favretto
*Assistant Litigation Deputy*

/s/ Eric Mothander
Eric Mothander
Noah Steimel
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7321
Charles.Mothander@cfpb.gov
Noah.Steimel@cfpb.gov