James Kim (admitted *pro hac vice*)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff,*<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLD-INGS LLC.,<br><br>*Defendants.* | **DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:23-cv-00462-JNP-JCB<br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**


RELIEF SOUGHT AND GROUNDS FOR MOTION ..... 1

INTRODUCTION ..... 1

ARGUMENT ..... 4

I. This Case Should Be Dismissed Because The Bureau Filed And Is Prosecuting This Lawsuit Using Unlawfully Obtained Funds. ..... 4

II. The Bureau Lacks Jurisdiction Over Snap (Counts I-II, IV-VI, VIII). ..... 6

A. Congress Only Gave The Bureau Authority Over Leases That Meet The Requirements Of The Functional Equivalence Test, And Snap's Alleged Leases Of "One-Time Auto Repairs And Services" Do Not. ..... 7

B. The Bureau's Attempt To Regulate Snap's LTO Agreements Violates The Major Questions Doctrine. ..... 8

III. Snap's Hybrid Leases Of Auto Parts And Attendant Installation Did Not Extend "Credit" (Counts I-VI). ..... 12

A. Snap's Hybrid Auto Parts And Installation Leases Did Not Create A Debt. ..... 13

B. Snap's Hybrid Leases Of Auto Parts And Installation Were Not A "Purchase [Of] Property Or Services." ..... 16

IV. This Enforcement Action Violates Due Process. ..... 18

V. Even If The CFPA Applied, The Amended Complaint Fails To Plausibly Allege That Snap Engaged In Deceptive (Count I) Or Abusive (Count II) Conduct. ..... 19

A. The Bureau Fails To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Deceptive (Count I). ..... 20

B. The Amended Complaint Fails To Raise A Plausible Inference That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms (Count II). ..... 23

VI. Because Snap Is Not A "Covered Person" Under The CFPA, Count VII And All Claims Against Snap U.S. Holdings LLC And Snap Finance Holdings LLC Should Be Dismissed. ..... 24

CONCLUSION ..... 25




302420276v1

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)....................11

*Anderson v. Nextel Partners, Inc.*,
745 N.W.2d 464 (Iowa 2008)....................15

*Aslam v. United States Dep't of State*,
No. 2:22-cv-00701, 2023 WL 6163969 (D. Utah Sept. 21, 2023)....................5

*Barney v. Holzer Clinic, Ltd.*,
110 F.3d 1207 (6th Cir. 1997)....................15

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)....................9

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....................20

*Chamber of Commerce of U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023)....................12

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)....................18, 19

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*,
51 F.4th 616 (5th Cir. 2022)....................6

*CFPB v. Community Financial Services Ass'n of America, Ltd.*,
601 U.S. 416 (2024)....................2, 4

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974)....................5

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................18

*FTC v. Bunte Bros.*,
312 U.S. 349 (1941)....................11

*Gelles Racing, Inc. v. Ferris*,
75 Va. Cir. 273 (Va. Cir. Ct. 2008)....................18

*HCSC-Laundry v. United States*,
450 U.S. 1 (1981)....................8

*Hickey v. Brennan*,
969 F.3d 1113 (10th Cir. 2020) ....................8

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992) ....................20

*Kurimski v. Shell Oil Co.*,
570 F. Supp. 3d 1228 (S.D. Fla. 2021) ....................22

*Liberty Leasing Co. v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998) ....................15, 16

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) ....................24

*Mitchell v. Comm'r of Internal Revenue*,
775 F.3d 1243 (10th Cir. 2015) ....................8

*Perez v. Loren Cook Co.*,
803 F.3d 935 (8th Cir. 2015) ....................19

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016)....................18

*RRX Indus., Inc. v. Lab-Con, Inc.*,
772 F.2d 543 (9th Cir. 1985) ....................18

*Tavernaro v. Pioneer Credit Recovery, Inc.*,
43 F.4th 1062 (10th Cir. 2022) ....................20

*United States v. Graham*,
305 F.3d 1094 (10th Cir. 2002) ....................13

*United States v. Moss*,
872 F.3d 304 (5th Cir. 2017) ....................19

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)....................11

*W. Virginia v. EPA*,
597 U.S. 697 (2022)....................9, 11

**Statutes:**

12 U.S.C. §289(a)(2)....................4

12 U.S.C. §289(a)(3)....................4

12 U.S.C. §5328....................6

12 U.S.C. §5345(c)....................6

12 U.S.C. §5481(5)....................7

12 U.S.C. §5481(5)-(6)....................7

12 U.S.C. §5481(7)....................12, 13, 16

12 U.S.C. §5481(15)(A)(i)-(ii)....................7

12 U.S.C. §5481(15)(A)(ii)....................7, 8

12 U.S.C. §5497(a)(1)....................4

12 U.S.C. §5497(a)(1)-(2)....................4

12 U.S.C. §5497(e)(1)(A)....................6

31 U.S.C. §§1341-1342....................6

Cal. Civ. Code §1812.635....................12

Fla. Stat. §559.9232(1)(a)....................12, 17

**Regulations:**

12 C.F.R. §1005.2(f)....................12, 13, 16

89 Fed. Reg. 61358 (July 31, 2024)....................14

**Legislative Materials:**

Consumer Rental Purchase Agreement Act, S. 1208, 113th Cong. (June 20, 2013)....................10

Consumer Rental Purchase Agreement Act, H.R. 1588, 112th Cong. (Apr. 15, 2011) (H.R. 1588)....................10

Consumer Rental Purchase Agreement Act, H.R. 1701, 107th Cong. (May 3, 2001) .....9

*Examining Rental Purchase Agreements and the Potential Role for Federal Regulation: Hearing Before the Subcomm. on Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Servs.*, 112th Cong., 1st Sess. (July 26, 2011) .....10

*H.R. 1701 - The Consumer Rental Purchase Agreement Act: Hearing Before the Subcomm. on Fin. Instits. & Consumer Credit of the H. Comm. on Fin. Servs.*, 107th Cong., 1st Sess. (July 12, 2001) .....10

