ERIC MOTHANDER
NOAH STEIMEL
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
202-435-7321
charles.mothander@cfpb.gov
noah.steimel@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff*,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC,<br><br>*Defendants*. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00462-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. Snap's Agreements for Auto Repairs and Services Constitute "Credit" under the CFPA and EFTA. ..... 3

A. Consumers' Payments under Snap's Agreements for Auto Repairs and Services Are Not Contemporaneous or Substantially Contemporaneous with One-Time Labor or Service Costs. ..... 4

B. One-Time Auto Repairs and Services Cannot Be Surrendered, Possessed, or Recalled. ..... 7

II. The CFPA Does Not Limit the Bureau's Authority to Regulate Agreements Styled as Leases to 12 U.S.C. § 5481(15)(A)(ii). ..... 10

III. Whether Snap's Agreements for Auto Repairs and Services Constitute "Credit" Does Not Implicate the Major Questions Doctrine ..... 11

IV. This Action Does Not Violate Due Process. ..... 14

V. Counts I and II of the Bureau's Amended Complaint Plausibly Allege Violations of the CFPA. ..... 15

A. The Amended Complaint Plausibly Alleges Snap's "100 Day Cash Payoff" Advertisement was Misleading. ..... 15

B. The Amended Complaint Plausibly Alleges Snap Materially Interfered with Consumers' Ability to Understand the Terms and Conditions of its Agreements. ..... 18

VI. The Bureau's Amended Complaint Sufficiently Pleads a Common Enterprise Among the Snap Defendants. ..... 19

VII. The Bureau's Funding is Valid and Provides No Basis for Dismissal. ..... 21

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## CASES

*Adirondack Med. Ctr. v. Sebelius*,
740 F.3d 692 (D.C. Cir. 2014) ..... 11

*Albers v. Bd. of Cty. Com'rs of Jefferson Cty., Colo.*,
771 F.3d 697 (10th Cir. 2014) ..... 10

*Am. Warehouse & Moving Serv. of Atlanta, Inc. v. Floyd's Diesel Servs., Inc.*,
296 S.E.2d 64 (Ga. Ct. App. 1982) ..... 9

*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ..... 11

*Brothers v. First Leasing*,
724 F.2d 789 (9th Cir. 1984) ..... 4

*CFPB v. Active Network, LLC*,
No. 4:22-cv-00898, 2024 WL 4437639 (E.D. Tex. Oct. 7, 2024) ..... 22

*CFPB v. Aria*,
54 F.4th 1168 (9th Cir. 2022) ..... 15

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ..... 21, 23

*CFPB v. Glob. Fin. Support, Inc.*,
No. 15-CV-2440-GPC-AHG, 2021 WL 242939 (S.D. Cal. Jan. 25, 2021) ..... 15

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ..... 15, 17

*CFPB v. Ocwen Fin. Corp.*,
No. 17-80495-CIV, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) ..... 14

*CFPB v. Ocwen Fin. Corp.*,
No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019) ..... 14

*CFPB v. SoLo Funds, Inc.*,
No. 2:24-cv-04108-RGK-AJR (C.D. Cal. Oct. 17, 2024) ..... 25

*CFPB v. TCF Nat'l Bank*,
No. CV 17-166 (RHK/DTS), 2017 WL 6211033 (D. Minn. Sept. 8, 2017) ..... 18

*CFTC v. Int'l Fin. Servs., Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004) ........................................................................ 20

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)........................................................................................................ 14

*Cnty. of Santa Fe v. Pub. Serv. Co. of New Mexico*,
311 F.3d 1031 (10th Cir. 2002) ..................................................................................... 17

*Dorton v. Kmart*,
229 F. Supp. 3d 612, 625 (E.D. Mich. 2017)........................................................... 8, 10

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)........................................................................................................ 14

*FTC v. Crescent Publ'g Grp., Inc.*,
129 F. Supp. 2d 311 (S.D.N.Y. 2001) ........................................................................... 17

*FTC v. Kochava Inc.*,
671 F. Supp. 3d 1160 (D. Idaho 2023) .......................................................................... 13

*FTC v. Lanier Law, LLC*,
194 F. Supp. 3d 1238 (M.D. Fla. 2016)......................................................................... 21

*FTC v. LoanPointe, LLC*,
525 F. App'x 696 (10th Cir. 2013) ........................................................................... 15, 21

*FTC v. LoanPointe, LLC*,
No. 2:10-cv-225, 2011 WL 4348304 (D. Utah Sept. 16, 2011) ..................................... 21

*FTC v. Neovi, Inc.*,
598 F. Supp. 2d 1104 (S.D. Cal. 2008)........................................................................... 21

*FTC v. Nudge, LLC*,
No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695 (D. Utah June 14, 2022)....................... 17, 20

*FTC v. Zurixx, LLC*,
No. 2:19CV713-DAK-DAO, 2020 WL 6898341 (D. Utah Nov. 24, 2020) ........................... 20

*HCSC-Laundry v. United States*,
450 U.S. 1 (1981)............................................................................................................ 11

*Hunt v. Hamm*,
No. 15-cv-960-SCY/WPL, 2016 WL 10565462 (D.N.M. May 31, 2016)........................... 22

*ISE Ent. Corp. v. Longarzo*,
No. CV 17-9132-MWF (JCX), 2018 WL 5298692 (C.D. Cal. Apr. 16, 2018)........................ 10

*Janke v. Brooks*,
No. 11-CV-00837-REB-BNB, 2012 WL 1229891 (D. Colo. Apr. 11, 2012)........................... 9

*Landgraf v. USI Film Products*,
511 U.S. 244 (1994)........................................................................................................ 15

*Laramore v. Ritchie Realty Mgmt. Co.*,
397 F.3d 544 (7th Cir. 2005) ...................................................................................... 5, 10

*Liberty Leasing Co. v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998) .............................................................................. 8

*Mitchell v. Speedy Car-X, Inc.*,
712 N.E.2d 768 (Ohio Ct. App. 1998)............................................................................. 9

*Ollie v. Waypoint Homes, Inc.*,
No. 14-CV-01996-YGR, 2014 WL 5474606 (N.D. Cal. Oct. 28, 2014)................................ 10

*Riethman v. Berry*,
287 F.3d 274 (3d Cir. 2002) ........................................................................................... 5

*Rocky Mountain Wild v. Dallas*,
98 F.4th 1263 (10th Cir. 2024) ...................................................................................... 22

*Salt Lake City Corp. v. Sekisui SPR Americas, LLC*,
482 F. Supp. 3d 1177 (D. Utah 2020)............................................................................... 9

*SEC v. Binance Holdings Ltd.*,
No. 23-cv-1599-ABJ, 2024 WL 3225974 (D.D.C. June 28, 2024) ......................................... 13

*SEC v. Coinbase, Inc.*,
No. 23 CIV. 4738 (KPF), 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ............................... 14

