James Kim (admitted *pro hac vice*)
Nathan R. Marigoni (Utah Bar No. 14885)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
c/o 600 Peachtree Street NE Suite 3000
Atlanta, Georgia 30308
Phone:  404-885-3000
James.Kim@troutman.com
Nathan.Marigoni@troutman.com

Sabrina Rose-Smith (admitted *pro hac vice*)
Levi W. Swank  (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC  20036
Phone:  202-346-4000
Fax:  202-346-4444
srosesmith@goodwinlaw.com
lswank@goodwinlaw.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>*Plaintiff*,<br><br>v.<br><br>SNAP FINANCE LLC, SNAP RTO LLC, SNAP SECOND LOOK LLC, SNAP U.S. HOLDINGS LLC, SNAP FINANCE HOLDINGS LLC.,<br><br>*Defendants*. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**Case No. 2:23-cv-00462-JNP-JCB**<br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett**<br><br>**ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

    I.    The Bureau's Use Of Unlawfully Obtained Funds To Litigate This Action Warrants Dismissal. ............................................................................................ 1

    II.    The Bureau Lacks Authority Over Snap's Leases Because All Agree The Leases Do Not Meet The Requirements Of The CFPA's Lease-Specific Provision ................ 3

    III.    This Enforcement Action Violates Due Process. ............................................................ 6

    IV.    Snap's Leases Are Not "Credit" Because They Did Not Create "Debt." ...................... 6

    V.    The Bureau Has Failed To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Materially Misleading (Count I). .......................................... 8

    VI.    The Bureau Has Failed To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms (Count II). .............................. 9

CONCLUSION ............................................................................................................................ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*,
   771 F.3d 697 (10th Cir. 2014) ..................................................................................................3

*CFPB v. Active Network, LLC*,
   No. 22-00898, 2024 WL 4437639 (E.D. Tex. Oct. 7, 2024) ......................................................2

*CFPB v. Community Financial Services Ass'n of America, Ltd.*,
   601 U.S. 416 (2024) ...................................................................................................................2

*CFPB v. TCF National Bank*,
   No. 17-166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017) .......................................................10

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ...................................................................................................................6

*Davis v. City of Dearborn*,
   No. 09-14892, 2010 WL 3476242 (E.D. Mich. Sept. 2, 2010) ..................................................3

*HCSC-Laundry v. United States*,
   450 U.S. 1 (1981) .......................................................................................................................4

*McGoveran v. Amazon Web Servs., Inc.*,
   No. 20-01399, 2023 WL 2683553 (D. Del. Mar. 29, 2023) ......................................................3

*Ryan v. Shawnee Mission U.S.D. 512*,
   416 F. Supp. 2d 1090 (D. Kan. 2006) ........................................................................................3

*Tremblay v. OpenAI, Inc.*,
   No. 23-03223, 2024 WL 3640501 (N.D. Cal. July 30, 2024) ....................................................3

*United States v. Hansen*,
   599 U.S. 762 (2023) ...................................................................................................................2

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) .......................................................................................3

**Statutes:**

5 U.S.C. § 706 ..................................................................................................................................3

12 U.S.C. § 5390(n)(2) ...........................................................................................................2

12 U.S.C. § 5465(c) ...............................................................................................................2

12 U.S.C. § 5481(7) .......................................................................................................4, 5, 6

12 U.S.C. § 5481(15)(A)(i).................................................................................................4, 5

12 U.S.C. § 5481(15)(A)(ii)............................................................................................3, 4, 5

12 U.S.C. § 5481(15)(A)(xi).................................................................................................6

12 U.S.C. § 5497(a)(1)...........................................................................................................1

12 U.S.C. § 5497(e) ...............................................................................................................2

12 U.S.C. § 5497(e)(1)(A) .....................................................................................................2

31 U.S.C. § 1341....................................................................................................................3

**Rule:**

Fed. R. Civ. P. 12(g)(2)......................................................................................................1, 3