H.R. Rep. No. 112-565 (June 29, 2012) .....10

H.R. Rep. No. 107-590 (July 18, 2002) .....10

**Other Authorities:**

Cong. Rsch. Serv., Consumer Rental-Purchase (Rent-To-Own) Agreements (Apr. 18, 2007) .....9

*Debt*, Black's Law Dictionary (12th ed. 2024) .....13

*Debt*, Random House Webster's Unabridged Dictionary (2d ed. 1997) .....13

*Debt*, Webster's Second New Collegiate Dictionary (3d ed. 2005) .....13

*Earnings*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007) .....5

*Earnings*, Nasdaq, Glossary, https://www.nasdaq.com/glossary/e/earnings .....5

*Earnings*, Oxford Dictionary of Accounting (4th ed. 2010) .....5

FTC, *Survey of Rent-to-Own Customers* (Apr. 2000), https://www.ftc.gov/reports/survey-rent-own-customers .....10

U.S. Const. art. I, §9, cl. 7 .....4

UCLA §104(d) .....17

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Defendants (collectively "Snap") move to dismiss the Amended Complaint with prejudice because (i) the Consumer Financial Protection Bureau ("Bureau") filed and is prosecuting this enforcement action using funds obtained in violation of restrictions on its funding; (ii) Snap is not subject to the jurisdiction of the Bureau because its leases are not within the narrow category of lease the Consumer Financial Protection Act ("CFPA") authorizes the Bureau to regulate; (iii) Snap leases that included "one-time auto repairs and services" did not extend credit; (v) due process precludes the Bureau from applying its new interpretation here; (vi) Counts I and II fail to state a claim for further reasons; and (vii) because the CFPA does not apply, (a) the Bureau's derivative CFPA claim for violations of the Fair Credit Reporting Act ("FCRA") should be dismissed, as should (b) all claims against Snap U.S. Holdings and Snap Finance Holdings.

## INTRODUCTION

Following the dismissal of its original Complaint, the Bureau has filed an Amended Complaint that takes aim at an alleged narrow sub-category of Snap's legacy lease-to-own ("LTO" or "lease") agreements: leases of what the Bureau calls "one-time auto repairs and services." Dkt. No. 59 ("AC") ¶¶3-6. The Amended Complaint is clear, however, that at least insofar as the service or installation was attendant to a lease of auto parts (*i.e.*, a hybrid lease of auto parts and installation or other related services) these alleged leases had no different or other terms than the legacy leases that the Court has already held are not subject to the CFPA or EFTA.[1] They had 60-day terms (AC ¶51), payment was contemporaneous with possession (*id.*), consumers had the contractual right to terminate their agreements upon return or surrender of the parts and payment of

[1] The Amended Complaint does not re-allege a claim under the Truth in Lending Act.

any delinquent amounts (*id.* ¶¶52, 59), and, as a result, the leases imposed no obligation on consumers to make any future payments. Though the Bureau continues to allege that certain customer service representatives told consumers that "one time labor or services [] cannot be returned or surrendered, and thus consumers are required to continue making payments" (*id.* ¶74), the Bureau acknowledges that Snap's leases of auto parts and attendant installation or other services "[i]n fact, . . . include no such exceptions to consumers' 'Right to Terminate' their future payment obligations" (*id.* ¶75). Reduced to its essence, therefore, the Amended Complaint again urges the Court to "consider the practical operation of the [] lease as alleged rather than the formal terms of the lease agreement." Dkt. No. 49 ("Order") at 13. The Court rejected the Bureau's prior invitation to do so, and held that application of federal consumer financial law is determined by the terms of the lease agreement. The Court should do the same here. This lawsuit also suffers from multiple other dispositive and threshold infirmities that require dismissal with prejudice.

First, the Court should dismiss this lawsuit with prejudice without assessing the sufficiency of the Bureau's allegations, because the Bureau filed and is litigating this action using funds obtained in violation of statutory limits on its funding imposed by the CFPA. Under the CFPA, the Bureau draws its funds only from the Federal Reserve's *net* earnings, but the Federal Reserve has no such earnings. This failing was not addressed in *CFPB v. Community Financial Services Ass'n of America, Ltd.*, 601 U.S. 416 (2024) ("*CFSA*"), but the Court's reasoning there supports Snap's interpretation that "earnings" in the CFPA means *net* earnings, which the Federal Reserve does not have. As a result, the Bureau has no lawful authority to prosecute this enforcement action.

Second, the Bureau lacks jurisdiction over Snap and its leases of "one-time auto repairs and services"—both hybrid leases of auto parts and attendant installation and any alleged services-

only leases. The CFPA only authorizes the Bureau to impose the dictates of federal consumer financial law on a narrow category of leases—those with "initial terms of . . . at least 90 days" that are also the "functional equivalent of purchase finance arrangements." The Bureau does not allege that the leases at issue here meet either requirement (nor do they). The Bureau's effort to expand its authority beyond that expressly conferred under the CFPA flouts the intent of Congress and implicates the major questions doctrine.

Third, even if the CFPA's and EFTA's definitions of "credit" were relevant here, Snap's hybrid leases of auto parts and attendant installation or related services did not extend credit.[2] As discussed above, because Snap's leases allegedly required payments contemporaneous with possession or use of the parts and services, and consumers had the right to terminate their leases, the lease agreements did not create a "debt," or result in a "purchase [of] goods or services."

Fourth, due process precludes the Bureau from retroactively applying this novel interpretation of the CFPA for the first time in the context of this enforcement action.

Fifth, the Amended Complaint also suffers from claim-specific pleadings defects. Count I should be dismissed because Snap's "100 Day Cash Payoff" advertising slogan was neither misleading to a reasonable consumer nor likely to impact their conduct. And Count II should be dismissed because the Amended Complaint fails to plausibly allege that Snap's legacy Merchant Portal materially interfered with consumers' ability to understand their lease terms.

Finally, because the CFPA does not apply here, (i) Snap U.S. Holdings and Snap Finance

[2] The Bureau also alleges that certain merchants coded one-time labor or service costs in such a way that resulted in consumers leasing "exclusively one-time labor or service costs." AC ¶¶5, 54-56. Because facts beyond the pleadings are necessary to demonstrate why any such (alleged) leases were not extensions of credit, Snap is not moving to dismiss Counts I-VI as to these alleged leases, and instead will respond to the allegations in a future responsive pleading.