*SEC v. Terraform Labs Pte. Ltd.*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023) ............................................................................ 13

*Shaumyan v. Sidetex Co.*,
900 F.2d 16 (2d Cir. 1990) ....................................................................................... 4, 5

*United States v. Freeman*,
688 F. Supp. 3d 1 (D.N.H. 2023)..................................................................................... 13

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)........................................................................................... 12

*West Virginia v. EPA*,
597 U.S. 697 (2022)........................................................................................... 12

**STATUTES**

12 U.S.C. § 289(a)(1)-(3)........................................................................................ 23

12 U.S.C. § 390(n) ................................................................................................. 24

12 U.S.C. § 5465(c) ............................................................................................... 24

12 U.S.C. § 5497(a)(1)........................................................................................... 21

12 U.S.C. § 5497(a)(2)........................................................................................... 25

12 U.S.C. § 5497(e) ............................................................................................... 24

12 U.S.C. § 5497(e)(1)(B) ..................................................................................... 25

12 U.S.C. § 5531(a) ............................................................................................... 15

12 U.S.C. § 5531(b) ............................................................................................... 15

12 U.S.C. § 5531(d)(1) .......................................................................................... 18

12 U.S.C. § 5536(a)(1)(A) ..................................................................................... 20

12 U.S.C. § 5564(a) ............................................................................................... 13

31 U.S.C. § 1341 *et seq*.......................................................................................... 25

**OTHER AUTHORITIES**

Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 3, 2023),
https://crsreports.congress.gov/product/pdf/IN/IN12081 ....................................... 23

*Earnings*, Investopedia, https://www.investopedia.com/terms/e/earnings.asp............................ 24

*Earnings*, Merriam Webster's Collegiate Dictionary, 11th ed. (2006)....................................... 23

*Earnings*, Oxford English Dictionary, https://www.oed.com/dictionary/earning_n1 (online ed.
2024) ....................................................................................................................... 22

Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* (Apr. 2024), https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf ...................... 24

S. Rep. No. 111-176 (Apr. 30, 2010) ........................................................................... 24

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 6

Fed. R. Civ. P. 12(g) ................................................................................................. 22

**REGULATIONS**

12 C.F.R. § 1005.2(f) .................................................................................................. 3

**CONSTITUTIONAL PROVISIONS**

Art. I, § 9, cl. 7 ......................................................................................................... 23

## INTRODUCTION

The Consumer Financial Protection Bureau (Bureau) filed its Amended Complaint to address the Snap Defendants' (collectively, Snap or Defendants) violations of Federal consumer financial law in connection with financing auto repairs and services through "lease purchase" or "rental-purchase" agreements (Agreements). Snap categorizes its Agreements for auto repairs and services separately from, for example, its leases for tires, and the Agreements represent a considerable portion of its financing business. *See* Am. Compl. ¶ 24.

Snap's Agreements for auto repairs and services are credit under the Consumer Financial Protection Act of 2010 (CFPA) and the Electronic Fund Transfer Act (EFTA). Under these Agreements, consumers' scheduled payments, whether over 12 or 18 months, are not contemporaneous or substantially contemporaneous with the value received for one-time auto repair and service costs. Nor can auto repairs and services—for example, engine repairs, transmission repairs, and collision repairs—be surrendered, possessed, or recalled. Am. Compl. ¶ 3. As alleged, and consistent with the Court's August 1 Order (Order) (ECF No. 49) and the precedent addressing this question, Snap's Agreements for auto repairs and services granted consumers the right to defer payment of a debt. *Id.* ¶ 92.

In its Motion to Dismiss (Motion) (ECF No. 60), Snap concedes that it is not moving to dismiss the Bureau's Counts I–VI for its Agreements that financed exclusively one-time labor or service costs. *See* Mot. at 3 n.2.[1] However, Snap maintains that the Bureau lacks statutory

---

[1] Snap also appears to misstate the Bureau's allegation that Snap's auto repair merchant partners often code one-time labor or service costs as costs for products for Snap's recordkeeping purposes. *Compare* Am. Compl. ¶ 55 ("[A]uto repair merchant partners often code one-time labor or service costs—including for 'auto repair,' 'transmission repair,' 'engine repair,' and 'collision repair'—as costs for 'Products' for the Snap Defendants' recordkeeping[.]") *with* Mot. at 3 n.2 ("[C]ertain merchants coded one-time labor or services costs in such a way that resulted

authority under the CFPA and the EFTA over a new subcategory of its Agreements that it deems "hybrid" leases, composed of "auto parts" and services "attendant to a lease of auto parts." *See* Mot. at 1. But Snap's singular focus on "parts" fails to squarely address the Bureau's amended allegations concerning the one-time labor or service costs for which consumers do not make substantially contemporaneous payments, and its arguments also misstate consumers' remedial rights under its Agreements. Snap's latest challenge to the Bureau's funding similarly lacks merit, as do its new arguments concerning the major questions doctrine and due process.

In financing auto repairs and services comprised (in some cases entirely) of one-time labor or service costs, Snap engaged in deceptive and abusive acts and practices in violation of the CFPA, and also violated EFTA's prohibition on "compulsory use" for extensions of credit. Then, while servicing its Agreements, Snap continued to violate the CFPA's prohibition on deceptive acts and practices, as well as the Fair Credit Reporting Act (FCRA) and Regulation V through its role as a furnisher of information to consumer reporting agencies. In response to the Bureau's well-pleaded allegations, Snap invites this Court to engage in what amounts to a premature fact-finding exercise into the precise contours of "hybrid" leases, and to contemplate hypotheticals concerning remedial rights that are unsupported by the record. The Bureau urges the Court to decline Snap's invitation and deny Snap's Motion in full.

---

in consumers leasing 'exclusively one-time labor or service costs.'"). To be clear, the Bureau alleges consumers "financed exclusively one-time labor or service costs not attendant to any parts or merchandise" based on the Agreements themselves, *see* Am. Compl. ¶ 5 (citing Exs. A, F, and G), rather than on merchant coding.

## ARGUMENT

### I. Snap's Agreements for Auto Repairs and Services Constitute "Credit" under the CFPA and EFTA.

The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The CFPA defines "financial product or service" to include "extending credit and servicing loans." 12 U.S.C. § 5481(15)(A)(i). "Credit" under the CFPA and Regulation E (which implements EFTA) is defined as "the right . . . to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7); *accord* 12 C.F.R. § 1005.2(f).