INTRODUCTION

The Bureau's attempt to revive this enforcement action by clinging to a narrow alleged sub-category of Snap's legacy LTO agreements fares no better than its previous attempt to subject all of Snap's legacy LTO agreements to its jurisdiction. The Bureau lacks the requisite authority for several threshold reasons, including because it currently has no statutorily-authorized source of funds with which to prosecute this action and because Congress has refused to give the Bureau authority over leases like Snap's legacy LTO agreements. Even if it were appropriate to analyze Snap's leases under the CFPA's "credit" prong, Snap's legacy LTO agreements for auto parts and attendant installation or other related services created no "debt," and so were not credit. Finally, Counts I and II are defectively pled and should be dismissed for the reasons below.

ARGUMENT

I.  **The Bureau's Use Of Unlawfully Obtained Funds To Litigate This Action Warrants Dismissal.**

The Bureau does not dispute that the funds used to file and prosecute this lawsuit came from the Federal Reserve System and that, since September 2022, the Federal Reserve System has had no net income to transfer to the Bureau.[1] It argues instead that the term "earnings" in the CFPA means *gross* income, notwithstanding dictionary definitions to the contrary. Mot. 4-5. The Bureau argues that Snap's definitions are inapposite because they are "specific to the private-company context." Opp. 23. But the "earnings" referred to in the statute are "combined" from the twelve regional banks that comprise the Federal Reserve System, 12 U.S.C. § 5497(a)(1), each of which has the hallmarks of a private corporation, including having shareholders and issuing

---

[1] Fed. R. Civ. P. 12(g)(2) is inapposite for the reasons provided below. *See* note 3, *infra*.

dividends.[2]  And regardless of how it describes the Federal Reserve System's income (Opp. 24), the Bureau does not disagree that the Financial Accounting Manual repeatedly describes the amounts from which the Bureau obtains its funding as "net earnings."  ECF No. 61-1 at 52-53.

The Bureau fails to reconcile its reading of the statute with *CFPB v. Community Financial Services Ass'n of America, Ltd.*, which described the Bureau's funding as coming from "*surplus funds in the Federal Reserve System* [that] would otherwise be deposited into the general fund of the Treasury."  601 U.S. 416, 425 (2024) (emphasis added).  Gross income is not surplus funds; net income is.

The Bureau's other arguments also fail.  *CFPB v. Active Network, LLC*, No. 22-00898, 2024 WL 4437639 (E.D. Tex. Oct. 7, 2024), did not reject this argument "on its merits"; rather, the Court simply found that the Bureau had pleaded plausible claims.  *Id*. at *2.  Its one-sentence holding makes no mention of the argument Snap advances here.  Further, both of the U.S. Code provisions the Bureau cites use the term "earnings" to refer to investment returns of third-party entities.  *See* 12 U.S.C. § 5390(n)(2); *id*. § 5465(c).  The Bureau's funding provision has no similar contextual limitation.  Nor is the Bureau's reading "needed to make the statutory scheme work" (Opp. 24), because the Bureau may request appropriations directly from Congress.  12 U.S.C. § 5497(e).  The Bureau's suggestion (Opp. 24-25) that the statute only permits such a request for funds "above the cap for transfers from the Federal Reserve" is belied by the statute's text, which authorizes the Bureau to request appropriations whenever "th[e] sums available to the Bureau under this section will not be sufficient."  12 U.S.C. § 5497(e)(1)(A).

---

[2] The Bureau also improperly relies on definitions focusing on *individuals'* earnings from their labor or services rather than earnings for *entities*.  *See United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them.").

2

Finally, the Bureau says that Congress "has not provided that actions taken without proper funding must be undone" (Opp. 25), but the Anti-Deficiency Act ("ADA") does not displace a *court's* authority to vacate unlawful agency action. *E.g.*, 5 U.S.C. § 706. In any event, the ADA prohibits the Bureau from *continuing* to prosecute this case. *See* 31 U.S.C. § 1341.