Holdings should be dismissed from the case; and (ii) the Bureau's derivative CFPA claim predicated on alleged violations of the Fair Credit Reporting Act ("FCRA") should also be dismissed.

## ARGUMENT

### I. This Case Should Be Dismissed Because The Bureau Filed And Is Prosecuting This Lawsuit Using Unlawfully Obtained Funds.

The Court should dismiss this case with prejudice because it is being litigated with funds transferred to the Bureau in violation of statutory restrictions on its funding and, therefore, in violation of the Appropriations Clause's mandate that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, §9, cl. 7.

Under the CFPA, the Bureau funds its operations by making a demand of the Federal Reserve in "the amount determined by the [Bureau's] Director to be reasonably necessary to carry out" its operations, subject to a cap of twelve percent of the total operating expenses of the Federal Reserve. 12 U.S.C. §5497(a)(1)-(2). Those funds may come, however, only "from the combined earnings of the Federal Reserve System." *Id*. §5497(a)(1).

The "earnings" of the Federal Reserve are its net earnings—*i.e.*, revenues in excess of expenditures and other losses. The Supreme Court confirmed as much in *CFSA*, holding that the Bureau's funding is subject to the Appropriations Clause, because the funds derive from the "*surplus funds* in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." 601 U.S. at 425 (emphasis added); *see* 12 U.S.C. §289(a)(3) (directing transfer of surplus funds to the Treasury). The Federal Reserve's "surplus fund[s]" are its "net earnings." *Id*. §289(a)(2).

The plain meaning of "earnings" (which the CFPA does not define) confirms this interpretation. As a matter of plain English, "earnings" means "net income"—*i.e.*, income in excess of

expenditures and other losses. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 391 (11th ed. 2007) (defining "earnings" as "the balance of revenue after deduction of costs and expenses"). That is also true of the term's specialized meaning under well-established accounting principles applicable to a bank like the Federal Reserve. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 201 (1974). The Federal Reserve prepares its financial statements in accordance with the Financial Accounting Manual for Federal Reserve Banks, which the Board of Governors of the Federal Reserve developed specifically to address the "nature and function of a central bank." *See* Declaration of Levi W. Swank ("Swank Decl."), Ex. 1, at iii.[3] That manual states that "earnings" means profits. *See id.* §12.60 (stating that remittances are paid from "net earnings"); *see also Earnings*, Oxford Dictionary of Accounting (4th ed. 2010) (defining "earnings" as "[t]he net income or profit of a business"); Nasdaq, Glossary (defining "earnings" as "[n]et income for the company during a period").[4] Thus, the Bureau's funding must come from the combined net income or profits of the Federal Reserve System.

Since September 2022, the Federal Reserve has had no net earnings or profits. Swank Decl., Ex. 2. For the year ending December 31, 2023, the Federal Reserve reported a cumulative "[d]eferred asset" amount of $133.3 billion, which "represents the net accumulation of costs in excess of earnings." *Id.*, Ex. 3 at 3, 61. The Federal Reserve continues to operate at a loss, reporting a deferred asset of $175 billion as of last month. *Id.*, Ex. 4 at 48. Despite its lack of earnings, the Federal Reserve has continued to transfer funds to the Bureau. *Id.*, Ex. 5 at 4 ($315 million

[3] The Court may take judicial notice of official government publications publicly available on a government agency's website. *See Aslam v. United States Dep't of State*, No. 2:22-cv-00701, 2023 WL 6163969, at *9 & n.115 (D. Utah Sept. 21, 2023).

[4] https://www.nasdaq.com/glossary/e/earnings.

transfer for first quarter of FY 2024). These transfers are, as the Bureau acknowledges, the "principal[]" means by which "[t]he CFPB is funded." *Id*.

The requirement that the Bureau's funding come from the combined "earnings" of the Federal Reserve System stands in stark contrast to how Congress chose to fund the Financial Stability Oversight Council and the Office of Financial Research—both also created by the CFPA. For the first two years of its existence, the expenses of the Oversight Council were "treated as expenses of, and paid by, the Office of Financial Research," 12 U.S.C. §5328, which was funded by the Federal Reserve in "an amount sufficient to cover the expenses of the Office," *id*. §5345(c). Congress similarly could have funded the Bureau from any source of revenue at the Federal Reserve's disposal. Instead, it limited the Bureau's funding solely to the combined "earnings" of the Federal Reserve System.

This is not to say that the Bureau must cease operations until the Federal Reserve returns to profitability. If the "sums available to the Bureau" from the Federal Reserve are "not . . . sufficient to carry out [its] authorities," the Bureau may seek appropriations directly from Congress. 12 U.S.C. §5497(e)(1)(A). The Court should not permit the Bureau to flout its enabling statute and bypass Congress by using unlawfully requisitioned funds to prosecute this enforcement action. Instead, the Court should dismiss this lawsuit with prejudice. *See Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022), *rev'd and remanded on other grounds*, *CFSA*, 601 U.S. 416. At a minimum, the Anti-Deficiency Act prevents the Bureau from continuing to prosecute this action. *See* 31 U.S.C. §§1341-1342.

## II. The Bureau Lacks Jurisdiction Over Snap (Counts I-II, IV-VI, VIII).

Under the CFPA, the Bureau has jurisdiction only over a "covered person," which is a

person that offers or provides a "consumer financial product or service." 12 U.S.C. §5481(5)-(6). The definition of "consumer financial product or service" includes a narrow category of leases, and the Bureau does not allege in the Amended Complaint that the LTO agreements at issue in this lawsuit fall within that narrow category. Snap, therefore, is not a "covered person" subject to the CFPA. The Bureau's attempt to expand its limited authority, by arguing for the first time that LTOs are subject to the CFPA because they extend "credit" (AC ¶92), contravenes the language of the statute and runs afoul of the major questions doctrine.

### A. Congress Only Gave The Bureau Authority Over Leases That Meet The Requirements Of The Functional Equivalence Test, And Snap's Alleged Leases Of "One-Time Auto Repairs And Services" Do Not.