Snap's Agreements for auto repairs and services meet the CFPA's and EFTA's definitions of "credit"; consumers receive a service at origination and pay for it across the schedule set forth in their Agreement. Contrary to true leases, here: (1) the exchange of value between the parties is not contemporaneous or substantially contemporaneous across the 12- or 18-month payment schedule; and (2) the one-time labor or services identified as part, or the entirety, of the "Property" being purchased cannot be surrendered, possessed, or recalled, such that consumers cannot exercise the remedial rights provided for in their Agreements. As a result, even under Snap's proposed "hybrid" subcategory, consumers' payment obligation to Snap remains deferred under the terms of their Agreements. By "extending credit" through Agreements for auto repairs and services, Snap meets the definition of a "covered person" and is subject to the Bureau's jurisdiction. *See* 12 U.S.C. § 5481(6).

### A. Consumers' Payments under Snap's Agreements for Auto Repairs and Services Are Not Contemporaneous or Substantially Contemporaneous with One-Time Labor or Service Costs.

Snap does not move to dismiss Counts I–VI of the Bureau's Amended Complaint for Agreements that financed "exclusively one-time labor or service costs," Mot. at 3 n.2, and instead limits its arguments to its proposed subcategory of "hybrid" leases. Regarding "hybrid" leases, Snap argues that "consumers were only contractually required to make payments contemporaneous with their possession of the parts." Mot. at 13. But Snap's argument is belied both by the Bureau's well-pleaded allegations and the Agreements themselves, which do not state that consumers' payments are made exclusively in exchange for the value of physical parts. Rather, as alleged: the auto repairs and services financed by Snap's Agreements are completed before or at the time of contracting, *see* Am. Compl. ¶¶ 3–5; the total amount consumers owe for the auto repairs and services is inclusive of one-time labor or service costs, *see id.* ¶¶ 4, 54; consumers' scheduled payments over their initial "term" typically, or almost always, do not cover the cash price of the one-time labor or services they received under their Agreement, *see id.* ¶ 58; and consumers are scheduled to continue to pay for the costs of the auto repairs and services over a period of 12 or 18 months, *see id.* ¶¶ 3, 45; *cf. Brothers v. First Leasing*, 724 F.2d 789, 798 (9th Cir. 1984) (Canby, J., dissenting) (characterizing lease arrangements as "payments (normally in advance) for contemporaneous use").

This type of arrangement is in marked contrast, for example, to the home-improvement contract in *Shaumyan v. Sidetex Co*., which required plaintiffs to pay for work in five installments, with nearly half of the projected cost due by the time work commenced and a final payment due upon completion. 900 F.2d 16, 17 (2d Cir. 1990). The Second Circuit found that the arrangement demanded "incremental payments as the work progressed," and that those payments

were "substantially contemporaneous with [the defendant's] performance under the contract." *Id.* at 18. Thus, the court held that no right to defer payment was created, and that the contract was not a credit transaction subject to the Equal Credit Opportunity Act (ECOA). *Id.*

In the case of Snap's Agreements for auto repairs and services—including Snap's "hybrid" leases—there are no "progress payments" or "incremental payments as the work progressed." Rather, Snap's Agreements finance auto repairs and services that are completed at the outset of the contract; all consumer payments (whether over 12 or 18 months) in exchange for the value of one-time labor and service costs are due afterwards. As this Court observed: "It is somewhat difficult to imagine how an exchange of value for a (one-time) service could be contemporaneous or substantially contemporaneous if stretched out over the course of twelve months." Order at 18 n.17.[2]

For example, the Agreement attached as Exhibit B to the Bureau's Amended Complaint could fit within Snap's proposed "hybrid" subcategory, as it identifies (on its first page) "Rebuild Kit For Accord, Labor To Install Transmission" as the "Property" being "purchased." While the amount the consumer owes is based on the invoice total, *see* Am Compl. ¶¶ 4, 54, for the purpose of illustration, it would take the consumer in Exhibit B 12 weeks (based on the Agreement's $217.50 biweekly payment schedule) to exceed the cash price ($1,100) of strictly

---

[2] Accordingly, Snap's Agreements for auto repairs and services are also readily distinguished from the legal services contract analyzed in *Riethman v. Berry*, where payment was due when services were rendered. 287 F.3d 274, 277–78 (3d Cir. 2002) ("Even if [defendants] failed to strictly enforce their rights against tardy clients, the express terms of their fee agreements plainly manifest their right to prompt and full payments."). Finally, Snap's Agreements for auto repairs and services are a far cry from the "typical" residential lease arrangement addressed in *Laramore v. Ritchie Realty Mgmt. Co.*, for which there is no deferral of a debt where the tenant pays rent to the landlord on the first of each month for the right to continue to occupy the premises for the coming month. 397 F.3d 544, 547 (7th Cir. 2005). Again, none of these characteristics are present in the case of Snap's Agreements for auto repairs and services completed by the outset of the contract, and with payment terms reaching 12 or 18 months.

the labor portion of the "Property" purchased by that Agreement. This reality of *when* payments are made—including under a "hybrid" example—underscores the lack of a contemporaneous exchange of value for the auto repairs and services financed by Snap's Agreements. If the consumer in Exhibit B were to somehow uninstall and return any physical "rebuild kit" for their transmission prior to that 12-week mark, the consumer's scheduled payments *still* would not have reached the value of the one-time labor financed by the Agreement.

Further, determining the precise contours of Agreements meeting Snap's proposed "hybrid" subcategory would require a fact-finding exercise premature for the Rule 12(b)(6) stage. For example, in the Agreement attached as Exhibit D to the Bureau's Amended Complaint, certain invoiced costs (e.g., "bleed and clean" and "oil change," all in addition to labor costs to "replace mount," "replace rack and pinion," and for an "alignment") do not appear to be related or "attendant" to any invoiced "auto parts." Regardless, again, the consumer's scheduled weekly payments ($53.33) across their initial 60-day "term" would not reach the cash price of strictly the one-time labor or service costs financed by that Agreement.

At bottom, the Bureau has plausibly alleged that Snap's Agreements financed auto repairs and services that are not contemporaneous or substantially contemporaneous with consumers' scheduled payments. Am. Compl. ¶¶ 3, 92. That includes Agreements that appear to meet Snap's proposed "hybrid" subcategory, given the reality of when payments are made in exchange for the value of one-time labor or service costs, as reflected in those Agreements.[3]

---

[3] In discussing "hybrid" leases, Snap also cites to its policy of capping labor and service costs to thirty percent of the total lease amount, which is not a fact alleged in the Amended Complaint. *See* Mot. at 13. Regardless, as alleged, Snap's Agreements often "reflect that [consumers] financed exclusively one-time labor or service costs not attendant to any auto parts or merchandise." *See* Am. Compl. ¶ 5; *see also* Am. Compl., Ex. A (identifying "Transmission Repair" as the "Property" being purchased); Ex. F ("Auto Repair"); and Ex. G ("Repair, Repairs"). The Bureau also alleges that Snap's "merchant partners often code one-time labor or

### B. One-Time Auto Repairs and Services Cannot Be Surrendered, Possessed, or Recalled.

In its Motion, Snap asserts that consumers' remedial rights under "hybrid" leases are the same as those under its leases strictly for property. According to Snap, "consumers could terminate their leases at the end of any term by paying for past use of the auto parts and returning or surrendering them." Mot. at 13. Again, Snap's argument conflicts with the Bureau's allegations as well as the terms of its own Agreements. Snap's Agreements do not provide consumers the right to terminate payment obligations by returning or surrendering only a portion (e.g., physical parts) of what was financed as "Property." Because consumers cannot exercise remedial rights for the one-time labor or services identified as "Property" financed by Snap's Agreements, the Agreements reflect a transaction for credit, as consumers' payment obligation (or debt) to Snap remains deferred. *See* Am. Compl. ¶ 92.