## II. The Bureau Lacks Authority Over Snap's Leases Because All Agree The Leases Do Not Meet The Requirements Of The CFPA's Lease-Specific Provision.

The CFPA grants the Bureau authority over only a narrow category of "leases." 12 U.S.C. § 5481(15)(A)(ii). As the Court previously held, Snap's leases do not meet these requirements. The Bureau does not argue otherwise. That is dispositive. Mot. 13-16.[3]

The Bureau argues that under Snap's reading of the statute a party could circumvent jurisdiction by calling any agreement a "lease." But that theoretical concern is irrelevant here. The Bureau's original Complaint alleged that all of Snap's legacy LTO agreements were "leases of personal . . . property" under 12 U.S.C. § 5481(15)(A)(ii); *see* ECF No. 2 ¶ 89. This Court rejected that allegation, not because Snap's LTO agreements were not "leases of personal . . . property,"

---

[3] Snap has not waived this or any other argument it makes. *Cf.* Opp. 10 n.7 (citing Fed. R. Civ. P. 12(g)(2)). Rule 12(g)(2) is "not implicated here" "[b]ecause [the] current Rule 12(b)(6) motion is the first such motion with respect to [the Bureau's] first amended complaint." *Ryan v. Shawnee Mission U.S.D. 512*, 416 F. Supp. 2d 1090, 1094 n.2 (D. Kan. 2006); *see also Tremblay v. OpenAI, Inc.*, No. 23-03223, 2024 WL 3640501, at *1 (N.D. Cal. July 30, 2024) (same); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 893 (C.D. Cal. 2012) (same). Moreover, Rule 12(g)(2) only prohibits a party from "raising a *defense or objection* that was available to the party but omitted from its earlier motion," Fed. R. Civ. P. 12(g)(2) (emphasis added); it does not prohibit *new arguments* in support of a previously raised defense. *McGoveran v. Amazon Web Servs., Inc.*, No. 20-01399, 2023 WL 2683553, at *5 (D. Del. Mar. 29, 2023). Finally, even if Rule 12(g)(2) applied here, this Court may adjudicate a new argument that is not raised for the purpose of delay, *see, e.g.*, *Davis v. City of Dearborn*, No. 09-14892, 2010 WL 3476242, at *4 (E.D. Mich. Sept. 2, 2010) (collecting cases), particularly as Snap could still "present[] the argument in a motion for judgment on the pleadings under Rule 12(c)," *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 771 F.3d 697, 704 (10th Cir. 2014).

12 U.S.C. § 5481(15)(A)(ii), but because they lacked an "initial term" of "at least 90 days." ECF No. 49 at 19-22 ("Order") (quoting 12 U.S.C. § 5481(15)(A)(ii)). The Court itself repeatedly described Snap's LTO agreements as "leases." *See, e.g.*, Order 1-4, 9-10, 13-14. And for good reason: although the Bureau now asserts that under certain specific circumstances (*i.e.*, where services are included) Snap's legacy LTOs were an extension of credit, they otherwise have all of the indicia of consumer leases. So here, the question is not whether Snap's LTO agreements are "leases," but whether they are a "financial product or service" even though they are indisputably *not* within the narrow category of lease encompassed by § 5481(15)(A)(ii). The answer is "no." Mot. 7-8. That some courts have found leases to be credit under a *different* statute (ECOA) does not change that answer, because the ECOA lacks a provision like § 5481(15)(A)(ii) that specifically identifies and limits which leases may be regulated. *Cf.*, Opp. 10.