The CFPA defines a "consumer financial product or service" to include:

(i) extending credit and servicing loans, . . .
(ii) extending or brokering leases of personal or real property that are the functional equivalent of purchase finance arrangements, if—
(I) the lease is on a non-operating basis; [and]
(II) the initial term of the lease is at least 90 days; . . .

12 U.S.C. §§5481(5), (15)(A)(i)-(ii). In its decision, this Court held that Section 5481(15)(A)(ii) did not apply to Snap's legacy merchandise-only leases because their initial terms were 60 days—not "at least 90 days," as required under the statute. Order at 20-22. In the Amended Complaint, the Bureau does not allege that Snap's leases of "one-time auto repairs and services" satisfy the statutory requirements for the Bureau to regulate them as leases under the CFPA. And for good reason, as these leases, too, "featured a 60-day term." AC ¶51; *see, e.g.*, AC, Ex. A at 1.

Instead, the Bureau alleges that Snap's leases for "one-time auto repairs and services" are a "consumer financial product or service" because they "extend credit" under Section 5481(15)(A)(i). This interpretation of the statute, however, violates the "basic principle of

statutory construction that a specific statute . . . controls over a general provision . . . , particularly when the two are interrelated and closely positioned." *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981); *see Hickey v. Brennan*, 969 F.3d 1113, 1121 (10th Cir. 2020) (statutory provision that "both directly and specifically answers th[e] question" controlled over provision that "touches th[e] question, at best, only indirectly and generally"). Here, the statute specifies that only "leases" with specifically defined characteristics are a "consumer financial product or service." It is settled that Snap's leases—including its leases for "one-time auto repairs and services"—do not have these features. The Bureau's reliance on the CFPA's definition of "credit" to bypass the provision that "directly and specifically" addresses the issue violates the cardinal principle of statutory interpretation that "the specific governs the general." *Hickey*, 969 F.3d at 1121.

The interpretation of the CFPA advanced by the Bureau here would also render meaningless the CFPA's carefully delineated limits on the types of leases that constitute a "financial product or service." *See Mitchell v. Comm'r of Internal Revenue*, 775 F.3d 1243, 1253 (10th Cir. 2015) (rejecting interpretation of "general[ly] applicab[le]" provision that would "render meaningless the more specific" provision). The CFPA's lease-specific provision (12 U.S.C. §5481(15)(A)(ii)) expressly contemplates that certain leases may have credit-like characteristics (*i.e.*, be "the functional equivalent of a purchase finance arrangement[]"), but Congress only subjected a narrow category of such leases to the Bureau's jurisdiction (*i.e.*, those with an initial term of "at least 90 days"). *See* 12 U.S.C. §5481(15)(A)(ii); Order at 20-21. Fundamental principles of statutory interpretation prevent the Bureau from exercising jurisdiction over Snap's leases under the CFPA.

### B. The Bureau's Attempt To Regulate Snap's LTO Agreements Violates The Major Questions Doctrine.

While the plain text of the CFPA forecloses the Bureau's attempt to assert jurisdiction over

Snap's LTOs, "[t]he major questions doctrine reinforces that conclusion." *Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring). Under that doctrine, an agency claiming "power over 'a significant portion of the American economy'" must identify a "clear congressional authorization." *W. Virginia v. EPA*, 597 U.S. 697, 722-23 (2022) (citation omitted). That is especially true where the agency "claim[s] to discover in a long-extant statute an unheralded power" to "adopt a regulatory program that Congress has conspicuously and repeatedly declined to enact itself." *Id.* at 724 (citation omitted).

The LTO industry has existed for over half-a-century and serves over 4 million American consumers each year. Swank Decl., Ex. 6, at 4-5. Recognizing the LTO industry's impact on the national economy, numerous bills have been introduced in Congress over the past two decades—both before and after the CFPA's enactment—that would have comprehensively regulated the industry at the federal level. *See, e.g.*, Cong. Rsch. Serv., Consumer Rental-Purchase (Rent-To-Own) Agreements (Apr. 18, 2007) ("For more than a decade, there has been considerable debate over the need for regulation of the rent-to-own industry."). All of them have failed. In the process, Executive Branch officials have repeatedly disclaimed the statutory authority to regulate the LTO industry—authority the Bureau now claims, for the first time, in this enforcement action.

For example, legislation introduced in 2001 to regulate the LTO industry would have mandated specific consumer disclosures, prohibited certain terms from being including in a lease, and preempted certain conflicting state laws. *See* Consumer Rental Purchase Agreement Act, H.R. 1701, 107th Cong., §§1004-1005, 1007, 1018 (May 3, 2001). Officials from the Federal Trade Commission and the Federal Reserve testified during a congressional hearing on that legislation that LTOs are "not specifically regulated by the Federal laws that govern other credit or leasing

transactions," but are instead "governed by State law." *H.R. 1701 – The Consumer Rental Purchase Agreement Act: Hearing Before the Subcomm. on Fin. Instits. & Consumer Credit of the H. Comm. on Fin. Servs.*, 107th Cong., 1st Sess., at 8 (July 12, 2001) (statement of Howard Beales, Dir. Bureau of Consumer Prot., FTC); *see id*. at 9 (similar) (statement of Dolores S. Smith, Dir., Div. of Consumer Affairs, Bd. of Governors, Fed. Reserve Sys.)). The House Report on that legislation thus concluded that "there is no Federal oversight or regulation of the rent to own industry." H.R. Rep. No. 107-590, at 10 (July 18, 2002); *accord* FTC, *Survey of Rent-to-Own Customers* (Apr. 2000) (similar).[5]

Similar legislation was introduced in the very next Congress after passage of the CFPA. *See* Consumer Rental Purchase Agreement Act, H.R. 1588, 112th Cong. (Apr. 15, 2011) (H.R. 1588); *see also* Consumer Rental Purchase Agreement Act, S. 1208, 113th Cong. (June 20, 2013). During a congressional hearing on that legislation, the Deputy Director of the FTC's Bureau of Consumer Protection explained that the Bureau had been given "limited" authority in this area, such that it was doubtful the agency had "the authority they would need to regulate" the LTO industry. *Examining Rental Purchase Agreements and the Potential Role for Federal Regulation: Hearing Before the Subcomm. on Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Servs.*, 112th Cong., 1st Sess., at 9 (July 26, 2011). Other witnesses likewise concluded that the Bureau lacked authority to regulate the LTO industry. *See id*. at 36. Consistent with that view, the House Report recognized that, despite the CFPA, there was still "no federal oversight or regulation of the rent-to-own industry." H.R. Rep. No. 112-565, at 10 (June 29, 2012). Echoing that conclusion, a Bureau Task Force acknowledged that "rent-to-own transactions are not credit" subject to the

[5] https://www.ftc.gov/reports/survey-rent-own-customers.