As alleged, consumers cannot possess or return the one-time labor or services extended to fix, for example, their transmission. *See* Am. Compl. ¶ 3 (citing Ex. A ("Transmission Repair") and Ex. B ("Labor to Install Transmission")). Nor can consumers possess or return the one-time labor or services extended to fix their engine or steering system. *See id.* (citing Ex. C ("Engine Install") and Ex. D ("Replace Mount"; "Replace Rack and Pinion"; "Alignment")).[4] Nor can consumers, for that matter, surrender the dried paint or dissipated fluids associated with certain

---

service costs—including for 'auto repair,' 'transmission repair,' 'engine repair,' and 'collision repair'—as costs for 'Products' for the Snap Defendants' recordkeeping," Am. Compl. ¶ 55, and also group together "parts and labor" and code both as costs for "Products" for recordkeeping purposes, *id.* ¶ 56. Snap's stated policy of limiting service costs to a certain percentage of an invoice total—which has changed over the applicable period—is of minimal relevance given the Bureau's allegations about what Snap, in fact, financed through its Agreements.

[4] Thus, Snap's contention that, "[a]t most, the Bureau insinuates that some *parts* would be difficult or impractical to surrender" (Mot. at 14 (emphasis added)) is in plain contradiction with the Bureau's allegations regarding one-time *services* that cannot be surrendered, possessed, or recalled. *See* Am. Compl. ¶¶ 3, 92.

auto repair Agreements. *See id.* ¶ 3 (citing Ex. D ("Oil Change") and Ex. E ("Auto Repair & Painting")).

However, under the terms of Snap's Agreements, termination requires consumers to return such one-time labor or services, as well as those paints or fluids, as "Property" that was purchased. As alleged, the remedial rights in Snap's Agreements are tied to "surrendering or returning to [Snap] the *Property* in its original condition, less reasonable wear and tear." *See* Am. Compl. ¶¶ 52, 59 (emphasis added). Nothing in the text of Snap's Agreements permits consumers who received auto repairs and services to terminate their payment obligations by surrendering or returning only a *portion* (e.g., physical parts) of that "Property." Including under Agreements that appear to meet Snap's "hybrid" subcategory (e.g., Am. Compl., Exs. B, C, and D), Snap finances "Property" that cannot, under any scenario, be surrendered, recalled, or repossessed, and thus consumers' payment obligation, or debt, to Snap under their Agreement remains deferred.

The remedial rights under Snap's Agreements for auto repairs and services contrast sharply with those in contracts that courts have held to be true leases. For example, the court in *Liberty Leasing Co. v. Machamer* held that "the lessees were not obligated to pay the total lease amount in all circumstances under the lease agreements" because the lessees' financial obligation "would have been extinguished upon the surrender of possession of the equipment[.]" 6 F. Supp. 2d 714, 717 (S.D. Ohio 1998). Likewise, in connection with its finding that the lessee "ha[d] no obligation whatsoever to purchase the product," the court in *Dorton v. Kmart* noted that if the lessee "does nothing except make the minimum payments on the lease, he must eventually return the product to Defendants." 229 F. Supp. 3d 612, 625 (E.D. Mich. 2017). Again, these key remedial features discussed in *Machamer* and *Dorton*, and highlighted by this Court in its

Order—namely, "the contractual right to repossess the leased property" and the "(conditional) right to surrender possession," Order at 13—are absent when it comes to the one-time labor or services comprising part, or the entirety, of the "Property" financed by Snap's auto repair Agreements.[5]

As a final point, Snap's citations to state codes, the Uniform Consumer Leasing Act, and the Uniform Commercial Code (UCC) further support the Bureau's position. The labor or services that Snap finances through its auto repair Agreements are not "services related to the agreement" or otherwise part of an "incidental sale." *See* Mot. at 17. Rather, those one-time costs comprise—whether part, or the entirety of—what the Agreement identifies as the "Property" being "purchased." *See* Am. Compl. ¶¶ 4, 5, 54. As detailed above, the Bureau's allegations do not, and need not, extend beyond the Agreements themselves to show why Snap's contracts for auto repairs and services reflect the extension of credit. To the extent Snap now seeks to examine "facts outside of the four corners of the contract" under a "predominant purpose" test relevant to the UCC, *see Salt Lake City Corp. v. Sekisui SPR Americas, LLC*, 482 F. Supp. 3d 1177, 1189 (D. Utah 2020), this Court's Order forecloses such an approach. *See* Order at 14 n.13.[6]

---

[5] Indeed, as this Court observed: "[B]ecause services can neither be surrendered nor possessed, the significance of the parties' remedial rights in the arrangement [an exchange of value for a one-time service] is very different from lease arrangements for possession of property." Order at 18 n.17.

[6] Further, courts have concluded that a mixed contract to repair a vehicle is a contract predominately for *services* and thus outside the purview of the UCC's Article 2. *See, e.g.*, *Janke v. Brooks*, No. 11-CV-00837-REB-BNB, 2012 WL 1229891, at *3 (D. Colo. Apr. 11, 2012) (unpublished); *see also Mitchell v. Speedy Car-X, Inc.*, 712 N.E.2d 768, 769–70 (Ohio Ct. App. 1998) (finding suit was based on the defendant providing a service—performing some repair on plaintiff's car, and any goods sold were incidental to the repair service, thus, UCC did not apply); *Am. Warehouse & Moving Serv. of Atlanta, Inc. v. Floyd's Diesel Servs., Inc.*, 296 S.E.2d 64, 66 (Ga. Ct. App. 1982) ("[T]he transaction was a contract for appellee's services to repair appellant's original engine and [ ] the supplying of new component parts was merely an 'incidental part' of appellee's overall services in this regard.").

## II. The CFPA Does Not Limit the Bureau's Authority to Regulate Agreements Styled as Leases to 12 U.S.C. § 5481(15)(A)(ii).