      The Bureau says that the specific-controls-the-general principle applies only if the two provisions are in "conflict[]." Opp. 11. But that *is* the case here. Section 5481(15)(A)(ii)'s exclusion of all but a narrow category of leases from the definition of "financial product or service" cannot be reconciled with the Bureau's interpretation of § 5481(15)(A)(i), which would render those exact same leases a "financial product or service." Indeed, the CFPA discusses credit and leases in sequence, highlighting that Congress distinguished the products. *Compare* 12 U.S.C. § 5481(15)(A)(i) (discussing credit), *with id*. § 5481(15(A)(ii) (discussing leases). It makes no difference that "[t]he CFPA's definition of 'credit' in 12 U.S.C. § 5481(7) does not exempt 'leases'" explicitly (Opp. 11); what matters is that § 5481(15)(A)(ii) addresses the precise subject of leases at issue here, and the "interrelated and closely positioned" § 5481(15)(A)(i) does not. Mot. 7-8 (quoting *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981)).

The Bureau also fails to explain how its reading does not render § 5481(15)(A)(ii) meaningless. The Bureau says that § 5481(15)(A)(ii) still has work to do under one specific scenario: a hypothetical lease with an initial term of 90 days that does not "meet the definition of 'credit'" in § 5481(7). Opp. 11. But that does not change the reality that reading § 5481(15)(A)(i) to *include* leases that are *excluded* under § 5481(15)(A)(ii) would eviscerate the latter's carefully delineated criteria for when, and only when, a lease is covered by the CFPA. Mot. 7-8.

On the major questions doctrine, the Bureau ignores Snap's showing that Congress time and again refused to grant the Bureau (or another federal agency) the very authority the Bureau claims here. Mot. 8-10. The Bureau also does not dispute that this enforcement action is the first time the Bureau (or any federal agency) has asserted authority to regulate the LTO industry. Mot. 11. Nor does the Bureau respond to Snap's showing that this lawsuit would intrude on an area that has been the domain of state law since its inception. Mot. 11-12. Instead, the Bureau argues that the doctrine does not apply here because the Bureau is only asserting authority over "certain" Snap leases, not the company or the industry writ-large. Opp. 12. But the former is only true because this Court foreclosed the Bureau's effort to assert jurisdiction over all of Snap's legacy LTO agreements. And the latter is disingenuous because the Bureau continues to assert it has complete authority over the industry in other enforcement actions. *See, e.g.*, ECF No. 31 ¶¶ 27-36, 150-52, *CFPB v. Acima Holdings, LLC*, No. 24-00525 (D. Utah Sept. 27, 2024). Finally, the Bureau is wrong that the major questions doctrine "does not apply to agency enforcement actions." Opp. 13. The cases the Bureau cites hold only that specific enforcement actions did not implicate the doctrine, not that it is inapplicable on its face. Opp. 13-14.[4]

---

[4] Snap is moving to dismiss Counts I-VI as to all of its LTO agreements on these grounds.

### III. This Enforcement Action Violates Due Process.

The Bureau does not dispute that this enforcement action is the first time it (or any federal agency) has provided any public indication that LTO agreements may be regulated as extensions of credit, and therefore does not dispute that it is seeking to apply a new interpretation retroactively to Snap. The Bureau's contention that "nothing in the CFPA makes rulemaking a predicate to enforcement" misses the point. Opp. 14. Although Snap submits that, under these circumstances, a rulemaking would be required under 12 U.S.C. § 5481(15)(A)(xi), due process at a minimum required some form of prior notice given the Bureau's "lengthy period of conspicuous inaction." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012); *see* Mot. 18-19 (collecting cases). The Bureau argues that *SmithKline* is distinguishable because it involved an attempt to rely on an agency's new interpretation of an ambiguous statute. Opp. 14. But here, too, the Bureau has newly interpreted the CFPA to extend to leases not otherwise covered by the lease-specific provision of the statute. That here the CFPA *unambiguously* forecloses the Bureau's interpretation makes this first-of-its-kind enforcement action an even clearer due process violation.