CFPA. Swank Decl., Ex. 7, Bureau of Consumer Fin. Prot., 1 *Taskforce on Federal Consumer Financial Law Report* 215 (Jan. 2021).

Congress has thus "conspicuously and repeatedly declined," time and time again, to grant the Bureau (or another federal agency) the authority the Bureau now claims. *W. Virginia*, 597 U.S. at 724, 731 (rejecting agency interpretation that would "enable[] [the EPA] to enact a program that, . . . Congress considered and rejected' multiple times") (citation omitted). Given the frequency of 60-day lease terms across the LTO industry, Congress's decision to give the Bureau jurisdiction over leases that were the functional equivalent of a purchase finance arrangement but only where the leases had (among other things) initial terms of at least 90 days can only be viewed as a conscious decision not to subject the LTO industry to the Bureau's oversight and enforcement authority. Until the filing of this lawsuit, moreover, the Bureau had never publicly claimed the statutory authority to regulate the LTO industry. That lengthy period of regulatory inaction further undercuts the Bureau's nascent claim that the CFPA grants it such power. *See FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941) (holding that "the want of assertion of power by those who presumably would be alert to exercise it[] is equally significant in determining whether such power was actually conferred"); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (rejecting agency's assertion of "newfound authority to regulate millions of small sources").

Finally, the Bureau's lawsuit here also "intrudes into an area that is the particular domain of state law," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021)—a primary concern underlying the major questions doctrine. *See W. Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). Forty-seven states specifically regulate LTO transactions. These state statutes vary widely, including as to a core issue here of whether attendant services may be

included in a lease without converting the lease to a credit transaction. *Compare, e.g.*, Cal. Civ. Code §1812.635 (prohibiting inclusion of service plans), *with* Fla. Stat. §559.9232(1)(a) (permitting the inclusion of "services related to the agreement" in the "cash price"). Congress has repeatedly declined to displace this extensive and robust state-based regulation of the LTO industry, reinforcing that the major questions doctrine precludes the Bureau's assertion here of a previously "unheralded power" to impose the dictates of federal consumer financial protection laws on the LTO industry and Snap's leases. *See Chamber of Commerce of U.S. v. CFPB*, 691 F. Supp. 3d 730, 740-41 (E.D. Tex. 2023) (applying major questions doctrine and enjoining Bureau action that "would allow the agency to displace" an extensive body of state regulations).

## III. Snap's Hybrid Leases Of Auto Parts And Attendant Installation Did Not Extend "Credit" (Counts I-VI).

Even were it appropriate to analyze Snap's leases under the CFPA's and EFTA's definitions of "credit," Snap's leases of auto parts (*e.g.*, tires) that included attendant one-time installation or other related services (collectively, "auto parts and installation") were not extensions of credit because they did not grant consumers the right to "[1] defer payment of a debt, [2] incur debt and defer its payment, or [3] purchase property or services and defer payment for such purchase." 12 U.S.C. §5481(7) (CFPA); *see* 12 C.F.R. §1005.2(f) (EFTA).

The Bureau alleges that certain Snap lease agreements included both auto parts and installation costs because "merchant partners often itemize the costs of the auto parts or merchandise being installed or replaced as part of the invoice appended to the consumer's Agreement." AC ¶4. As a result, "[t]he total amount consumers owe under their [lease agreement] is based on their invoice total, and is inclusive of labor or service costs." *Id.* To be clear, and as Snap stated at oral argument, its policies and procedures only permitted leases to include installation or other services

directly related to the leased merchandise, and capped the cost of such attendant services at thirty percent of the total lease amount. Curiously, despite the Bureau's multi-year, pre-suit investigation and Snap's production of voluminous documents, the Amended Complaint makes no mention of Snap's policy limiting the inclusion of services in its leases.

Regardless, despite the Bureau's evasive pleading, the Court need not await factual development to resolve the precise circumstances under which attendant installation and other related services were permitted to be included in a lease because even the facts alleged on the face of the Amended Complaint demonstrate that such leases were not an extension of credit because they neither created a "debt" nor were they a "purchase [of] property or services."

**A. Snap's Hybrid Auto Parts And Installation Leases Did Not Create A Debt.**

Snap's hybrid leases of auto parts and installation did not create a "debt," because they did not obligate consumers to make future payments. Instead, consumers were only contractually required to make payments contemporaneous with their possession of the parts. And consumers could terminate their leases at the end of any term by paying for past use of the auto parts and returning or surrendering them. For these reasons, the leases did not "defer payment of a *debt*" or "incur *debt* and defer its payment." *See* 12 U.S.C. §5481(7); 12 C.F.R. §1005.2(f) (emphases added).

Neither the CFPA nor EFTA defines the term "debt," so its ordinary meaning controls. *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002). "Debt" is "[a]n obligation or liability to pay or render something to another." Webster's Second New Collegiate Dictionary 297 (3d ed. 2005); *accord* Random House Webster's Unabridged Dictionary 514 (2d ed. 1997) (similar); *Debt*, Black's Law Dictionary (12th ed. 2024) (similar). The Bureau recently



302420276v1

acknowledged elsewhere that a "commonsense understanding" of the term "debt" at least requires an "obligation by a consumer to pay another party." 89 Fed. Reg. 61358, 61360 (July 31, 2024).