In its Motion, Snap also contends (for the first time in this case) that the Bureau's authority to regulate agreements styled as leases is limited to those meeting the conditions found in 12 U.S.C. § 5481(15)(A)(ii). *See* Mot. at 8.[7] Under Snap's argument, so long as an agreement is styled as a "lease" that includes an "initial term" of less than 90 days, the Bureau would have no possibility of authority, regardless of the agreement's remaining features. But what a party calls its agreement is not controlling, and courts have recognized that agreements styled as leases may in fact reflect the extension of credit. *See, e.g.*, *Laramore*, 397 F.3d at 547 n.2 (an arrangement labeled a "lease" could nonetheless be crafted such that it might, by its terms, meet ECOA's definition of "credit"); *Dorton*, 229 F. Supp. 3d at 623 n.8 (noting the same); *Ollie v. Waypoint Homes, Inc.*, No. 14-CV-01996-YGR, 2014 WL 5474606, at *2 (N.D. Cal. Oct. 28, 2014) (unpublished) (noting the same). Indeed, this Court's Order analyzed whether Snap's leases for property represented the right to deferred payment (for the question of meeting the CFPA's definition of "credit" in 12 U.S.C. § 5481(7)) separately from whether Snap's leases met the conditions found in 12 U.S.C. § 5481(15)(A)(ii). *See, e.g.*, Order at 13, 20.

That Snap's Agreements for auto repairs and services meet the CFPA's definition of "credit" does not, of course, render 12 U.S.C. § 5481(15)(A)(ii) "meaningless." *Cf.* Mot. at 8. For example, if Snap's leases for strictly property featured an initial term of at least 90 days they

---

[7] Courts in other circuits "commonly invoke Rule 12(g)(2) to reject new arguments raised in a motion to dismiss an amended complaint that could have been raised in a previous motion to dismiss a prior complaint but were not." *ISE Ent. Corp. v. Longarzo*, No. CV 17-9132-MWF (JCX), 2018 WL 5298692, at *4 (C.D. Cal. Apr. 16, 2018) (unpublished). Should the Court wish to consider the issue, the Bureau addresses the merits of all of Snap's new arguments here (and below in Sections III, IV, and VII) in the interest of efficiency. *See Albers v. Bd. of Cty. Com'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 703–04 (10th Cir. 2014).

would meet the conditions found in 12 U.S.C. § 5481(15)(A)(ii) but would not, under the Court's Order, meet the definition of "credit" found in 12 U.S.C. § 5481(7). Nor are these CFPA definitions "irreconcilably conflicting," such that the canon cited by Snap (Mot. at 8) of a specific statutory provision controlling over a general provision would apply. *See, e.g.*, *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014) ("The [specific/general] canon is impotent [ ] unless the compared statutes are 'irreconcilably conflicting.'"); *cf. HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (newly enacted, more precise exemption held to prevail over earlier, more general exemption on the basis of detailed evidence of legislative intent). The CFPA's definition of "credit" in 12 U.S.C. § 5481(7) does not exempt "leases"; rather, it tracks the definitions of "credit" found in ECOA and EFTA. For the reasons above, and in the Bureau's Amended Complaint, *see* Am. Compl. ¶ 92, Snap's Agreements for auto repairs and services meet the CFPA's definition. By "extending credit" through such Agreements, Snap is a "covered person" under the CFPA, and is subject to the Bureau's jurisdiction under the statute's plain terms. *See* 12 U.S.C. § 5481(6).

## III. Whether Snap's Agreements for Auto Repairs and Services Constitute "Credit" Does Not Implicate the Major Questions Doctrine.

Snap next claims that allowing the Bureau to "attempt to regulate Snap's LTO Agreements" would violate the major questions doctrine. *See* Mot. at 8–12 (capitalization altered). This argument misunderstands the Bureau's relevant allegations and the nature of the major questions doctrine, so the Court should reject it.

"[T]he so-called Major Questions Doctrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy' or make 'decisions of vast economic and political significance.'" *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 725 (10th Cir. 2024) (quoting *Utility Air Regul. Grp. v. EPA*, 573

U.S. 302, 324 (2014)). This doctrine thus prevents agencies from "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). But the doctrine plays a role only in "extraordinary cases"—"cases in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 721 (internal quotation marks omitted).

There is no reason to hesitate here because, for one thing, the Bureau has not—as Snap would have it—somehow improperly read into a "previously little-used backwater provision," *id.* at 730, the "statutory authority to regulate the LTO industry," Mot. at 9. The Amended Complaint alleges only that certain Agreements offered by Snap are "credit" under the CFPA and EFTA. *See* Am. Compl. ¶¶ 92–93, 115–117. The Bureau's authority with respect to credit transactions—including to pursue violations of the consumer laws by covered persons offering credit—is express (and seemingly not in dispute). *See, e.g.*, 12 U.S.C. § 5481(15)(A)(i). While Snap may disagree as to whether the Amended Complaint adequately alleges that the relevant Agreements meet the definition of "credit," the answer to that question does not remotely resemble the sort of "decisions of vast economic and political significance" to which courts have applied the major questions doctrine. Nor does the Bureau's ability to pursue violations in extending credit decide the different questions of the extent of the Bureau's authority over "the LTO industry" generally, or with respect to products that are not credit.[8]

[8] For this reason, Snap's lengthy recitation of federal and state approaches to regulating "the LTO industry," *see* Mot. at 8–11, is wholly beside the point.

More fundamentally, the doctrine does not apply to agency enforcement actions. In pursuing this action, the Bureau is simply using the authority Congress expressly granted it to enforce the law, 12 U.S.C. § 5564(a), and in doing so is "merely asking" the court to "interpret and apply a statute enacted by Congress" to a subset of one entity's agreements. *See FTC v. Kochava Inc.*, 671 F. Supp. 3d 1161, 1180 (D. Idaho 2023). Courts have regularly refused to extend the major questions doctrine to similar questions of statutory application in agency enforcement actions. *See, e.g.*, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599-ABJ, 2024 WL 3225974, at *42 (D.D.C. June 28, 2024) (unpublished) (explaining that, even if ruling "could have important implications for the broader crypto asset industry," the SEC's "lawsuit seeking that ruling is an unremarkable exercise of the agency's enforcement authority"); *United States v. Freeman*, 688 F. Supp. 3d 1, 18 (D.N.H. 2023) (rejecting application of major questions doctrine to financial regulator's efforts to "apply[] its existing regulatory authority to a different type of funds"). The Court should likewise reject application of the doctrine here.

If any more were needed, Snap's argument fails on its own terms too. That is, even if the doctrine applied to agency enforcement actions and even if the relevant question here was the Bureau's authority over the LTO industry as a whole or over LTO products, this case still would not involve a major question. Snap says that "[t]he LTO industry has existed for over half a century and serves over 4 million American consumers each year." Mot. at 9. But if that were enough, "almost every large industry would qualify as one of 'vast economic and political significance' and the doctrine would frustrate the administrative state's ability to perform the function for which Congress established it: the regulation of the American economy." *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 189–90 (S.D.N.Y. 2023); *see also Binance Holdings*, 2024 WL 3225974, at *41 (holding that cryptocurrency "industry, while important,"

does not "have the broad reach that has motivated courts to apply the doctrine to other industries"); *SEC v. Coinbase, Inc.*, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *14 (S.D.N.Y. Mar. 27, 2024) (unpublished) (same).