### IV. Snap's Leases Are Not "Credit" Because They Did Not Create "Debt."

Even if it were appropriate to analyze whether Snap's hybrid LTO agreements were "credit" under the CFPA, the Amended Complaint fails to plausibly allege that they were. Mot. 12-18. "Credit" means the "right . . . to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7). The Bureau does not address, and so concedes, that Snap's hybrid LTO agreements were not a "purchase" of property or services (Mot. 16-18), and it offers no persuasive response to Snap's showing

6

that its hybrid LTO agreements did not create a "debt." Mot. 13-16.[5]

The Bureau primarily argues that consumers' payments under hybrid leases were not "contemporaneous" with "the value received." Opp. 1, 4-6. That is relevant only to whether a "debt" is deferred, not whether a "debt" exists in the first place. Here, no debt was created. Mot. 13-16. The Bureau does not dispute that a "debt" requires an obligation to make future payments, and that its allegations and the terms of Snap's hybrid leases state that consumers can avoid future payments by exercising their contractual right to terminate their agreements. Mot. 13-14.

Instead, the Bureau argues that in theory consumers could not exercise their termination rights because the leased "property" was sometimes defined to include intangible one-time services, which could not physically be returned. Opp. 7-8. But the return of the *physical* property terminated the lease agreement. The Court need not await any factual discovery on this issue: the Bureau itself alleges that despite some customer service representatives having told consumers they could not terminate their leases because of included "one-time labor or services," Snap's "Agreements include no such exceptions to consumers' 'Right to Terminate.'" AC ¶¶ 73-75. The Bureau does not allege—because it cannot—that consumers were contractually precluded from terminating agreements that included attendant services. Moreover, the LTO agreements themselves confirm that termination only required return of the *physical* property: the consumer could exercise the termination right by returning the property "in its original condition, less reasonable wear and tear" ECF No. 52-4 at 2, or "in good repair," ECF No. 52-3 at 2; *see* AC ¶ 59. By

---

[5] The Bureau's argument that identifying which LTO agreements include "attendant" labor would be difficult (Opp. 6), is no barrier to granting the Motion. The Bureau concedes that such agreements exist (*e.g.*, tires and installation), so the Court may resolve the Motion on that basis. Nor does the need to categorize Snap's leases evaporate if the Court denies the Motion, as the Bureau argues that only a specific category of lease—those including "one-time services"—are at issue.

7

contrast, the Bureau's current interpretation would render core provisions of the lease agreements inoperative, contrary to its own allegations. Finally, it does not matter that the value of the returned property is less than the total cost of the parts and attendant installation service; the value of any used and returned merchandise is always less than its initial retail value.

Even if a contemporaneous exchange of payment and possession were required, the Bureau does not dispute that consumers' payments under hybrid LTO agreements were contemporaneous with possession. Opp. 4. Consumers made payments at periodic intervals during the period of their use and enjoyment of the property. Some of the cases cited by the Bureau discuss the payment intervals, but none requires a precise allocation of payment and value (as opposed to payment and possession being contemporaneous). In any event, the Bureau ignores Snap's argument (Mot. 16) that in the specific context of auto parts, the "value received" (AC ¶ 3) by a consumer from parts and attendant installation is inextricably intertwined—*e.g.*, tires have no value without installation, and vice versa. Snap also retained a reversionary interest in the physical property (Mot. 15), and if the property was returned, the consumer retained no residual "value" from either the physical property or the attendant installation or services. Value and possession went hand in hand.

### V. The Bureau Has Failed To Plausibly Allege That The "100-Day Cash Payoff" Advertising Slogan Was Materially Misleading (Count I).

The Bureau effectively concedes that its theory and factual allegations are the same here as in the original Complaint.[6] It argues the advertisement was deceptive because it included "no other description or explanation of the cost, length, or terms of its Agreements." Opp. 16. But the

---

[6] The Bureau amended its Complaint to add an allegation that the advertisement also included the phrase "No Credit Needed," but it makes no mention of this language in its Opposition, nor does it contest Snap's showing of what this statement means. Mot. 21.