Under Snap's hybrid leases, however, consumers had no contractual obligation to make future payments to Snap. Despite re-focusing its allegations on leases that allegedly included one-time services, the Bureau alleges that these lease agreements had the same terms as Snap's legacy lease agreements that were the subject of the original Complaint. *Compare* AC ¶¶46, 50-52, *with* Compl. ¶¶41, 45-47. Thus, "[c]onsumers paid for 60-day periods of possession of the leased property," Order at 13, but were not contractually obligated to renew their leases upon expiration of any 60-day term, AC ¶¶51-52; Compl. ¶¶46-47; *see* Order at 24. Rather, consumers had the right to "terminate [their] lease payment obligations under th[e] Agreement" at the end of any 60-day lease period upon payment of past due amounts and surrender of the property. AC ¶¶51-52.[6]

The Bureau's allegation that the "services" component of a hybrid lease for auto parts and installation could not itself be surrendered or returned makes no difference, *see* AC ¶3, because the Bureau does not allege that consumers were contractually precluded from terminating their lease agreements upon surrender or return of the "parts" (*e.g.*, the tires) to which the services were related. At most, the Bureau insinuates that some parts would be difficult or impractical to return or surrender. That, too, is irrelevant, because "the formal terms of the lease agreement," not the practicalities involved, dictate whether a credit arrangement existed. Order at 13-14. And, as to the terms of the relevant lease agreements, the Bureau alleges that the leases "include no []

[6] In its Order, the Court correctly held that a consumer's obligation to pay past due amounts to terminate their lease did not transform the lease into a credit arrangement, because "consumers . . . had a contractual right to terminate the agreement after the initial term," and could "conditionally decline to renew the lease for subsequent terms." Order at 24, 25-26. The same is true here.

exceptions to consumers' 'Right to Terminate' their future payment obligations." AC ¶75. Thus, no "debt" was created because "upon executing the [] lease, consumers did not bind themselves 'in all circumstances' to pay the total lease amount." Order at 13; *see also Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 718 (S.D. Ohio 1998) (no debt created because leases "provided for remedial scenarios where the lessees' financial obligation to Plaintiff was extinguished"); *Anderson v. Nextel Partners, Inc.*, 745 N.W.2d 464, 468 (Iowa 2008) (similar, under state law).[7]

Though more is not necessary, Snap's remedial rights for hybrid leases were the same as those for merchandise. *See* AC, Ex. C at 3. As to both, Snap "retained, at all times, the contractual right to repossess the leased property from delinquent consumers." Order at 13. That the value of the repossessed property in this scenario (*e.g.*, tires) would be less than the leased value of both the parts plus attendant installation is irrelevant. The Bureau's original Complaint similarly suggested that certain leased merchandise (*e.g.*, mattresses or tires) had little or no residual value, but the Court held that neither the CFPA nor EFTA applied regardless. And, moreover, that Snap allegedly did not routinely exercise its remedial rights—either because of practical considerations (*e.g.*, uninstalling breaks), the residual value of the parts (*e.g.*, used tires), or for some other reason—"did not . . . grant consumers the right to defer payment." Order at 14; *see also Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1211 (6th Cir. 1997) (holding that "where there is no duty to pay, there cannot be a right to defer payment" of a debt).

---

[7] The Bureau alleges that certain customer service representatives told consumers that "auto parts or merchandise installed as part of auto repairs" could not be returned or surrendered. AC ¶74. The Bureau made this same allegation in its original Complaint, *see* Compl. ¶67, but the Court correctly held that whether credit has been extended begins and ends with the black-and-white terms of the lease agreement itself, and, as alleged, the agreement itself contained no such exceptions to termination. The same is true here.

It makes no difference that "consumers' scheduled payments . . . are not contemporaneous or substantially contemporaneous with the value received." AC ¶3. "Contemporaneous payment" is relevant only to whether payment of a debt has been *deferred*, not whether a debt has been *created* in the first place. *See* 12 U.S.C. §5481(7); 12 C.F.R. §1005.2(f). Under Snap's hybrid leases of auto parts and installation, consumers had no obligation to make future payments (Order at 13), and so consumers did not incur any "debt."

In any event, the relevant lease agreements did provide for payment contemporaneous with the consumer's possession, use, and enjoyment of the auto parts. Consumers made payments pursuant to 60-day terms that corresponded with their possession of the parts, but could terminate any future payment obligation by returning or surrendering the parts. Thus, as in *Liberty Leasing*, "the lessees' financial obligation, or debt for the total lease price, would have been extinguished upon the surrender of possession of the equipment; *i.e.* the lessees' financial obligation was *contemporaneous* with possession." 6 F. Supp. 2d at 717. Even if the Court were required to trace "the value received" by a consumer over time, Snap submits that auto parts (*e.g.*, tires, brakes) have little or no "value" to the consumer absent attendant installation or other related services. The same often holds true for mattresses (delivery), furniture (assembly), and refrigerators (installation). Thus, the "value received" by the consumer is substantially commensurate with their periodic payments. And, if a consumer terminates their lease and returns the auto parts, the consumer retains no residual "value" from the installation.

### B. Snap's Hybrid Leases Of Auto Parts And Installation Were Not A "Purchase [Of] Property Or Services."

The Bureau also alleges that Snap's hybrid leases of parts and installation granted consumers the right to "purchase property or services and defer payment for such purchase." AC ¶92.

Under the lease terms, however, consumers did not "purchase" (*i.e.*, acquire ownership of) the parts and installation or other related services until after they had either (a) exercised one of the early pay-off options; or (b) repeatedly renewed their 60-day lease terms for the maximum potential 12- or 18-month duration. AC ¶¶49-51; *e.g.*, AC, Ex. C at 1. Though the installation may have been performed at the outset of the lease agreement, the Amended Complaint does not allege—and the leases attached to it do not provide—that consumers "purchased" that service at the time of signing. To the contrary, the lease agreements refer to the parts and installation collectively as the leased "[p]roperty" (AC ¶54), and state that Snap "own[s] the Property unless and until you make the payments necessary to acquire ownership" (AC, Ex. C at 1). Consumers also retained the "[r]ight to [t]erminate" their lease agreements (*id.* ¶124), which would absolve them of any obligation to make future payments or pay the full price of the auto parts and installation. Thus, the Court's previous holding applies fully here. *See* Order at 13 n.11.