**IV. This Action Does Not Violate Due Process.**

Snap cites no caselaw to support its statement that the Bureau "could have, and should have, announced its views [concerning LTO transactions] in a public rulemaking[.]" Mot. at 19. And for good reason: Courts have consistently rejected this type of "fair notice" argument in opposition to Bureau enforcement actions. *See CFPB* v. *Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *18 (S.D. Fla. Sept. 5, 2019) (unpublished) (collecting cases), *adhered to on denial of reconsideration*, No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019).

Instead, Snap attempts to rely on *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)—a case addressing the "void for vagueness" doctrine—for its fair notice argument. *Fox* involved a criminal statute, a restriction on speech, and an attempt by the agency to enforce retroactively a revised agency interpretation. None of those factors exist here. Snap also cites to *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) to suggest it was somehow misled by "conspicuous inaction" on the part of the Bureau in regulating leasing companies. Again, *Christopher* involved a party's attempt to rely on an agency's new interpretation of an ambiguous statute; here, courts have long analyzed whether a lease grants the right to defer payment under a definition of "credit" tracking the one found in the CFPA. *See* Order at 10–12. In any case, nothing in the CFPA makes rulemaking a predicate to enforcement. *See* 12 U.S.C.

§§ 5531(a), (b), 5564(a); *see also Ocwen Fin. Corp.*, 2019 WL 13203853, at *17. Snap's due process argument is without merit.[9]

## V. Counts I and II of the Bureau's Amended Complaint Plausibly Allege Violations of the CFPA.

### A. The Amended Complaint Plausibly Alleges Snap's "100 Day Cash Payoff" Advertisement was Misleading.

Under the CFPA, an "act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (internal quotation marks omitted); *see also FTC v. LoanPointe, LLC*, 525 F. App'x 696, 700 (10th Cir. 2013) (applying the FTC Act). "To determine whether a representation is deceptive, the Court looks at whether the 'net impression' created by the representation is 'likely to mislead' the consumers. Proof of actual deception is not required." *CFPB v. Glob. Fin. Support, Inc.*, No. 15-CV-2440-GPC-AHG, 2021 WL 242939, at *10 (S.D. Cal. Jan. 25, 2021) (unpublished) (internal citation omitted), *aff'd sub nom. CFPB v. Aria*, 54 F.4th 1168 (9th Cir. 2022).

The Bureau's Amended Complaint describes how Snap's "100 Day Cash Payoff" advertisements were likely to mislead—and did mislead—reasonable consumers concerning the nature of Snap's Agreements. The Bureau alleges that, through at least 2020, Snap provided its auto repair merchant partners with its "100 Day Cash Payoff" advertisement to display in their stores. Am. Compl. ¶¶ 7, 29. Such advertisements were thus viewable to consumers who applied

---

[9] Further, Snap's due process argument does not provide a ground to dismiss this action, as the imposition of prospective relief is unaffected by fair notice issues. *See, e.g.*, *Landgraf v. USI Film Products*, 511 U.S. 244, 273 (1994) ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.").

for and received Snap's financing for auto repairs and services while at these storefront locations. *See id.* ¶¶ 35, 36. And as further illustrated by the copy of the advertisement the Bureau includes in its Amended Complaint, Snap's "100 Day Cash Payoff" advertisement had no other description or explanation of the cost, length, or terms of its Agreements. *Id.* ¶ 29. Thus, the Bureau alleges, "Consumers who received the Snap Defendants' financing for auto repairs and services reasonably believed they had entered into a 100-day financing agreement, where their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." *Id.* ¶ 106.

In its Motion, Snap again attempts to spin the Bureau's well-pleaded allegations, first by contending the consumers who saw Snap's advertising "had already chosen to lease from Snap." Mot. at 20. That, of course, is not what the Bureau alleges. *See* Am. Compl. ¶ 7, 29 (advertisements provided to auto repair merchants to display in their stores, and thus visible to consumers before their decision to apply). Snap also suggests that the phrase "100 Day Cash Payoff" at most communicated that consumers "had the option of acquiring ownership of the merchandise by paying off their lease, with cash, in 100 days[.]" Mot. at 21. Again, this argument has no basis in the Bureau's allegations. Indeed, consumers cannot make regular payments, or schedule new payments to Snap, in "cash." *See* Am. Compl. ¶¶ 103, 104.

Snap also notes that a mortgage commonly uses the term "payoff" in connection with early "ownership," and that a written explanation of Snap's early payment option could be found within the text of a consumer's Agreement. *See* Mot. at 21. Snap's argument comparing its use of "payoff" to that term's use in a traditional credit arrangement underscores the likelihood that its advertisements (given their lack of further explanation) create a misleading net impression regarding the true nature of Snap's Agreement. Nor would the Agreement itself absolve Snap of

liability, as a "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance." *Gordon*, 819 F.3d at 1194; *see also Resort Car Rental Sys., Inc.*, 518 F.2d 962, 964 (9th Cir. 1975) (advertising is deceptive "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.").[10] In any event, Snap's competing factual narratives have no place at this stage. *See Cnty. of Santa Fe v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1035 (10th Cir. 2002).

Finally, Snap disputes the materiality of its own advertisements. *See* Mot. at 22. "A representation [is] material if it [is] likely to affect a consumer's decision to buy a product or service." *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *12 (D. Utah June 14, 2022) (unpublished) (internal quotation marks omitted). As alleged, Snap provided auto repair merchants with its "100 Day Cash Payoff" advertisements, and required merchants to display the advertisements in their stores for consumers to view. Am. Compl. ¶¶ 7, 27–29. The advertisements relate to the costs and terms associated with Snap's financing. *Id.* ¶¶ 29–31. Such representations have long been held to be material. *See, e.g.*, *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material[.]").

In sum, the Bureau has alleged Snap's "100 Day Cash Payoff" advertisements that were displayed in auto repair storefronts led consumers who financed auto repairs and services through Snap's Agreements to reasonably believe they had entered into a 100-day financing agreement, whereby their automatically scheduled payments would fulfill their payment

[10] Relevant here, the Bureau's Amended Complaint also alleges that throughout the period when Snap's "100-day Cash Payoff" advertising was in use, "auto repair merchants frequently DocuSigned and submitted Purchase Agreements through the Merchant Portal on behalf of consumers without consumers' prior review of their Agreement." Am. Compl. ¶ 39.

obligations at the close of the 100-day period. For these reasons, the Bureau has plausibly alleged a claim for a deceptive act or practice.