8

Bureau cites no authority, nor is there any, that the default payment option must be advertised or that an advertisement must contain instructions about how to exercise the advertised payment option. The Bureau also concedes that "consumers cannot make *regular* payments . . . to Snap[] in 'cash,'" Opp. 16 (emphasis added)—meaning the advertisement told consumers they must use a method of payment different than their automatically-scheduled debits. The Bureau suggests that the term "payoff" "underscores" that the lease was "a traditional credit arrangement" (Opp. 16), but whether consumers believed their leases were credit has nothing to do with the Bureau's theory of deception—*viz.*, whether consumers believed "their automatically scheduled payments would fulfill their payment obligations by the close of the 100-day period." Opp. 16. The Bureau mischaracterizes the lease agreement's conspicuous instructions about how to exercise the early payment option as "later corrective" statements. Opp. 17. But there was nothing to correct: the Bureau does not dispute that the advertised "100 Day Cash Payoff" option was available to every consumer. Finally, as to materiality, the Bureau says the advertising slogan was "likely to affect a consumer's decision to buy a product or service" because it relates to the "costs" of the lease. Opp. 17. But even had the Bureau pled that, there is no plausible basis to infer that any consumer would have chosen not to lease from Snap because there is no dispute that the advertised option was available to every consumer after they entered into their lease and all the consumer had to do to exercise it was "schedule a new payment" within 100 days. AC ¶ 104.

## VI. The Bureau Has Failed To Plausibly Allege That Snap Materially Interfered With Consumers' Ability To Understand Their Lease Terms (Count II).

The Bureau does not dispute that the Amended Complaint, like the original Complaint, does not allege that merchants signed and submitted leases without a consumer's authorization or without the consumer having had the opportunity to review the agreement. The Bureau attempts

9

to side-step its admission to this effect, but even the additional language quoted by the Bureau does not support its unpled insinuation that consumers lacked the opportunity to review their agreements. Opp. 19. The Bureau says the allegation that consumers did "not see or sign their own Agreement" is enough (Opp. 18), citing to *CFPB v. TCF National Bank*, No. 17-166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017). But in that case, the complaint alleged specific conduct that impeded consumers from understanding their transactions, including directing employees to use a deceptive script and structuring the form-signing process to hide certain specific information. *Id.* at *3. Here, the Bureau has alleged nothing to support a plausible abusiveness claim.

The Bureau argues (AC ¶ 42) that merchants allegedly "failed to adequately explain" certain unidentified features of the lease or "otherwise misled consumers," but it conspicuously does not identify any supporting factual allegations. Instead, the Bureau pairs this allegation with complaints from consumers who assert that they did not fully understand the cost of their lease. This is far from enough because the Bureau does not allege facts that plausibly connect the two allegations. Particularly where, as here, the Bureau does not dispute both that consumers had the opportunity to review their agreements and those agreements clearly explained the terms, no plausible abusiveness claim has been alleged.

Finally, other than reiterating its allegations, the Bureau makes no attempt to (i) explain how a processing fee that did not bind the consumer to the lease agreement could have materially interfered with their understanding of the agreement, or (ii) respond to Snap's showing that the processing fee was no different in effect than an application fee. Mot. 24.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

| | |
|---|---|
| Dated:  November 1, 2024 | Respectfully submitted,<br><br>/s/ *Nathan R. Marigoni*<br>James Kim (admitted *pro hac vice*)<br>Nathan R. Marigoni (Utah Bar No. 14885)<br>**TROUTMAN PEPPER HAMILTON SANDERS LLP**<br>c/o 600 Peachtree Street NE Suite 3000<br>Atlanta, Georgia 30308<br>Phone:  404-885-3000<br>James.Kim@troutman.com<br>Nathan.Marigoni@troutman.com<br><br>Sabrina Rose-Smith (admitted *pro hac vice*)<br>Levi W. Swank  (admitted *pro hac vice*)<br>**GOODWIN PROCTER LLP**<br>1900 N Street NW<br>Washington, DC  20036<br>Phone:  202-346-4000<br>Fax:  202-346-4444<br>srosesmith@goodwinlaw.com<br>lswank@goodwinlaw.com<br><br>*Attorneys for Defendants* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ *Nathan R. Marigoni*
Nathan R. Marigoni