State law reinforces that inclusion of attendant installation or other related services in a lease does not render it subject to the Bureau's jurisdiction. Some state LTO laws specifically authorize inclusion in the lease of "services related to the agreement." Fla. Stat. §559.9232(1)(a). Indeed, the Uniform Consumer Leasing Act ("UCLA") provides that "[i]f a transaction that is predominantly a consumer lease includes an incidental sale of goods, services, or other benefits, . . . the incidental sale is not subject to" state credit sales statutes. UCLA §104(d). Courts routinely analyze whether a transaction is a sale or lease under the Uniform Commercial Code ("UCC"), moreover, and have found transactions that include services to be leases if the lease is

"predominantly" for goods.[8] The Bureau's position—that a lease's inclusion of installation and related services renders it a purchase—would upend this settled framework.

**IV. This Enforcement Action Violates Due Process.**

Even if the Court accepted the Bureau's invitation to re-write the CFPA to regulate Snap's hybrid leases, permitting the Bureau to *apply* that new interpretation retroactively in the context of this first-of-its-kind enforcement action would also deprive Snap of the fair notice that due process requires. It is "[a] fundamental principle in our legal system . . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This long-recognized principle exists so "that regulated parties should know what is required of them" and to prevent "those enforcing the law [from acting] in an arbitrary or discriminatory way," *Fox*, 567 U.S. at 253.

Courts have repeatedly applied these principles to prohibit agencies from retroactively applying new interpretations of law in the context of an enforcement action. In *Fox*, for example, this Court held that the FCC violated the Due Process Clause when it brought an enforcement action concerning "fleeting expletives and a brief moment of indecency" despite the FCC's policy at the time giving no notice that "fleeting moments of indecency" were actionable. 567 U.S. at 245-46, 247-48, 253-55; *see also PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (Kavanaugh, J.) (similar).

These due process safeguards also apply when regulated parties have relied on an agency's "very lengthy period" of "conspicuous inaction." *Christopher v. SmithKline Beecham Corp.*, 567

[8] *See, e.g., RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985); *Gelles Racing, Inc. v. Ferris*, 75 Va. Cir. 273, 274 (Va. Cir. Ct. 2008).

U.S. 142, 158 (2012). "It is one thing to expect regulated parties to conform their conduct to an agency's interpretation once the agency announces them," but it "is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Id.* at 158-59; *see also Perez v. Loren Cook Co.*, 803 F.3d 935, 941, 943 (8th Cir. 2015) (holding that an agency's "announcement of . . . an unprecedented interpretation [of its regulation] in [an administrative] citation . . . amounted to unfair surprise," where the agency was "familiar" with the conduct but engaged in lengthy period of "conspicuous inaction"); *United States v. Moss*, 872 F.3d 304, 312, 315 (5th Cir. 2017) (similar).

This enforcement action violates due process. Before this enforcement action, the Bureau had never publicly taken the position that LTO transactions were covered by the CFPA's or EFTA's prohibitions. It could have, and should have, announced its views in a public rulemaking, which would have afforded Snap (and the industry) fair notice and an opportunity for comment and challenge. Imposing the dictates of federal consumer financial law on the LTO industry "for the first time [through this] enforcement proceeding" following an extended period of "conspicuous inaction," *Christopher*, 567 U.S. at 158-59, deprives Snap of due process.

### V. Even If The CFPA Applied, The Amended Complaint Fails To Plausibly Allege That Snap Engaged In Deceptive (Count I) Or Abusive (Count II) Conduct.

Count I re-alleges that Snap violated the CFPA by providing merchants with misleading advertisements (AC ¶¶100-108), and Count II alleges that certain aspects of Snap's "application and contracting process" materially interfered with consumers' ability to understand the terms of their leases (*id.* ¶¶109-113). Though the Bureau now directs these allegations to alleged leases of "one-time auto repairs and services," the substance of these claims is the same.

**A. The Bureau Fails To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Deceptive (Count I).**

The Bureau continues to allege that Snap violated the CFPA by providing merchants with advertisements that included the phrase "100 Day Cash Payoff." AC ¶102. The only new allegation made in this regard is that "along with the prominent phrase '100 Day Cash Payoff,' Snap Finance's advertisements . . . included phrases such as 'No Credit Needed.'" *Id.* ¶29.

The Bureau's theory is the same: that Snap's "100 Day Cash Payoff" advertisement led consumers who had already chosen to lease from Snap to "believe[] they had entered into a 100-day financing agreement, under which their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." AC ¶¶34, 106. Again, the Bureau does not allege that this advertising slogan was false—*i.e.*, that it misrepresented the terms and conditions of an available lease option. Nor does the Bureau allege that a "100 Day Cash Payoff" was not an option available to every consumer.

To determine whether an advertising statement is misleading, courts evaluate the statement in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall "net impression" is misleading. *See CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). Courts therefore assume that "the reasonable consumer would read a communication in its entirety and make sense of a communication by assessing it as a whole and in its context." *Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1072 (10th Cir. 2022). If the "overall net impression" is found to be misleading, the court must then determine if the statement was material—*i.e.*, "likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (citation omitted).

Here, the "100 Day Cash Payoff" advertising slogan was neither. On its face, the most the

phrase "100 Day Cash Payoff" communicated to a reasonable consumer was that they had the option of acquiring ownership of the merchandise by paying off their lease, with cash, in 100 days—which the Bureau does not contest was an option available to every consumer. This four-word slogan made no promises or representations about how a consumer could exercise that early payment discount option, nor whether this was the only lease option, one of many, or the default. To the extent it left any impression in this regard, the only reasonable inference is that the consumer must pay off their lease *with cash*—*i.e.*, through a payment method different than their automatically-scheduled electronic debits. Moreover, the term "payoff" is commonly used to indicate the payment required to obtain ownership earlier than provided for under the default terms (*e.g.*, a mortgage "payoff"). For these reasons, and because the first page of the lease agreement itself clearly explains how to exercise this option, *e.g.*, AC, Ex. A at 1, no reasonable consumer was likely to have been misled into believing that their automatically scheduled payments would result in the purchase of the auto parts and labor for their "cash" price on day 100. And, despite the opportunity to amend, the Bureau alleges no facts—such as the number or proportion of Snap's consumers who successfully elected the "100 Day Cash Payoff" or consumer complaints—that would raise a plausible inference that any consumers were misled.