**B. The Amended Complaint Plausibly Alleges Snap Materially Interfered with Consumers' Ability to Understand the Terms and Conditions of its Agreements.**

In Count II, the Bureau alleges Snap's Merchant Portal application and contracting process materially interfered with consumers' ability to understand the terms and conditions of their Agreements. *See* 12 U.S.C. § 5531(d)(1). In support, the Bureau alleges Snap designed and implemented a process where applications and contracts were primarily completed and signed on a merchant's own computer or tablet, and that auto repair merchants frequently signed and submitted Agreements on behalf of consumers without their prior review. Am. Compl. ¶¶ 38, 39, 111. That Snap's application and contracting process led consumers to not see or sign their own Agreement is a plausible allegation of "material interference" with consumers' ability to understand the Agreement's terms. *See, e.g.*, *CFPB v. TCF Nat'l Bank*, No. CV 17-166 (RHK/DTS), 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017) (unpublished) (finding the Bureau plausibly alleged material interference, where the bank's alleged conduct was likely to confuse customers about its overdraft services, even where consumers received a federally mandated written notice explaining those services).

This is particularly the case given the Bureau's further allegations that merchants were left to explain Snap's Agreements to consumers without written guidance, and that auto repair merchants often failed to adequately explain the Agreements or otherwise misled consumers. Am. Compl. ¶¶ 41, 42. Finally, Snap's Merchant Portal process required approved consumers to complete a payment transaction before the possibility of learning the full costs and terms or of seeing their final Agreement. *Id.* ¶ 43. This allegation plausibly states an additional way in which Snap's contracting process materially interfered with consumers' ability to understand their

Agreement—particularly given the accompanying allegations that auto repair merchants misled consumers regarding the nature of the Agreements, and also signed and submitted Agreements without consumers' prior review.

The Bureau's well-pleaded allegations are inconsistent with Snap's competing inference that consumers *authorized* merchants to sign their Agreement on their behalf without their prior review. *See* Mot. at 23. Here, Snap excerpts a statement from the hearing transcript, stating that consumers had "the opportunity to review the terms of the financing agreement" before signing their Agreement. *Id.* But as Bureau counsel explained on the next page of the transcript, "a merchant would ultimately have to spin their computer around so the consumer could see the agreement. The merchant had the ability to complete this entire process on their own computer . . . and it would bear out that consumers [ ] as alleged did not even see or sign their agreement, this was a very common complaint that Snap received." Hr'g Tr. 51:6–15 (Jul. 26, 2024).

The allegations in the Bureau's Amended Complaint concerning consumer complaints further illustrate this reality. *See* Am. Compl. ¶ 40 ("our most common complaint"). Indeed, consumers who received Snap's financing through its Merchant Portal process complained "all the time," and in similar ways, that they were not informed of the costs and terms of Snap's Agreements. *See id.* ¶ 44. For these reasons, the Bureau has plausibly alleged a claim for an abusive act or practice with respect to Snap's Merchant Portal process.

## VI. The Bureau's Amended Complaint Sufficiently Pleads a Common Enterprise Among the Snap Defendants.

In addressing the Bureau's remaining FCRA claim, this Court previously held that "the common-enterprise doctrine fits uneasily in this case—particularly considering the dismissal of

the better part of the CFPB's claims." Order at 29.[11] But the Bureau's Amended Complaint alleges that Snap's Agreements for one-time auto repairs and services constitute credit under the CFPA and EFTA; Snap is a covered person subject to the Bureau's authority; and the Bureau has sufficiently pleaded violations of the CFPA and EFTA in Counts I–VI. Accordingly, the Bureau continues to allege a common enterprise among the Snap Defendants.[12]

A common enterprise exists when, "for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Nudge*, 2022 WL 2132695, at *48. None of these factors is dispositive. *See, e.g.*, *FTC v. Zurixx, LLC*, No. 2:19CV713-DAK-DAO, 2020 WL 6898341, at *3 (D. Utah Nov. 24, 2020) (unpublished) ("Defendants improperly ask this court to treat certain nondispositive common enterprise factors as dispositive and ignore the overlapping ownership, control, and business purpose that the Plaintiffs do allege.").

The Bureau's Amended Complaint alleges common control among the Snap Defendants, that the Defendants share the same business address, and that they issue financial statements and balance sheets on a consolidated basis. Am. Compl. ¶ 25. The Amended Complaint also alleges

---

[11] Historically applied under the FTC Act, "common enterprise liability has been consistently applied to the CFPA." *Ocwen Fin. Corp.*, 2019 WL 13203853, at *12. Courts have applied the common enterprise doctrine to other Federal consumer financial protection statutes as well. *See id.* (noting common enterprise liability theory has been applied to claims arising under TILA and the FDCPA); *see also CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004) (applying common enterprise to Commodity Exchange Act).

[12] Snap concludes its Motion by maintaining that Snap is not a covered person and contending "Count VII and all claims against Snap U.S. Holdings LLC and Snap Finance Holdings LLC should be dismissed." Mot. at 24 (capitalization altered). But Snap is not moving to dismiss Counts I–VI for at least a subset of its Agreements, Mot. at 3 n.2, and thus, at this time, concedes the Bureau's authority. Further, "Count VII" is the FCRA claim that the Court has already upheld. In any case, the Bureau no longer asserts that FCRA claim (or its final Count VIII, brought under 12 U.S.C. § 5536(a)(1)(A)) against Snap U.S. Holdings LLC or Snap Finance Holdings LLC in its Amended Complaint. *See* Am. Compl. ¶¶ 140, 144.

that the Defendants all operate through the website and branding of Snap Finance, which is the only Defendant with employees, and which services all agreements held by Snap RTO and Snap Second Look. *Id.* ¶¶ 18–20, 25. Such allegations describe an interrelated network of companies that, if proven, would be sufficient to demonstrate the existence of a common enterprise. *See, e.g.*, *FTC v. LoanPointe*, No. 2:10-cv-225DAK, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011) (unpublished) ("Because the Defendants have shared ownership and control, office space and addresses, and employees, they are a common enterprise and are liable for injunctive relief and, jointly and severally, for monetary relief."), *aff'd*, 525 F. App'x 696 (10th Cir. 2013); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) (deeming a common enterprise existed where the "Defendants shared office space, employees, payroll funds, and other expenses . . . [and] also engaged in unified advertising"); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1269–73 (M.D. Fla. 2016) (finding a common enterprise where the owners shared ownership and control over several entities, shared employees, shared offices, commingled funds, shared advertising and used similar attorney client agreements); *Zurixx*, 2020 WL 6898341, at *3 (common enterprise sufficiently pled in complaint detailing "overlapping ownership, management structure, and business purpose among [the defendants]"). The Bureau's allegations are, at this stage, consistent with findings of a common enterprise among the Snap Defendants.