That certain advertisements also included the phrase "No Credit Needed" supports no different conclusion. It is unclear from the Amended Complaint why the Bureau thinks the phrase "No Credit Needed" supports its view that "100 Day Cash Payoff" is misleading. In context, the phrase "No Credit Needed" simply conveys that a consumer need not have a credit score or credit history to be approved for a lease from Snap—hence the immediately preceding sentence, "approval in a snap!" *Id.* ¶29.

If the Bureau believes that a consumer would have reasonably believed that the "100 Day Cash Payoff" was the default payment term, that too is an implausible inference to draw. "Reasonable consumers . . . understand that [] signage does not necessarily provide the complete universe of pricing-related information." *Kurimski v. Shell Oil Co.*, 570 F. Supp. 3d 1228, 1242-46 (S.D. Fla. 2021) (dismissing deceptive advertising claim). No reasonable consumer would have concluded that because Snap advertised a "100 Day Cash Payoff" that they were automatically scheduled to pay off their lease for its "cash" price in 100 days.

In any event, this four-word slogan was not likely to affect the conduct of a reasonable consumer—a required element of a deception claim under the CFPA. The Bureau's allegation of materiality is a legal conclusion: it simply says, without any factual enhancement, that the phrase "100 Day Cash Payoff" "was material." AC ¶107. But the Bureau does not allege that the advertisement induced any consumer to lease from Snap, *see id.* ¶106 (alleging only that consumers who had already "received the Snap Defendants' financing" were misled as to their subsequent conduct), nor does the Bureau plausibly allege any effect on consumer behavior after execution of the lease agreement, given the express deadline stated in the advertisement itself, that electronic debits were the default method of payment, and further instructions on how to exercise the cash payoff option contained on the first page of the lease—which the Bureau at oral argument acknowledged was made available to consumers both before and after execution. Swank Decl., Ex. 8, at 46:16-47:6, 50:5-7. The Amended Complaint pleads no new facts (*e.g.*, consumer complaints) that would raise a plausible inference that the four-word advertising slogan had any impact at all on consumers.

### B. The Amended Complaint Fails To Raise A Plausible Inference That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms (Count II).

In Count II, the Bureau re-alleges that Snap's legacy Merchant Portal process materially interfered with consumers' ability to understand their lease agreements because it "designed and implemented a Merchant Portal application and contracting process" that the Bureau believes "led to" certain consumers not fully understanding the terms of their leases. AC ¶111.

Even as to the legacy process, the Bureau has failed to plausibly allege any "material interference" with consumers' ability to understand their leases. The Amended Complaint asserts that certain "auto repair merchants" signed and submitted agreements "on behalf of consumers without consumers' prior review of their Agreement" (AC ¶39), but is devoid of any allegation that merchants signed and submitted lease agreements without a consumer's authorization *and* without the consumer having been afforded the opportunity to review the agreement. Indeed, the Bureau conceded at oral argument that consumers had "the opportunity to review the terms of the financing agreement" before signing. Swank Decl., Ex. 8, at 50:5-7. That some consumers complained to Snap about merchants signing their lease agreements does not close this plausibility gap. AC ¶40.

The Bureau also alleges that Snap relied on merchants to explain lease agreements while providing them with no written guidance. AC ¶41. But the lease agreement itself—which consumers had the opportunity to review—clearly explains the terms and conditions. *See, e.g.*, AC, Exs. A-G. The Bureau does not allege otherwise, and identified no legal duty of Snap's to supplement this fulsome explanation.

In any event, the Bureau does not allege facts concerning what information merchants

allegedly "failed to adequately explain" or how they "otherwise misled consumers." All the Bureau does allege is that, despite the clear and conspicuous terms of the lease, "consumers did not understand" all of those terms and that some of those consumers subsequently complained to Snap. AC ¶¶42, 44. Absent more, a consumer's alleged lack of "understand[ing]" at most "alleges facts that are merely consistent with a defendant's liability," which "stops short of the line between possibility and plausibility of entitlement to relief." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) (citation and quotation marks omitted).

Finally, the Amended Complaint does not plausibly allege that requiring consumers to pay a processing fee "materially interfered" with their ability to understand their lease agreements. The only way that could even conceivably be true is if paying the fee—which the Bureau alleges occurred before the consumer was provided with a copy of the agreement, AC ¶43—bound the consumer to the lease agreement. But the Complaint alleges the opposite—that consumers paid the processing fee *before* "signing the[] . . . Agreement" and being contractually bound to it. *Id.* The alleged processing fee was no different than an application fee. That the consumer may have paid the fee after *applying* for a lease, rather than before, is a distinction without a difference.

## VI. Because Snap Is Not A "Covered Person" Under The CFPA, Count VII And All Claims Against Snap U.S. Holdings LLC And Snap Finance Holdings LLC Should Be Dismissed.

The Bureau has no derivative catch-all CFPA claim for alleged violations of FCRA because Snap is not a "covered person" subject to the CFPA. Thus, although Snap does not move to dismiss the FCRA claim, Count VII should be dismissed.

Likewise, the Court previously dismissed the surviving FCRA claim as to the two holding company Defendants—Snap US Holdings LLC and Snap Finance Holdings LLC—holding that

the common enterprise doctrine does not extend to claims under FCRA or the CFPA's catch-all provision. Order at 30-31. Here, the Bureau continues to rely on a common enterprise theory of liability as to both Defendants. AC ¶25. Thus, the Court should "decline[] to extend the common-enterprise doctrine to the CFPB's surviving claim[]" under FCRA (Order at 30), and dismiss Snap U.S. Holdings LLC and Snap Finance Holdings LLC from the case.

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Dated: September 20, 2024

Respectfully submitted,

/s/ Nathan R. Marigoni
James Kim (admitted *pro hac vice*)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone: 404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2024, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ Nathan R. Marigoni
Nathan R. Marigoni