## VII. The Bureau's Funding is Valid and Provides No Basis for Dismissal.

The Bureau is funded from the Federal Reserve System's "combined earnings." 12 U.S.C. § 5497(a)(1). That means the Federal Reserve's income—not what is left after paying other obligations. Seeking to find fault with the Bureau's funding despite the recent Supreme Court decision upholding it, *see CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) (*CFSA*), Snap insists otherwise. In Snap's view, the Bureau may draw money only when

the Federal Reserve System has *net* earnings, which Snap takes to mean the surplus that is left over after payment of (non-Bureau) obligations and that, by statute, must be remitted to the Treasury. Mot. at 4–6. The Court should reject this argument, either procedurally or on its merits. *See CFPB v. Active Network, LLC*, No. 4:22-cv-00898, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024) (unpublished) (summarily rejecting motion to dismiss raising identical argument related to the Bureau's earnings).

Snap again raises an argument in its second motion to dismiss that "was available . . . but omitted from its earlier motion." *See* Fed. R. Civ. P. 12(g); *see also Hunt v. Hamm*, No. 15-cv-960-SCY/WPL, 2016 WL 10565462, at *2 (D.N.M. May 31, 2016) (unpublished) (Rule "places strict limitations on the filing of successive Rule 12 motions[.]").[13] Snap's argument also fails on the merits because it relies on an atextual and unworkable approach to the term "earnings" in § 5497. Because "earnings" is not statutorily defined, the Court must apply its ordinary meaning. *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1291 (10th Cir. 2024). The ordinary meaning of "earnings" is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets."); *Earnings*, Oxford English Dictionary (online ed. 2024)[14] ("[T]he money made through working, trade or business activity, etc."). Thus, the "combined earnings" of the Federal Reserve System is simply the total revenue generated by the System's components.

To support its claim that "earnings" really means "net earnings" here, Snap first suggests

---

[13] Snap may claim that this argument was not available until the Supreme Court's recent decision in *CFSA*, but that is inconsistent with how it has otherwise argued the issue. In Snap's view, *CFSA* did no more than "confirm" its reading of the statute. *See* Mot. at 4.
[14] https://www.oed.com/dictionary/earning_n1.

that the Supreme Court in *CFSA* already held as much. The Court did nothing of the sort. As Snap recognizes, Mot. at 4, the Court discussed the source of the Bureau's funds only to address the "threshold" question of whether the money transferred by the Federal Reserve Board is even "subject to the requirements of the Appropriations Clause[,]" given that the Clause covers money "'drawn from the Treasury.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7). In noting that, by statute, "surplus funds" in the System would otherwise go to Treasury (and thus these moneys at least are clearly subject to the Appropriation Clause), the Court did not suggest that the Bureau may be funded only when the System generates a surplus. And more generally, the opinion did not interpret the term "earnings," which was not in dispute.

Snap next suggests that the plain meaning of "earnings" supports its reading. It relies on a secondary definition in a general-purpose dictionary; but the first definition, which Snap ignores, supports the Bureau. *See Earnings*, Merriam Webster's Collegiate Dictionary, 11th ed. (2006) (first defining earnings as "something (as wages) earned"). Snap also looks to an accounting dictionary, a stock-index glossary, and the Financial Accounting Manual for Federal Reserve Banks. None of these sources help Snap. The first two are specific to the private-company context, where earnings can mean profits. But the Federal Reserve System is not like a private company, including because it "is not profit-maximizing" and "[l]osses do not affect the Fed's ability to honor its liabilities." Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 3, 2023).[15] Besides, the "surplus funds" destined for the Treasury are not equivalent to private-company net earnings, as Snap otherwise suggests: the Federal Reserve System sends the Treasury surpluses only after paying dividends to Reserve Bank stockholders. *See* 12 U.S.C. § 289(a)(1)-(3). In contrast, private-company "earnings" are what is used to pay dividends—not

[15] https://crsreports.congress.gov/product/pdf/IN/IN12081.

what is left *after* paying them. *See, e.g.*, *Earnings*, Investopedia.[16]

The Financial Accounting Manual, too, supports the Bureau rather than Snap. It explains that the Federal Reserve Banks' income is the sum of their various "earnings." Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* 47–48 (Apr. 2024).[17] By contrast, it describes funds remitted to the Treasury as "*excess* earnings." *Id.* at 53 (emphasis added). The use of a qualifier—net or excess—makes clear that remittances to the Treasury make up just a subset of the System's overall earnings.

Finally, Snap's approach to "earnings" is inconsistent with statutory context and would be unworkable in practice. Other provisions of the Dodd-Frank Act, which created and funded the Bureau, similarly use the term "earnings" to refer to the income or money earned by agencies or other entities. *See, e.g.*, 12 U.S.C. § 390(n)(2)); *id.* § 5465(c). And applying that definition consistently to the Bureau's funding mechanism is needed to make the statutory scheme work. When Congress created the Bureau after the 2008 financial crisis, it deemed "the assurance of adequate funding" "absolutely essential."[18] S. Rep. No. 111-176, at 163 (Apr. 30, 2010). In Snap's telling, Congress instead funded the agency so it would be intermittently unable to oversee the financial markets, often at times of economic disruption when its work would be most needed.

Snap's answer is that the Bureau can request supplemental appropriations. *See* Mot. at 6 (citing 12 U.S.C. § 5497(e)). But that authorization to request additional funding was meant for situations where the Bureau needs money above the cap for transfers from the Federal Reserve.

---

[16] https://www.investopedia.com/terms/e/earnings.asp.
[17] https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf.
[18] Snap notes that Congress crafted other mechanisms for the Federal Reserve System to fund the Financial Stability Oversight Counsel and Office of Financial Research. *See* Mot. at 5. But that sheds no light on the definition of "earnings" in Section 5497.

*See id.* § 5497(e)(1)(B) (requiring the Director, in requesting supplemental appropriations, to explain why "the funding needs of the Bureau are anticipated *to exceed* the level" set out in § 5497(a)(2) (emphasis added)). Snap's contrary view would implausibly require Congress to somehow predict future shortfalls at the Federal Reserve in order to appropriate sufficient money in advance to ensure adequate funding.

And even if Snap were correct, dismissal would not be warranted. Congress—which has the power of the purse—has not provided that actions taken without proper funding must be undone. *See generally* Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.*; Order at 3, *CFPB v. SoLo Funds, Inc.*, No. 2:24-cv-04108-RGK-AJR (C.D. Cal. Oct. 17, 2024), ECF No. 54 (denying similar motion because court was not persuaded "that the Bureau's source of funding," even if somehow illegitimate, would be "grounds for dismissal").

**CONCLUSION**

For the reasons stated, Snap's Motion should be denied in full.

Dated: October 18, 2024

Respectfully submitted,

/s/ Eric Mothander
Eric Mothander
Noah Steimel
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7321
Charles.Mothander@cfpb.gov
Noah.Steimel@cfpb.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which sent automatic notice to counsel of record.

*/s/* Eric Mothander
Eric Mothander